**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED HEALTHCARE SERVICES,** | § | |
| **INC., UNITEDHEALTHCARE** | § | |
| **INSURANCE COMPANY** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 3:20-cv-0301-X** |
| **v.** | § | |
| | § | |
| **SYNERGEN HEALTH, LLC** | § | |
| | § | |
| **Defendant.** | § | |

---

### SYNERGEN HEALTH, LLC'S OBJECTIONS AND ANSWERS
### TO PLAINTIFFS' 08/01/2022 INTERROGATORIES

TO:    Plaintiffs, United Healthcare Services, Inc. and UnitedHealthcare Insurance Company, by and through their attorneys of record, Scott P. Kerew, Adam J. Sinton, Joseph J. Minock, and Benjamin D. Van Horn, SINTON, SCOTT, MINOCK & KEREW, 3438 Peachtree Road, Suite 925, Atlanta, Georgia 30326, and Andrew G. Jubinsky, FIGARI + DAVENPORT, LLP, 901 Main Street, Suite 3400, Dallas, TX 75202-3796

Defendant Synergen Health, LLC ("Synergen" or "Defendant") hereby serves its Objections and Answers to Plaintiffs United Healthcare Services, Inc. and UnitedHealthcare Insurance Company's 08/01/2022 Interrogatories (the "Interrogatories").

### OBJECTIONS TO INSTRUCTIONS

1.    Synergen objects to the Instructions set forth in the Interrogatories to the extent they exceed and/or conflict with the nature and scope of discovery permitted under the Federal Rules of Civil Procedure. In responding to the Interrogatories, Synergen will comply with the Federal Rules of Civil Procedure but will not undertake any obligations beyond those imposed by law.

---

2.      Synergen further objects to the Instructions to the extent they impose a time period that extends beyond March 1, 2017, as United does not assert that any of the alleged fraudulent insurance claims at issue were submitted after December 2017.

## OBJECTIONS TO DEFINITIONS

1.      Defendant specifically objects to the definitions of the terms "Synergen," "You," and "Your" as being overly broad, vague, and ambiguous, in that it includes unidentified parents, subsidiaries, affiliates, consultants, successors, predecessors, assigns, and attorneys. Defendant further objects to such definition as a violation of the attorney-client privilege and work product doctrine to the extent it includes Defendant's attorneys.

2.      Defendant objects to the definition of the term "Communication" as being overly broad, vague, and ambiguous, in that it includes unidentified internal and external verbal, printed, or electronic exchanges of information of every kind and nature. Defendant further objects to such definition as a violation of the attorney-client privilege and work product doctrine to the extent it includes exchanges of information with Defendant's attorneys.

3.      Defendant objects to the definition of the term "Identify" as being overly broad, vague, and ambiguous, in that it states to describe a document "with sufficient specificity to permit the reader to ascertain said Document or Communication and seek its production by way of a request for production or subpoena."

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 7**:  For the period beginning January 1, 2015, through December 31, 2016, Identify each of Synergen's "other clients" that had Lab Services equipment for two (or more) separate laboratories connected to a single lab information system, as referenced by Mel Gunawardena during the Rule 30(b)(6) deposition of Synergen on July 20, 2022.

SYNERGEN HEALTH, LLC'S OBJECTIONS AND
ANSWERS TO PLAINTIFFS' 08/01/2022 INTERROGATORIES                                                    PAGE 2
CLARKHILL\D2829\392506\268412656.v1-8/31/22

App. 2

**ANSWER**:     Defendant objects to this interrogatory because it is irrelevant, as this lawsuit does not concern any of Synergen's "other clients." Defendant further objects to this interrogatory because it seeks Defendant's proprietary and/or trade secret business information. Therefore, Defendant is not responding to this interrogatory.

**INTERROGATORY NO. 8**:  For the period beginning January 1, 2015, through December 31, 2016, Identify each of Synergen's "other clients" that had Lab Services equipment for one laboratory connected to two (or more) separate lab information systems, as referenced by Mel Gunawardena during the Rule 30(b)(6) deposition of Synergen on July 20, 2022.

**ANSWER**:     Defendant objects to this interrogatory because it is irrelevant, as this lawsuit does not concern any of Synergen's "other clients." Defendant further objects to this interrogatory because it seeks Defendant's proprietary and/or trade secret business information. Therefore, Defendant is not responding to this interrogatory.

**INTERROGATORY NO. 9**:   State all facts and bases that You contend support Your "assumption" that between July 1, 2016, and December 31, 2016, ALG's Lab Services equipment was connected to UTox's lab information system, and, as applicable, Identify the Persons, Communications, and/or Electronic Messages that provided or otherwise conveyed such facts or bases to You.

**ANSWER**:     Defendant objects to this interrogatory because it is a contention interrogatory that requires Defendant to marshal its evidence before trial; as discovery, including the taking of depositions, is ongoing, Defendant need not answer such an interrogatory at this time. *See In re Katrina Canal Breaches*, 2007 WL 1852184, at *3 (E.D. La. June 27, 2007) ("As to contention interrogatories of this sort, Rule 33(c) provides that the court may order that such an interrogatory need not be answered until after designated discovery has been completed or until a pre-trial conference or other later time."). Defendant further objects to this interrogatory because it calls for a narrative response more appropriate for a deposition. Defendant further objects to this interrogatory because it constitutes a fishing expedition. Therefore, Defendant is not responding to this interrogatory.

**INTERROGATORY NO. 10**:   State all facts and bases that You contend support Your "assumption" that between July 1, 2016, and December 31, 2016, ALG's Lab Services equipment was connected to US Tox's lab information system, and, as applicable, Identify the Persons,

SYNERGEN HEALTH, LLC'S OBJECTIONS AND
ANSWERS TO PLAINTIFFS' 08/01/2022 INTERROGATORIES                                   PAGE 3
CLARKHILL\D2829\392506\268412656.v1-8/31/22

App. 3

Communications, and/or Electronic Messages that provided or otherwise conveyed such facts or bases to You.

**ANSWER**:   Defendant objects to this interrogatory because it is a contention interrogatory that requires Defendant to marshal its evidence before trial; as discovery, including the taking of depositions, is ongoing, Defendant need not answer such an interrogatory at this time. *See In re Katrina Canal Breaches*, 2007 WL 1852184, at *3 (E.D. La. June 27, 2007) ("As to contention interrogatories of this sort, Rule 33(c) provides that the court may order that such an interrogatory need not be answered until after designated discovery has been completed or until a pre-trial conference or other later time."). Defendant further objects to this interrogatory because it calls for a narrative response more appropriate for a deposition. Defendant further objects to this interrogatory because it constitutes a fishing expedition. Therefore, Defendant is not responding to this interrogatory.

**INTERROGATORY NO. 11**:   State all facts and bases that You contend support Your "assumption" that between July 1, 2016, and December 31, 2016, True's Lab Services equipment was connected to UTox's lab information system, and, as applicable, Identify the Persons, Communications, and/or Electronic Messages that provided or otherwise conveyed such facts or bases to You.

**ANSWER**:   Defendant objects to this interrogatory because it is a contention interrogatory that requires Defendant to marshal its evidence before trial; as discovery, including the taking of depositions, is ongoing, Defendant need not answer such an interrogatory at this time. *See In re Katrina Canal Breaches*, 2007 WL 1852184, at *3 (E.D. La. June 27, 2007) ("As to contention interrogatories of this sort, Rule 33(c) provides that the court may order that such an interrogatory need not be answered until after designated discovery has been completed or until a pre-trial conference or other later time."). Defendant further objects to this interrogatory because it calls for a narrative response more appropriate for a deposition. Defendant further objects to this interrogatory because it constitutes a fishing expedition. Therefore, Defendant is not responding to this interrogatory.

**INTERROGATORY NO. 12**:   State all facts and bases that You contend support Your "assumption" that between July 1, 2016, and December 31, 2016, True's Lab Services equipment was connected to US Tox's lab information system, and, as applicable, Identify the Persons, Communications, and/or Electronic Messages that provided or otherwise conveyed such facts or bases to You.

SYNERGEN HEALTH, LLC'S OBJECTIONS AND
ANSWERS TO PLAINTIFFS' 08/01/2022 INTERROGATORIES                                                           PAGE 4
CLARKHILL\D2829\392506\268412656.v1-8/31/22

App. 4

**ANSWER**:    Defendant objects to this interrogatory because it is a contention interrogatory that requires Defendant to marshal its evidence before trial; as discovery, including the taking of depositions, is ongoing, Defendant need not answer such an interrogatory at this time. *See In re Katrina Canal Breaches*, 2007 WL 1852184, at *3 (E.D. La. June 27, 2007) ("As to contention interrogatories of this sort, Rule 33(c) provides that the court may order that such an interrogatory need not be answered until after designated discovery has been completed or until a pre-trial conference or other later time."). Defendant further objects to this interrogatory because it calls for a narrative response more appropriate for a deposition. Defendant further objects to this interrogatory because it constitutes a fishing expedition. Therefore, Defendant is not responding to this interrogatory.

**INTERROGATORY NO. 13**:  Identify all Communications and/or Electronic Messages between You and any Next Health Personnel, whether directly (through their professional and/or personal accounts/addresses) or through their respective attorneys and regardless of whether You or the Next Health Personnel initiated or responded to said Communication or Electronic Message, between January 1, 2018, and present.

**ANSWER**:    Defendant objects to this interrogatory to the extent it infringes upon joint or common defense privileges and the subject matter of same. Defendant further objects to this interrogatory because it is irrelevant, as January 1, 2018 to the present is beyond the time period during which the relevant facts in this case occurred. Therefore, Defendant is not responding to this interrogatory.

**INTERROGATORY NO. 14**:  Identify all Communications and/or Electronic Messages between Mel Gunawardena and any of the following individuals between April 20, 2022, and July 20, 2022, regarding the processes or procedures by which Synergen extracted or received information from UTox's or US Tox's lab information system and submitted Claims reflecting that information to United using ALG's or True's billing credentials: (i) Gillian De Silva; (ii) Malsha Thilakaranthe.

**ANSWER**:    Defendant objects to this interrogatory to the extent it infringes upon the attorney-client privilege or work-product protection. Defendant further objects to this interrogatory because this time period is beyond the time period during which the relevant facts in this case occurred, and is therefore irrelevant. Therefore, Defendant is not responding to this interrogatory.

**INTERROGATORY NO. 15**:  Identify and describe all steps, procedures, protocols, or other measures, if any, which Synergen implemented or otherwise applied to prevent, limit, or otherwise

SYNERGEN HEALTH, LLC'S OBJECTIONS AND
ANSWERS TO PLAINTIFFS' 08/01/2022 INTERROGATORIES                                    PAGE 5
CLARKHILL\D2829\392506\268412656.v1-8/31/22

App. 5

guard against the following risk areas identified in the Office of Inspector General's Compliance

Program Guidance for Third-Party Medical Billing Companies, dated December 18, 1998:

      a.      "Billing for items or services not actually documented";

      b.      "Knowing misuse of provider identification numbers";

      c.      "Duplicate billing in an attempt to gain duplicate payment";

      d.      "Failure to properly use modifiers"; and

      e.      "Routine waiver of copayments and billing third-party insurance only."

**ANSWER**:   Defendant objects to this interrogatory because it is overbroad, vague, not reasonably calculated to lead to the discovery of admissible evidence, and harassing. Specifically, "all steps, procedures, protocols, or other measures" is vague. The burden of responding outweighs any relevant information. Defendant further objects to this interrogatory because it calls for a narrative response more appropriate for a deposition. Defendant further objects to this interrogatory because it seeks to have Defendant marshal all of its evidence prior to trial. Defendant further objects to this interrogatory because it constitutes a fishing expedition. Therefore, Defendant is not providing any response to this interrogatory.

Dated:  August 31, 2022           Respectfully submitted,

                      */s/ Laura Reilly O'Hara*
                      **LAURA REILLY O'HARA**
                      State Bar No. 00784694
                      **ELIZABETH F. GRIFFIN**
                      State Bar No. 24092450
                      **DANIEL J. OLDS**
                      State Bar No. 24088152
                      **CLARK HILL PLC**
                      901 Main Street, Suite 6000
                      Dallas, Texas 75202
                      214.651.2250 (direct-O'Hara)
                      214.659.4094 (direct-O'Hara)
                      lohara@clarkhill.com
                      egriffin@clarkhill.com
                      dolds@clarkhill.com

                      **ATTORNEYS FOR DEFENDANT**
                      **SYNERGEN HEALTH, LLC**

SYNERGEN HEALTH, LLC'S OBJECTIONS AND
ANSWERS TO PLAINTIFFS' 08/01/2022 INTERROGATORIES              PAGE 6
CLARKHILL\D2829\392506\268412656.v1-8/31/22

App. 6

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing document was electronically served on all counsel of record on August 31, 2022.

*/s/ Laura Reilly O'Hara*
Laura Reilly O'Hara

**SYNERGEN HEALTH, LLC'S OBJECTIONS AND**
**ANSWERS TO PLAINTIFFS' 08/01/2022 INTERROGATORIES**                                                    **PAGE 7**
CLARKHILL\D2829\392506\268412656.v1-8/31/22

App. 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED HEALTHCARE SERVICES,** | § | |
| **INC., UNITEDHEALTHCARE** | § | |
| **INSURANCE COMPANY** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 3:20-cv-0301-X** |
| **v.** | § | |
| | § | |
| **SYNERGEN HEALTH, LLC** | § | |
| | § | |
| **Defendant.** | § | |

### SYNERGEN HEALTH, LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' 08/01/2022 REQUESTS FOR PRODUCTION OF DOCUMENTS

TO:     Plaintiffs, United Healthcare Services, Inc. and UnitedHealthcare Insurance Company, by through their attorneys of record, Scott P. Kerew, Adam J. Sinton, Joseph J. Minock and Benjamin D. Van Horn, SINTON, SCOTT, MINOCK & KEREW, 3438 Peachtree Road, Atlanta, Georgia 30326, and Andrew G. Jubinsky, FIGARI + DAVENPORT, LLP, 901 Main Street, Suite 3400, Dallas, TX 75202-3796.

Defendant Synergen Health, LLC ("Synergen" or "Defendant") hereby serves its Objections and Responses to Plaintiffs' 08/01/2022 Requests for Production (the "Requests").

### OBJECTIONS TO INSTRUCTIONS

1.      Defendant objects to the Instructions set forth in the Requests to the extent they exceed and/or conflict with the nature and scope of discovery permitted under the Federal Rules of Civil Procedure. In responding to the Requests, Defendant will comply with the Federal Rules of Civil Procedure but will not undertake any obligations beyond those imposed by law.

2.      Defendant further objects to the Instructions to the extent they impose disclosure requirements for documents withheld pursuant to privilege beyond the requirements set forth in the Federal Rules of Civil Procedure. Such an instruction is overly broad and unduly burdensome.

**SYNERGEN HEALTH, LLC'S OBJECTIONS AND RESPONSES TO**
**PLAINTIFFS' 08/01/2022 REQUESTS FOR PRODUCTION OF DOCUMENTS**                                          **PAGE 1**
CLARKHILL\D2829\392506\268412670.v1-8/31/22

App. 8

Defendant will comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure with respect to documents withheld on the basis of privilege, if any.

3.        Defendant further objects to the Instructions to the extent they impose a "relevant time period" of January 1, 2011 to the present. Each of United's claims against Defendant in this lawsuit stem from its alleged actions as Next Health's third-party billing entity. However, as set forth in United's Complaint, Andrew Hillman and Seymon Narosov did not create Next Health until "the end of 2014." See Compl., ¶ 17. Further, United does not assert that any of the alleged fraudulent insurance claims at issue were submitted after December 2016.

## OBJECTIONS TO DEFINITIONS

1.        Defendant specifically objects to the definitions of the terms "Synergen," "You," and "Your" as being overly broad, vague, and ambiguous, in that it includes unidentified parents, subsidiaries, affiliates, consultants, successors, predecessors, assigns, and attorneys. Defendant further objects to such definition as a violation of the attorney-client privilege and work product doctrine to the extent it includes Defendant's attorneys.

2.        Defendant objects to the definition of the term "Communication" as being overly broad, vague, and ambiguous, in that it includes unidentified internal and external verbal, printed, or electronic exchanges of information of every kind and nature. Defendant further objects to such definition as a violation of the attorney-client privilege and work product doctrine to the extent it includes exchanges of information with Defendant's attorneys.

3.        Defendant objects to the definition of the term "Document" to the extent it seeks to require Defendant to manipulate or create documents, or otherwise places a burden on Defendant not permitted in the Texas Rules of Civil Procedure.

SYNERGEN HEALTH, LLC'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' 08/01/2022 REQUESTS FOR PRODUCTION OF DOCUMENTS                    PAGE 2
CLARKHILL\D2829\392506\268412670.v1-8/31/22

App. 9

4.      Defendant objects to the definition of the term "Identify" as being overly broad, vague, and ambiguous, in that it states to describe a document "with sufficient specificity to permit the reader to ascertain said Document or Communication and seek its production by way of a request for production or subpoena."

## RESPONSES TO PLAINTIFFS' 8/01/2022 REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 40**:   All Communications and Electronic Messages identified in interrogatory no. 9, served contemporaneously herewith; that is, all Communications and Electronic Messages that You contend support Your "assumption" that between July 1, 2016, and December 31, 2016, ALG's Lab Services equipment was connected to UTox's lab information system.

**RESPONSE**:  Defendant objects to this request because, like interrogatory no. 9, it seeks to have Defendant marshal its evidence before trial. Defendant further objects to this request because it assumes facts not in evidence, i.e., that the "assumption" referenced is necessarily supported by specific documentation. Defendant further objects to this request because it constitutes a fishing expedition. Therefore, Defendant is not producing any documents in response to this request.

**REQUEST FOR PRODUCTION NO. 41**:   All Communications and Electronic Messages identified in interrogatory no. 10, served contemporaneously herewith; that is, all Communications and Electronic Messages that You contend support Your "assumption" that between July 1, 2016, and December 31, 2016, ALG's Lab Services equipment was connected to US Tox's lab information system.

**RESPONSE**:  Defendant objects to this request because, like interrogatory no. 10, it seeks to have Defendant marshal its evidence before trial. Defendant further objects to this request because it assumes facts not in evidence, i.e., that the "assumption" referenced is necessarily supported by specific documentation. Defendant further objects to this request because it constitutes a fishing expedition. Therefore, Defendant is not producing any documents in response to this request.

**REQUEST FOR PRODUCTION NO. 42**:   All Communications and Electronic Messages identified in interrogatory no. 11, served contemporaneously herewith; that is, all Communications

SYNERGEN HEALTH, LLC'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' 08/01/2022 REQUESTS FOR PRODUCTION OF DOCUMENTS                    PAGE 3
CLARKHILL\D2829\392506\268412670.v1-8/31/22

App. 10

and Electronic Messages that You contend support Your "assumption" that between July 1, 2016, and December 31, 2016, True's Lab Services equipment was connected to UTox's lab information system.

**RESPONSE**:  Defendant objects to this request because, like interrogatory no. 11, it seeks to have Defendant marshal its evidence before trial. Defendant further objects to this request because it assumes facts not in evidence, i.e., that the "assumption" referenced is necessarily supported by specific documentation. Defendant further objects to this request because it constitutes a fishing expedition. Therefore, Defendant is not producing any documents in response to this request.

**REQUEST FOR PRODUCTION NO. 43**:   All Communications and Electronic Messages identified in interrogatory no. 12, served contemporaneously herewith; that is, all Communications and Electronic Messages that You contend support Your "assumption" that between July 1, 2016, and December 31, 2016, True's Lab Services equipment was connected to US Tox's lab information system.

**RESPONSE**:  Defendant objects to this request because, like interrogatory no. 12, it seeks to have Defendant marshal its evidence before trial. Defendant further objects to this request because it assumes facts not in evidence, i.e., that the "assumption" referenced is necessarily supported by specific documentation. Defendant further objects to this request because it constitutes a fishing expedition. Therefore, Defendant is not producing any documents in response to this request.

**REQUEST FOR PRODUCTION NO. 44**:   All Communications and Electronic Messages identified in interrogatory no. 13, served contemporaneously herewith; that is, all Communications and/or Electronic Messages between You and any Next Health Personnel, whether directly (through their professional and/or personal accounts/addresses) or through their respective attorneys and regardless of whether You or the Next Health Personnel initiated or responded to said Communication or Electronic Message, between January 1, 2018, and present.

**RESPONSE**: Defendant objects to this request to the extent it infringes upon joint or common defense privileges and the subject matter of same. Defendant further objects to this request because it is irrelevant, as January 1, 2018 to the present is beyond the time period during which the relevant facts in this case occurred. Therefore, Defendant is not responding to this request.

SYNERGEN HEALTH, LLC'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' 08/01/2022 REQUESTS FOR PRODUCTION OF DOCUMENTS                                    PAGE 4
CLARKHILL\D2829\392506\268412670.v1-8/31/22

App. 11

**REQUEST FOR PRODUCTION NO. 45**:  All Communications and Electronic Messages identified in interrogatory no. 14, served contemporaneously herewith; that is, all Communications and/or Electronic Messages between Mel Gunawardena and any of the following individuals between April 20, 2022, and July 20, 2022, regarding the processes or procedures by which Synergen extracted or received information from UTox's or US Tox's lab information system and submitted Claims reflecting that information to United using ALG's or True's billing credentials: (i) Gillian De Silva; (ii) Malsha Thilakaranthe.

**RESPONSE**: Defendant objects to this request to the extent it invades the work-product protection or attorney-client privilege. Defendant further objects to this request because this time period is beyond the time period during which the relevant facts in this case occurred, and is therefore irrelevant. Therefore, Defendant is not producing any documents in response to this request.

**REQUEST FOR PRODUCTION NO. 7 [sic]**:  All Documents evidencing or otherwise relating to the steps, procedures, protocols, or other measures Synergen implemented or otherwise applied to prevent, limit, or otherwise guard against the following risk areas identified in the Office of Inspector General's Compliance Program Guidance for Third-Party Medical Billing Companies, dated December 18, 1998:

      a.      "Billing for items or services not actually documented";

      b.      "Knowing misuse of provider identification numbers";

      c.      "Duplicate billing in an attempt to gain duplicate payment";

      d.      "Failure to properly use modifiers"; and

      e.      "Routine waiver of copayments and billing third-party insurance only."

**RESPONSE**: Defendant objects to this request because it is overbroad, vague, not reasonably calculated to lead to the discovery of admissible evidence, and harassing. Specifically, "the steps, procedures, protocols, or other measures" is vague. The burden of responding outweighs any relevant information. Defendant further objects to this request because it, like interrogatory number 15 which was served contemporaneously, impermissibly seeks to have Defendant marshal

SYNERGEN HEALTH, LLC'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' 08/01/2022 REQUESTS FOR PRODUCTION OF DOCUMENTS        **PAGE 5**
CLARKHILL\D2829\392506\268412670.v1-8/31/22

App. 12

all of its evidence prior to trial. Defendant further objects to this request because it constitutes a fishing expedition. Therefore, Defendant is not providing any documents in response to this request.

Dated:  August 31, 2022                     Respectfully submitted,


                                            */s/ Laura Reilly O'Hara*_____
                                            **LAURA REILLY O'HARA**
                                            State Bar No. 00784694
                                            **ELIZABETH F. GRIFFIN**
                                            State Bar No. 24092450
                                            **DANIEL J. OLDS**
                                            State Bar No. 24088152
                                            **CLARK HILL PLC**
                                            901 Main Street, Suite 6000
                                            Dallas, Texas 75202
                                            214.651.2250 (direct-O'Hara)
                                            214.659.4094 (direct-O'Hara)
                                            lohara@clarkhill.com
                                            egriffin@clarkhill.com
                                            dolds@clarkhill.com

                                            **ATTORNEYS FOR DEFENDANT**
                                            **SYNERGEN HEALTH, LLC**


### CERTIFICATE OF SERVICE

        This is to certify that a true and correct copy of the foregoing document was electronically served on all counsel of record on August 31, 2022.

                                            */s/ Laura Reilly O'Hara*_____
                                            Laura Reilly O'Hara

App. 13

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

UNITED HEALTHCARE SERVICES,
INC., UNITEDHEALTHCARE
INSURANCE COMPANY,

     Plaintiffs,

v.

SYNERGEN HEALTH, LLC,

     Defendant.

Civil Action No. 3:20-cv-00301-E

## <u>NOTICE OF RULE 30(b)(6) DEPOSITION OF SYNERGEN HEALTH, LLC</u>

Please take notice that pursuant to Fed. R. Civ. P. 30 Plaintiff United Healthcare Services, Inc. shall take the deposition of **Synergen Health, LLC** regarding all information known or reasonably available to Synergen Health, LLC with respect to the subject matters identified in **<u>Exhibit A</u>** hereto. **Pursuant to the revisions to Rule 30(b)(6) effective December 1, 2020**, Plaintiffs and Synergen Health, LLC, "promptly after [this] notice . . . is served, . . . must confer in good faith about the matters for examination." Plaintiffs therefore request that counsel for Synergen Health, LLC meet and confer with Plaintiffs' counsel about these matters within two weeks of service of this Notice or as soon as otherwise reasonably possible. Plaintiffs further request that Synergen Health, LLC provide written notice at the time of conferral, but in no event fewer than five business days before the deposition, of the name(s) and employment position(s) of the individual(s) designated to testify on Synergen Health, LLC's behalf.

This deposition shall commence on **April 20, 2022,** at 9:00 a.m. at Clark Hill PLC, 901 Main Street, Suite 6000, Dallas, Texas 75202, or at such other time and location as agreed upon by the parties and shall be taken before a duly certified court reporter and notary public or other person authorized by law to administer oaths. The deposition will be recorded by stenographic means and by videotape.

1

/s/ Scott P. Kerew

**FIGARI + DAVENPORT, LLP**

Andrew G. Jubinsky
andy.jubinsky@figdav.com

901 Main Street, Suite 3400
Dallas, TX 75202-3796
Telephone: (214) 939-2000
Facsimile: (214) 939-2030

**SINTON SCOTT MINOCK & KEREW**

Scott P. Kerew
skerew@ssmklaw.com
Joseph J. Minock
jminock@ssmklaw.com
3438 Peachtree Rd., Ste. 925
Atlanta, GA 30326
Telephone: (470) 323-0004

Adam J. Sinton
asinton@ssmklaw.com
Benjamin D. Van Horn
bvanhorn@ssmklaw.com
1525 Raleigh St., Ste. 503
Denver, CO 80204
Telephone: (720) 738-9894

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I, Scott P. Kerew, certify that on March 28, 2022, I caused the foregoing Notice of Rule 30(b)(6) Deposition to be served by electronic mail to all counsel of record in the above-captioned case.

/s/ Scott P. Kerew

2

App. 15

## EXHIBIT A

In construing these topics, all terms shall be construed to encompass as broad a range of information as permitted under the Federal Rules of Civil Procedure. The following definitions are to assist the deponent(s) in preparing to answer questions on the noticed topics. However, these definitions should not be construed to in any way abrogate Synergen Heath, LLC's obligation to prepare to answer questions in good faith.

## Definitions

1. "**UHC**" shall mean Plaintiffs United Healthcare Services, Inc. and UnitedHealthcare Insurance Company and their respective parents, subsidiaries, and affiliates.

2. "**Synergen**," "**You**," and "**Your**" shall mean Defendant Synergen Health, LLC, its predecessors, and its successors, and its/their respective officers, directors, members, employees, agents, parents, subsidiaries, affiliates, consultants, assigns, and attorneys.

3. "**Next Health**" shall mean Next Health, LLC, its predecessors (*e.g.*, Business Partners in Healthcare, US Health Group), and its successors (*e.g.*, Critical Health Management), and its/their respective officers, directors, members, employees, agents, parents, subsidiaries, affiliates, consultants, assigns, and attorneys.

4. "**Next Health Labs**" shall mean American Laboratories Group, LLC ("**ALG**"), United Toxicology, LLC ("**UTox**"), US Toxicology, LLC ("**US Tox**"), Medicus Laboratories, LLC ("**Medicus**"), and True Labs, LLC ("**True**"), and their respective officers, directors, members, employees, agents, parents, subsidiaries, affiliates, consultants, successors, predecessors, assigns, and attorneys.

5. "**Next Health Personnel**" means Next Health employees, owners, and/or contractors, including, but not limited to, Nick Austin, Mike Austin, Amir Mortazavi, Semyon Narosov, Andrew Hillman, Josh Ihde, Jeremy Rossel, Cary Rossel, Arvin Zeinali, Paul Muniz, Brandon Williams, Corey Dudley, Karynn Harvard, Brent Cotton, and Cara Gudgel.

6. "**Medical Professional**" shall mean any physician, nurse practitioner, physician assistant, or other individual provider of healthcare services to Persons.

7. "**Provider**" shall mean any hospital, clinic, physician's office, treatment center, laboratory or other facility providing healthcare services to Persons.

3

8. "**Lab Service**" shall mean any procedure, service, or test billed or billable using National Uniform Billing Committee Procedure Codes beginning 8xxxx, G04xx, or G6xxx.

9. "**Claim**" shall refer to any submission seeking benefits, reimbursement, or payment for Lab Services, which was submitted to UHC under one of the Next Health Labs' billing credentials between January 1, 2014, and June 1, 2017, including all information contained therein.

10. "**Payor**" shall refer to any entity that insures or administers plans of insurance that provide health and welfare benefits to Persons who receive medical services, including, *inter alia*, UHC.

11. "**Document**" shall mean all writings, recordings, or photographs, as those terms are respectively defined in Federal Rules of Evidence 1001(a), (b), and (c), as well as any and all tangible items, written and graphic matter, electronically stored information ("**ESI**"), and any drafts or copies thereof, however produced or reproduced, in Your actual or constructive possession, custody, or control, including, *inter alia*, writings, drawings, graphs, charts, photographs, phono-records, sound tapes or recordings, images, papers, books, accounts, letters, microfilm, magnetic tape, magnetic discs, magnetic strips, optical characters, recognition characters, punched paper tapes, microfiche, punched cards, telegrams, voices, statements, account recommendations, notes, minutes, inter-office memoranda, reports, studies, contracts, ledgers, books of account, vouchers, hotel charges, cost sheets, stenographer notebooks, calendars, appointment books, diaries, time sheets or logs, computer printouts, computer files, electronically stored data, data compilations in any medium from which information can be obtained or can be translated through detection and other devices into a reasonably usable form, or any other tangible thing within the scope of applicable law.

12. "**Communication**" shall mean all internal and external verbal, printed, or electronic exchanges of information of every kind and nature, including, but not limited to, conferences, correspondence, letters, memoranda, meetings, e-mails, text messages, posts, and telephone calls.

13. "**Person**" shall mean any individual, corporation, partnership, joint venture, firm, agency, board, authority, commission, cooperative organization, association, municipality, governmental body, or other such entity.

## Topics

In accordance with Fed. R. Civ. P. 30(b)(6), Plaintiffs designate the following matters for examination. Unless otherwise indicated, the relevant time-period for each topic is January 1, 2014, to June 1, 2017.

App. 17

**Background**

1. Synergen's ownership and personnel structure from its inception to present.

2. Synergen's experience and qualifications as a revenue-cycle management solution for its clients.

3. Synergen's document and data retention policies in effect for the period between January 1, 2014, and present.

**Synergen's Relationship with Next Health**

4. Synergen's relationship with Next Health and Next Health Personnel, Synergen's knowledge of Next Health's business, the reasons Synergen did business with Next Health, as well as the parties' agreements and contracts, the parties' division of responsibilities and obligations, and the compensation Synergen received in connection with its work for Next Health.

5. The roles and responsibilities of Synergen's personnel with respect to its work for Next Health.

6. All periodic reports Synergen sent to Next Health, including the contents and purposes of these reports and bases, information, or data upon which such reports were formulated.

**Claim Submission**

7. Synergen's policies and procedures governing the creation and submission of claims for out-of-network laboratory services to commercial payors which were effective for the period between January 1, 2014, to June 1, 2017.

8. Synergen's use or observation of industry manuals, instructions, or policies governing the creation and submission of claims for out-of-network laboratory services to commercial payors (*e.g.*, National Uniform Claim Committee 1500 Health Insurance Claim Form Reference Instruction Manual) for the period between January 1, 2014, and June 1, 2017.

9. The software, platforms, and processes by which Next Health and Synergen transmitted, received, and exchanged any and all data elements underlying the Claims subsequently submitted to UHC.

10. Synergen's receipt, extraction, review, analysis, storage, and retention of the "data miners," as well as any other information created by or received through Next Health's lab information system, for purposes of creating and transmitting the Claims to UHC.

11. The creation, maintenance, and monitoring of profiles or identifiers for or corresponding to the Next Health Labs, including billing profiles, ordering locations, provider profiles, lockboxes, or office keys.

12. The software, platforms, and processes by which Synergen created the Claims and submitted those Claims to UHC, whether via clearinghouse or otherwise.

13. Synergen's monitoring, management, and reconciliation of payments UHC made to Next Health Labs, including as reflected on Provider Remittance Advices, Provider Explanation of Benefits, or their 835 electronic equivalents.

**Treatment of Certain Claims**

14. For the period between January 1, 2015, and December 31, 2016, Synergen's evaluation of and response to any instances in which UHC payments to a Next Health Lab slowed down, stopped, or were delayed, as well as Synergen's Communications with Next Health regarding the same and any actions taken by Synergen and Next Health as a result.

15. Synergen's Communications with Next Health regarding potential or recommended practices or methods for avoiding the placement of flags by UHC on the Claims submitted by or on behalf of a Next Health Lab for the period between January 1, 2015, and December 31, 2016.

16. The placement of holds or freezes on the submission of Claims to UHC between January 1, 2015, and January 26, 2017, including Synergen's role in the placement of those holds or freezes and Synergen's Communications with Next Health relating to the placement of those holds or freezes.

17. The creation and submission of Claims to UHC using UTox's billing credentials between August 1, 2015, and January 26, 2017, including Synergen's role in the creation and submission of those Claims and Synergen's Communications with Next Health relating to the creation and submission of those Claims.

18. The creation and submission of Claims to UHC using US Tox's billing credentials between August 1, 2015, and January 26, 2017, including Synergen's role in the creation and submission of those Claims and Synergen's Communications with Next Health relating to the creation and submission of those Claims.

19. The creation and submission of Claims to UHC using Medicus's billing credentials between August 1, 2015, and January 26, 2017, including Synergen's role in the creation and submission of those Claims and Synergen's Communications with Next Health relating to the creation and submission of those Claims.

20. The creation and submission of Claims to UHC using ALG's billing credentials between August 1, 2015, and January 26, 2017, including Synergen's role in the creation and submission of those Claims and Synergen's Communications with Next Health relating to the creation and submission of those Claims.

21. The creation and submission of Claims to UHC using True's billing credentials between July 1, 2016, and January 31, 2017, including Synergen's role in the creation and submission of those Claims and Synergen's Communications with Next Health relating to the creation and submission of those Claims.

**Synergen's Role Concerning Patient Statements/Billing/Collections**

22. Synergen's involvement in the development and promulgation of patient billing statements regarding Lab Services performed by Next Health Labs, including the volume of statements sent; the format and content of the statements; and Synergen's use of third-party vendors, including Mail My Statements, to create and promulgate statements.

7

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF TEXAS
 3                     DALLAS DIVISION
 4    UNITED HEALTHCARE SERVICES, )
      INC., UNITED HEALTHCARE      )
 5    INSURANCE COMPANY,           )
                                   )
 6           Plaintiffs,           )
                                   )
 7    v.                           )   Civil Action No.
                                   )   3:20-cv-00301-E
 8    SYNERGEN HEALTH, LLC,        )
                                   )
 9           Defendant.           )
10
11    *************************************************
12           VIDEOTAPED ORAL DEPOSITION OF
13                  SYNERGEN HEALTH, LLC
14      BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
15                   MEL GUNAWARDENA
16                   APRIL 20, 2022
17    *************************************************
18        On the 20th day of April, 2022, at 9:25 a.m.,
19    the videotaped oral deposition of the above-named
20    witness was taken at the instance of the Plaintiffs,
21    before Michelle L. Munroe, Certified Shorthand
22    Reporter in and for the State of Texas, at the
23    offices of Clark Hill PLC, 901 Main Street, Suite
24    6000, Dallas, Texas, pursuant to Notice and the
25    agreement hereinafter set forth.
```

Page 50

1 who did the retrieval, but they did the coding of
2 the claims, and they would upload it into what they
3 called Box.com, which was a file transfer --
4     Q.   Uh-huh.
5     A.   -- system where we would take those
6 already coded claims.  So we never went into a Data
7 Miner until Q3 of 2015.
8     Q.   Okay.
9     A.   And we would take those and load it into
10 the billing system.
11    Q.   AMD?
12    A.   AdvancedMD.
13        We had a system called SYNERGEN Billing
14 Interface which would take these files and
15 automatically -- we had to pick to say what's the --
16 what the file is, what -- there was a naming
17 convention to say where -- which lab it originated
18 from.  We had a dedicated AMD office key, what they
19 call office key, for each of the labs.  They had
20 five labs, so we had one for each lab.  And we would
21 then upload it through the SYNERGEN Billing
22 Interface.
23    Q.   At which point in time was --
24    A.   This is all the -- this is through -- up
25 to about third quarter of 2015.

Page 51

1     Q.   And so CTECH -- let me say it back to you
2 and tell me --
3     A.   Yes.
4     Q.   -- if I got it right.
5        There's LABDAQ, which is Next Health's
6 LIS, right?
7     A.   That's right.
8     Q.   CTECH is a company, and they essentially
9 were in charge of -- however they got the data out
10 of LIS, but they extracted it or got it --
11    A.   That's right.
12    Q.   -- converted it in some form or fashion,
13 gave it to you?
14    A.   What they did was they coded it.  The --
15    Q.   I guess what are they coding?
16    A.   They did the coding.
17    Q.   Yeah.
18    A.   The coding -- so in the lab information
19 system, it doesn't code the procedure codes.  It
20 tells you what -- at least at that time.  It will
21 tell you --
22    Q.   You would say --
23    A.   -- what tests were run.
24    Q.   Yeah.  Okay.
25    A.   What tests were run had to be converted to

Page 52

1 CPT procedure codes.
2     Q.   Got it.
3     A.   That was done by CTECH, and then we would
4 get that file, and then -- with all of the other
5 data fields we'll upload it.
6     Q.   And then that file, you -- how does that
7 work?  You drag and drop it into the SYNERGEN
8 Billing --
9     A.   Interface, that's right.
10    Q.   -- Interface?
11    A.   That's correct.
12    Q.   Literally just --
13    A.   Well, there was a -- there was a process.
14    Q.   I don't mean to --
15    A.   There was a process.  There was a naming
16 convention.  There's a dropdown to pick what lab,
17 what type of test it was.  They had different names
18 for -- they would say this was a toxicology for
19 Lab A, this is toxicology Lab B screen or
20 confirmation, whatever they called it.
21    Q.   Uh-huh.
22    A.   And there was a matching dropdown to pick
23 up, and then it would run and -- and load it into
24 the billing system.
25    Q.   Was that a -- did that map to -- in AMD

Page 53

1 directly to the office key or were there provider
2 profile the names?
3     A.   Yes, there was -- there was map to the
4 provider profiles off the office key, that's
5 correct.
6     Q.   Because, like, for reporting purposes,
7 right, Next Health wanted to know the difference
8 between streams and confirmations, for example --
9     A.   That's correct.
10    Q.   -- right?
11        And so US Tox was the name of a
12 laboratory, right?
13    A.   United -- yeah, US Toxicology.
14    Q.   US Toxicology.  Excuse me.
15        And if I remember right, the provider
16 profile, I think, was literally US Tox for -- for
17 one subpart of -- let me back up.
18        They are getting -- CTECH is getting --
19 has a file that's going to be a US Tox file but also
20 then a Reliant file because that was the
21 confirmation lab that was being tracked; is that
22 correct?
23    A.   I -- I don't remember.  I have the list of
24 information, but it could be.  I don't know.
25    Q.   We're going to look at some specific.  I

14 (Pages 50 - 53)

Page 202

1    We saw in the Data Miners, right?
2    A.   That's right.
3    Q.   And are you saying that that came over
4  into AMD as well?  It was --
5    A.   It was in the custom tab, just a custom
6  data field.  We just put that in there.
7    Q.   I see.
8      If you look at Exhibit 5, the third page
9  of it, please.
10    A.   Yes.
11    Q.   It looks like the fifth thing down says
12  "fin class" -- I assume is financial class -- and it
13  says "ordering location name."
14      Do you see that?
15    A.   Yes.
16    Q.   The ordering location name is referring to
17  the Data Miner.  The "fin class" is referring to
18  the -- presumably the header in the AMD, the field
19  in AMD?
20    A.   That seems like that.
21    Q.   Right.
22      And "BF," the column at the far right is
23  the column where ordering location name in the Data
24  Miner was, correct?
25    A.   It seems like that.

Page 203

1    Q.   Okay.  So those communicated with each
2  other it looks like.  Got it.
3      I hate to do this to you.  If you go the
4  next page, please.
5    A.   Yes.
6      MS. O'HARA:  On Exhibit 5?
7      MR. SINTON:  On Exhibit 5.
8    Q.   This is a -- do you see where it says --
9  we looked -- it says "order loc name" on the first
10  column --
11    A.   I see that.
12    Q.   -- and then "ordering location name" in
13  the second?
14    A.   I see that.
15    Q.   Can you -- I'm -- I don't know how AMD is
16  set up and structured.
17      Can you help me understand what to -- what
18  to make of that?  It may be as simple, right, is the
19  Data Miner Header "ordering location name" just maps
20  into two fields in AMD, right?
21    A.   That seems to be.  I have not mapped the
22  fields into AMD, but when I look at this custom tab,
23  it looks like in the patient -- in AdvancedMD, we
24  could create custom tabs, which is just custom
25  fields.  And I believe these are the different

Page 204

1  fields and different data that just went in the --
2  that they were -- that these were outside of some of
3  the -- that seems to be outside of the billing
4  information that we require.  Looks like it but...
5    Q.   Okay.  I appreciate you trying to help me
6  through.
7      Let's stop talking about ordering location
8  for a moment and -- and talk about instead -- for me
9  it's Exhibit 2, the bottom of page 28, please.
10    A.   Yes.
11    Q.   And it says -- there's a bullet says,
12  Billing Profiles:  Each LABDAQ login corresponds to
13  a different billing entity.
14      Do you see that?
15    A.   Yes.
16    Q.   If you then turn the page to 29 and go
17  down about halfway, there's a bullet that says,
18  Office Keys.
19    A.   I see that.
20    Q.   Do you see that?
21      And the second sub-bullet there says,
22  There is a unique LABDAQ login for each entity.
23      Do you see that?
24    A.   I see that.
25    Q.   Am I correct in understanding this to mean

Page 205

1  that for each LABDAQ -- for each LABDAQ, there -- it
2  corresponded to a different billing entity?  Like --
3  so -- that's at the bottom of 28, right?
4    A.   Yes.
5    Q.   And billing entity is basically another
6  name, effectively, for office key.  Fair?
7    A.   Yes and no.  I can -- I can explain.  A
8  billing entity is in our -- the way we -- the
9  nomenclature that we use, billing entity is a
10  provider that is sending the claims to bill.
11    Q.   Okay.
12    A.   So in this case with Next Health, it is a
13  lab.  So it's a CLIA certified lab --
14    Q.   Uh-huh.
15    A.   -- with a tax ID and NPI.  That's a
16  billing entity.
17      For that corresponding billing entity, we
18  have to have a billing office key, and that was --
19  that's the one-to-one correlation.  And then with
20  that was the LIS, as well, one-to-one correlation.
21    Q.   Okay.  So like -- I think this is the
22  transitive property.  Office key, on that same page
23  we're looking at, 126196 -- do you see that?  It's
24  Exhibit 2, page 29, there's a table at the bottom,
25  far right said --

52 (Pages 202 - 205)

United Healthcare Services, Inc.   Vs. Synergen Health, LLC

Page 206

1    A.   Yes.
2    Q.   -- it says Office Key 126196, right?
3    A.   That's right.
4    Q.   That is effectively equal to United
5  Toxicology, right, a lab with, as you noted above, a
6  CLIA certification with a unique tax ID and an NPI,
7  right?
8    A.   That's correct.
9    Q.   And there would then be a corresponding
10 LIS or LABDAQ for United Toxicology, right?
11   A.   That is correct.
12   Q.   And I think you told me earlier, right,
13 that -- it's in your notes, too.  Hold on.
14        If you go to page 21, please, of
15 Exhibit 2.
16   A.   Yes.
17   Q.   You said that the way that SYNERGEN knew
18 to -- the way that SYNERGEN knew which license
19 entity performed the test was based on the name of
20 the Data Miner that contained the claim information,
21 correct?
22   A.   That is correct.
23   Q.   And that sort of -- I mean, that's exactly
24 what the -- it's not exactly.
25        That is what the third bullet on page 21

Page 207

1  of Exhibit 2 says, correct?
2        Can you --
3    A.   Third bullet, yes.
4    Q.   Will you read that for me?
5    A.   Claims were billed out of the office key
6  of the corresponding LIS that had its own CLIA
7  certified lab that the claims were extracted from.
8        That's correct.
9    Q.   See if I get this right here.  I couldn't
10 remember where our page problem was.
11        And so we just read that third bullet,
12 right?
13        MS. O'HARA:  Yeah.
14   A.   That's what I read.  Do you want me to
15 read it again?
16   Q.   You don't need to.  No, I just -- I'm --
17 this high process -- high-level process flow thing
18 is not on my copy of yours.  And that's what I
19 was -- it's not a big deal.
20        MR. SINTON:  Let me take a step back
21 and clean that up.
22        MS. O'HARA:  Okay.
23   Q.   So the exhibit that we have marked as
24 Exhibit 2, which I think is on the screen right
25 now -- if it's not, it will be in a moment -- is

Page 208

1  slightly different than the document that we have
2  been looking at.  It appears to be a formatting
3  issue.  I don't think there's any substantive
4  difference.
5        MS. O'HARA:  Yeah, because that line
6  is on the next page.  I think for some reason when
7  they printed that -- here, look -- pull it -- turn it
8  over.  In the corner, is it not?
9        MR. SINTON:  Uh-huh.
10        MS. O'HARA:  See, it's on mine.
11        MR. SINTON:  We all have the same
12 version.  This version is just slightly different.
13 And so it seems, frankly, unimportant administrative.
14 I just want to --
15        MS. O'HARA:  Right.  Because --
16 because that line is up here on ours --
17        MR. SINTON:  On the copy that you
18 have, that I have, and --
19        MS. O'HARA:  -- it's on the bottom on
20 that one, yeah.
21        MR. SINTON:  -- that SYNERGEN's
22 corporate representative has, correct?
23        MS. O'HARA:  Yeah.
24        MR. SINTON:  So we have all been
25 looking at the same thing, but this may look just

Page 209

1  slightly different.
2        MS. O'HARA:  Right.  But from a
3  formatting as opposed to a content standpoint.
4        MR. SINTON:  If we come across more
5  differences in it, we'll note it.  But I understand
6  that substantively there's no difference between
7  these, right?
8        MS. O'HARA:  Right.  Right.  And we --
9  and, again, we can attach Mel's copy as Exhibit 2A or
10 something so that you have got the exact --
11        MR. SINTON:  We'll figure that out.
12 I'm not overly concerned about it.
13   Q.   Okay.  So we just -- we read that third
14 bullet on page 21.
15        The bullet above it says that, Claims that
16 were coded were enter to AMD through the SYNERGEN
17 Billing Interface, automatically uploaded to the
18 corresponding billing office key of that CLIA
19 certified lab.
20        Can you explain to me what the
21 automatically uploaded part there means?
22   A.   There was no manual entry.  So there was
23 no manual data entry off all these fields.  So there
24 were -- when you look at a file --
25   Q.   Uh-huh.

53 (Pages 206 - 209)

United Healthcare Services, Inc.   Vs. Synergen Health, LLC

Page 214

1    A.   Yes.
2    Q.   -- your focus for me, please, there are
3 now more.  There are -- I think there's 8-ish.
4    A.   Yes, I see that.
5    Q.   And I take it that that is not surprising.
6 Businesses shift.  There are more -- let me just ask
7 you.
8        Do you know the differences between them?
9 Were you surprised, I guess, that there are
10 differences?
11   A.   I'm not surprised because over time they
12 were adding different subcategories.
13   Q.   For example, we know this is back from,
14 like, 2013 or 2014, right, Exhibit 5?
15       And Next Health didn't have a substance
16 abuse division, right, at that point?
17   A.   I don't believe so.
18   Q.   So it makes sense that there is not a
19 provider profile that connects to substance abuse or
20 was used to identify substance abuse, right,
21 whereas, there does exist such a thing on the more
22 recent chart that's on page 29 of Exhibit 2, right?
23       MS. O'HARA:   Objection; form.
24   A.   From my understanding, yes.
25   Q.   Fair enough.

Page 215

1        The office key bullet that is on page 29
2 of Exhibit 2, the third bullet there says, If Data
3 Miner for UTT was extracted from UTT LIS, then it
4 was billed under UTT office key.
5    A.   That's correct.  That was part of the
6 process.
7    Q.   But the Data Miner for UTT could only be
8 extracted from the UTT LIS, right?
9    A.   Yes.
10   Q.   Right.  I just wanted to make sure that
11 there wasn't some piece I was missing there.
12   A.   That is correct.
13   Q.   It wouldn't be a UTT Data Miner unless it
14 was extracted from the UTT LIS, right?
15   A.   That's correct.
16   Q.   And if it was extracted from the UTT LIS,
17 it would have had the UTT nomenclature related to
18 the one we looked at earlier?  Or maybe you can't
19 say what it would be named, I guess.  Sorry.
20   A.   Yes, they should have.  And also the
21 provider profiles, all of that would have been
22 matching that information.
23   Q.   Would that have been in the -- in the --
24 in the naming convention?
25   A.   That's correct, naming convention.

Page 216

1    Q.   Okay.  So we have a UTT Data Miner that's
2 taken out of the United Tox LABDAQ, and then it
3 would have been billed under office key 126196 for
4 United Toxicology, correct?
5    A.   That's correct.
6    Q.   And that's true for -- if we just go down
7 to the one below, US Toxicology, this is not a --
8 that bullet point, all I'm saying, is not UTT
9 specific, correct?
10   A.   That is correct, that's just an example.
11   Q.   So if a Data Miner is extracted from the
12 US Tox LIS, then it would be billed under office key
13 127531, right?
14   A.   That is correct.
15   Q.   Between 2013 and twenty -- the middle of
16 2016, there are only three office keys that Next
17 Health really used, correct?
18   A.   I don't remember.  I know that they had
19 five.
20   Q.   Total, right?
21   A.   Five total.
22   Q.   And so do you -- do you know when the
23 American Lab Group office key was either created or
24 registered or whatever that process is?
25   A.   I think latter part of 2016.

Page 217

1    Q.   Same for True Labs office key?
2    A.   Yeah, I don't remember the exact dates on
3 that.
4    Q.   Going back to the LABDAQ information that
5 everything has been extracted from the LIS, it's
6 SYNERGEN's understanding that there is nothing in
7 that file that tells SYNERGEN which billing entity
8 performed the test, right?  They're -- let me say
9 that first.  Within the file.  We can -- not
10 including that little tab at the bottom, right?
11       As far as the fields go, there is not a
12 field that tell -- that SYNERGEN could look to to
13 tell it which billing entity actually performed the
14 services?
15       MS. O'HARA:   Objection; form.
16   A.   The -- the billing entity information is
17 in the office key.  So because there is a
18 corresponding LIS status corresponding to that
19 office -- to that lab --
20   Q.   Uh-huh.
21   A.   That was the one that said, okay, you
22 download from here, put the naming convention, and
23 then you load it into that office key.  But is there
24 a field that states UTT inside the UTT office key,
25 no.

55 (Pages 214 - 217)

App. 25

Page 230

1   Q.   Where did this come from; do you know?
2   A.   Where does this come from?
3   Q.   Uh-huh.
4   A.   This is a process flow we put together
5   just to explain to you, for me as well.  I wanted to
6   take some notes to see how it was running.
7   Q.   So this is a process flow that someone
8   created recently to explain?
9   A.   That's right.
10   Q.   This didn't exist back in 2017, for
11   example, 2016?
12   A.   I am not sure.  I need to take a look.
13   Q.   Was this a SYNERGEN employee that put this
14   together?
15   A.   Gillian.
16   Q.   Gillian?
17   A.   Gillian put it together, yes.
18   Q.   And it looks like this is basically
19   chopped up, for lack of a better term.  If you turn
20   to page 37, please, of Exhibit 2.
21   A.   I see.
22   Q.   37 and 38, these are -- am I correct that
23   these are the same thing we're looking at?
24   A.   It is -- it is the same thing, just
25   basically stating that where the -- where the claims

Page 231

1   was performed is where the Data Miner is coming
2   from, and where the Data Miner comes from is where
3   we process in the office key.  And that was the
4   process.
5   Q.   It doesn't mention the naming convention,
6   right, that you were referencing earlier?
7   A.   No.
8   Q.   Would that happen -- like, would that
9   naming convention be created or the file be saved
10   with that naming convention?
11       I don't know if you can see my fingers
12   pointing but sort of in between the box that says
13   "retrieve Data Miners" and then the box next to it
14   that says "complete batch inventory"?
15   A.   My understanding, yes.  Yes.  Sorry, it's
16   small.
17   Q.   It's all right.
18       On page 19 of Exhibit 2, we sort of set
19   this aside earlier, but DNA and molecular testing.
20   A.   Yes.  Which page are you on?
21   Q.   I'm sorry.  19 of Exhibit 2, please.
22   A.   Okay.  Yes.
23   Q.   Those were -- I think you said a couple
24   times those were treated differently than at least
25   the toxicology stuff, right?

Page 232

1   A.   That's correct.
2   Q.   Can you tell me about that, what --
3   A.   So even prior to us taking over from
4   CTECH, all the files were coming through Box.com, so
5   even DNA and molecule were coming through that.  And
6   because the volume was low, they said they'll
7   continue to do the coding and send to us.
8   Q.   Uh-huh.
9   A.   And because the volume was high in the
10   toxicology side, that's what they wanted us to
11   handle, the coding side.  So they wanted us to be
12   responsible for the toxicology side.  The DNA and
13   MIT, they said they'll continue to do.
14   Q.   So you didn't have to worry about the
15   coding for that?  You did have --
16   A.   We never did the coding, no.
17   Q.   Those are standalone Data Miners, though?
18   A.   Standalone Data Miners that they sent to
19   us that had the -- we didn't go to the LIS and pull
20   any of those down.  They --
21   Q.   Put it on Box, right?
22   A.   They just came through Box.com because
23   they had -- just like they did when CTECH was doing
24   all the work, that's when the -- that's how they
25   came before.  And they told us we'll continue to do

Page 233

1   the DNA and the MIT coding and downloading those
2   files because the volume was very low.
3   Q.   And so how did you know which office key
4   to submit those through if the Data Miner was, you
5   know, PGXL whatever 01052016, right?
6   A.   It is from the naming convention, right.
7   So that's how it was done even when with CTECH.
8   Even with CTECH, they had a naming convention that
9   we had to follow to say, this name, this came from
10   this lab so, therefore, we had to -- we had to put
11   it into the correct office key.
12       So that's a -- there was a naming
13   convention identifying which lab it came from.  So
14   we used that naming convention to put it into the
15   office key.  That's how it happened prior to us
16   doing the downloads.
17   Q.   And so my example, you're saying there are
18   not going to be Data Miners that say PGXL and then
19   whatever date?
20   A.   I don't -- I don't know the name but there
21   is a way to identify it, yes.
22   Q.   I'm trying to understand, I guess, that --
23   you said that the way you identified the office key
24   that it's going to be submitted through is the
25   naming convention, and there's not an office key

59 (Pages 230 - 233)

Page 254

1    Q.   Mr. Gunawardena, I just handed you a
2  document that we marked as Exhibit 6. It's got a
3  Bates number in the bottom right corner of 111516.
4       Do you see that?
5    A.   Uh-huh.
6    Q.   And can you describe this -- the top email
7  there?  Who -- let me just say:  Who is it from and
8  who are they sending it to?
9    A.   It's from Nick Austin to Mazeer and
10 Gillian and Pravindi, as well as copy to Paul and
11 Corey Dudley from Next Health.
12   Q.   Okay.  And it's, what, July 12, 2016?
13   A.   That's correct.
14   Q.   Can you please read what Nick says in that
15 top email?
16   A.   Sure.  Hi guys, please pass on to anybody
17 I have left off.  Starting tomorrow, we will be
18 billing UHC samples (both toxicology and genetics)
19 for the below list of physicians through ALG.
20 They're going to come through United Toxicology's
21 LABDAQ under the ordering location UHALG.  I want to
22 bill these under the normal laboratory charge
23 master, not the workers' comp schedule we set up for
24 Texas Mutual.  Please let me know if you have any
25 questions or need additional info.

Page 255

1    Q.   So the second sentence, he says, Starting
2  tomorrow, we will be billing UHC samples.
3       Do you see that?
4    A.   Yes.
5    Q.   UHC samples, does that mean specimens
6  collected from patients that have UHC insurance?
7    A.   That's correct.
8    Q.   And I don't know if you flipped the page,
9  but there's a list of physicians.
10      Do you see that?
11   A.   Yes, I see that.
12   Q.   He says, We're going to be billing UHC
13 samples (both toxicology and genetics) for the below
14 list of physicians through ALG.  Right?
15   A.   That's right.
16   Q.   The below list of physicians, are those
17 referring providers?
18   A.   That's correct.
19   Q.   And "through ALG" at the end of that
20 sentence would be -- am I correct that that would be
21 office key --
22   A.   ALG office key.
23   Q.   Yeah, what was that, 133465?
24   A.   What page are you looking at?
25   Q.   I'm looking at page 30 of your notes.

Page 256

1    A.   Yes.
2    Q.   Right?
3    A.   133465, that's correct.
4    Q.   And the next sentence says, They're going
5  to come through United Toxicology's LABDAQ.
6       Do you see that?
7    A.   I see that.
8    Q.   That means based on all of our discussion
9  today, right, there must have been an extraction
10 that SYNERGEN did from United Toxicology's LABDAQ
11 for this whatever subset of claims.
12      That's the only way to get them, right?
13   A.   So --
14      MS. O'HARA:  Objection; form.
15   A.   Okay.  So I'm familiar with this email.
16   Q.   Okay.  Great.  Please --
17   A.   Because -- because Laura had done some
18 discovery and looked at it and shared this
19 information.
20      You're missing two more emails that you
21 should take a look at.  I believe Nick Austin made a
22 mistake in that -- in that email because if you look
23 at the subject, the subject says, Toxicology and
24 genetics samples, accession through ALG.
25      So they're saying the -- they're running

Page 257

1  the samples through ALG.  That's the topic of the
2  subject.  If you look at the subject --
3    Q.   I see that.
4    A.   Okay.  That's also sent by Nick.
5    Q.   Uh-huh.
6    A.   So he says in the second email, We're
7  going to send it through United Toxicology and it's
8  going to come through UHALG.
9       Well, that -- they're going to start
10 sending United Toxicology lab to the LABDAQ after
11 billing through ALG, right.  Can't happen.
12      MR. SINTON:  So I'm just going to --
13 I'll object to the responsiveness.
14   Q.   I just -- if you can read that sentence
15 again.  I think that --
16   A.   They're going to come through United
17 Toxicology LABDAQ under the ordering location UHALG.
18   Q.   Right.
19   A.   Okay.  If you look at the emails after
20 this from my team, my team will state that there is
21 no information coming under UHALG for these
22 physicians under the United Toxicology or UST LABDAQ
23 Data Miners.
24   Q.   So you said UST?  I lost you.
25   A.   Sorry.  Our team stated that United

65 (Pages 254 - 257)

Page 302

1     A.   In 2015 or 2016, whatever that timeline.
2 There was an email that -- you should have that as
3 well.
4     Q.   And did you say -- when you said make sure
5 that that needs to happen, did you follow up?
6     A.   I didn't follow up, but that was -- that
7 was discussed in our meetings --
8     Q.   And so --
9     A.   -- internal -- internal meetings.
10    Q.   How did they make sure that that was
11 happening?
12    A.   To follow the -- follow the -- follow the
13 request that was made by me to make sure that as I
14 had drawn in the diagrams of what -- what comes out
15 of the LABDAQ from the -- the specimens run in -- in
16 a lab, comes out of a LABDAQ LIS system, and that
17 from that LIS, you're billing to the corresponding
18 office key.
19    Q.   You're talking about the -- what's in your
20 notes?
21    A.   Yeah, what I...
22    Q.   And did you put that together or did
23 Gillian put that together?
24    A.   Gillian helped put this thing together.
25    Q.   Okay.  We have -- it turns out that that

Page 303

1 is not in line with what was happening at the time
2 based on what we have now looked at, right?
3         MS. O'HARA:  Objection; form.
4     A.   Based on the workflow I need to confirm,
5 yes.
6         MS. O'HARA:  We have been going over
7 an hour.  The reason -- the reason I asked before how
8 much you have is because the air goes off at 6:00.
9 So if you --
10        MR. SINTON:  It's very hot.
11        MS. O'HARA:  -- you know, don't want
12 us to get heat exhaustion -- Daniel, can you go
13 downstairs and tell them to please turn the air back
14 on.
15        And how much time do we have on the
16 record?
17        THE VIDEOGRAPHER:  We're at 1 minute
18 from being at 6 hours.
19        MR. SINTON:  Let's take a break.  I
20 want to be done in very short order.  I've got, like,
21 three more documents to get through.
22        MS. O'HARA:  Okay.
23        THE VIDEOGRAPHER:  We're going off the
24 record at 6:31.
25        (Recess 6:31 p.m. to 6:46 p.m.)

Page 304

1         THE VIDEOGRAPHER:  We're back on the
2 record at 6:46.
3     A.   Adam, I have a point on Exhibit 8.  I read
4 part of it during the break, and on page 1, 2, 3 --
5 4, it says, Please find the first draft
6 documentation -- so in this document, the fourth
7 page from Bharkavi, it says, Please find attached
8 first draft documentation, attached LABDAQ Data
9 Miner for your reference.
10        So I just need to make sure what that
11 process was.  Okay.  I just want to make sure --
12    Q.   Sure.
13    A.   -- this was the final.  I just wanted to
14 let you know.
15    Q.   I think you will find it instructive.
16    A.   Okay.
17    Q.   But, yeah, I see what you're saying.  No
18 problem.
19        Let's mark -- what was that, Exhibit 8?
20    A.   Exhibit 8, yes.
21        THE REPORTER:  We're on 10.
22        MR. SINTON:  10 is next.  What was 9?
23        THE WITNESS:  9 was this.
24        MR. SINTON:  Gotcha.
25        This will be 10.

Page 305

1         (Exhibit 10 marked.)
2     Q.   Mr. Gunawardena, you have just been handed
3 what we marked as Exhibit 10.  It has a Bates Number
4 in the bottom right corner of 134910.
5         And you will see that it is -- the bottom
6 of that first page -- I'm going to put it on this
7 right here.
8         Starts with an August 9th email where you
9 are informing Andrew Hillman that the first payment
10 from UHC has come in for ALG.
11        Do you see that?
12    A.   I see that.
13    Q.   You know what, my apologies.  The first
14 email is actually -- looks like it's from Pravindi
15 to a different group of folks, right?
16        I'm sorry.
17        But you then take that, it looks like,
18 right here and forward it to Andrew, correct?
19    A.   That's right.
20    Q.   And then Andrew responds, Thanks, Mel, for
21 the information.  We should consider splitting some
22 of the rest among all of our Clinical Laboratory
23 Improvement Amendments numbers, CLIA numbers, right?
24    A.   I see that.
25    Q.   That's August 9, 2016, too.

77 (Pages 302 - 305)

United Healthcare Services, Inc.   Vs. Synergen Health, LLC

---

Page 326

1    Q.  -- second-to-last page.
2         Do you see that third box where -- across
3    the top -- it mentions "ordering location" once
4    more, right?
5    A.  I see that.
6    Q.  And so this is a SYNERGEN document.
7    SYNERGEN is using ordering location for something
8    here, right?
9    A.  To filter, right?  It says to filter.
10   Q.  Uh-huh.
11   A.  So, again, like I said, it is -- they're
12   filtering it but it is not going in a claim.
13   Q.  Understood.
14        And I guess my point is that I'm --
15   ordering location doesn't go in a claim, right?
16   A.  That's correct.
17   Q.  What goes in a claim is office key, right?
18   A.  The data inside of the master files, yes.
19   Q.  Which is the tax identification number and
20   the CLIA number --
21   A.  NPI, CLIA.
22   Q.  -- and the NPI and the address --
23   A.  That's correct.
24   Q.  -- correct?
25   A.  That's correct.

---

Page 327

1    Q.  And that is also headed with a singular --
2    a single office key, right?
3    A.  That's correct.
4    Q.  Each office key has multiple provider
5    profiles in AMD connected to it, correct?
6    A.  That's correct.
7    Q.  So anything that has one of those provider
8    profiles would generate a claim that has the office
9    key associated with it, right?
10   A.  That's correct.
11   Q.  If Next Health and SYNERGEN needed to
12   communicate in mass about claims to determine or to
13   dictate which lab would be used -- which lab's
14   billing credentials would be used to submit a claim
15   to United HealthCare, one way to do it would be the
16   ordering location field to relate to a provider --
17   specific provider profile, right?
18        MS. O'HARA:  Objection; form.
19   A.  I am not sure about that.  Yeah, I'm not
20   sure about that.
21   Q.  If an ordering location was created by
22   Next Health that related directly to a provider
23   profile that was created in AMD by SYNERGEN --
24   follow me so far?
25   A.  Again, that doesn't -- that doesn't seem

---

Page 328

1    to be the case because the provider profiles -- if
2    you look at ordering location, there are multiple
3    ordering locations and much fewer provider profiles.
4    Q.  Right.  Sure.
5    A.  So there's -- there's fewer provider
6    profiles and much more ordering locations.  So what
7    you stated of having one-to-one correlation is
8    not -- is not true.
9    Q.  I'm sorry, I didn't mean to state that.
10        What I'm trying to say -- the one-to-one
11   correlation we talked about before, right, is office
12   key, mailing entity, LABDAQ, right?
13   A.  That's correct.
14   Q.  But we actually know that that doesn't
15   quite line up because there's more LABDAQs than
16   there are office keys, right?
17        MS. O'HARA:  Form.
18   Q.  Just put it aside.  It doesn't matter.
19        What really is important is rather than a
20   one-to-one correlation, if you had the office key at
21   the top of the pyramid --
22   A.  Yes.
23   Q.  -- correct -- below it there are, let's
24   say, four provider profiles, right?
25   A.  Yes.

---

Page 329

1    Q.  And then below that, there are a number of
2    ordering locations at the base.  There could be
3    however many.
4         But if they related because of
5    conversations SYNERGEN and Next Health had, they
6    knew that one of those ordering locations connected
7    to one of those provider profiles, the claim would
8    end up coming out of AMD and to United HealthCare
9    with the office key that's at the top of that
10   pyramid, right?
11   A.  That can happen within that office key.
12   But, again, I need to make -- confirm this.
13   Q.  And I would suggest if you look at Data
14   Miners that begin with going to Nick's email, UH,
15   and then anything in the middle --
16   A.  Okay.
17   Q.  -- ending in ALG --
18   A.  Okay.
19   Q.  -- it will connect to a provider profile
20   that will connect to an ALG office key, and you will
21   be able to identify all of the claims that were
22   submitted to United HealthCare through ALG.  Okay?
23   A.  Okay.  I will check it.
24   Q.  I would also suggest if you look at
25   ordering location and for a period when United

---

Veritext Legal Solutions

800.808.4958                                               App. 29
                                                           770.343.9696

Page 401

1 the UTT Data Miner and they had to be filtered out
2 of that ordering location, and that's the reason.
3    Q.   So the ALG and True Labs claims were
4 coming from the UTT LABDAQ or the UTT Data Miner,
5 and then the ordering location was used to filter
6 them out, is what you're saying, right?
7    A.   Yes.
8    Q.   And my question, I think, at line 16 was
9 really -- I said "nomenclature," but I think I was
10 talking about a naming convention that you had been
11 describing earlier.  Does that seem right?
12       MS. O'HARA:  Objection, form.
13    A.   Yes, it seems that, yeah.
14 BY MR. SINTON:
15    Q.   And how does that provider profile point
16 work into this, I guess?
17    A.   The provider profiles were used under
18 each lab to be able to track the -- one is it -- it
19 showed the different types of specimens that were
20 being run under each of the Office Keys.
21    Q.   I'm looking at your --
22    A.   Document?
23    Q.   -- notes, Exhibit 2.  Like, just as a
24 tangible example, if the Office Key was 126196
25 for -- which is United Toxicology's Office Key --

Page 402

1 I'm looking at page 29.
2 (Interruption by the reporter for clarification.)
3       MR. SINTON:  United Toxicology.
4 BY MR. SINTON:
5    Q.   The provider profile UTOX would indicate
6 a stream, right?  And the provider profile UTCON
7 would indicate a confirmation test?
8    A.   Yes.
9    Q.   That's what you're describing?
10    A.   Yes.
11    Q.   Okay.  So that's what the provider
12 profiles are, and I guess is -- so you're just
13 saying that -- throw all that out the window for
14 ALG and True Labs, basically?
15       MS. O'HARA:  Objection, form.
16    A.   I'm saying is that if it's coming from
17 UTT, it will have the UTT provider profiles; but if
18 the ordering location had True Labs and ALG, the
19 corresponding provider profile names of ALG and
20 True Labs will be used.  And that's what I'm
21 stating here.
22 BY MR. SINTON:
23    Q.   Can you -- do you have an understanding
24 how that works?
25    A.   So let me explain again.

Page 403

1    Q.   Yeah.
2    A.   Your question is:  And if it was
3 extracted from UTT LIS, it would have the UTT
4 nomenclature.
5       So in -- in -- my understanding was,
6 okay, if the nomenclature was the same, then we
7 would just use provider profiles from UTOX.  UTT
8 would be UTOX, UTCON, UTSAS, all of that.
9       THE REPORTER:  I'm sorry.
10       THE WITNESS:  Sorry.  UTSAS.  That are
11 names that are in the UTT provider profile.
12 BY MR. SINTON:
13    Q.   Those are all different provider
14 profiles for United Toxicology, correct?
15    A.   Yes.
16    Q.   Okay.
17    A.   So what I -- why I added that at the end
18 is based on my research, I found that the UT -- the
19 UTT Data Miner also had ALG and True Labs claims in
20 there that we had to filter out using the ordering
21 location.
22    Q.   Uh-huh.
23    A.   So, therefore, the nomenclature would
24 not only be for UTT, it will also have provider
25 profile -- have to be named under True Labs and ALG

Page 404

1 as well, not just UTT.  That's why the correction
2 was made here.
3    Q.   And you just said again your "research."
4    A.   Right, yes.  My research, yes.  The
5 investigation that I did, yes.
6    Q.   And is that -- that's what we've already
7 talked about; there's nothing else?
8    A.   Nothing else.
9    Q.   Because that flowchart in Exhibit 8 only
10 references, I think -- we can look at it, I
11 suppose, but it talks about Sirius, right?  It
12 talks about how to handle Sirius or substance abuse
13 claims, right?
14    A.   Yes, but I also -- that -- that brought
15 up the question about how the ordering location was
16 used, and that was the discussion I had with Malsha
17 and Gillian about the filtering that was done.
18    Q.   Okay.  So we haven't talked about that
19 yet?
20       MS. O'HARA:  Objection, form.
21    A.   Could you -- could you repeat that?
22 BY MR. SINTON:
23    Q.   I'm sorry.  My understanding was that
24 you looked at Exhibit 8?
25    A.   And Exhibit 6 as well.

16 (Pages 401 - 404)

30(b)(6) Met Gunawardana , Vol. II
July 20, 2022
United Healthcare Services, Inc., United Healthcare Insurance Company Vs. Synergen Health, LLC

Page 413

1 claims from UTT LIS. And I've given some examples
2 of it and provided the filtering instructions that
3 they had given us, for example.
4     Q.   What examples are you --
5     A.   Examples in the ordering location, says
6 it will have UH, then the ordering location name
7 and ALG. It'll say UH ordering location True Lab.
8 That was the instructions that -- that Next Health
9 had given us.
10     Q.   And, I guess, what did Malsha say to you
11 that led you to understand that this previously
12 unknown to you process applied to the US Toxicology
13 LABDAQ in addition to the United Toxicology LABDAQ?
14     A.   I asked her -- I asked Malsha what were
15 the -- there were the two new labs that came in,
16 both -- that was the two which is ALG and True
17 Labs, and asked them where the claims were coming
18 from and where were they filtering it from and how
19 were they filtering it from, and that's the
20 information that she shared with me, and then
21 Gillian confirmed that with her, and then we put
22 this -- I put that in the notes for clarification
23 in the document that I had shared as Exhibit 2.
24     Q.   In this comment, it says not just ALG
25 claims, but it says:  "Results sheets were

Page 414

1 extracted from UTT and UST LIS."
2          What does that mean?
3     A.   Even the -- all the information.  So
4 when -- when claims are processed or test is done.
5 A test is done, from our understanding, in a lab.
6 It has -- they include the requisition, the result
7 sheets, and the data that needs for billing.
8     Q.   Uh-huh.
9     A.   So all of that was in these Data
10 Miners --
11     Q.   So --
12     A.   -- and -- and the LIS systems.
13     Q.   So the claims -- the ALG claims that
14 were submitted to UHC were extracted -- not of just
15 the claims, but also the result sheets as well,
16 right? The results of the test came from United
17 Tox and US Tox LABDAQs, right?
18     A.   Yes.
19     Q.   And did you do any like -- anything else
20 you looked at after that, or what -- Malsha told
21 you that was the case?
22     A.   The -- I mean I looked at -- I mean, I
23 looked at the workflow.  I wanted to understand --
24 not looked at the workflow.  I confirmed the
25 workflow from them, and -- to make sure that we

Page 415

1 had -- the information that I was documenting here
2 was accurate.
3     Q.   Okay.  So I think we just clarified that
4 there's not an entry for page 216, line 14, but
5 there should be, right?
6     A.   Yes.
7     Q.   And that's the additional change to the
8 prior testimony that Data Miners from the US Tox
9 LABDAQ would not necessarily all be billed under
10 the US Tox Office Key, right?
11     A.   That is correct.
12     Q.   You now understand that some of the --
13 those claims from a Data Miner taken from the US
14 Tox LABDAQ would be submitted under the ALG Office
15 Key or the True Labs Office Key.
16     A.   Yes.
17     Q.   The next entry on here is page 217,
18 line 19.  And my question was:  As far as the
19 fields go in a Data Miner, right, there's not a
20 field that tells -- that tells SYNERGEN -- I can't
21 even read my own question.  I'm sorry.  Let me
22 start over.
23          As far as the fields go, there is not a
24 field that tell -- that SYNERGEN could look to to
25 tell it which billing entity actually performed the

Page 416

1 services.
2          And you responded that the billing
3 entity information is in the Office Key, so because
4 there's a corresponding LIS status corresponding to
5 that office -- to that lab...  and then that's
6 where our change comes in.
7     Q.   Can you -- can we clarify what -- what
8 you were trying to say?
9     A.   I'm trying to say that there's no
10 corresponding LIS.  There is -- except for ALG and
11 True Labs because it is not a one-to-one
12 correlation, so that's the same thing that I'm
13 trying to explain, that it's not a one-to-one
14 correlation.
15     Q.   But, ultimately, how does this affect, I
16 guess, like the -- you talked extensively on
17 April 20th about the -- how critical it was for the
18 naming convention of the file to determine how it
19 was going to be uploaded in AMD and under what
20 Office Key the claims would be submitted?
21     MS. O'HARA:  Objection, form -- sorry.
22 Go ahead.
23 BY MR. SINTON:
24     Q.   Do you recall testifying about the
25 naming convention and how it was the way that

19 (Pages 413 - 416)

United Healthcare Services, Inc., United Healthcare Insurance Company Vs. Synergen Health, LLC

Page 421

1 and the team didn't feel anything because from the
2 leadership side, they were saying they're running
3 these tests.
4        This was just more of a process flow
5 where -- how the data was coming, so they didn't
6 know how the LIS was connected to the machines.
7 They said this is how the data is coming, so we --
8 they documented that -- the process flow, and then
9 they billed it under that entity so...
10 Q.   So that's what she said to you?
11 A.   Yes.
12 Q.   You hearing that, though, must have
13 concerns based on what you told me -- or you
14 testified to on April 20th, right?
15        MS. O'HARA:  Objection, form.
16 A.   Could you -- could you repeat that?
17 BY MR. SINTON:
18 Q.   She said that she didn't have any
19 concerns about this process, but you hearing this
20 description of the process, you testified that if
21 that flowchart that we looked at was right, that
22 you had concerns, right?
23        MS. O'HARA:  Objection, form.
24 A.   I had questions -- I had concerns
25 because from my understanding to what was being

Page 422

1 shown, there was a discrepancy, so then I had a
2 concern.
3 BY MR. SINTON:
4 Q.   And so your concern was only that your
5 understanding was incorrect?  It wasn't that there
6 were any problems with that flow operating that
7 way?
8        MS. O'HARA:  Objection, form.
9 A.   At the time, I was not aware of -- or,
10 you know, from -- whether there was anything, you
11 know, questionable in the -- in the process flow
12 and how the data was flowing.
13        Today, if I was asked this was the data
14 flow was coming through, I would have asked
15 questions, but at the time, no.
16 BY MR. SINTON:
17 Q.   That's what -- and that's what I was
18 asking before, I guess, right, is I'm saying you,
19 Mr. Gunawardena, if you were in Malsha's shoes and
20 had known what they were being told, you would have
21 asked questions, right?
22        MS. O'HARA:  Objection, form.
23 A.   Again, at that time, there was no --
24 there was no doubts about whether they were testing
25 these labs -- claims at ALG or whether it's in

Page 423

1 another location.  The instructions that we were
2 shared and the discussions that we were having was
3 they're running in those specific labs, so how the
4 data was flowing was not something that Malsha
5 would even understand how the LIS is connected.
6        Today, from the information based on
7 this, you know, UHC, you know, lawsuit that's
8 there, now I'm aware of asking those questions if
9 something like this happened.
10 BY MR. SINTON:
11 Q.   So you're saying that there were no
12 questions about this flow, but let me make sure I
13 understand this right.  The claims that were being
14 billed under ALG's Office Key were not coming out
15 of a LABDAQ that ALG controlled or out of an ALG
16 LABDAQ at all, right?
17        MS. O'HARA:  Objection, form.
18 A.   At that time, at the latter part around
19 2016, 2017, we had other clients that had a single
20 LABDAQ or LIS with multiple labs connected.  So it
21 was not unusual to have multiple labs connected to
22 an LIS system.  That's -- when I was talking to the
23 team, to Malsha and the team, she said:  We didn't
24 have any questions on that.
25        Today when I look at the emails, look at

Page 424

1 the data, it seems that I would have asked
2 questions now.
3 BY MR. SINTON:
4 Q.   You -- so basically you're saying
5 because you you had other clients who -- from which
6 you received claims through a single LABDAQ but
7 submitted them through different billing
8 credentials, that you didn't think anything of it
9 for that to happen with -- in this instance.
10        MS. O'HARA:  Objection, form.
11 A.   That was -- at the time I was not aware
12 how there was different LISes -- I mean single LIS
13 and multiple labs connected, and we were separating
14 it out like this.  I was not aware of it.  Okay.
15 So if I was aware of that and how this was being
16 done, I would have asked questions.
17 BY MR. SINTON:
18 Q.   Right.
19 A.   I would have asked questions --
20 Q.   Okay.
21 A.   -- as to what was happening, but I was
22 not aware of it.
23 Q.   You weren't aware.  You were aware that
24 ALG was submitting claims, but you assumed that
25 those claims were coming through an ALG LABDAQ,

21 (Pages 421 - 424)

Page 429

1 UTT.
2 BY MR. SINTON:
3    Q.   Okay.  And you were just saying that
4 it's not exactly the same because there would --
5 this hypothetical we were discussing -- excuse me.
6         This hypothetical that we were
7 discussing beginning on page 219 and going all the
8 way to 221 is not exactly the same as what your
9 testimony is now that was actually occurring
10 because there are additional steps or layers that
11 would be required, right?
12    A.   Yes.
13    Q.   And if you actually flip to page 221 and
14 you start reading on line 1 down through line 6,
15 you'll actually see that the point you were making
16 was that it wouldn't work to extract things from
17 the UTT LABDAQ and then ultimately submit them
18 under the ALG Office Key because it would require
19 some, quote, serious manipulation.  Do you see
20 that?
21    A.   Yes.
22    Q.   And so do you agree that there was
23 serious manipulation actually occurring that you
24 now know about but you didn't know about on
25 April 20th?

Page 430

1         MS. O'HARA:  Objection, form.
2    A.   Yeah, I don't think it was manipulation
3 because it's -- that was a process that was given
4 to us stated by the client and talking to our team
5 was that this was how the data was going to flow
6 for ALG and True Labs.
7         If there was no information given and we
8 were just changing the names, yes, that would be
9 considered manipulation, but this was the flow and
10 the data that they shared with us of how the data
11 was going to flow to -- flow for ALG and True Labs.
12 BY MR. SINTON:
13    Q.   So because Next Health told you to do it
14 this way, it's not -- you don't -- you wouldn't --
15 consider it manipulation?
16    A.   I wouldn't --
17         MS. O'HARA:  Objection, form.
18    A.   Yeah.  I wouldn't say that that was not
19 how they were told.  They were saying how the data
20 was going to flow.
21 BY MR. SINTON:
22    Q.   Tell me what you mean, "how the data was
23 going to flow."
24    A.   Sure.  Because from -- our understanding
25 from the very beginning has been that they were

Page 431

1 running ALG and True Lab claims in those labs.  How
2 the data was going to flow to us is the
3 instructions that they had shared with us saying it
4 was going to be using the UTT and UST Data Miner,
5 so in this case Medicus as well.  So talking to the
6 team, they said this is just a flow of data coming
7 through.  There was never a question about whether
8 the claims were being run.  We didn't understand
9 how the data was going to flow, but they showed us
10 that identify -- how to identify the claims that
11 were different from one to the other.  That was
12 their understanding.
13    Q.   Who said that?  Sorry.
14    A.   Malsha.
15    A.   Malsha.
16    A.   Uh-huh.
17    Q.   And you clarified with her that there
18 was an identification via this ordering location
19 that -- well, I guess, how did she describe the
20 ordering location to you?
21    A.   Just, I mean, the same as ordering
22 location with the -- the naming convention that the
23 client had shared with us.
24    Q.   And it's the naming convention that
25 indicates how to bill the claims, right?

Page 432

1    A.   How to filter the claims and then how to
2 bill the claims.
3    Q.   Right.
4    A.   Yes.
5    Q.   And so it sounds like there may have
6 been an assumption that it's representative of how
7 the tests were performed, but is -- is that right?
8 I mean, was there an assumption?
9    A.   Yes.  Based on the discussions and
10 communication that they had with us, our -- our
11 assumption was that they were running those
12 specimens in those corresponding labs.
13    Q.   And you say "our understanding."
14 SYNERGEN, right?  Which discussions are you
15 describing?
16    A.   So let me take a look at some of the
17 exhibits here, and look at...
18    Q.   Are these going to be those discussions?
19 I don't mean to interrupt you.
20    A.   Yes.  I'll take a look, so I think we
21 should take a look at this.
22         So in June 16th, Exhibit 17, the email
23 on June 24th, it says SYNERGEN -- this is coming
24 from Nick Austin:  "SYNERGEN, until further notice,
25 please do not submit any United HealthCare bills

23 (Pages 429 - 432)

Page 437

1 do not actually reflect the way it worked for ALG
2 or for True Labs, right?
3      MS. O'HARA:  Object to the form.
4      A.   Yes.  Yes.
5 BY MR. SINTON:
6      Q.   235, lines 19 and 20.  This is just a
7 change.  You weren't sure about whether a Data
8 Miner included a column for Facility, and looks
9 like this change is, upon further investigation,
10 you found that there was not such a column in Data
11 Miner.
12     A.   Right.
13     Q.   This is a little bit of a different
14 issue than what we've been describing, right?
15     MS. O'HARA:  Objection, form.
16     A.   Yeah, just -- this is corrected.  Based
17 on the -- I investigated to see that information
18 was already in the document, already in the Data
19 Miner column, so I should have known that.
20 BY MR. SINTON:
21     Q.   235, you're saying I believe so, and
22 you're just saying -- okay, you're correcting that.
23 Your belief was -- was you weren't sure, right?
24 You weren't correct.  Excuse me.
25     MS. O'HARA:  Objection, form.

Page 438

1      A.   Yeah, I corrected it to reflect the --
2 what was accurate, and I stated that that response
3 should be changed, that there was not a column that
4 said Facility in the Data Miner, number 19
5 through 20.
6      MS. O'HARA:  Right.  Right.  Right, but
7 it wasn't -- you said you need to take a look, and
8 then you did.
9      THE WITNESS:  Yes, I took a look and
10 now --
11 BY MR. SINTON:
12     Q.   You're answering the question --
13     A.   Answering the question.
14     Q.   -- you sort of left open; is that fair?
15     A.   That's fair.
16     Q.   All right.  The last one of your changes
17 here is page 257, line 11.  And I believe we're
18 talking about Exhibit 6 here, actually.  Do you
19 have that Exhibit 6?
20     A.   Yes.
21     Q.   And I can't -- is this -- beginning on
22 line 6 at page 257, you're trying to read from this
23 email, right?  And you say -- so he says in the
24 second email, "We're going to send it through
25 United Toxicology and it's going to come through

Page 439

1 UHALG, and that must" -- you must have -- I guess
2 I'm not sure which of these two emails in
3 Exhibit 6, you know, that was specifically
4 referencing, but this change that you're -- that
5 you're making here, can you read that into this
6 response, I guess?
7      A.   It said:  Well that -- they're going to
8 start sending United Toxicology lab to the LABDAQ
9 after billing through ALG, right?  I said -- I
10 said, can't happen, but I said to add, "Unless the
11 LAN machines are connected to the same LIS, but
12 there has to be a way to identify them."
13     Q.   Okay.  And that's a "Correction" you
14 wrote as a reason for change, right?
15     A.   Yes.
16     Q.   And so what is it -- I guess --
17     A.   It should be, really, "Further
18 Investigation."  It is the same thing as the
19 further investigation.  It shouldn't be correction.
20     Q.   And what further investigation is that
21 change based on?
22     A.   Based on the same information that --
23 same information that I had gathered before.
24     Q.   And so the things that you gathered
25 before were Exhibit 6, which is what we're

Page 440

1 discussing, so it --
2      A.   And the discussions that I've had with
3 the team that -- that you can have -- you can have
4 a different lab connecting to the system, to the
5 LIS, and then you have an identifier to identify
6 the different claims, and that's what I was
7 correcting there.
8      Q.   And so did Malsha tell you that there
9 were ALG lab machines connected to the United Tox
10 LABDAQ?
11     A.   No.
12     Q.   Did she tell you that there were --
13 excuse me, ALG lab machines connected to the US Tox
14 LABDAQ?
15     A.   No.
16     Q.   Has anyone told you that there were ALG
17 lab machines connected to the United Tox LABDAQ?
18     A.   No.  It was an assumption.
19     Q.   Has anyone told you that there were ALG
20 lab machines connected to the US Tox LABDAQ?
21     A.   No, nobody specifically stated that.
22     Q.   Specifically stated it.  Did anybody
23 generally state it?
24     A.   No.  I mean, our understanding was that
25 if the data is coming through those, that it's

25 (Pages 437 - 440)

Page 441

1 connected to that LIS.
2    Q.   If the data is coming through those --
3    A.   Through those labs.  If the data was
4 coming through a lab to us, then -- through an LIS,
5 then the lab machines have to be connected to that
6 LIS.  That is our understanding.
7    Q.   So that makes sense to me for, like, the
8 United Tox lab machines because if you're getting
9 data from the United Tox LIS, but where is the
10 basis for the assumption that a different set of
11 lab machines from a different lab would be
12 connected to the LIS that you're pulling
13 information from?
14    MS. O'HARA:  Objection, form.
15    A.   We have clients that have a single LIS
16 system that have multiple lab -- labs connected to
17 it.
18 BY MR. SINTON:
19    Q.   So this is the other people did this
20 this way, so we didn't think anything odd about it,
21 right?
22    MS. O'HARA:  Objection, form.
23 BY MR. SINTON:
24    Q.   I don't mean to mischaracterize here.
25 I'm trying to understand.

Page 442

1    A.   That's correct.
2    Q.   And at what time -- what point in time
3 are we talking about where that was -- that was
4 going on or with the other clients?
5    MS. O'HARA:  Objection, form.
6    A.   Around 2016, I believe.  2016 there were
7 other labs that we had as well, but I don't
8 remember exactly.  I don't recall all the dates.
9 BY MR. SINTON:
10    Q.   Can you tell me what the lab was?
11    A.   I don't recall all -- there was a bunch
12 of -- many labs that were there.  I don't recall
13 exactly the names.
14    Q.   Any name?
15    A.   I don't -- I don't recall.
16    Q.   All right.  So that's all the changes
17 from your deposition change list, right?
18    A.   Yes.
19    Q.   And there were a couple of, sort of,
20 supplemental changes, I guess, that we found along
21 the way, right?
22    A.   Yes.
23    Q.   For example, let's just be clear about
24 it.  The one that -- the change that begins with
25 Page Number 205, we added an "except" to the quote,

Page 443

1 right?  Let me --
2    A.   Yeah.
3    Q.   So the entry that begins in the far left
4 column of page 205, we added "except" to the quote
5 there, right?
6    A.   Yes.
7    Q.   And we also, instead of it being a
8 "Correction" as a reason for change, you're --
9 you -- you're changing that now to "Further
10 Investigation," right?
11    A.   Yes.
12    Q.   And then there was a change that wasn't
13 in here at all for what was that, page 216, line 14
14 that related to US Tox, right, that sort of
15 mirrored the change at 216, line 5?
16    A.   Yes.
17    Q.   Right.  Page 219, leave that as it is, I
18 guess, but -- and then the last one we just talked
19 about, page 257, the reason for change is not a
20 "Correction" but a "Further Investigation," right?
21    A.   Yes.
22    MR. SINTON:  How's the AC coming along?
23    MS. O'HARA:  What was that?
24    MR. SINTON:  I said how is that AC
25 coming along?  I'm not mad at you for it.

Page 444

1    MS. O'HARA:  Probably overtaxed would be
2 my guess --
3    MR. SINTON:  Yeah, yeah.
4    MS. O'HARA:  -- because the
5 temperature --
6    MR. SINTON:  Yeah, I apologize.
7 BY MR. SINTON:
8    Q.   All right.  And I want to make sure that
9 we just ran through all the changes that we've got,
10 right?
11    A.   Yes.
12    Q.   And these are based on your -- your
13 investigation was based on your reading of
14 Exhibit 6 -- I'm going to list these off, right?
15 Reading of Exhibit 6, right?
16    A.   Yes.
17    Q.   Review of Exhibit 8, right?
18    A.   Yes.
19    Q.   And conversation with Malsha with
20 Gillian, right?
21    A.   Yes.
22    Q.   That was about 30 minutes?
23    A.   Just the two of them, yes.
24    Q.   And then separately your conversation
25 with Gillian as well?

26 (Pages 441 - 444)

DEPOSITION TOPICS FROM NOTICE:

1. SYNERGEN's ownership and personnel structure from its inception to present

SYNERGEN Health is a limited liability corporation (LLC) and has no outside investors and was established on February 14th, 2011. The majority ownership is currently held by Mel Gunawardena, Duminda Gunawardena and Mark *Kielwasser (estate).*

Synergen Health has an exclusive partnership with Synergen Health (PVT) LTD in Sri Lanka to provide operational services. The PVT entity is 100 percent owned by Surinda Gunawardena.

**Current Leadership Team**

- Mel Gunawardena – Managing Partner and Board Member (Since 2011)

- Duminda Gunawardena – Managing Partner and Board Member (Since 2011)

- Surinda Gunawardena – Managing Director (Since 2011)

- *Mark Kielwasser – Board Member (Since 2011 – Deceased 12th July 2021)*

**Leadership during time period at issue**

- Mel Gunawardena – Managing Partner (Since 2011)

- Duminda Gunawardena – Managing Partner (Since 2011)

- Surinda Gunawardena – Managing Director (Since 2011)

- *Mark Kielwasser – Board Member (Since 2011 – Deceased 12th July 2021)*

1



EXHIBIT
2
Gunawardena

App. 36

| Credentialing Report | Identify Payers Require Credentialing, Prepare and Submission of Application, tracking of application status, identify in-network opportunities | Status on Credentialing | AMD & Payers |
|---|---|---|---|
| Ad hoc Reports | | | |

## Claim Submission

7. SYNERGEN's policies and procedures governing the creation and submission of claims for out-of-network laboratory services to commercial payors which were effective for the period between January 1, 2014, to June 1, 2017.

There was no written policy or procedures for how out-of-network laboratory services to commercial payors should be submitted. However, SYERGEN followed CMS and AMA guidelines and Current Procedural Terminology (CPT) and International Classification of Diseases (ICD-9 & 10) Guidelines to submit claims using CMS 1500 forms. There was no distinction in the processing of in-network and out of network claims.

Refer to the below flow chart as to how claims were submitted to all payers.
- CTECH downloaded the source data (data miners) directly from Next Health's LIS and conducted the coding and provided the file to SYNERGEN for each lab to be entered into the billing system (Prior to Q3 2015 before SYNERGEN started the data miner extraction process)
- After Q3, 2015 - SYNERGEN extracted Data Miners (lab claim data) from corresponding Lab Information Systems (LIS) for each specific lab for tests performed from that lab on a daily basis with the exception of DNA and Molecular Infectious Testing (MIT) claims
- DNA & (MIT) - Data Miners were uploaded by client through Box.com with the naming convention indicating where the test was run
- Claims that had "Flags" and "Holds" were also sent on Box.com by Next Health with a naming convention with "-UR" at the end of the name of file
- Data miners for NextHealth labs included the following information
  - Patient related details
  - Claim related details
  - Diagnosis (ICD) codes
  - Primary & Secondary Payer name
  - Referring Provider Details
  - Ordering Location Details
  - Test Details
  - Other Data Tracking Details

19

App. 37

- The below table outlines the fields in the data miners that Next Health had set up in LABDAQ LIS and which fields were mapped to be on the CMS1500 form

| Field | Descriptions | CMS |
|---|---|---|
| UNDER REVIEW | A Note to indicate the Test was completed in LABDAQ | No |
| BILLING TYPE | A payer grouping done by the client | No |
| FIRST NAME | Patients Name, Gender, DOB & SSN | Yes |
| LAST NAME | | Yes |
| GENDER | | Yes |
| DOB | | Yes |
| SSN | | Yes |
| RELATIONSHIP | Patients Relationship to Insured | Yes |
| SUBSCRIBER FIRST NAME | Subscriber/Insured's Name, Gender & DOB | Yes |
| SUBSCRIBER LAST NAME | | Yes |
| SUBSCRIBER GENDER | | Yes |
| SUBSCRIBER DOB | | Yes |
| STREET | Patients Address Details | Yes |
| CITY | | Yes |
| STATE | | Yes |
| ZIP CODE | | Yes |
| DOS | Date of Service | Yes |
| PRIMARY PAYOR | Patients Primary Policy Details | Yes |
| PRIMARY ADDRESS 1 | | Yes |
| PRIMARY ADDRESS 2 | | Yes |
| PRIMARY CITY | | Yes |
| PRIMARY STATE | | Yes |
| PRIMARY ZIP | | Yes |
| POLICY NO | | Yes |
| PRIMARY GROUP NO | | Yes |
| SECONDARY PAYOR | Patients Secondary Policy Details | Yes |
| SECONDARY ADDRESS 1 | | Yes |
| SECONDARY ADDRESS 2 | | Yes |
| SECONDARY CITY | | Yes |
| SECONDARY STATE | | Yes |
| SECONDARY ZIP | | Yes |
| SECONDARY POLICY NO | | Yes |
| SECONDARY GROUP NO | | Yes |
| TERTIARY PAYOR | Patients Tertiary Policy Details | Yes |
| TERTIARY ADDRESS 1 | | Yes |
| TERTIARY ADDRESS 2 | | Yes |
| TERTIARY CITY | | Yes |
| TERTIARY STATE | | Yes |
| TERTIARY ZIP | | Yes |
| TERTIARY POLICY NO | | Yes |
| TERTIARY GROUP NO | | Yes |
| REFFERING PHYSICIAN FIRST NAME | Referring Physician Name | Yes |
| REFFERING PHYSICIAN LAST NAME | | Yes |

| DOI | Date of Injury | Yes |
|---|---|---|
| DX CODES | ICD 10 Codes | Yes |
| CPT CODES | CPT Codes | Yes |
| SPECIMEN CODE | Specimen/ Accession number | No |
| ADJUSTER NAME | | No |
| EMPLOYER NAME | | No |
| EMPLOYER ADDRESS | | No |
| EMPLOYER CONTACT | | No |
| EMPLOYER CONTACT PHONE | Applicable for Work related injuries | No |
| EMPLOYER CITY | | No |
| EMPLOYER STATE | | No |
| EMPLOYER ZIP CODE | | No |
| ADJUSTER PHONE | | No |
| ADJUSTER FAX | | No |
| ORDERING LOCATION NAME | Grouping provided by Next Health | No |
| ORDERING LOCATION ID | | No |
| ORDERING CLINIC NAME | Location where the specimens were collected | No |
| ORDERING CINIC ID | | No |
| NPI | Referring Physician NPI | Yes |
| REF LAB | Internal field used by Next Health | No |
| TEST | test preformed | No |
| COMPLETE STATUS/RUN DATE | Date the test was run | No |
| SWAB TYPE | The Specimen type | No |
| RECEIVED DATE | Date the Sample was received at the Lab | No |
| REQUISITION DATE | Date he Sample was entered to LABDAQ | No |
| PATIENT ID | system ref ID | No |

- Once the data Miners were downloaded, they were run through SYNERGEN's coding translation tool using coding rules that correspond to each test based on CPT and Local Coverage Determination (LCD) guidelines, which had been confirmed and signed off by Next Health.
- Claims that were coded were entered to AMD through SYNERGEN Billing Interface (SBI) automatically uploaded to the corresponding billing Office Key of that CLIA certified lab
- Claims were billed out of the Office Keys of the corresponding LIS that had its own CLIA certified lab that the claims were extracted from
- Next Health would send a daily "scan report" which stated the number of claims tested by each lab
- SYNEREGEN only billed claims if the 'ready to bill' claim count tally that came out of the LIS with the Next Health report which was sent via email.

High Level Process Flow:

21



App. 40

**DEPOSITION TOPICS FROM NOTICE:**

1. SYNERGEN's ownership and personnel structure from its inception to present

SYNERGEN Health is a limited liability corporation (LLC) and has no outside investors and was established on February 14th, 2011.  The majority ownership is currently held by Mel Gunawardena, Duminda Gunawardena and Mark *Kielwasser (estate).*

Synergen Health has an exclusive partnership with Synergen Health (PVT) LTD in Sri Lanka to provide operational services.  The PVT entity is 100 percent owned by Surinda Gunawardena.

**Current Leadership Team**

- Mel Gunawardena – Managing Partner and Board Member (Since 2011)

- Duminda Gunawardena – Managing Partner and Board Member (Since 2011)

- Surinda Gunawardena – Managing Director (Since 2011)

- *Mark Kielwasser – Board Member (Since 2011 – Deceased 12th July 2021)*

**Leadership during time period at issue**

- Mel Gunawardena – Managing Partner (Since 2011)

- Duminda Gunawardena – Managing Partner (Since 2011)

- Surinda Gunawardena – Managing Director (Since 2011)

- *Mark Kielwasser – Board Member (Since 2011 – Deceased 12th July 2021)*

EXHIBIT

15

PENGAD 800-631-6989

App. 41

| | | |
|---|---|---|
| *Requisitions and result sheets sent by SGH but received no payments* | | |
| **Medicus** - "Charges cannot be considered because there is evidence that services have been misrepresented" | 4,034 | $13,911,961 | $3,060,631.46 |
| Total on Hold | 18,380 | $70,681,555 | $27,471,557 |

Please find below the excerpts from meeting minute notes from 2016 to 2017 that illustrate what Next Health communicated to SYNERGEN that they were working with UHC legal to resolve the claims that are on hold without payments.

| # | Action Items – 05/20/2016 | Owner | Communicate To | Status | Due Date |
|---|---|---|---|---|---|
| 9. | UHC Appeals – Nick informed that the legal team would be drafting a letter of inquiry to be sent to UHC following the denials on claims appealed with medical records. A meeting to be taken place between UHC and NH attorneys on 09/12/2016. | SGH | Corey | Ongoing | 09/14/2016 |

| # | Action Items – 05/20/2016 | Owner | Communicate To | Status | Due Date |
|---|---|---|---|---|---|
| 5. | UHC Appeals – SGH shared a list of all UHC denied claims to as of 11/4 due to audit reasons. NH is in the process of finalizing a settlement with UHC. Further information will be provided by NH team. | NH | SGH | Ongoing | 12/14/2016 |

| # | Action Items – 09/02/2016 | Owner | Communicate To | Status | Due Date |
|---|---|---|---|---|---|
| 6. | United HealthCare - Misrepresentation denials for Medicus - Reconsideration forms were sent on the sample appeals, including progress notes faxed to Optum as the payer requires patient authorization. SGH to follow up on the appeals progress while Amber to provide the documentation on the rest of the escalated visits. | SGH | Corey | Pending | 12/21/2016 |

| # | Action Items – 05/20/2016 | Owner | Communicate To | Status | Due Date |
|---|---|---|---|---|---|
| 8. | UHC Appeals – SGH shared a list of all UHC denied claims to as of 11/4 due to audit reasons. NH is in the process of finalizing a settlement with UHC. Further information will be provided by NH team. | NH | SGH | Ongoing | 01/25/2017 |

| # | Action Items – 09/02/2016 | Owner | Communicate To | Status | Due Date |
|---|---|---|---|---|---|
| 9. | United HealthCare - Misrepresentation denials for Medicus – Reconsideration requests were also denied for patient Authorization. Corey to connect with compliance on the progress of the cover letter. | Corey | SGH | Pending | 01/25/2017 |

| # | Action Items – 05/20/2016 | Owner | Communicate To | Status | Due Date |
|---|---|---|---|---|---|
| 5. | UHC Appeals – SGH shared a list of all UHC denied claims to as of 11/4 due to audit reasons. The legal team has submitted a letter to UHC. Awaiting next steps. Currently discussing with compliance in relation to this. Next Health to advice on the next steps to follow. | Next Health | SGH | Ongoing | 05/31/2017 |

| # | Action Items – 09/02/2016 | Owner | Communicate To | Status | Due Date |
|---|---|---|---|---|---|
| 6. | United HealthCare - Misrepresentation denials for Medicus – The legal team has submitted a letter to UHC. Awaiting next steps to follow from the Next Health team, this is currently being discussed with the compliance team. | Next Health | SGH | Ongoing | 05/31/2017 |

| # | Action Items – 09/20/2016 | Owner | Communicate To | Status | Due Date |
|---|---|---|---|---|---|
| 6. | UHC Appeals – SGH shared a list of all UHC denied claims to as of 11/4 due to audit reasons. The legal team has submitted a letter to UHC. Awaiting next steps. Currently discussing with compliance in relation to this. Requested the claims to be on hold until legal team provides a response, currently under litigation. A counter offer is to be sent over to UHC next week therefore everything to be as is until a response is received from UHC. Appeals are being reviewed by the legal; allow 60 to 90 days to receive a response from the legal. SGH requested to submit a sample set of reconsiderations via UHC portal to determine if the denials would be overturned. NH team declined the request since there is ongoing audit. | Next Health | SGH | On going | 12/28/2017 |

17. The creation and submission of Claims to UHC using UTox's billing credentials between August 1, 2015, and January 26, 2017, including SYNERGEN's role in the creation and submission of those Claims and SYNERGEN's Communications with Next Health relating to the creation and submission of those Claims.

UTox (Screen Claims) was a provider profile (sub category of claims) that were billed under the UTT Office Key that came through the corresponding LIS (United Toxicology LLC)



18. The creation and submission of Claims to UHC using US Tox's billing credentials between August 1, 2015, and January 26, 2017, including SYNERGEN's role in the creation and submission of those Claims and SYNERGEN's Communications with Next Health relating to the creation and submission of those Claims.

US Tox (Screen Claims) was a provider profile (sub category of claims) that were billed under the UST Office Key that came through the corresponding LIS (US Toxicology LLC)



19. The creation and submission of Claims to UHC using Medicus's billing credentials between August 1, 2015, and January 26, 2017, including SYNERGEN's role in the creation and submission of those Claims and SYNERGEN's Communications with Next Health relating to the creation and submission of those Claims.

Medicus claims were billed under the Office Key that came through the corresponding LIS (Medicus Laboratories LLC)



20. The creation and submission of Claims to UHC using ALG's billing credentials between August 1, 2015, and January 26, 2017, including SYNERGEN's role in the creation and submission of those Claims and SYNERGEN's Communications with Next Health relating to the creation and submission of those Claims

ALG claims were billed under the Office Key that came through the corresponding LIS (American Lab Group LLC)



> **Commented [UIH8]:** ALG claims and result sheets were extracted from UTT & UST LIS.
>
> Client had provided the filtering instructions in the **"ordering location column"** to identify ALG Lab Claims that were coming through the LIS
>
> E.g. UH_OrderingLocationName_ALG

21. The creation and submission of Claims to UHC using True's billing credentials between July 1, 2016, and January 31, 2017, including SYNERGEN's role in the creation and submission of those Claims and SYNERGEN's Communications with Next Health relating to the creation and submission of those Claims.

True Labs were billed under the Office Key that came through the corresponding LIS (True Labs LLC)



> **Commented [UIH9]:** True Lab Wellness Claims Wellness came from Medicus LIS and Substance Abuse Claims from the UTT LIS
>
> Client had provided the filtering instructions in the **"ordering location column"** to identify True Lab Claims that were coming through the LIS
>
> E.g. UH_OrderingLocationName_TrueLabs

30(b)(6) Mel Gunawardena

April 20, 2022

United Healthcare Services, Inc. v. Synergen Health, LLC

DEPOSITION CHANGES

WITNESS:  MEL GUNAWARDENA

| Page No. | Line No. | Change | Reason for Change |
|---|---|---|---|
| 21 | 6 | "PRA" change to "ERA" | Correction |
| 24 | 15 | "PRA" change to "ERA" | Correction |
| 85 | 24 | "PRA" change to "ERA" | Correction |
| 103 | 23-24 | Change to "little charge we would have to charge 20% because we would have so many more people in the offices" | Correction |
| 152 | 16 | Add "I recall those are the only" | Correction |
| 200 | 12-13 | Add "we never used the ordering location on a claim" | Correction |
| 205 | 20 | Add at the end "with ALG and True Labs." | Correction |
| 215 | 6 | Add at the end "except for True Labs and ALG" | Further investigation |
| 215 | 22 | Add at the end "except for True Labs and ALG" | Further investigation |
| 216 | 5 | Change to "That's correct, except for any claims for ALG and True Labs." | Further investigation |
| 217 | 19 | Add at the end "except for ALG and True Labs" | Further investigation |
| 219 | 16 | Remove the word "wrong" | Correction |
| 231 | 4 | Add at the end "except for ALG and True Labs" | Further investigation |
| 235 | 19-20 | Change entire response to: "There was not a column that said 'facility' in the data miner." | Further investigation |
| 257 | 11 | Add at the end "unless the lab machines are connected to the same LIS, but there has to be a way to identify them." | Correction |
| | | | |
| | | | |
| | | | |

30(b)(6) Mel Gunawardena

April 20, 2022

United Healthcare Services, Inc. v. Synergen Health, LLC

DEPOSITION CHANGES

WITNESS:  MEL GUNAWARDENA

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_____

(Signature of Witness)

THE STATE OF ___Texas___

COUNTY OF ___Dallas___

Subscribed and sworn to before me by the said witness, MEL GUNAWARDENA, on this the __6th__ day of ___June___, 2022.

_____

Notary Public in and for the

State of __Texas__

County of __Dallas__

KATHERINE VIRGINIA DICKSON
My Notary ID # 133472268
Expires November 23, 2025

My commission expires: _____

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITEDHEALTHCARE SERVICES, INC., | § | Case No. 3:20-cv-00301 |
| UNITEDHEALTHCARE INSURANCE | § | |
| COMPANY, | § | |
|     Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| SYNERGEN HEALTH, LLC, | § | |
|     Defendants. | § | |

---

## EXPERT REPORT OF JACOB W. ADAMS, CPA, CFE

### May 6, 2022

---

Jacob W. Adams

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

# Table of Contents

I.   INTRODUCTION ................................................................................................................ 1

II.  QUALIFICATIONS .......................................................................................................... 1

III. DOCUMENTS RECEIVED AND INFORMATION CONSIDERED ................................ 1

IV.  BACKGROUND ............................................................................................................... 2

    IV.A. Litigation Allegations ................................................................................................. 2

    IV.B. Parties .......................................................................................................................... 2

    IV.C. Healthcare Claim Creation and Submission to Payors ............................................... 3

    IV.D. Synergen & Next Health's Relationship. .................................................................... 4

    IV.E. General Process of Synergen's Claim Submissions ..................................................... 4

V.   SUMMARY OF OPINIONS ............................................................................................. 5

VI.  BASIS FOR OPINIONS .................................................................................................. 6

    VI.A. Synergen did not adhere to its described process of creating and submitting claims to
    United. .................................................................................................................................. 6

        VI.A.1.  Synergen's Representation of Its Process for Creating and Submitting the Lab
        Claims at Issue. .......................................................................................................... 6

        VI.A.2.  Synergen's Represented Process Is Contradicted by the Data Miner File Names
        Produced by Synergen. ............................................................................................. 10

    VI.B.  Synergen submitted at least 6,953 claims to United under Next Health Labs' billing
    credentials that did not match the Next Health Lab from which the claim information was
    generated and/or obtained.  United paid Next Health Labs at least $15,700,539 associated with
    these claims. ....................................................................................................................... 16

        VI.B.1. United Claims Data. ....................................................................................... 17

        VI.B.2. Synergen Produced Data Miner Files. ........................................................... 19

        VI.B.3. Crosswalk between United Claims records and Synergen's Data Miner files ........ 21

        VI.B.4.  A&M found that at least 6,953 claims submitted by Synergen to United were
        generated and/or obtained from a Next Health Lab's LABDAQ that differed from the
        Next Health Lab whose credentials Synergen used to billed United, and that United paid
        $15,700,539 for these claims. ................................................................................. 23

    VI.C.  If Synergen did not extract the information included in claims it submitted under ALG's
    billing credentials from an ALG LABDAQ, then United paid $14,270,594 to ALG based on
    false information. ................................................................................................................ 28

    VI.D.  If Synergen did not extract the information included in claims it submitted under True
    Lab's billing credentials from a True Lab LABDAQ, then United paid $777,293 to True Labs
    based on false information. ................................................................................................. 28

    VII. ADDITIONAL INFORMATION ............................................................................... 28

App. 48

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

# I.  INTRODUCTION

1.      Counsel for UnitedHealthcare Insurance Company and UnitedHealthcare Services, Inc. (collectively "United" or "Plaintiffs") retained Alvarez & Marsal Disputes and Investigations, LLC ("A&M" or "we") to analyze and evaluate how Synergen Health, LLC ("Synergen" or "Defendant") created claims for Next Health Labs and submitted those claims to payors, including United.  Additionally, as necessary, we may respond to any expert reports issued for the Defendant and may provide testimony, as applicable.

# II. QUALIFICATIONS

2.      Founded in 1983, Alvarez & Marsal is a global professional services firm that assists clients in the corporate and public sectors with crisis management and other complex business issues. The Disputes and Investigations practice provides a broad range of analytical, investigative and technology services to law firms, corporate counsel, and management of companies involved in complex financial disputes and claims.  Our professionals include CPAs, CAs, MBAs, CFEs, CFA charter holders, JDs, and technology and industry experts.  Our firm is being compensated in this matter at hourly rates ranging from $125 to $750.

3.      I am a Certified Public Accountant, a Certified Fraud Examiner, and a Director at Alvarez & Marsal Disputes and Investigations, LLC with involvement in more than 100 cases with various elements of damage analysis, loss calculations, misappropriation of assets, indicia of fraud, and complex financial analysis across numerous business industries, including the healthcare industry. I earned my Masters Degree in Accounting and Bachelor of Science in Accounting from Texas A&M University.  My hourly billing rate is $375.  See **Exhibit 1** for a detailed biography.

# III.    DOCUMENTS RECEIVED AND INFORMATION CONSIDERED

4.      In the course of this engagement, we have consulted with Counsel and have reviewed or considered the documents and information listed in **Exhibit 2**.



Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

## IV.   BACKGROUND

### IV.A.   Litigation Allegations

5.      United's Complaint alleges that Synergen submitted insurance claims to United that contained false information, which caused United to pay claims it otherwise would not have paid, resulting in more than $18 million in damages.  The claims submitted to United are alleged to have contained several material misrepresentations and/or omissions regarding at least one of the following:

  i.    information identifying the provider who performed the services;
  ii.   information identifying the provider to whom patients were referred for the services; and/or
  iii.  information identifying the provider to whom United was issuing payments for the claims/services.

### IV.B.   Parties

6.      ***Plaintiffs***. United insures and administers healthcare benefit plans on behalf of itself and its insureds (*i.e.*, customers).  Healthcare providers submit claims to United for payment for services purportedly rendered for the insureds enrolled in United's benefit plans (called "Members" or "United Members"), and United processes, and then pays or denies the claims based upon the submitted claim information, the Member's benefit plan and medical policies.  Some providers are in-network with United, which means they have a contract with United that governs, among other things, what healthcare services rendered by that provider are payable, and in what amounts.  Other providers are out-of-network with United and separate out-of-network claim processing and payment methodologies apply to those claims, which are also governed by the Member's benefit plan.

7.      ***Defendant.*** Synergen provides revenue cycle management solutions and services to physician groups, laboratories, hospitals, and other medical providers.[1]  These services vary by

---

[1] April 20, 2022 Rule 30(b)(6) Deposition of Synergen Health, LLC ("Deposition of Synergen"), p. 18.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

client and may include multiple components, such as claim creation and submission, claim collection and claim denial management, payment posting and reconciliation, patient billing, and reporting information, as well as industry-wide and carrier-specific updates, to the client.[2]

### IV.C.    Healthcare Claim Creation and Submission to Payors.

8.      The claims at issue in this case were generally submitted in an electronic format containing information equivalent to what is contained on the industry standard CMS-1500 claim form.[3] United uses that information to process and adjudicate the claim, including determining whether the United member listed in the claim has coverage for the services listed in the claim and, if so, the amount of coverage.

9.      Each claim submission must include the following information:[4]

    i.   Patient's demographics, including patient name, date of birth, gender, and address;

    ii.  Insured/Member's demographics, including name, address, date of birth, and gender;

    iii. Patient's relationship to the insured;

    iv.  Insurance policy details, including plan or program name, policy group number, and policy number;

    v.   Information about the referring provider, including name and National Provider Identifier (NPI);

    vi.  Information about the services performed, including diagnosis code(s), date(s) of service, place(s) of service, patient charge amounts, and the provider's NPI;

    vii. Provider's billing credentials, including name, address, NPI, and federal tax identification number (TIN); and

    viii. Patient, insured, and provider signatures (or representations that such signatures exist).

10.     When a claim is submitted to a payor, such as United, the information contained in the claim is represented to be true, accurate, and complete.[5]

---

[2] Deposition of Synergen, pp. 18-29.
[3] Deposition of Synergen, pp. 100-101.
[4] Deposition of Synergen, Ex. 2; CMS Form 1500.
[5] Deposition of Synergen, p. 104.

A&M

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

### IV.D.      Synergen & Next Health's Relationship.

11.      In October 2013, Synergen originally contracted with Business Partners in Healthcare ("BPIH") to provide revenue-cycle management services, including reviewing and submitting claims to payors, managing clearinghouse and payor-level claim denials, reconciling payments on claims, issuing patient billing statements, and client reporting, in exchange for 3.95% of the amount paid for the lab services billed by Synergen.[6]  BPIH became Next Health at the end of 2014, and Synergen continued to perform services for Next Health (and the labs Next Health owned and controlled) through mid-2017.[7]

12.      Synergen submitted claims to United on behalf of, initially, three CLIA-licensed labs (Medicus Laboratories, United Toxicology, and US Toxicology) and eventually two additional CLIA-licensed labs (American Laboratories Group and True Labs), which were all owned and controlled by Next Health (collectively, the "Next Health Labs").[8]  Because Synergen's client, Next Health, had multiple labs (and thus multiple Laboratory Information Systems ("LIS"), as well as multiple corresponding Office Keys), Synergen's involvement in the creation and submission of claims was more complex than when it was dealing with a single lab.[9]

### IV.E.      General Process of Synergen's Claim Submissions.

13.      For lab claims, Synergen gathered much of the required information from a lab's LIS, which stores and tracks information about the patient and the tests performed on that patient's lab specimen.[10]  Each CLIA-licensed lab has its own LIS.  Synergen connects to a lab's LIS and directly extracts certain information, including information that must be included in a claim.[11]  The information that Synergen extracts from the LIS is referred to as a "Data Miner" (and is discussed more specifically below).[12]  Synergen uploads the Data Miner information into a practice

---

[6] Deposition of Synergen, Ex. 2.
[7] Deposition of Synergen, pp. 125-26.
[8] Deposition of Synergen, Ex. 2.
[9] Deposition of Synergen, pp. 211-12.
[10] Deposition of Synergen, p. 14.
[11] Deposition of Synergen, Ex. 2.
[12] Deposition of Synergen, p. 14.

App. 52

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

management platform, AdvancedMD ("AMD"), under a unique "Office Key" that corresponds to the billing credentials (including lab name, address, NPI, and TIN) for the particular CLIA-licensed lab from which the Data Miner information was obtained.[13]   AMD creates claims by combining some pieces of information from the Data Miner files with other information stored in AMD (namely, the billing credentials associated with the labs' respective Office Key).[14]  Synergen uploaded the electronic claims from AMD to Relay Health, a clearing house, to submit claims to payors such as United.[15]  Synergen also used AMD to track payments and other information in order to report back to Next Health.  As such, AMD contained many additional customizable data fields that were not reported on a claim to a payor such as United.

# V. SUMMARY OF OPINIONS

14.     Based on my education, training, experience, and review of the facts of this case, including the documents and information listed in **Exhibit 2**, I have formed the following opinions:

  i.   Opinion 1: Synergen did not adhere to its described process of creating and submitting claims to United.

  ii.   Opinion 2: Synergen submitted at least 6,953 claims to United under Next Health Lab billing credentials that did not match the Next Health Lab from which the claim information was generated and/or obtained.  United paid Next Health Labs at least $15,700,539 associated with these claims.

  iii.   Opinion 3: If Synergen did not extract the information included in claims it submitted under ALG's billing credentials from an ALG LABDAQ, then United paid $14,270,594 to ALG based on false information.

  iv.   Opinion 4: If Synergen did not extract the information included in claims it submitted under True Lab's billing credentials from a True Lab LABDAQ, then United paid $777,293 to True Labs based on false information.

---

[13] Deposition of Synergen, Ex. 2.
[14] Deposition of Synergen, Ex. 2.
[15] Deposition of Synergen, Ex. 2.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

# VI.  BASIS FOR OPINIONS

## VI.A.  Synergen did not adhere to its described process of creating and submitting claims to United.

15.  Synergen's corporate representative testified concerning Synergen's process for creating and submitting Next Health Lab claims to payors (and, specifically, United) and provided documents Synergen described as its corporate representative's notes that were prepared in preparation for Synergen's deposition, which also described the relevant processes.   Synergen detailed the method it used to obtain lab information from Next Health, the way it tracked, processed, and coded that information to generate electronic claims data, and the ultimate submission of those claims to United.

16.  Based on a review of the Data Miner files Synergen produced, Synergen did not adhere to its described process of creating and submitting claims to United.  The Data Miner files' naming conventions changed, were inconsistent, and often were ambiguous concerning the LIS from which their contents were extracted and/or the Office Key that should have been used to submit the claims. Synergen disaggregated the information it extracted in initial Data Miner files and then selectively put some of that information back together in new Data Miner files that it created. A&M tracked lab specimens across the Data Miner files and found thousands of specimens appeared in multiple Data Miner files that had conflicting Next Health Lab affiliations. In short, many Data Miner files are inconsistent with the processes, as described by Synergen.

### VI.A.1. Synergen's Representation of Its Process for Creating and Submitting the Lab Claims at Issue.

17.  Synergen testified that its process for creating and submitting claims for the Next Health Labs was uniform across all payors and, generally, was as follows: (i) Synergen extracted a Data Miner from each CLIA licensed lab's LIS; (ii) Synergen checked each Data Miner for completeness and removed incomplete rows; (iii) Synergen translated the tests listed in the Data Miner into the appropriate CPT codes; (iv) Synergen verified the number of specimens/claims with Next Health; (v) Synergen uploaded the Data Miner information to AMD under the Office Key

App. 54

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

that corresponded to the LIS from which the Data Miner was extracted and then billed claims out of that Office Key.[16]  That process, as represented, is set forth in more detail below:

      i.  ***Synergen extracted a Data Miner from each CLIA-licensed lab's LIS***.  The Next Health Labs each used an LIS software called LABDAQ.  Each CLIA-licensed lab had its own LABDAQ system and related login information.  Synergen logged in to a specific lab's LABDAQ and extracted a Data Miner, which Synergen saved as an Excel file using a standard naming convention to identify the Next Health Lab from which the information was sourced (discussed further below).  A Data Miner file contains certain information from a particular lab's LABDAQ, which is organized by 69 headers (*i.e.*, columns) in a spreadsheet.  The "Specimen Code" column contains a unique identifying number that is assigned to each specimen received by a lab and is then used to internally track that specimen.  This number is specimen-specific, but not claim-specific.  For example, one Specimen Code may be associated with two claims (*e.g.*, a single urine specimen, identified by a six-digit "Specimen Code," resulted in two claims: one claim for a toxicology screen and one claim for a toxicology confirmation).  The Specimen Code is used for tracking purposes and is not included in claim submissions.  Synergen testified that the "Ordering Location Name" column contained a grouping designation captured in AMD under "Patient Custom Tabs," but was also not included in claim submissions.[17]  The Data Miner files themselves do not contain any fields that identify the lab that actually performed the lab tests (or the LABDAQ from which the information was extracted).

      ii.  ***Synergen checked each Data Miner for completeness and removed irrelevant or incomplete rows***. Synergen was responsible for ensuring that mandatory fields were not blank and, if there were blanks, removing those rows from the data miner and making Next Health aware of the additional information that was necessary to create a claim.[18]

      iii.  ***Synergen translated the tests listed in the Data Miner into the appropriate CPT codes***. After Synergen extracted a Data Miner, it ran the Data Miner through a coding translation

---

[16] Deposition of Synergen, Ex. 2.
[17] Deposition of Synergen, pp. 158-59, 196-97.
[18] Deposition of Synergen, Ex. 2.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

tool, which used coding rules to translate particular tests or groups of tests into the correct CPT code.[19]

> iv. ***Synergen verified the number of specimens/claims with Next Health.*** Synergen had daily communication and coordination with Next Health to ensure that the correct number of specimens were processed into resulting claim submissions.[20]

> v. ***Synergen uploaded the Data Miner to AMD under the Office Key corresponding to the LIS from which the Data Miner was extracted.*** Synergen used the Synergen Billing Interface to automatically upload a Data Miner into the AMD Office Key that corresponded to the Next Health Lab's LIS from which the Data Miner was extracted.[21] An Office Key was a unique number Synergen assigned to each of the Next Health Labs in AMD, which corresponded to the lab's name, NPI, TIN, CLIA number, and address (*i.e.*, the lab's "billing credentials").[22] Each Office Key had one or more associated "provider profiles" in AMD, which Synergen used to track the different types of tests billed by the corresponding Next Health Lab (*e.g.*, a toxicology screen or a toxicology confirmation test) and to report to Next Health the types and quantities of tests being billed to payors.[23] According to Synergen, the provider profiles included under each of the Next Health Lab's Office Key were as follows:[24]

---

[19] Deposition of Synergen, Ex. 2. Prior to approximately June 2015, Synergen received Data Miner files that were extracted by Next Health, processed with CTECH coding algorithms, and then placed on Box.com for Synergen to download and then upload into AMD. Beginning in June 2015, Synergen connected directly with Next Health's LABDAQs to extract the Data Miner files (except for Data Miner files related to certain testing types (*e.g.*, PGXL, GeneID, and DNA), which Synergen continued to receive from Next Health via Box.com. Because the allegations at issue relate to the time period of June 2015 and later, for simplicity's sake, we will refer to Synergen's extraction of the Data Miner files.

[20] Deposition of Synergen, Ex. 2.

[21] Deposition of Synergen, Ex. 2.

[22] Deposition of Synergen, Ex. 2.

[23] Deposition of Synergen, Ex. 2.

[24] Deposition of Synergen, Ex. 2.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

**Table 1**

**List of Provider Profiles for Next Health Labs & Respective Office Keys**

| Office Key | Lab | NPI | CLIA | Provider Profile | Provider Profile. Description |
|---|---|---|---|---|---|
| 126196 | United Toxicology LLC | 1063707743 | 45D2023963 | UTOX | Tox – Screen – UTT |
| | | | | UTCON | Tox – Confirmation - ALG |
| | | | | UTSAS | Sirius - Substance Abuse Screen |
| | | | | UTSAC | Sirius - Substance Abuse Confirmation |
| | | | | UTDNA | Molecular Genetics |
| | | | | UTGEN | PGXL - Genetics |
| | | | | UTGID | GENE ID |
| | | | | UTPSY | Psychiatric |
| 127531 | US Toxicology LLC | 1225332042 | 45D2016335 | USTOX | Tox - Screen - UST |
| | | | | USCON | Tox - Confirmation - Reliant |
| | | | | USDNA | Molecular Genetics |
| | | | | USGET | PGXL - Genetics |
| | | | | USGID | GENE ID |
| | | | | USMIT | Molecular Infectious |
| 127532 | Medicus Laboratories LLC | 1841505153 | 45D2010531 | MLTOX | Tox - Screen |
| | | | | MLCON | Tox - Confirmation |
| | | | | MLSAS | Sirius - Substance Abuse Screen |
| | | | | MLSAC | Sirius - Substance Abuse Confirmation |
| | | | | MLBHT | Blood/Wellness |
| | | | | MLDNA | Molecular Genetics |
| 133465 | American Lab Group LLC | 1851746960 | 45D2100510 | ALGTOX | Tox - Screen |
| | | | | ALGCON | Tox - Confirmation |
| | | | | ALGDNA | Molecular Genetics |
| | | | | ALGGEN | PGXL - Genetics |
| | | | | ALGGID | GENE ID |
| 134134 | True Labs LLC | 1548613946 | 19D2110496 | TLTOX | Tox - Screen |
| | | | | TLCON | Tox - Confirmation |
| | | | | TLSAS | Sirius - Substance Abuse Screen |
| | | | | TLSAC | Sirius - Substance Abuse Confirmation |
| | | | | TLBHT | Blood/Wellness |

18.     Synergen testified that it relied on the naming conventions it applied to the Data Miner files to discern the Next Health Lab that performed the tests and identify the correct Office Key through which claims should be submitted.[25]

19.     Synergen represented that it used these naming conventions to ensure that the information from the Data Miner files (*i.e.*, the underlying claim details) would be uploaded to the AMD Office Key that matched the particular Next Health Lab's LABDAQ from which the information was extracted: "Claims were billed out of the Office Keys of the corresponding LIS that had its own

---

[25] Deposition of Synergen, pp. 271-72.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

CLIA certified lab that the claims were extracted from."[26]  "If [a] data miner for UTT [United Toxicology] was extracted from [the] UTT LIS – then it was billed under UTT Office Key."[27] Synergen unequivocally asserted that at no point did it bill claims through an Office Key that did not match the LABDAQ from which the claim information was extracted.[28]   Synergen acknowledged that if claims didn't match the original source of the information contained in them, it would be inappropriate and would mean that the information in the claims was incorrect.[29] Synergen testified that "[e]very Data Miner that was retrieved had its own name and had a file. There was no combining of Data Miners."[30]

### VI.A.2. Synergen's Represented Process Is Contradicted by the Data Miner File Names Produced by Synergen.

20.     A&M was provided 18,642 unique excel files, which we understand were produced by Synergen in response to United's requests in this litigation for all the Data Miner files that Synergen received from Next Health for purposes of submitting claims to United on behalf of the Next Health Labs.[31]

21.     A&M evaluated the naming conventions for these Data Miner files and found naming conventions varied significantly across time, and even across files containing essentially the same underlying data and information, which deviates from the represented process.

22.     For example, many Data Miner files were named to indicate the type of toxicology testing performed and the date (*e.g.*, UST – MM.DD.YYYY (indicating a US Toxicology screen test);

---

[26] Deposition of Synergen, Ex. 2.
[27] Deposition of Synergen, Ex. 2.
[28] Deposition of Synergen, Ex. 2.
[29] Deposition of Synergen, pp. 238-39.  Based on Synergen's representations, A&M further notes that to the extent Next Health had separate LABDAQs for Reliant and ALG, then any claims for tests (generally toxicology confirmation tests) for which information was retrieved from those LABDAQs but submitted to United under US Toxicology or United Toxicology's billing credentials, those claims would contain inaccurate or false information.
[30] Deposition of Synergen, p. 238.
[31] A&M was provided more than 33,093 bates-labeled spreadsheets, but after removing duplicate spreadsheets, there were 18,642 unique files.



Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

RELIANT – MM.DD.YYYY (indicating a US Toxicology confirmation test);[32] UTT – MM.DD.YYYY (indicating a United Toxicology screen test); or ALG – MM.DD.YYYY (indicating a United Toxicology confirmation test)[33]). Other Data Miner files were named to identify an Office Key, Provider Profile, and date (*e.g.*, 126196 – UTOX – MM.DD.YYYY (indicating a United Toxicology screen); 126196 – UTCON – MM.DD.YYYY (indicating a United Toxicology confirmation)).[34]

23.     Many other Data Miner files were named in a way that only identified the type of testing, with no additional detail of the LABDAQ source (or corresponding Office Key).  Examples of these appear in the table below:

| Table 2 | |
|---|---|
| **Examples of Data Miner Files Named with Test Type Only** | |
| **File Name** | **File Name** |
| - BHT | - NH GENETICS RAW DATA |
| - CON | - NH Genetics Scan Report |
| - GENE | - PGXL |
| - GENE ID | - Well |
| - TOX | - Wellness |

24.     Additionally, some Data Miner files only include commercial payors such as United (UHC within file names) and Blue Cross Blue Shield (BCBS within file names).  For example, one file Bates numbered SYNES00185407 is named "UHC UPLOAD," and another Bates numbered SYNES00186609 is named "BCBS TX". These naming conventions do not provide any indication of the LABDAQ from which the information was retrieved or a corresponding AMD Office Key or Provider Profile that identifies which Next Health Lab's billing credentials should be used to submit the subject claims.

---

[32] Deposition of Synergen, p. 287.
[33] Deposition of Synergen, pp. 286-87.
[34] Deposition of Synergen, Ex. 2.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

25.     Analyzing the contents of the Data Miner files, we noted that specimens (and associated data) often appeared in multiple Data Miner files, not in just a single file, as was expected based on Synergen's description of the process. We also noted that specimens appeared in multiple Data Miner files that had varying, and often conflicting, naming conventions (*e.g.*, a single specimen appeared in one Data Miner file that, from its file name, indicated the information therein was extracted from United Toxicology's LABDAQ, but the same specimen appeared in another Data Miner file that, from its file name, indicated the information therein was extracted from US Toxicology's LABDAQ).

26.     Upon review of the Data Miner files, in many instances, it appears that after Synergen extracted data from a LABDAQ and saved that data as an initial Data Miner file with a name indicating the data's source LABDAQ, Synergen would (i) disaggregate certain rows of data included within the initial Data Miner file, (ii) create a new Data Miner file with different naming convention, and (iii) then, in some instances, recombine certain rows of data with other disaggregated rows of data from other Data Miner files.  This process distances itself from the initial Data Miner file extracted by Synergen, moving the claims information to different files without the file naming conventions Synergen represented would be necessary to submit the claims under the correct Office Key (*i.e.*, the Office Key from which the information was originally extracted).

27.     A&M identified multiple patterns by which Synergen would disaggregate and recombine the Data Miner files, which we describe in detail below.

28.     To take one example, Synergen created a file named "Reliant 08-29-2016.xls" (SYNES00203475).  This file has no associated metadata (*e.g.*, no file creation or modification dates).  The file itself contains 85 rows of information, a small number of which reflect a "flag" or other issue in the column labeled "Billing Type."  That file is subsequently modified, as indicated by its metadata reflecting a "last modified" date of September 2, 2016, at 5:48 a.m. (SYNES00203476).  This file contains 83 rows of information, with the flagged items removed and only "commercial," "private pay," and "workers' comp" specimens remaining.  Within minutes, the file is renamed "127531-08-31-2016-USCON-08-29-16.xls," as indicated by its

App. 60

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

metadata, which reflects a "last modified" date of September 2, 2016, at 6:01 a.m. (SYNES00203477). At this time, the file is divided into two separate sheets. The first is named "Reliant 08-29-2016," and the second is "Sheet 1." The latter sheet contains 49 rows of information, all of which relate to specimens for which the "Primary Payor" is either United (19 member specimens) or Blue Cross Blue Shield of Texas (30 member specimens); the former sheet contains 34 rows of information, which relate to specimens for which the "Primary Payor" is some other insurer. Just over an hour later, a new file is created and named "ALGCON-08-29-16.xlsx," as indicated by its metadata, which reflects a "date created" of September 2, 2016, at 7:17 a.m. (SYNES00202108). This file contains 118 rows of information, all of which relate specimens for which the "Primary Payor" is either United or BCBS of Texas (plus two for Texas Mutual TWCC). The 19 United Members that had been isolated under "Sheet 1" in the prior file ("127531-08-31-2016-USCON-08-29-16.xls) all now appear in this new file (ALGCON-08-29-16.xlsx).[35] Notably, this file adds 25 more United Member specimens, which appear in parallel sets of Data Miner files associated with United Toxicology (*e.g.*, "UTT 08-29-2016.xls") and which were similarly isolated and separated from specimens for which the Primary Payor is one other than United (or BCBS of Texas) (*e.g.*, "126196-09-01-UTCON-08-29-16.xls") before being recombined with the aforementioned 19 United Member specimens in the ALGCON file (SYNES00202108).

29.     The United Claim data shows that each of the claims associated with these 19 specimens (and corresponding dates of service) were billed to United using ALG's billing credentials. United paid $20,336 on these claims.

30.     To take another example, A&M tracked the Data Miner files corresponding to Specimen Code 304281, which reflected a single specimen belonging to a United Member, which underwent a toxicology screen test and a toxicology confirmation test on August 4, 2016. The two tests resulted in this Specimen Code appearing in two parallel sets of Data Miner files:

---

[35] In reviewing these files more closely, A&M recognized that in addition to the "Primary Payor," the information contained in the Data Miner file column titled "Ordering Location Name" was predictive of the way in which Synergen would separate the claim information into two separate sheets. In this example, all of the claims that were isolated onto "Sheet 1" and subsequently moved into the ALGCON file had an Ordering Location of "UH U.S. Toxicology ALG." In the examples highlighted in Paragraph 29 below, the Ordering Location is similarly predictive.

App. 61

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

***Toxicology Screen.*** The first set begins with a Data Miner file named "UTT 08-05-2016.xls" (SYNES00228849). This file has no associated metadata (*e.g.*, no file creation or modification dates). The file itself contains 189 rows of information, many of which reflect a "flag" or other billing issue in the column labeled "Billing Type." The same Data Miner file name ("UTT 08-05-2016.xls") appears again, but its metadata reflects a "last modified" date of August 9, 2016, at 6:25 a.m. This file contained 93 rows of information, with the flagged items removed and only "commercial," "private pay," and "worker's comp" specimens remaining (SYNES00228853). Within minutes, the file is renamed "126196-08-08-2016-UTOX-08-05-16.xls," as indicated by its metadata, which reflects a "last modified" date of August 9, 2016, at 6:29 a.m. (SYNES00228850). At this time, the file is divided into two separate sheets. The first is named "UTT 08-05-2016," and the second is named "ALG." The latter sheet contains 40 rows of information, all of which relate to specimens for which the "Primary Payor" is either United (21 member specimens) or BCBS of Texas (19 member specimens); the former sheet contains 53 rows of information, which relate to specimens for which the "Primary Payor" is some other insurer. Less than an hour later, a new file is created and named "ALGTOX-08-05-16.xlsx," as indicated by its metadata, which reflects a "date created" of August 9, 2016, at 7:23 a.m. (SYNES00200651). This file contains 73 rows of information, all of which relate to specimens for which the "Primary Payor" is either United or BCBS of Texas (plus one for Texas Mutual TWCC). The 21 United Member specimens that had been isolated and grouped under the "ALG" sheet in the prior file ("126196-08-08-2016-UTOX-08-05-16.xls") all now appear in this new file ("ALGTOX-08-05-16.xlsx"). Notably, however, this new file adds in 12 more United Member specimens, which appear in parallel sets of Data Miner files associated with U.S. Toxicology (*e.g.*, "UST 08-05-2016.xls") and which were similarly isolated and separated from specimens for which the Primary Payor is one other than United or BCBS of Texas (*e.g.*, "127531-08-16-2015-USCON-08-05-16.xls") before being recombined with the aforementioned 21 United Member specimens in the ALGTOX file (SYNES00200651). The United Claim data shows that each of the claims associated with these 21 specimens (and corresponding dates of service) were billed to United using ALG's billing credentials. United paid $54,902 on these claims.

App. 62

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

***Toxicology Confirmation.*** The other set begins with a Data Miner file named "ALG 08-05-2016.xls" (SYNES00226518). This file has no associated metadata and contains 177 rows of information, many of which reflect a "flag" or other billing issue in the column labeled "Billing Type." This same file is later modified, as indicated in its metadata reflecting a "last modified" date of August 11, 2016, at 1:37 a.m. (SYNES00226516). This file contains 91 rows of information, with the flagged items removed and only "commercial," "private pay," and "worker's comp" specimens remaining. Shortly thereafter, the file is renamed "126196-08-10-2016-UTCON-08-04-2016.xls," as indicated by its metadata, which reflects a "last modified" date of August 11, 2016, at 2:10 a.m. (SYNES00226519). At this time, the file is divided into two separate sheets. The first is named "ALG 08-05-2016," and the second is named "ALG." The latter sheet contains 39 rows of information, all of which relate to specimens for which the "Primary Payor" is either United (21 member specimens) or BCBS of Texas (18 member specimens); the former sheet contains 52 rows of information, which relate to specimens for which the "Primary Payor" is some other insurer. A few hours later, a new file is created and named "ALGCON-08-05-16.xlsx," as indicated by its metadata, which reflects a "date created" of August 11, 2016, at 5:23 a.m. (SYNES00202072). This file also contains 39 rows, all of which relate to specimens for which the "Primary Payor" is either United or BCBS of Texas (plus one for Texas Mutual TWCC). The 21 United Member specimens that had been isolated and grouped under the "ALG" sheet in the prior file ("126196-08-10-2016-UTCON-08-04-16.xls") all now appear in this new file ("ALGCON-08-05-16.xlsx"). The United Claim data shows that each of the claims associated with these 21 specimens (and corresponding dates of service) were billed to United using ALG's billing credentials. United paid $54,626 on these claims.

31.     As these examples indicate, the Data Miner files produced by Synergen demonstrate that, contrary to its description of its role and processes, Synergen did not simply extract Data Miners from the Next Health Labs' LABDAQs and move the information in those Data Miners to the corresponding AMD Office Key and bill United accordingly. Instead, these examples show that Synergen *created* Data Miner files by disaggregating and recombining particular rows of data so that it could upload that data to an AMD Office Key that did not match the LABDAQ from which the information was originally extracted. As described more below, the time periods during which Synergen was manipulating information like this aligns very closely to periods during which

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

United (or other affected payors) were denying claims from the Next Health Labs that the information was originally extracted from.

32.     Further, A&M has identified many specimens that appear in multiple Data Miner files with conflicting Next Health Lab affiliations.  As described in section VI.B. below, A&M has identified at least 126 claims that were submitted to United under two different Next Health Labs' billing credentials; 1,100 claims that were included in files with two different Office Keys; 3,327 claims that were submitted to United through a Next Health Lab Office Key that does not correspond to the Office Key of the Data Miner file from which it was generated; and 2,400 claims where the specimen is included in a file with a Provider Profile that is not affiliated with the Next Health Lab Office Key with which it was submitted to United.  Each of these claims are further support that Synergen did not adhere to its described process of creating and submitting claims to United.

### VI.B.     Synergen submitted at least 6,953 claims to United under Next Health Labs' billing credentials that did not match the Next Health Lab from which the claim information was generated and/or obtained.  United paid Next Health Labs at least $15,700,539 associated with these claims.

33.     A&M analyzed the United Claims data and Synergen Data Miner files independently and then developed a crosswalk between the United Claims data and the Synergen Data Miner files to determine how the information in the claims submitted by Synergen to United matched (or did not match) the information that Synergen extracted from the Next Health Labs' LABDAQs.  A&M's analysis of this combined dataset identified at least four patterns of Synergen's manipulation of the information it extracted from Next Health's LABDAQs, which resulted in Synergen submitting at least 6,953 claims to United under billing credentials (*i.e.*, representing services were performed by a certain lab) that did not match the Next Health Lab from which the claim information extracted (*i.e.*, the lab that actually performed the services in the claims).  United paid $15,700,539 for these claims, as detailed in the table below.

App. 64

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

| | | | | | |
|---|---|---|---|---|---|
| **Table 3** | | | | | |
| **Specimens Submitted by Synergen to United were Generates and/or Obtained from LABDAQ that Differed from Next Health Lab Credentials Used to Bill United** | | | | | |
| **Next Health Lab** | **[1] Two Next Health Labs Billed** | **[2] Found Under Two Office Keys** | **[3] Mismatch of Office Key & United Billed Lab** | **[4] Lab Affiliation Inconsistent with United Billed Lab** | **Total** |
| **Amount Paid by United** | | | | | |
| AMERICAN LABORATORIES GROUP LLC | $    213,318 | $    4,319,486 | $    6,382,030 | $    3,280,212 | $    14,195,046 |
| UNITED TOXICOLOGY LLC | 79,231 | 18,890 | - | 113,321 | **211,442** |
| US TOXICOLOGY LLC | 30,991 | 14,079 | - | - | **45,071** |
| MEDICUS LABORATORIES LLC | - | - | 138,495 | 1,110,486 | **1,248,981** |
| **Total Amount Paid by United** | $    323,540 | $    4,352,456 | $    6,520,525 | $    4,504,019 | $    15,700,539 |
| **Number of Specimens** | | | | | |
| AMERICAN LABORATORIES GROUP LLC | 126 | 1,072 | 3,274 | 1,597 | **6,069** |
| UNITED TOXICOLOGY LLC | 40 | 26 | - | 35 | **101** |
| US TOXICOLOGY LLC | 86 | 2 | - | - | **88** |
| MEDICUS LABORATORIES LLC | - | - | 53 | 768 | **821** |
| Less: Overlap of Specimens | (126) | | | | **(126)** |
| **Total Number of Specimens** | **126** | **1,100** | **3,327** | **2,400** | **6,953** |

## VI.B.1.  United Claims Data.[36]

34.    A&M performed an analysis on the United Claims data to develop an understanding of the characteristics, patterns, volumes, and quantum of the claims Synergen submitted to United for the Next Health Labs.

35.    The United Claims data is structured by claim line (*i.e.*, a single claim that included four services would be reflected by four separate rows in the claim data).  Each row of information includes, among many other things, a date of service, a patient's name, information about the patient's benefit plan, the services performed, the NPI, name, and address of the lab that performed the services, and a "Patient Number," which was generated by Synergen in AMD (referred to as "Visit Number" in Synergen reports) and included in claim submissions to United.  Each claim has a distinct Patient Number.[37]

36.    Synergen submitted a total of 59,742 claims to United, spread across the four labs owned and controlled by Next Health, with a date of service ("DOS") between 1/1/2015 and 4/30/2017:

---

[36] UHC000002168-2174; UHC00021484; (collectively, "United Claims" data).
[37] The Patient Number field is "PTNTNBR" in the United Claim data.

App. 65

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

### Table 4

| | Claims Submitted | First DOS | Last DOS |
|---|---|---|---|
| **Claims Synergen Submitted to United by Next Health Lab** | | | |
| **New Health Lab** | | | |
| UNITED TOXICOLOGY LLC | 28,808 | 1/2/2015 | 4/10/2017 |
| US TOXICOLOGY LLC | 10,952 | 1/5/2015 | 9/7/2016 |
| MEDICUS LABORATORIES LLC | 9,275 | 1/2/2015 | 4/28/2017 |
| AMERICAN LABORATORIES GROUP LLC | 10,707 | 3/11/2015 | 12/30/2016 |
| **Total Claims [1/1/2015-4/30/2017]** | **59,742** | | |

37.   The graph below reflects the claims Synergen submitted to United, by time and by lab:



App. 66

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

### VI.B.2. Synergen Produced Data Miner Files.

38.    As stated above, A&M was provided 18,642 unique excel files, which we understand were produced by Synergen in response to United's requests in this litigation for all the Data Miner files that Synergen received from Next Health for purposes of submitting claims to United on behalf of the Next Health Labs.[38]

39.    A&M performed an analysis on the Synergen Data Miner files to develop an understanding of the characteristics, patterns, volumes, and quantum included within these files.

40.    A&M notes the contents of the Data Miner files produced are not limited to information that related to United as the payor, but include other commercial insurance companies, federal payors, workers compensation, and other various entities.

41.    As discussed previously, the Data Miner files have an assortment of naming conventions, which sometimes include an Office Key six-digit prefix, specimen-type acronym suffixes, provider profiles, various dates (or date ranges), and other miscellaneous information.  A majority of the Data Miner files contain one sheet (or tab), however, A&M noted that some Data Miner files contained two sheets (sometimes uniquely named with a Provider Code and sometimes named with default Excel names such as "Sheet 1").  Generally, the Data Miner files contained the same 69 column headers, which includes detail of the specimens, including the following:

---

[38] A&M was provided more than 33,093 bates-labeled spreadsheets, but after removing duplicate spreadsheets, there were 18,642 unique files.

App. 67

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

**Table 5**

**Column Headers Included in Data Miner Files**

| No. | Column Header | No. | Column Header | No. | Column Header |
|-----|---------------|-----|---------------|-----|---------------|
| 1 | UNDER REVIEW | 24 | POLICY NO | 47 | SPECIMEN CODE |
| 2 | BILLING TYPE | 25 | PRIMARY GROUP NO | 48 | ADJUSTER NAME |
| 3 | FIRST NAME | 26 | SECONDARY PAYOR | 49 | EMPLOYER NAME |
| 4 | LAST NAME | 27 | SECONDARY ADDRESS 1 | 50 | EMPLOYER ADDRESS |
| 5 | GENDER | 28 | SECONDARY ADDRESS 2 | 51 | EMPLOYER CONTACT |
| 6 | DOB | 29 | SECONDARY CITY | 52 | EMPLOYER CONTACT PHONE |
| 7 | SSN | 30 | SECONDARY STATE | 53 | EMPLOYER CITY |
| 8 | RELATIONSHIP | 31 | SECONDARY ZIP | 54 | EMPLOYER STATE |
| 9 | SUBSCRIBER FIRST NAME | 32 | SECONDARY POLICY NO | 55 | EMPLOYER ZIP CODE |
| 10 | SUBSCRIBER LAST NAME | 33 | SECONDARY GROUP NO | 56 | ADJUSTER PHONE |
| 11 | SUBSCRIBER GENDER | 34 | TERTIARY PAYOR | 57 | ADJUSTER FAX |
| 12 | SUBSCRIBER DOB | 35 | TERTIARY ADDRESS 1 | 58 | ORDERING LOCATION NAME |
| 13 | STREET | 36 | TERTIARY ADDRESS 2 | 59 | ORDERING LOCATION ID |
| 14 | CITY | 37 | TERTIARY CITY | 60 | ORDERING CLINIC NAME |
| 15 | STATE | 38 | TERTIARY STATE | 61 | ORDERING CINIC ID |
| 16 | ZIP CODE | 39 | TERTIARY ZIP | 62 | NPI |
| 17 | DOS | 40 | TERTIARY POLICY NO | 63 | REF LAB |
| 18 | PRIMARY PAYOR | 41 | TERTIARY GROUP NO | 64 | TEST |
| 19 | PRIMARY ADDRESS 1 | 42 | REFFERING PHYSICIAN FIRST NAME | 65 | COMPLETE STATUS/RUN DATE |
| 20 | PRIMARY ADDRESS 2 | 43 | REFFERING PHYSICIAN LAST NAME | 66 | SWAB TYPE |
| 21 | PRIMARY CITY | 44 | DOI | 67 | RECEIVED DATE |
| 22 | PRIMARY STATE | 45 | DX CODES | 68 | REQUISITION DATE |
| 23 | PRIMARY ZIP | 46 | CPT CODES | 69 | PATIENT ID |

**(1) Combining Synergen Data Miner Files.**

42.     In order to evaluate the information included in the Data Miner files, A&M combined the 18,642 Data Miner files using structured query language ("SQL") software.  Based on a review of the column details, A&M noted a set of columns within the Data Miner files which were consistently populated.  These columns contained claim detail relevant to the LABDAQ source of the claims data and information to assist in combining the data to the United Claims data.  A&M extracted the detail related to the following columns for further evaluation:

App. 68

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

**Table 6**

**Fields A&M Retained in Data Miner File Analysis**

| No. | Column Header | No. | Column Header |
|---|---|---|---|
| 1 | UNDER REVIEW | 16 | DOI |
| 2 | BILLING TYPE | 17 | DX CODES |
| 3 | FIRST NAME | 18 | CPT CODES |
| 4 | LAST NAME | 19 | SPECIMEN CODE |
| 5 | DOB | 20 | ORDERING LOCATION NAME |
| 6 | SSN | 21 | ORDERING LOCATION ID |
| 7 | RELATIONSHIP | 22 | ORDERING CLINIC NAME |
| 8 | SUBSCRIBER FIRST NAME | 23 | NPI |
| 9 | SUBSCRIBER LAST NAME | 24 | REF LAB |
| 10 | DOS | 25 | TEST |
| 11 | PRIMARY PAYOR | 26 | COMPLETE STATUS/RUN DATE |
| 12 | POLICY NO | 27 | SWAB TYPE |
| 13 | PRIMARY GROUP NO | 28 | RECEIVED DATE |
| 14 | REFFERING PHYSICIAN FIRST NAME | 29 | REQUISITION DATE |
| 15 | REFFERING PHYSICIAN LAST NAME | 30 | DATA MINER FILES |

*Note: These 30 fields are a subset of the 69 fields set forth in Table 5.*

43.     Additionally, A&M included the metadata for the Data Miner files in the database as well, including the file name, tab name, and the date created and last date modified. A&M extracted the data using SQL and converted to Microsoft Excel for further analysis.

### VI.B.3. Crosswalk between United Claims records and Synergen's Data Miner files

44.     In order to further evaluate the information included in the Data Miner files against the United Claims data, A&M performed various analyses to build a crosswalk between the two datasets. There are no unique identifiers which can be used to establish a direct crosswalk between the Data Miner files and the United Claims data. Therefore, to build a crosswalk between the two datasets, A&M created a master spreadsheet which tied the "Patient Number" from the United Claims data to the "Specimen Code" in the Data Miner files by using the "Visit Number" field in reports created by Synergen.

45.     Synergen created several reports for Next Health after claims were submitted that included both a Visit Number and Specimen Code field (*e.g.*, Production Reports, Collection Reports, and Marketing Reports). A&M compiled the reports into a table containing more than 650,000 lines,

App. 69

which contained 57,809 Visit Numbers that matched a Patient Number from the United Claim data (out of a total of 59,724 Patient Numbers) and was able to determine the 30,766 specimen numbers relevant to United Claims.

46.     As noted previously, the Data Miner files contain claims submitted not only to United but many other payors as well.  Therefore, in order to isolate the relevant transactions included in the combined Data Miner files, A&M prepared a list of relevant specimen numbers associated with United Claims data.  While A&M noted that there is only one Specimen Code per specimen, per lab, there were some duplicate Specimen Codes between Medicus and one of the other labs.[39]  To account for this while identifying the relevant data in the combined Data Miner files, A&M created a unique identifier through a concatenation, or combination, of the Specimen Code and the date of service (DOS).  There were 30,211 unique Specimen Code concatenations that A&M was able to crosswalk to the United Claim data.  Using this concatenated identifier, A&M was able to isolate 207,061 lines from the combined Data Miner files that connected to the United Claims data.[40]

47.     Using the crosswalk from the Patient Number in the United Claims data to the Specimen Number in the Data Miner files, A&M was able to identify and include fields for the Next Health Lab billing credentials that were used to submit claims to United for each specimen and the amount United paid on those specimens.

48.     Lastly, A&M prepared a summary of the detail included in the Data Miner file names.  The first step was to include a "General Naming" convention used in the file naming, which generally included a provider profile, office key, or other naming convention.  For example, a file named "126196-01-04-2016-UTCON-12-29-15" would be categorized as "UTCON."  Second, using the table provided by Synergen which included the provider profiles associated with each Office

---

[39] One Specimen Code, for toxicology tests, usually resulted in two Visit Numbers (one for the screen and one for the confirmation).

[40] A&M notes that in additional to the concatenation unique identifier crosswalk performed, we also performed a crosswalk using only the specimen numbers.  For the line items that did not overlap with the unique identifier crosswalk, the crosswalk using the specimen number only resulted in thousands of line items for payors other than United.  A&M filtered the payor column for those that included "United" or "UHC" and included those in the extracted United relevant data, as well.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

Key,[41] A&M categorized the General Naming fields based on their "Lab Affiliation" or lab Office Key.  These Lab Affiliations groups included eight categories: 1) United Toxicology, 2) US Toxicology, 3) Medicus, 4) ALG, 5) True Labs, 6) Sirius, 7) Reliant, and 8) Other/Unknown. Third, A&M included a category for Data Miner file names which had an Office Key number prefix.  The example listed above would be categorized with a "126196" Office Key.   Using this summary, A&M populated fields with the information described above for each of the 207,061 lines in the combined Data Miner files.

### VI.B.4. A&M found that at least 6,953 claims submitted by Synergen to United were generated and/or obtained from a Next Health Lab's LABDAQ that differed from the Next Health Lab whose credentials Synergen used to billed United, and that United paid $15,700,539 for these claims.

49.     A&M analyzed the combined datasets discussed above and identified at least four patterns by which Synergen manipulated the information it extracted from the Next Health Labs' LABDAQs in ways that resulted in Synergen submitting at least 6,953 claims to United that did not accurately reflect the Next Health Lab that performed the underlying services.  United paid $15,700,539 on account of these claim submissions.

### (1) Same Specimen was Submitted under Two Different Next Health Labs

50.     While building the crosswalk for the two datasets, A&M analyzed the specimen numbers and corresponding Next Health Lab which the specimens were submitted to United.  During this analysis, A&M identified 126 specimens that were submitted to United twice, each time under a different Next Health Lab's billing credentials.  At least one of these two submissions would have been a misrepresentation of the Next Health Lab which the claim information originated. These double submissions do not represent a re-testing situation, because if the specimen would have been tested by one Next Health Lab and then re-tested by another Next Health Lab, it would have received its own unique specimen number under each of the two Next Health Labs' LABDAQs.

---

[41] Deposition of Synergen, Ex. 2.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

51.     For example, Specimen Code 268171, with a DOS of 4/1/2016, was billed through United Toxicology and ALG, which United paid $1,273 to ALG related to the claim.  Each submission had a unique Patient Number.  However, the submissions made to United were for the same specimen number, for the same patient, on the same DOS.

52.     Synergen submitted 126 claims to United under ALG's billing information for services that had already been listed in claims submitted to United under United Toxicology or US Toxicology's billing information.  United paid $323,540 on these claims.  Refer to Exhibit 3 for additional detail.

53.     Below is a summary of the number of specimens and amount United paid by Next Health Lab related to these claims.

| Table 7 | | |
|---|---|---|
| **Summary of Specimens Submitted Under Two Different Next Health Labs** | | |
| **Next Health Lab** | **# of Specimens** | **Amount Paid by United** |
| AMERICAN LABORATORIES GROUP LLC | 126 | $        213,318 |
| UNITED TOXICOLOGY LLC | 40 | 79,231 |
| US TOXICOLOGY LLC | 86 | 30,991 |
| Less: Overlap of Specimen Counts | (126) | |
| **Total** | **126** | **$        323,540** |

**(2) Specimens Associated with Data Miners with Two Different Office Keys**

54.     Based on Synergen's representations, the Data Miner files would be extracted and/or obtained from a particular LABDAQ for the lab that performed the tests, and the file would be named with information that would let Synergen identify the origin of that claim information.  One specific naming convention noted was to include the Office Key number in the file name.  A&M evaluated the specimens that were included in Data Miner files which had an "Office Key" number in the file name.  A&M identified 1,100 specimens which were included in Data Miner files with differing Office Keys.  According to Synergen, the LABDAQ source and respective Office Key

App. 72

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

would not and could not change.[42]  Therefore, where a specific specimen appeared in two files with different Office Keys in the name, it indicates Synergen moved the information used in claims out of a file that was named to accurately reflect the lab that performed the test and into a file for a lab that did not perform the test.

55.     For example, Specimen Code 126682 was included in a Data Miner file with an ALG Office Key number (133465) and also was included in a Data Miner file with an US Toxicology Office Key number (127531).  United paid $9,342 on this claim.

56.     Below is a summary of the number of specimens and amount United paid by Next Health Lab related to these claims.  Refer to Exhibit 4 for additional detail.

| Table 8 | | |
|---|---|---|
| **Summary of Specimens Associated with Two Different Office Keys** | | |
| **Next Health Lab** | **# of Specimens** | **Amount Paid by United** |
| AMERICAN LABORATORIES GROUP LLC | 1,072 | $    4,319,486 |
| UNITED TOXICOLOGY LLC | 26 | 18,890 |
| US TOXICOLOGY LLC | 2 | 14,079 |
| **Total** | **1,100** | **$    4,352,456** |

### (3) Mismatch between Office Key Files & Lab Used to Billed United

57.     A&M further analyzed the specimens that are included in Data Miner files which had file names that include an Office Key.  Based on Synergen's representation, "At no point did SYNERGEN bill claims that were not corresponding to the [O]ffice [K]ey of a certain lab."[43] However, A&M identified 3,327 specimens that were included in a Data Miner file that conflicted with the Next Health Lab billing credentials used to submit claims to United.   Therefore, the claims made to United misrepresented the Next Health Lab LABDAQ from which the information was extracted.

---

[42] Deposition of Synergen, Ex. 2.
[43] Deposition of Synergen, Ex. 2.

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

58.     For example, for Specimen Code 274943, the claims were submitted to United under Medicus' billing credentials, which United paid $5,717.  However, this specimen appears in a Data Miner file with United Toxicology's Office Key.

59.     Below is a summary of the number of specimens and amount United paid by Next Health Lab related to these claims.  Refer to Exhibit 5 for additional detail.

| **Table 9** | | |
| :--- | :---: | :---: |
| **Summary of Specimens with Office Keys that Do Not Match Billing Credentials for Submission to United** | | |
| **Next Health Lab** | **# of Specimens** | **Amount Paid by United** |
| AMERICAN LABORATORIES GROUP LLC | 3,274 | $      6,382,030 |
| MEDICUS LABORATORIES LLC | 53 | 138,495 |
| **Total** | **3,327** | **$      6,520,525** |

### (4) Specimens that were included in Data Miner files that were associated with a lab that differed from the Next Health Lab credentials that billed United

60.     For the specimens that were not included in any Data Miner file which had an Office Key naming convention, A&M further analyzed the Data Miner files in which these specimens were included.  Based on Synergen's representations, if a Data Miner file had a naming convention that included a provider profile, then it would be submitted to United using the billing credentials for the Next Health Lab's Office Key with which that provider profile was associated.  Therefore, it would have only been appropriate for specimens to be included in Data Miner files that corresponded to the Office Key used to submit the claims to United.

61.     However, A&M identified 2,400 specimens which were included in Data Miner files that were named with provider profiles that conflicted with the Office Key of the Next Health Lab used to submit the claims to United.

App. 74

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

62.     Below is a summary of the number of specimens and amount United paid by Next Health Lab related to these claims.  Refer to Exhibits 6A-6C for additional detail.

| Table 10 | | |
|---|---|---|
| **Summary of Specimens Included in Data Miners with Lab Affiliations Inconsistent with Next Health Lab Credits that Billed United** | | |
| **Next Health Lab** | **# of Specimens** | **Amount Paid by United** |
| AMERICAN LABORATORIES GROUP LLC | 1,597 | $      3,280,212 |
| MEDICUS LABORATORIES LLC | 768 | 1,110,486 |
| UNITED TOXICOLOGY LLC | 35 | 113,321 |
| **Total** | **2,400** | **$      4,504,019** |

### (5) Overall Specimens & Amounts

63.     Overall, A&M identified at least 6,953 claims where Synergen manipulated the information it extracted from a Next Health Labs' LABDAQs, which resulted in Synergen submitting claims to United under billing credentials that did not match the Next Health Lab from which the claim information was extracted.  United paid $15,700,539 Next Health for these claims, as detailed in the table below.

| Table 11 | | | | | |
|---|---|---|---|---|---|
| **Specimens Submitted by Synergen to United were Generates and/or Obtained from LABDAQ that Differed from Next Health Lab Credentials Used to Bill United** | | | | | |
| **Next Health Lab** | **[1] Two Next Health Labs Billed** | **[2] Found Under Two Office Keys** | **[3] Mismatch of Office Key & United Billed Lab** | **[4] Lab Affiliation Inconsistent with United Billed Lab** | **Total** |
| **Amount Paid by United** | | | | | |
| AMERICAN LABORATORIES GROUP LLC | $     213,318 | $   4,319,486 | $   6,382,030 | $   3,280,212 | $   14,195,046 |
| UNITED TOXICOLOGY LLC | 79,231 | 18,890 | - | 113,321 | 211,442 |
| US TOXICOLOGY LLC | 30,991 | 14,079 | - | - | 45,071 |
| MEDICUS LABORATORIES LLC | - | - | 138,495 | 1,110,486 | 1,248,981 |
| **Total Amount Paid by United** | **$     323,540** | **$   4,352,456** | **$   6,520,525** | **$   4,504,019** | **$   15,700,539** |
| **Number of Specimens** | | | | | |
| AMERICAN LABORATORIES GROUP LLC | 126 | 1,072 | 3,274 | 1,597 | 6,069 |
| UNITED TOXICOLOGY LLC | 40 | 26 | - | 35 | 101 |
| US TOXICOLOGY LLC | 86 | 2 | - | - | 88 |
| MEDICUS LABORATORIES LLC | - | - | 53 | 768 | 821 |
| Less: Overlap of Specimens | (126) | | | | (126) |
| **Total Number of Specimens** | **126** | **1,100** | **3,327** | **2,400** | **6,953** |

App. 75

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

**VI.C.** **If Synergen did not extract the information included in claims it submitted under ALG's billing credentials from an ALG LABDAQ, then United paid $14,270,594 to ALG based on false information.**

64.     Per the request of Counsel, we have been asked to calculate the amount United paid on all claims submitted to it through ALG's billing credentials, based on the assumption that Synergen did not extract the information included in those claims from an ALG LABDAQ.  Based on that assumption, United paid ALG $14,270,594 based on false information.[44]

**VI.D.** **If Synergen did not extract the information included in claims it submitted under True Lab's billing credentials from a True Lab LABDAQ, then United paid $777,293 to True Labs based on false information.**

65.     Per the request of Counsel, we have been asked to calculate the amount United paid on all claims submitted to it through True Labs' billing credentials, based on the assumption that Synergen did not extract the information included in those claims from a True Labs LABDAQ. Based on that assumption, United paid True Labs $777,293 based on false information.[45]

# VII.   ADDITIONAL INFORMATION

66.     The procedures performed hereunder do not constitute an audit made in accordance with generally accepted auditing standards or other attestation standard.  This report was prepared to assist the Court and counsel with the resolution of the litigation as styled on the cover page of this report and is intended solely for use in connection with this matter and is not to be used, referred to, or distributed for any other purpose.

67.     We may prepare and utilize at trial a variety of demonstrative charts and graphs to present our opinions and conclusions to the jury.

---

[44] UHC000002168.
[45] UHC000021484.


App. 76

Expert Report of Jacob W. Adams
*UnitedHealthcare, et al. vs. Synergen Health, LLC*
May 6, 2022

68.     Our analysis is ongoing and we reserve the right to supplement our findings and modify our opinions as applicable as additional information becomes available.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

App. 77