**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED HEALTHCARE SERVICES, INC.,** | § | |
| **UNITEDHEALTHCARE INSURANCE** | § | |
| **COMPANY,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. 3:20-CV-0301-X** |
| **vs.** | § | |
| | § | |
| **SYNERGEN HEALTH, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT SYNERGEN HEALTH, LLC'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Synergen Health, LLC ("Synergen") files its Brief in support of its Motion for Summary Judgment (the "Motion") pursuant to Federal Rule of Civil Procedure 56 and LR 56.1–56.7.

Respectfully submitted,

/s/ Laura Reilly O'Hara
**LAURA REILLY O'HARA**
State Bar No. 00784694
**ELIZABETH F. GRIFFIN**
State Bar No. 24092450
**DANIEL J. OLDS**
State Bar No. 24088152
**CLARK HILL PLC**
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:  214.651.2250 (direct-O'Hara)
Fax:  214.651.4094 (direct-O'Hara)
Email: lohara@clarkhill.com
Email: egriffin@clarkhill.com
Email: dolds@clarkhill.com

**ATTORNEYS FOR DEFENDANT**

## <u>TABLE OF CONTENTS</u>

III.   INTRODUCTION AND BACKGROUND FACTS ...........................................................8

IV.   LEGAL STANDARDS ....................................................................................................12

V.   GROUNDS FOR SUMMARY JUDGMENT ..................................................................14

      1.   Plaintiffs have no evidence that Synergen committed fraud and cannot prove the four essential elements of a fraud claim under Texas law. .........................................................................14

      2.   Plaintiffs failed to bring suit within the four-year limitations period and cannot now bring a fraud claim against Defendant and the summary judgment evidence conclusively negates the application of the discovery rule here. ...................................14

VI.   ARGUMENT ...................................................................................................................14

   1.   UHC cannot produce evidence that Synergen committed fraud...........................14

      A.   ELEMENT 2 FAILS: UHC's evidence of Synergen's alleged fraud is entirely circumstantial or inadmissible. ..........................16

      B.   ELEMENT 4 FAILS: UHC did not reasonably rely on Synergen's allegedly fraudulent representations. .......................................28

   2.   Alternatively, UHC's claim is barred by the statute of limitations. .....................33

      A.   UHC's fraud claim accrued prior to December 6, 2015. ..........................33

      B.   Texas courts rarely apply the discovery rule and it is not applicable here. ........................................................................................35

         (i)   UHC is a sophisticated party with a complex system set up to detect and prevent waste, fraud, and abuse. ...................37

         (ii)   UHC's corporate representative testified that UHC was aware of fraudulent activity related to Next Health labs well before December 6, 2015. ...................................37

         (iii)   As a result of its sophistication and its actual knowledge of alleged fraudulent activity related to Next Health labs, UHC was in a superior position to discover any alleged fraud perpetrated on it. ................................42

         (iv)   UHC has unsuccessfully made these same arguments under similar circumstances in Texas courts. ...............................45

(v)      UHC cannot recover for any claims Synergen submitted, not just those UHC paid prior to December 6, 2015. .......................................................................48

## TABLE OF AUTHORITIES

### CASES

*AKB Hendrick, LP v. Musgrave Enters., Inc.*,
    380 S.W.3d 221 (Tex. App.—Dallas 2012, no pet.)........................................................ 31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................................... 12

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
    590 S.W.3d 471 (Tex. 2019)........................................................................................ 29

*Beal Bank, S.S.B. v. Schleider*,
    124 S.W.3d 640, 647 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)
    (quoting with approval *Lozano v. Lozano*, 52 S.W.3d 141, 148–49 (Tex.
    2001) ................................................................................................................. 16, 17

*BP Am. Production Co. v. Marshall*,
    342 S.W.3d 66............................................................................................... 42, 43

*Browning-Ferris, Inc. v. Reyna*,
    865 S.W.2d 925 (Tex. 1993)........................................................................................ 17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................................... 12

*City of Houston v. Clear Creek Basin Auth.*,
    589 S.W.2d 671 (Tex. 1979)........................................................................................ 13

*Crisp v. Sw. Bancshares Leasing Co.*,
    586 S.W.2d 610 (Tex. Civ. App. 1979, writ ref'd n.r.e.) (citation omitted).................... 15

*Deal v. Louisiana ex rel. Dept. of Justice*,
    No. 11-743-JJB-RLB, 2013 WL 4546772, at *6 (M.D. La. 2013).................................. 28

*Dorsey v. Academy Moving & Storage, Inc.*,
    423 F.2d 858 (5th Cir. 1970) ...................................................................................... 28

*Draughon v. Johnson*,
    631 S.W.3d 81 (Tex. 2021), *reh'g denied* (Sept. 24, 2021)............................................ 13

Fed. R. Civ. P. 26(a) ...................................................................................................... 28

*Ford Motor Co. v. Ledesma*,
    242 S.W.3d 32 (Tex. 2007)......................................................................................... 33

*Grant Thornton, LLP v. Prospect High Income Fund*,
    314 S.W.3d 913 (Tex. 2010) (quoting *Lewis v. Bank of Am. NA*, 343 F.3d
    540, 546 (5th Cir. 2003)) ...................................................................... 29

*Hancock v. Variyam*, 400 S.W.3d 59, 70–71 (Tex. 2013) (quoting *Hammerly Oaks,*
    *Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)) ....................................... 16

*In re Lipsky*,
    460 S.W.3d 579 (Tex. 2015) (orig. proceeding) ........................................... 16

*In re Polyurethane Foam Antitrust Litigation Direct Purchaser Class*,
    No. 1:10 MD 2196 WL 12747961, at *14 (N.D. Ohio 2015) ........................... 28

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
    712 F.3d 185 (5th Cir. 2013) ................................................................ 13

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*,
    546 S.W..3d 648 (Tex. 2018) .......................................................... 14, 31

*KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*,
    988 S.W.2d 746 (Tex. 1999) ................................................................ 13

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) ............................................................... 13

*Martinez v. Bally's Louisiana, Inc.*,
    244 F.3d 474 (5th Cir. 2001) ............................................................... 32

*Matis v. Golden*,
    228 S.W.3d 301 (Tex. App.—Waco 2007, no pet.) ...................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 US. 574 (1986) ........................................................................ 13

*Murphy v. Owens-Illinois, Inc.*,
    779 F.2d 340 (6th Cir. 1985) ............................................................... 28

*Nat'l Prop. Holdings, L.P. v. Westergren*,
    453 S.W.3d 419 (Tex. 2015) (per curiam) (quoting *Thigpen v. Locke*, 363
    S.W.2d 247, 251 (Tex. 1962)) .............................................................. 31

*PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*,
    146 S.W.3d 79 (Tex. 2004) ................................................................ 37

*Rogers v. Ardella Inter Vivos Trust No. 2*,
    162 S.W.3d 281 (Tex. App.—Amarillo 2005, pet. denied) ............................. 49

*Sandt v. Energy Maint. Servs. Grp. I, LLC*,
    534 S.W.3d 626 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ............................ 36

*Schlumberger Tech. Corp. v. Pasko*,
    544 S.W.3d 830 (Tex. 2018) ............................................................................................. 13

*Sears, Roebuck & Co. v. Meadows*,
    877 S.W.2d 281 (Tex. 1994) ............................................................................................. 32

*Seigler v. Wal-Mart Stores Tex., L.L.C.*,
    30 F.4th 472 (5th Cir. 2022) ............................................................................................. 19

*Spoljaric v. Percival Tours, Inc.*,
    708 S.W.2d 432 (Tex. 1986) ............................................................................................. 17

*Spreadsheet Automation Corp. v. Microsoft Corp.*,
    587 F.Supp.2d 794 (E.D. Tex. 2007) ................................................................................ 27

*Suarez v. City of Tex. City*,
    465 S.W.3d 623 (Tex. 2015) ............................................................................................. 16

*Taylor v. Rothstein Kass & Co. PLLC*,
    No. 3:19-CV-1594-D, 2020 WL 554583, at *7 (N.D. Tex. 2020) .................................... 16

*Tho Q. Pham v. Carrier*,
    No. 07-15-00031-CV, 2017 WL 1291660, at *4 (Tex. App.—Amarillo
    2017, no pet.) (mem. op.) .................................................................................................. 49

*United Healthcare Services and United Healthcare Insurance Company v. Next
    Health LLC et al.*,
    No. 5:17-cv-243-X-BT ("Next Health Case") .................................................................... 8

*United Healthcare Servs. Inc. v. First Street Hospital LP*,
    570 S.W.3d 323 (Tex. App.—Houston [1st Dist. 2018], pet. denied) ................. 45, 48, 49

*Vanderbilt Mortg. and Finance, Inc. v. Flores*,
    692 F.3d 358 (5th Cir. 2012) ............................................................................................. 43

*Via Net v. TIG Insurance Company,*
    211 S.W.3d 310 (Tex. 2006) ....................................................................................... 44, 45

*W. Invs., Inc. v. Urena*,
    162 S.W.3d 547 (Tex. 2005) ............................................................................................. 33

## **RULES**

Fed. R. Civ. P. 26(a)(1)(A)(ii) ............................................................................................. 28

Fed. R. Civ. P. 56(a) ............................................................................................................. 12

## OTHER AUTHORITIES

*The Exceptions Prove the Rule: Recalibrating the Discovery Rule and Equitable Fraud Exceptions to the Legal Injury Rule*, 71 BAYLOR L. REV. 63, 118 (2019) ........................................................................................................................ 36

## III.
## INTRODUCTION AND BACKGROUND FACTS

Plaintiffs United Healthcare Services, Inc. and United Healthcare Insurance Company (collectively "UHC") sued Synergen Health, LLC ("Synergen") alleging common law fraud regarding reimbursement claims Synergen submitted to UHC on behalf of Next Health LLC from September 2015 through December 2016. Synergen vigorously denies the allegations against it.

UHC is a health insurance company that administers health and welfare benefit plans. Synergen is a revenue cycle management and billing company that contracts with healthcare providers and ancillary entities (e.g., laboratories) to perform insurance billing, collection, and related services including claim appeals and accounts receivable monitoring. On October 1, 2013, Synergen entered into a pilot Revenue Cycle Management Agreement to perform those services for Business Partners in Healthcare, Inc. ("BPIH"), which became Next Health, LLC. During the time period at issue, i.e., September 2015 through December 2016, Synergen submitted claims for laboratory specimen testing performed by Next Health-affiliated laboratories to UHC and other insurance companies. The claims were based on information Next Health provided to Synergen, and on which Synergen relied.

In January of 2017, UHC sued Next Health alleging, among other claims, fraud, and sought $120,000,000 in damages. *See United Healthcare Services and United Healthcare Insurance Company v. Next Health LLC et al.*, No. 5:17-cv-243-X-BT ("Next Health Case"). UHC brought various claims against Next Health, including fraud. Next Health Doc. No. 1, ¶¶ 221–241. UHC accused Next Health of perpetrating a massive scheme to defraud UHC out of millions of dollars:

> Specifically, Next Health and its subsidiary labs paid bribes and kickbacks to referral sources (physicians, sober homes, sales consultants, etc.) in exchange for test orders; they inappropriately utilized standing test protocols regardless of patients' medical histories, clinical conditions, or needs; they performed and billed for testing services that were not ordered by physicians; they

> improperly billed for services that they did not perform; and they
> routinely ignored patients' payment responsibilities to avoid
> drawing attention to the scheme.

Next Health Doc. No. 1, ¶ 2. UHC alleged that, although Next Health's purported scheme went back years, "[i]t was not until mid-2016 that United uncovered the true nature of Next Health's illegal operation." Doc. 1, ¶ 4–5. UHC's case against Next Health remains pending before this Court.

Ultimately Next Health ceased doing business. Its founding members, Andrew Hillman and Semyon Narosov, pled guilty on September 17, 2018 and September 13, 2018, respectively, to conspiracy to pay and receive healthcare bribes while affiliated with other entities during the time period of 2008 through January 2013 in connection with various hospitals including Forest Park. Synergen was neither involved nor accused in any of the foregoing.

UHC claims it first learned of the existence of Synergen in 2019. On December 6, 2019, Synergen and UHC entered into a tolling agreement. Shortly thereafter, UHC filed this lawsuit against Synergen.

Here, UHC accuses Synergen of conspiring with Next Health to submit reimbursement claims to UHC that misrepresented the identity of the CLIA-certified[1] laboratory that performed the testing. UHC alleges Synergen did this to "trick" UHC into paying claims performed by laboratories it had flagged as suspicious and from which UHC had therefore stopped paying claims. Synergen vehemently denies that it ever intended to defraud UHC.

According to UHC's Supplemental Interrogatory Responses of July 22, 2022 and August 31, 2022, it is relying on the following evidence to prove its fraud claim: (1) Synergen's pleadings; (2) the declarations of Nick Austin, Corey Dudley (a former Next Health employee), and Josh

---

[1] CLIA-certified labs comply with applicable federal regulations, i.e., regulations under the Clinical Laboratory Improvement Amendments of 1988.

Daniel, as well as the deposition testimony of Semyon Narosov , all from the Next Health case; and (3) the deposition of Synergen's corporate representative, Mel Gunawardena. UHC's fraud claim fails because (1) UHC cannot prove Synergen committed fraud and (2) UHC sued Synergen after the statute of limitations expired, over four years after accrual.

There is no evidence that would allow UHC to prevail on its fraud claim. The evidence UHC claims to have is mere speculation which is no evidence of fraud under Texas law. UHC purports to rely on Synergen's pleadings and the 2022 deposition testimony of Synergen's corporate representative, Mel Gunawardena, as evidence of fraud. But neither Synergen's pleadings nor Mr. Gunawardena's testimony could reasonably be construed to imply or state that Synergen intended or attempted to defraud UHC. Rather, UHC speculates that the reason Synergen took certain actions in submitting claims to UHC for Next Health labs was to defraud UHC. UHC's evidence in this regard is nothing more than speculation about Synergen's motives which, without corroborating evidence, is insufficient evidence to sustain a fraud claim under Texas law.

UHC further claims that it has evidence of fraud because it has two declarations of former Next Health executives, Josh Daniel and Nick Austin, who, as part of their settlement with UHC, attested that Synergen conspired with Next Health to defraud UHC. But when deposed, both witnesses conceded their declarations were speculative on those issues, and admitted they did not have firsthand knowledge of any such collusion or fraudulent intent by Synergen. Moreover, UHC made execution of the witnesses' respective declarations a component of their personal settlement with UHC in that case. These declarations, (produced by UHC marked "Confidential" in this case, so they cannot be attached hereto) were contradicted by their own deposition testimony and provided to extricate themselves from continued litigation, are no evidence of fraud.

Additionally, UHC cannot prove fraud because it must show justifiable reliance on Synergen's alleged misrepresentations. However, UHC is a highly sophisticated party, replete with a network of comprehensive systems designed to detect and prevent fraud, waste, and abuse. In fact, UHC suspected fraud regarding Next Health's labs before September of 2015. Legally, UHC cannot have justifiably relied on alleged misrepresentations contained in claims submitted on behalf of Next Health beginning in September of 2015 because (1) UHC is highly sophisticated and was in an ideal position to detect potential fraud, and (2) UHC did in fact suspect fraud on the part of Next Health labs concurrently with or prior to September of 2015.

Finally, UHC has no evidence that any of Synergen's conduct caused UHC any harm it would not have otherwise sustained. According to UHC, Next Health intended to defraud UHC by submitting lab claims using the credentials of labs that did not actually perform the tests. Synergen submitted claims to UHC at the direction of Next Health.  There is no evidence that Next Health would not have submitted the claims to UHC, with or without Synergen.  Synergen asks the Court to take judicial notice of the claims and damages alleged by UHC with respect to Next Health as set forth in the Next Health Case. Not only does UHC have no evidence that Synergen committed fraud, UHC filed its lawsuit past the statute-of-limitations deadline. Fraud claims under Texas law have a four-year statute of limitations. UHC and Synergen signed a tolling agreement on December 6, 2019. However, UHC's fraud claim accrued over four years before that date, making UHC's fraud claim time barred. UHC admits that it paid allegedly fraudulent claims before December 6, 2015. Doc. No. 80, p. 4. UHC erroneously attempts to invoke the discovery rule, a limited exception that delays claim-accrual until UHC knew or, exercising reasonable diligence, should have known of Synergen's alleged fraud. To invoke the discovery rule, UHC must establish that Synergen's alleged fraud was "inherently undiscoverable." UHC cannot do so. Exercising

reasonable diligence, UHC, as a highly sophisticated party, should have learned of its alleged harm or the conduct allegedly causing such harm before December 6, 2015.

In short, the undisputed facts establish that UHC cannot produce evidence of fraud as a matter of law. Additionally, UHC filed suit after the statute of limitations expired. Therefore, the Court should grant Synergen summary judgment and dismiss UHC's fraud claim in full.

## SUMMARY JUDGMENT EVIDENCE

In support of its motion for summary judgment and this brief, Synergen relies on the following exhibits contained in *Defendant's Appendix of Summary Judgment Evidence*, which is contemporaneously filed and incorporated herein by reference as if fully set forth:

(1)    Excerpts from the depositions of Synergen Corporate Representative Mel Gunawardena;

(2)    Excerpts from the deposition of UHC Corporate Representative Kelly Tobin;

(3)    Excerpts from the deposition of Nick Austin;

(4)    Excerpts from the deposition of Josh Daniel;

(5)    Excerpts from the deposition of Plaintiffs' expert Jacob Adams;

(6)    Declaration of Corey Dudley;

(7)    Plaintiffs' response to request for admission number 21.

## IV.
## LEGAL STANDARDS

A court should render summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant has the initial burden of identifying the motion grounds and showing that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Under Texas law, a defendant seeking summary judgment on the affirmative defense of limitations must conclusively establish that defense. *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 193 (5th Cir. 2013). Specifically, the movant bears the burden of proving "(1) when the cause of action accrued, and (2) that the plaintiff brought its suit later than the applicable number of years thereafter—i.e., that the statute of limitations has run." *Draughon v. Johnson*, 631 S.W.3d 81, 89 (Tex. 2021), *reh'g denied* (Sept. 24, 2021) (internal quotations omitted). Additionally, the movant must "negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999); *see Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 834 (Tex. 2018).

Once the movant meets its burden under Rule 56(c), the non-movant must "go beyond the pleadings" and identify "specific facts" in the record "showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. An issue is material only if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248. This burden is not satisfied by "some metaphysical doubt as to the material facts," or by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

UHC cannot raise a fact issue in avoidance of the statute of limitations. *See KPMG*, 988 S.W.2d at 748; *see City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979). Thus, no genuine dispute of material fact exists and Synergen is entitled to summary judgment.

## V.
## GROUNDS FOR SUMMARY JUDGMENT

Synergen is entitled to summary judgment on the following grounds:

1.      Plaintiffs have no evidence that Synergen committed fraud and cannot prove the four essential elements of a fraud claim under Texas law.

2.      Plaintiffs failed to bring suit within the four-year limitations period and cannot now bring a fraud claim against Defendant and the summary judgment evidence conclusively negates the application of the discovery rule here.

## VI.
## ARGUMENT

**1.      UHC cannot produce evidence that Synergen committed fraud.**

UHC has no evidence that Synergen committed fraud. The elements of a common-law fraud claim in Texas are: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).

UHC relies on three main pieces of evidence to prove its fraud claim: (1) Synergen's pleadings; (2) the deposition of Synergen's corporate representative, Mel Gunawardena, and (3) the declarations of Nick Austin, Corey Dudley, and Josh Daniel, as well as the deposition testimony of Semyon Narosov from a companion case. None of this constitutes evidence that would be legally sufficient to sustain a jury finding of liability on the part of Synergen for the alleged fraud.

UHC's evidence is insufficient, as a matter of law, to raise an issue of material fact on any of these elements. Legally, UHC's purported evidence is in fact no evidence at all. In essence,

UHC asserts that when Synergen submitted Next Health's lab claims to UHC for payment, the claims originated from labs for which UHC had begun denying claims and requiring supporting medical documentation, but Synergen submitted the claims using billing codes from different labs that had not been flagged by UHC.

UHC's fraud claim essentially consists of the following assertions: (1) from September 2015 through January 2016, Synergen and Next Health agreed to submit certain claims for lab services ordered from and performed by United Toxicology using US Toxicology's billing information, even though the underlying testing had not been ordered from US Toxicology and US Toxicology had not performed any testing services; (2) from September 2015 through January 2016, Synergen and Next Health agreed to submit "substance abuse" claims using Medicus's billing information, even though the underlying testing had not been ordered from Medicus and Medicus had not performed any testing services; and (3) from July 2016 to December 2016, Synergen worked with Next Health executives to create new billing profiles for two Next Health subsidiaries—ALG and True Labs—which were then used to submit "false" claims to UHC for testing ordered from and performed by United Toxicology, US Toxicology, and Medicus from which, by that point, UHC had begun denying claims submitted to it. Doc. No. 1, ¶¶ 23–55.

Under Texas law, "[e]ach party to a fraudulent scheme is responsible for the acts of the others done in furtherance of the fraudulent scheme." *Crisp v. Sw. Bancshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex. Civ. App. 1979, writ ref'd n.r.e.) (citation omitted). However, as recently noted by this District, "it is not clear that Texas law recognizes a cause of action for 'participation in fraud' that is separate from a direct claim for fraud or conspiracy," and that a plaintiff likely has to plead that a party "himself engaged in fraudulent conduct with the requisite knowledge and intent." *Taylor v. Rothstein Kass & Co. PLLC*, No. 3:19-CV-1594-D, 2020 WL 554583, at *7

(N.D. Tex. 2020). Thus, Synergen cannot be held liable for Next Health's fraudulent conduct if Synergen did not itself have the requisite intent.

> **A.      ELEMENT 2 FAILS: UHC's evidence of Synergen's alleged fraud is entirely circumstantial or inadmissible.**

All of UHC's purported evidence of fraud claim is meager and circumstantial. "[T]he equal inference rule . . . provides that a jury may not reasonably infer an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'" *Hancock v. Variyam*, 400 S.W.3d 59 (Tex. 2013) (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)). In other words, "when the circumstantial evidence is so slight that any plausible inference is purely a guess, it is in legal effect no evidence." *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 647 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (quoting with approval *Lozano v. Lozano*, 52 S.W.3d 141, 148–49 (Tex. 2001) (Phillips, C.J., concurring and dissenting)). Thus, "although circumstantial evidence may be used to establish any material fact, 'it must transcend mere suspicion.'" *Id.* (quoting *Lozano*, 52 S.W.3d at 149 (Phillips, C.J., concurring and dissenting)). "Legally sufficient circumstantial evidence requires a logical bridge between proffered evidence and the necessary fact." *Id.* (quoting *Lozano*, 52 S.W.3d at 152 (Phillips, C.J., concurring and dissenting)). "An inference is not reasonable . . . if it is premised on mere suspicion[.]" *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015). The Texas Supreme Court has held that "fraud [can]not be inferred from the vague, indefinite, and inconclusive testimony of interested witnesses." *In re Lipsky*, 460 S.W.3d 579, 588 (Tex. 2015) (orig. proceeding). In short, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 & n.3 (Tex. 1993).

Thus, many Texas courts have held circumstantial evidence to be sufficient in proving a fraud claim *when there is corroborating evidence*. *See, e.g.*, *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent); *Matis v. Golden*, 228 S.W.3d 301 (Tex. App.—Waco 2007, no pet.), *disapproved on other grounds by Bonsmara Nat. Beef Co., LLC v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385 (Tex. 2020). But that is not the case here.

UHC's evidence is so circumstantial that any inference that Synergen committed fraud would be nothing more than conjecture.

First, UHC claims that Synergen's own pleadings demonstrate fraud because they "acknowledge" that Synergen informed Next Health each time UHC began denying claims for laboratory services submitted through one of Next Health's labs and, in many cases, coordinated with Next Health soon thereafter to "hold" (i.e., not submit) certain claims for services that had been ordered from and performed by those labs. Nowhere in Synergen's pleadings does it state that Synergen knowingly conspired with Next Health to defraud UHC, and Synergen vehemently denies that allegation. At best, UHC's evidence in this regard is entirely circumstantial, and "is so slight that any plausible inference is purely a guess." *Beal Bank*, 124 S.W.3d at 647. Synergen's actions are far more likely, but at a minimum just as easily understood as complying with its obligations to keep Next Health informed as to the status of claims and to facilitate reimbursement for services provided to UHC insureds.  As UHC acknowledges, "[b]ecause medical billing and coding can be complex, providers often employ companies to oversee their billing processes and act as their billing agents." Doc. No. 1, ⁋ 14. The evidence does not show that Synergen was committing fraud; rather, Synergen was simply doing its job.

Second, Mr. Gunawardena's testimony does not demonstrate any fraud on the part of Synergen. UHC alleges that Mr. Gunawardena's testimony "demonstrates that Synergen knowingly extracted claim information from one lab's information system and submitted claims to UHC representing that the underlying lab services had been performed by another lab entirely." But again, this inference from Mr. Gunawardena's testimony is purely a circumstantial guess and proves nothing. Mr. Gunawardena testified about the process by which Synergen would submit claims to payors like UHC for payment. In essence, Mr. Gunawardena testified that each Next Health lab had its own unique laboratory information system ("LIS"), or LABDAQ. APP 1. Each lab's LABDAQ corresponded with a single office key—containing that lab's billing information—which was then used to submit claims. APP 1. Mr. Gunawardena testified that Synergen would bill claims under a given office key that corresponded to that office key's lab's LABDAQ—a one-to-one billing system. APP 1-3. But Mr. Gunawardena testified that this was not the case for ALG and True Labs claims, which did not have their own unique LABDAQs. APP 4. UHC speculates that this means Synergen was knowingly perpetrating fraud, but UHC has no corroborating evidence to support such a conclusion. In fact, Mr. Gunawardena testified explicitly that Synergen never intended to commit any fraud, and that Synergen thought the samples were being re-run through the labs the credentials of which were used for the claim submissions. APP 5.

Moreover, UHC has no expert or lay testimony to establish or even suggest that the process utilized by Synergen in submitting claims to it as described by Mr. Gunawardena constituted fraud.

Third, UHC's reliance on declarations from Nick Austin, Corey Dudley, and Josh Daniel, as well as the deposition testimony of Semyon Narosov in another case is without merit, as those pieces of evidence are essentially no evidence at all. Nowhere in Dudley's declaration does he state that Synergen intended to defraud UHC. All Dudley states is that (1) Hillman, Austin, and

others "instructed me to inform Synergen that all Sirius Laboratories tests should be billed to UHC through Medicus Laboratories," (2) that "Austin instructed Synergen to stop submitting claims to UHC through United Toxicology and U.S. Toxicology because Next Health was 'working to set up another lab to accession/process/bill through," and (3) that "Austin informed Synergen that Next Health had created a new lab that it would use to bill for 'UHC samples,' despite the fact that the tests were 'going to come through United Toxicology.'" APP 53-59. Dudley never states that Synergen knew of any fraud on the part of Next Health or that Synergen had any ulterior motive in following Next Health's instructions. Again, this indicates nothing more than that Synergen was trying to do its job: submit claims to payors like UHC on behalf of Next Health in order to have those claims paid.

The declarations of Austin and Daniel, on the other hand, both purport, on their face, to implicate Synergen in a fraudulent scheme with Next Health. But neither declaration carries any evidentiary weight because both Austin and Daniel conceded that their declarations were based on conjecture and speculation during their deposition testimonies, rather than firsthand knowledge of any wrongdoing. A declaration that conflicts with the declarant's deposition testimony cannot be used to defeat summary judgment. *See generally Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (affidavit that contradicts sworn deposition testimony cannot be used to defeat summary judgment).

During his deposition, Daniel testified as follows:

> Q.    Okay. Did you hear or see anyone giving Synergen direction on sending out patient statements?
> A.    No, because I didn't recall who at Next Health directed them to go send out patient statements. I just know that it was done.
> Q.    Well, how do you know that it was done?
> A.    Because I remember just coming out of the meeting with United Healthcare. It was we need to make sure that all the

> reconciliation - - I knew that it was an initiative, I knew that it was something that needed to happen; but I don't know who individually by name specifically directed that to go get done.
>
> Q.     Well, other than knowing that your group at Next Health had discussed after the United meeting that statements needed to be sent, how do you know that anyone at Next Health gave that direction to Synergen? That's what I'm asking.
>
> A.     Well, I just assumed that it was going to happen because we as a group talked that it needed to happen.
>
> . . . .
>
> Q.     All right. You don't have any personal knowledge that that was shared with Synergen, that the reason for sending out statements was so that fewer patients would tell United they had never received any bill?
>
> A.     No, that was an assumption on why these patient statements needed to go out.

APP 45-48. In other words, Daniel admitted he has no personal knowledge of Next Health directing Synergen to send out patient statements to UHC members that had not previously received any statements so that fewer patients would tell UHC that they had never received any bill.

And during his deposition, Daniel reversed course on the attestations in his declaration and testified that Synergen was unaware of any fraudulent conspiracy:

> Q.     Right. But if - - what I'm saying is, from Synergen's perspective, there would be no reason - - because, you know, this instruction is given, hold the samples, don't bill anything else under [United Toxicology] or US Tox[icology] until we can set up a new lab and rerun those samples and bill through the new lab.
>
> A.     Yes.
>
> . . . .
>
> Q.     - - so certainly that's a very direct statement that Synergen is not supposed to just rebill under some new lab, specimens that were run by another lab. They are to wait until the new lab is set up and then the specimens will be rerun by Next Health and then they will be billed to United; correct?
>
> A.     Correct. Right.
>
> Q.     All right. So is there any information that you have that would suggest Synergen was aware that that process would be different when it came to what you have said in paragraph 47 about billing through ALG? In other words, Synergen was not being told:

> Just take those bills and rerun them or - - or resubmit them through another lab; and we're not going to bother to rerun the specimens. They weren't told that in that meeting; correct?
>
> . . . .
>
>        A.     They weren't told in the meeting that I reference in paragraph 47. It wasn't specified that ALG had not run those samples.
>
>        Q.     (By Ms. O'Hara) Right.
>
>        A.     It wasn't specifically said in the meeting.
>
>        Q.     Right. And you don't have any knowledge from any source that that was ever said to Synergen. True?
>
>        A.     That it was never communicated to Synergen, that is true.
>
>        Q.     Right. Right.
>
>        And it is not your testimony, Mr. Daniel, that Mr. Gunawardena, Mr. Mel Gunawardena or Mr. Duminda Gunawardena or any of their employees or employees of Synergen were committing fraud with respect to United Healthcare, is it?
>
>        A.     No.

APP 49-51. In other words, Daniel testified that Synergen was never told the tests were not actually being re-run through ALG, and Daniel has no knowledge that Synergen or any of its employees ever committed fraud with respect to UHC.

Likewise, Nick Austin attested in his declaration that Synergen committed fraud, but admitted that was not true during his deposition testimony. In his deposition, Austin testified as follows:

>        Q.     (By Ms. O'Hara) So as you sit here today, you don't have any personal knowledge that Synergen was aware that those samples had not been rerun before they were billed out to US Toxicology and Medicus?
>
> . . . .
>
>        **A.**     I am not aware that Synergen specifically discussed were these tests rerun. I don't know what Synergen knew or didn't know.
>
> . . . .
>
>        Q.     Was there any discussion that you recall ever in these meetings in September of 2015 where someone suggested that the samples should be billed for improperly?
>
>        A.     No.

APP 31-32.

And, at his deposition, Austin testified that he had no information that could lead him to believe Synergen did not interpret the message to mean the samples should be run through different labs and then billed through those labs, rather than processing them out of one lab and then dividing them amongst other labs just for billing:

> Q.    Right. So the conversation wasn't about let's process them all out of one lab and then divide them up amongst other labs just for the billing. It was process, i.e., run the samples, and bill through additional labs?
> A.    I don't know if we specified testing separately from billing.
> Q.    Okay. But process means testing, right?
> A.    I mean, process means process. It's handling the sample. I'm not a clinician. So as it relates to our relationship with Synergen, I'm talking about bills.
> Q.    Right. But, again, in terms of Synergen's perspective on the situation, they were viewing it as processing, running samples and billing samples through the same lab?
> . . . .
> Q.    (By Ms. O'Hara) You don't have any information?
> A.    I don't have any information about Synergen and how they interpreted any messages, nor do I know if the word process was specifically used in an e-mail or not.

APP 33-34. Moreover, Austin testified that he had no knowledge that the plan to spread claims out across multiple labs' billing information to avoid scrutiny from UHC ever actually took place:

> Q.    The last phrase of your declaration Paragraph 19 says, "Suggested spreading out the claims across multiple labs' billing information to try to avoid scrutiny from UHC."
>       Was that process ever implemented by Synergen or .
> . . Next Health?
> A.    Not to my knowledge, no.

APP 34. And Austin admitted that he had no independent recollection of telling Synergen that, even though samples were coming through on United Toxicology's lab information system, they were to be billed under ALG's CLIA:

> Q.    (By Ms. O'Hara) Let's move on to Paragraph 20 of your declaration. Mr. Austin, you say, "In July 2016, based on

instructions from Andrew Hillman and Seymon Narosov, I communicated with several Synergen and Next Health employees about submitting all claims for patients with UHC insurance plans to UHC using ALG's billing information. This information for these claims was sent to Synergen through the United Toxicology laboratory information system, but Synergen identified the claims to submit to UHC under ALG's billing information, instead of United Toxicology's billing information, by looking for ordering locations that started with UH and ended with ALG."

Could you explain what you meant by that paragraph?

A.      So when the samples were - - when samples are processed on Next Health's laboratory information system and ordering location is provided, which is used to track the samples in collections and make sure that they are associated with the right laboratory and, if applicable, syndicated laboratory.

What I'm saying in that paragraph is that we updated the ordering locations for those samples in question to clarify that although they were coming through on United Toxicology or US Toxicology's - - in this paragraph I'm only referring to United Toxicology. Even though they were coming through on United Toxicology's lab information system, they were to be billed under ALG's CLIA.

Q.      (By Ms. O'Hara) What was your understanding of why Andrew Hillman and Seymon Narosov told you to instruct Synergen in that way?

A.      United Healthcare had ceased paying United Toxicology for its laboratory samples.

Q.      Did you communicate this in an e-mail to Synergen?

A.      Yes.

Q.      Were you in possession of that e-mail when you signed your declaration or worked on Paragraph 20 of your declaration?

A.      I had seen a copy of it that was provided by United Healthcare's counsel.

Q.      So the samples that you were instructing Synergen on in Paragraph 20, were those laboratory toxicology samples only?

A.      I believe they were - - I don't know whether genetic samples were included in there, but the majority of them would have been toxicology samples.

Q.      All right. Other than the e-mail that you said United Healthcare's lawyers showed you, did you have any independent recollection of the content or the instructions that you gave that you talk about in Paragraph 20 to your declaration?

> A.    The only information besides what I remember from my time at Next Health is the e-mails, of which there were more than one, that I saw as provided by United Healthcare's counsel.
>
> Q.    Okay. But separate and apart from the e-mail, did you actually have an independent recollection of what you wrote in - - or what you signed off on in Paragraph 20 of your declaration?
>
> . . . .
>
> A.    I remember - - I remember that time period, but more generally than what it is in the declaration. The specificity in the declaration comes from review of the e-mails.
>
> Q.    (By Ms. O'Hara) Okay. So let's just go through Paragraph 20 and tell me which part you do have specific recollection of.
>
> A.    I remember it - - I could not have clarified exactly what the ordering locations look like without review of the e-mails.
>
> Q.    What is your understanding - - anything else in Paragraph 20 that you could not have signed off on without looking at the e-mails?
>
> A.    No.

APP 35-37. Austin further admitted that he could not recall any conversation he had with Synergen regarding this plan:

> Q.    Do you recall ever having any conversations with anyone at Synergen about the content of your Paragraph 20 to your declaration? I'm sorry. Paragraph 19 or 20.
>
> A.    I don't recall any specific e-mail conversations about those paragraphs.
>
> Q.    Okay. I'm referring to the old-fashioned understanding of the word conversation, which meant, like verbally.
>
> A.    Not that I can remember.

APP 38. Further, Austin testified that the samples run by United Toxicology and US Toxicology and billed by True Labs could have been done under a reference agreement, which is permissible:

> Q.    (By Ms. O'Hara) Yes. How do you know that via reference agreements those samples weren't run by US Toxicology or United Toxicology and then billed by True Labs?
>
> A.    Those samples were run by United Toxicology and US Toxicology and billed by True Labs.
>
> Q.    Okay. But what I'm saying is how do you know it wasn't done under a reference agreement which is permissible, correct?
>
> . . . .

   A. There were reference agreements in place, they could have been.

APP 39-40. Austin also testified that, regarding Synergen "closely monitor[ing] incoming payments," he had no information to indicate that it was not simply because that was Synergen's job:

   Q. (By Ms. O'Hara) On Paragraph 22 of your declaration you say, "Synergen closely monitored incoming payments from UHC to determine whether labeling claims for services performed by United Toxicology with ALG or True Labs' billing information was working."

    When you say, "To determine whether labeling claims for services performed by United Toxicology" - - was working - - "with ALG or True Labs billing information was working," where do you get that? What's the basis for that statement?

   A. I mean we were able to successfully collect on those samples.

   Q. Right. And monitoring payments was part of what Next Health had hired Synergen as a revenue cycle management company to do; that was part of their regular responsibilities, correct?

   A. Yes.

   Q. All right. So - - so other than it being part of their regular responsibilities, is it your testimony there was some additional monitoring that was done here?

   A. There was more frequent communication that was occurring at that time.

   Q. And when you say more frequent communication, what do you mean by that?

   A. I mean that Next Health employees, including Andrew Hillman and Seymon [sic] Narosov, were sending requests to Synergen asking for status updates.

   Q. So Synergen was complying with the requests made to it by Next Health for more frequent reporting on reimbursement; is that right?

   A. Synergen was replying to messages received by Next Health, in addition to providing the routine reporting to me.

   Q. Okay. And when you say in the second part of that Paragraph 20 - - 22, "Synergen sent near-daily updates about UHC payments to ALG and True Labs," is that again near-daily based upon requests by Seymon [sic] Narosov and Andrew Hillman?

> A.      Not just them, but requests from Next Health members and employees.
>
> Q.      In other words, Synergen didn't decide to provide near-daily updates of its own accord, it was instructed by Next Health to do that?
>
> A.      I don't recall Synergen changing their process other than to reply to requests from Next Health.

APP 41-42. In essence, Daniel's and Austin's declarations are, legally, not evidence that can support UHC's fraud claim.

Austin's and Daniel's declarations are even more so lacking any probative value because of the way circumstances under which UHC procured those declarations. Nick Austin testified that it was his understanding that him signing the declaration was a requirement of his settlement agreement with UHC:

> Q.      What did this declaration have to do with the settlement agreement, based on your understanding?
>
> A.      It was part of the settlement agreements with United Healthcare.
>
> Q.      When you say part of the settlement agreement, do you mean it was a requirement of the settlement agreement you entered into with United?
>
> A.      That was my understanding.

APP 30. Additionally, Daniel testified as follows:

> Q.      So when you provided the document - - the content of this declaration, was that in person at the mediation?
>
> A.      Yes, ma'am.
>
> Q.      Was it your understanding that signing this declaration was a requirement of you being dismissed from the lawsuit that had been filed against you by United?
>
> A.      No, I didn't - - I didn't take it as a requirement. It was part of the information that we discussed there at the mediation, but I don't - - I can't say that this declaration was required in order to settle.
>
> Q.      Well, what is your understanding of why it was addressed during the mediation?
>
> A.      My understanding was - - is that part of the mediation was to discuss financially a release, as well as to discuss information. But I don't know - - in other words, there was a

> financial component and then there was conversations; and I don't know what of the two actually led to settlement.
>
> Q.      But payment of a settlement amount and signing a declaration was part and parcel of the release you got to get out of the lawsuit United filed against you?
>
> A.      What I am saying is, is I don't know if there, for example, had just been a financial settlement if that would have gotten me out of the lawsuit. I don't know that. Does that make sense? I don't know what United Healthcare exactly needed to release us from the lawsuit. It could have just been all a financial thing, or it could have been just all - - do you see what I'm saying?
>
> Q.      Well, it wasn't just a financial thing. You signed the document.
>
> A.      Right. Correct. Yeah, it was - -
>
> Q.      Right.
>
> A.      - - in this - - yes.
>
> Q.      Okay.
>
> A.      Yes.
>
> Q.      And it was attached to the settlement agreement. True?
>
> A.      Yes, ma'am, that is correct.

APP 43-44. Thus, not only were Daniel's and Austin's declarations contradicted by their own deposition testimony, but they were also heavily incentivized to sign such declarations. *See Spreadsheet Automation Corp. v. Microsoft Corp.*, 587 F.Supp.2d 794, 801 (E.D. Tex. 2007) (evidence of consent decrees, settlements, and licenses made under threat of litigation would likely confuse jury and therefore inadmissible under Federal Rule of Evidence 403).

Finally, UHC purports to rely on the deposition testimony of Semyon Narosov from UHC's companion case against Next Health before this Court. However, UHC never produced a copy of this deposition testimony in discovery, and therefore UHC cannot rely on it to prove its fraud claim against Synergen. *See* FED. R. CIV. P. 26(a)(1)(A)(ii) ("[A] party must, without awaiting a discovery request, provide to the other parties: a copy—or a description by category and location— of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the

use would be solely for impeachment."); *Dorsey v. Academy Moving & Storage, Inc.*, 423 F.2d 858, 861 (5th Cir. 1970); *see also Deal v. Louisiana ex rel. Dept. of Justice*, No. 11-743-JJB-RLB, 2013 WL 4546772, at *6 (M.D. La. 2013) (failure to disclose certain financial documents pursuant to Rule 26(a) may preclude introduction of those evidence to prove damages at trial). Moreover, Synergen was not given any notice of the deposition, much less an opportunity to attend and question the witness. Courts have held that deposition testimony of a witness in another case cannot be used against a party when the party did not attend the deposition or have a predecessor in interest in attendance because it does not meet the hearsay exception under Rule 804(b)(1). *Murphy v. Owens-Illinois, Inc.*, 779 F.2d 340, 343–44 (6th Cir. 1985); *see also In re Polyurethane Foam Antitrust Litigation Direct Purchaser Class*, No. 1:10 MD 2196, 2015 WL 12747961, at *14 (N.D. Ohio 2015). The effort by UHC to obtain evidence against Synergen in a deposition it was not given notice of or permitted to attend is violative of the Federal Rules and must be excluded.

At best, UHC's evidence is merely conjecture and speculation, requiring a potential factfinder to hazard a guess as to what the evidence means. Therefore, UHC's evidence does not raise a question of material fact on its fraud claim as a matter of law and Synergen is entitled to summary judgment.

    **B.**       **ELEMENT 4 FAILS: UHC did not reasonably rely on Synergen's allegedly fraudulent representations.**

To prove fraud, UHC must show that it relied on Synergen's allegedly fraudulent representations of what labs the claims originated and that such reliance was justified. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496–97 (Tex. 2019) (plaintiff must show that it actually relied on defendant's representation and that such reliance was justifiable). However, none of the evidence demonstrates that UHC's reliance was reasonable. To the contrary, UHC is a sophisticated party with the ability to verify the relevant information and detect fraud.

The Texas Supreme Court has held that "a person may not justifiably rely on a misrepresentation if 'there are "red flags" indicating such reliance is unwarranted.'" *Grant Thornton, LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)).

UHC had a comprehensive system set up to detect the kind of fraud it accuses Synergen of in this case. UHC implements fraud, waste, and abuse prevention measures to minimize the risk of fraudulent payment and overpayment. *See* Doc. No. 1 ¶¶ 12, 22. Thus, not only had UHC already developed a suspicion that Next Health, on whose behalf Synergen was submitting claims, was allegedly committing fraud, UHC has a complex network set up to investigate, detect, and stop fraudulent claims and unsubstantiated reimbursement. For example, Optum Health is a "sister segment of United Healthcare," and carries out its fraud, waste, and abuse program, on top of UHC's Special Investigation Unit ("SIU"). APP 6-7. UHC has *entire units* and company-wide initiatives dedicated to detecting and preventing fraud, waste, and abuse, and thus was uniquely situated to become aware of fraud or attempted fraud perpetrated on it through the claim submission process. UHC's corporate representative, Kelly Tobin, testified as follows regarding Optum's fraud, waste, and abuse functions:

> So it's vast in terms of the number of activities that are performed. But data analytics can be performed within that organization. They do receipt of tips, leads and referrals. And then review in triage of tip, leads and referrals. They perform prepayment-type functionality. And when I say prepayment functionality, that can mean lots of things on its review of claim prior to payment.
>
> Some of those functions may request medical records. Some of those may have a secondary review of the actual claims that have been submitted. It may request documentation, not medical records, but other supplementary information.
>
> They also perform functions to identify the sanctions and licensure loss. They perform recovery activity for the organization. So if there

was an overpayment that had been identified, they would perform the - - intake of the accounts receivable and then allocate that appropriate across claims.

APP 8.

As Tobin testified, one of the main areas of cooperation between Optum and UHC's SIU was referrals of tips for investigation:

So the overarching fraud, waste and abuse program, which Optum is a part of, the overarching process is set up to look for [and] prevent, detect and correct fraud, waste and abuse.
And so we, as an organization, as most organizations are set up to be looking for potential fraud, waste and abuse matters and we identify those in a variety of ways. One of the best ways that we get information is based on tips. And so if a tip comes in, it's pretty direct information in regards to something that's occurring.

Also, all of the organization is really looking for fraud, waste and abuse, right. We're all kind of students of – of the dollar. And so we are all looking for any potential fraud, waste and abuse occurring within the organization or outside of the organization that is impacting our members. And so it's all of our responsibility. Meaning, all of UHC to be watching for that in the work that we do and then reporting that according to the fraud, waste and abuse tip lines.

APP 8-9.

Whether a party's reliance was justified usually presents a question of fact. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018). But that element can be negated as a matter of law when circumstances exist under which reliance cannot be justified. *Id.* In determining whether justifiable reliance is negated as a matter of law, courts "must consider the nature of the [parties'] relationship and the contract." *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no pet.). "In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests . . . . [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d

419, 424 (Tex. 2015) (per curiam) (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)). And when a party fails to exercise such diligence, it is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." *See AKB*, 380 S.W.3d at 232. "To this end, that party 'cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations.'" *JPMorgan*, 546 S.W.3d at 654 (quoting *Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland 2015, pet. denied) (mem. op.)).

UHC simply states that it "relies on the accuracy of information in claim forms" and that "it reasonably and in good faith relies on the information provided to it in the claim forms to determine whether payment is owed and, if so, the amount of the payment to make." Doc. No. 1, ¶ 14. But UHC's head-in-the-sand approach does not hold up under Texas law. UHC is set up to detect fraud, waste, and abuse in claim reimbursement submissions like the ones at issue in this case. Particularly when, as here, the suspicion had been formed. UHC had a duty to avail itself of its highly specialized and complex system of fraud detection to determine the accuracy of the information that was allegedly presented to it.

Not only was UHC set up to detect fraud in claim submissions, but submissions from Next Health-affiliated laboratories were already on UHC's radar long before Synergen submitted the claims at issue in this case. Tobin testified that the first investigation of United Toxicology for fraud, waste, and abuse was in August of 2015, and that the reason UHC began that investigation was because UHC members were complaining of being billed by United Toxicology labs for services not actually rendered. APP 18. In fact, Tobin admitted that UHC identified abnormal testing activity regarding Medicus going back to late 2014 or early 2015. APP 23.

UHC was suspicious of Next Health labs Medicus in late 2014 and United Toxicology in August of 2015. Thus, its reliance on alleged misrepresentations about these labs' claims was not justified. UHC did not justifiably rely on Synergen's alleged misrepresentations as a matter of law and Synergen is entitled to summary judgment.

Element four of UHC's fraud claim also fails because Synergen's allegedly fraudulent misrepresentations did not harm UHC. A fraud claim under Texas law requires both reliance and causation. *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994). But none of UHC's evidence raises a question of material fact as to whether Synergen's alleged fraudulent misrepresentations actually caused any harm to UHC. In essence, UHC's pleadings allege that Synergen acted as a messenger between Next Health and UHC. But Synergen's singular own actions—according to UHC's own allegations—did not proximately cause UHC's alleged damages, which the Court should treat as a judicial admission. *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001) ("A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them. Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention."). Without Synergen, Next Health would have simply executed its alleged scheme by itself or in conjunction with another revenue cycle management company.

The components of proximate cause are cause-in-fact and foreseeability. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). The test for both cause-in-fact and producing cause is whether the defendant's conduct was a substantial factor in bringing about the injury that would not otherwise have occurred. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007); *Urena*, 162 S.W.3d at 551. Simply put, Synergen was not a substantial factor in bringing about UHC's harm from Next Health's alleged scheme. Perhaps the best indication of that is UHC's current case

against Next Health. Moreover, UHC says it did not even know who Synergen was until 2019, years after UHC had sued Next Health for its conduct in this alleged scheme. APP 24-25. It defies logic that Synergen could have been an integral player in this alleged scheme when UHC, by its own admission, knew about it for years and sued various individuals and entities for their role in it before UHC ever heard of Synergen. Because UHC cannot prove that Synergen caused UHC harm, UHC's fraud claim must fail.

### 2.      Alternatively, UHC's claim is barred by the statute of limitations.

Under Texas law, the statute of limitations for a fraud cause of action is four years. TEX. CIV. PRAC. & REM. CODE § 16.051; *Little v. Smith*, 943 S.W.3d 414, 420 (Tex. 1997). "As a general rule, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). Accordingly, UHC's fraud claim is time-barred because it is based on claims submitted by Synergen more than four years before the date on which the parties entered into a tolling agreement—December 6, 2019. Because the allegedly fraudulent billing by Synergen at issue began prior to December 6, 2015 and because UHC paid on those claims prior to December 6, 2015, giving rise to Plaintiffs' cause of action at that time, Synergen's claims are time-barred.

### A.      UHC's fraud claim accrued prior to December 6, 2015.

There is no question that Synergen's allegedly fraudulent claim submissions to UHC began before December 6, 2015. We know this because **UHC itself admitted that a subset of the claims at issue were submitted to UHC prior to December 6, 2015 and that UHC paid some of those claims prior to that date**. Doc. No. 80, p. 4 (UHC stating in pleading that a subset of claim submissions at issue were submitted to UHC prior to December 6, 2015, and UHC paid a portion

of claims prior to December 6, 2015). *Martinez*, 244 F.3d at 476. Further, UHC's designated expert, Jacob Adams, even testified that UHC paid on a portion of these claims prior to December 6, 2015:

> A.     So you would like to know the amount reimbursed for Date of Service prior to - -
> Q.     December 6, 2015.
> A.     Yes. Let me obtain that information.
> . . . .
> Q.     Mr. Adams, did you have an opportunity to calculate make [sic] those calculations we discussed before the break?
> A.     Yes, I did. For opinion five, the amount of the reimbursements related to that that were prior to December 6[,] 2015 Date of Service was $5,483,320. And for opinion six, for the amount of reimbursements for Date of Service prior to December 6, 2015, the amount was $2,398,045.

APP 52.

UHC believes this means that "UHC cannot recover under fraud for any harm it knew about, or should have known about, prior to December 6, 2015." Doc. 80, at p. 4. But this is only partially correct. Because the allegedly fraudulent claims at issue in this lawsuit originated prior to December 6, 2015, even though they allegedly stretched into 2016, UHC's fraud claim is barred by limitations in its entirety.

The accrual date for a cause of action occurs when "a wrongful act causes a legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721 (Tex. 2016); *Mbome v. Njie*, 2019 WL 13203320, at *6 (N.D. Tex. 2019) ("Texas courts hold that 'a cause of action can generally be said to accrue when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury.'"). Here, as UHC admits, that accrual date began prior to December 6, 2015.

**B.      Texas courts rarely apply the discovery rule and it is not applicable here.**

In order to save its fraud claim, UHC relies on the discovery rule, "a very limited exception to statutes of limitations" that "defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996); *see also Yumilicious Franchise, LLC v. Barrie*, No. 3:13-CV-4841-L, 2015 WL 1822877, at *2 (N.D. Tex. Apr. 22, 2015) (citing *Barker v. Eckman*, 213 S.W.3d 306, 311–12 (Tex. 2006)). Doc. No. 1, ¶ 63.

Application of the discovery rule "should be few and narrowly drawn[.]" *S.V. v. R.V.*, 933 S.W.2d 1, 25 (Tex. 1996). The discovery rule only applies "when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable." *Wagner & Brown, Ltd. v. Harwood*, 58 S.W.3d 732, 734 (Tex. 2001). "The determination of whether the discovery rule applies to a particular cause of action is a question of law." *TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008). To determine if an injury is inherently undiscoverable, courts should look at whether a party's "injury was 'the type of injury that could be discovered through the exercise of reasonable diligence.'" *Archer v. Tregellas*, 566 S.W.3d 281, 290 (Tex. 2018) (quoting *BP Am. Production Co. v. Marshall*, 342 S.W.3d 59, 66 (Tex. 2011)).

In fraud cases, "knowledge of facts that could cause a reasonably prudent person to make an inquiry that would lead to discovery of the cause of action is in the law equivalent to knowledge of the cause of action for limitations purposes." *Town of Dish v. Atmos Energy Corp.*, 519 S.W.3d 605, 613 (Tex. 2017) (quoting with approval *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 436 (Tex. App.—Fort Worth 1997, pet. denied)). Once a party is on inquiry notice of an alleged fraud, the limitations period begins. *See Sandt v. Energy Maint. Servs. Grp. I, LLC*, 534 S.W.3d 626, 642 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (concluding that nature of allegations

in publicly available court filings but party on inquiry notice of allegations and obligated party to investigate).

As the Fifth Circuit said just last year, "**Texas courts have set the inherently undiscoverable bar high, to the extent that the discovery rule will apply only where it is nearly impossible for the plaintiff to be aware of his injury at the time he is injured**." *Academy of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 998 F.3d 190, 200 (5th Cir. 2021) (internal quotation marks omitted) (emphasis added). Commentators agree: two legal scholars wrote in 2019 that since 1996 the Texas Supreme Court has consistently held, "as a matter of law, that the plaintiff was not diligent enough—i.e., the inherently undiscoverable requirement could not be satisfied." Lonny Hoffman and Bret Wells, *The Exceptions Prove the Rule: Recalibrating the Discovery Rule and Equitable Fraud Exceptions to the Legal Injury Rule*, 71 BAYLOR L. REV. 63, 118 (2019). The facts of this case do not surpass the high inherently undiscoverable bar because, with reasonable diligence, UHC knew or, at least, should have known of its injury and/or the alleged injury-causing conduct if it had exercised reasonable diligence.

It is unclear when UHC first learned that it was paying on claims that allegedly originated from labs other than what was presented on the claim submission. UHC's counsel refused to allow its corporate representative to testify about that, and UHC's assertions of privilege in that regard are currently the subject of a motion to compel. Doc. No. 71. But what is undeniably clear is that, legally, the undisputed facts demonstrate that UHC at least *should have been aware* of its alleged injury or the alleged injury-causing conduct prior to December 6, 2015. To reiterate, it does not matter that UHC may not have known of "the specific cause of the injury" or "the party responsible for it." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 93–94 (Tex. 2004). If UHC should have known it was injured prior to December 6, 2015 or should have known

of the conduct that caused the injury prior to December 6, 2015, the statute of limitations began to run, at the latest, at that time and prior to December 6, 2015.

### (i)   UHC is a sophisticated party with a complex system set up to detect and prevent waste, fraud, and abuse.

As outlined above, UHC is a highly sophisticated party with an entire system set up to detect the kind of fraud it accuses Synergen of in this case. By its own admission, UHC has an entire unit dedicated to preventing waste, fraud, and abuse. *See* Doc. No. 1, ¶¶ 12, 22. UHC denies claims when it suspects fraud or if the payment is otherwise not warranted based on the claim. Doc. No. 1, ¶ 24 ("In early September 2015, UHC began denying claims submitted to it by United Toxicology unless or until United Toxicology provided UHC with medical records supporting the claims."); ¶ 40 ("[B]ased on member complaints and Next Health's inability to substantiate its services by providing medical records, UHC was denying claims submitted to it using United Toxicology, US Toxicology, and Medicus's billing information."); ¶ 56 ("Synergen shares with its clients the information it learns about the way that payors (like UHC) pay, investigate, and deny claims."). Given its vast array of resources, UHC was in the perfect position to discover exactly the type of fraudulent activity of which it alleges it was a victim in this case.

### (ii)   UHC's corporate representative testified that UHC was aware of fraudulent activity related to Next Health labs well before December 6, 2015.

Not only was UHC set up to detect fraud in claim submissions, but submissions from Next Health-affiliated laboratories were already on UHC's radar long before December 6, 2015. Tobin testified that the first investigation of United Toxicology for fraud, waste, and abuse was in August of 2015, and that the reason UHC began that investigation was because UHC members were complaining of being billed by United Toxicology labs for services not actually rendered. APP 18.

In fact, UHC admits that it investigated claims for lab services submitted by at least one Next Health subsidiary laboratory prior to January 1, 2015. APP 60.

In pleading the discovery rule, UHC alleges that it never knew of any of the allegedly fraudulent activity surrounding the Next Health labs until June 2016. Doc. No. 80, p. 4. But UHC's corporate representative's deposition testimony directly contradicts that notion:

> Q.      . . . . [W]hen did the first investigation of United Toxicology for fraud, waste, and abuse begin?
> A.      When did we get our first activity or when was the first activity related to fraud, waste and abuse --
> Q.      Yes.
> A.      -- related to one of the Next Health entities?
> Q.      Correct.
> A.      Okay. And then is there a specific entity you're referencing --
> Q.      Yes. United Toxicology.
> A.      United Toxicology. Regards to United Toxicology, I believe that was August of 2015.
> Q.      What information did United Healthcare have regarding United Toxicology in August of 2015 as it related to potential fraud, waste, and abuse?
> A.      At that time, I believe that there was information in regards to -- I think we had gotten some member complaints that at that time. So there were some referrals that had come through.
> Q.      Member complaints with respect to what specifically?
> A.      Services not being rendered, I believe.

APP 17-18. After being tipped off that potentially fraudulent conduct was occurring vis-à-vis United Toxicology, UHC's in-house lawyers brought the issue to the SIU, which opened the investigation:

> Q.      What led to that first SIU investigation against United Toxicology?
> A.      My recollection of that was that there was an escalated legal matter as it relates to a flag that had been placed on United Toxicology. And my - - Rick Munson was engaged by legal and ultimately I was then engaged and asked to go and perform an onsite inspection or my team to perform an onsite inspection of United Toxicology.

We were invited down by United Toxicology's attorneys, counsel at the time, to inspect the facility. And the reason for the inspection - - or the reason that they had requested that we come down to do the inspection is because there was concern that it was a paper lab; meaning, that it didn't - - it only existed on paper. It didn't exist in a brick and mortar type functionality. And so we were invited to come down and - - and identify that - - verify that - -

. . . .

Q.      (By Ms. O'Hara) You didn't personally visit in 2016. Who personally visited in 2016?

A.      It would have been Jeffrey Lewitsky and Thomas Laurlia.

. . . .

Q.      What was your understanding of Mr. Lewitsky and Mr. Laurlia's conclusions after they returned from the site visit?

A.      That United Toxicology was there physically.

. . . .

Q.      What was the conclusion of United following the investigation visit that Mr. Lewitsky and Mr. Laurlia made to Untied Toxicology in [January] of 2016?

. . . .

Mr. Minock: I'll object to the extent this calls for privileged information.

A.      So I can tell you factually what happened in terms of like - -

Q.      (By Ms. O'Hara) Let's start with that, yes.

A.      So when - - when we, United, were approached by legal counsel for the Next Health entities, and specifically at this time United Toxicology, they were concerned about the flag that had been placed on that entity, United Toxicology. They had requested that we come down there and verify that they were not what we refer to as a phantom lab.

Prior to my team going down there and doing those investigations, we lifted or removed that flag. And then we went down there, and based upon our review and the report back from Jeff and Thomas that there was a physical location for that laboratory, we did not place a flag back on the provider, United Toxicology. *We did continue to investigate United Toxicology.*

Q.      In what way did you continue to investigate United Toxicology? And when I say "you," I mean United Healthcare as an organization.

Mr. Minock: Objection to the extent this calls for privilege information.

A.      So we continued an investigation as it relates to the entity.

Q.      What did that investigation entail?

A.      I'm - - the privileged piece of it is where I'm starting to get tripped up in terms of the actual investigation.

. . . .

Mr. Minock: I'll just renew the objection as to extent and just cautious [sic] the witness not to reveal any privileged information. I know you're not trying to probe the - -

Ms. O'Hara: Right. So - - so you're - - by that, your [sic] cautioning as to attorney/client communication or - - I just want to be sure I know what privilege you're asserting. Is it attorney/client or work product or what?

Mr. Minock: It would be both. It's - - it would be both.

Q.      (By Ms. O'Hara) Okay. Can you answer the question?

A.      So in regards to the Untied Tox investigation - - or United Toxicology investigation - - so I want to step back just a tiny bit just to the very end of 2015, in terms of when I was engaged in terms of doing - - requesting the onsite and the communications that were going on there.

When I had indicated that it had been an escalated matter within the organization or it had been escalated, it had been escalated to Nicholas Maglio and then Jonathan Wilson, who is here with us, in terms of it being a legal matter. And so Nick and Jonathan engaged Rick Munson and myself. And that's how the onsite and the investigation began.

And so to be clear and part of what my question was obviously in terms of where you were - - what questions you were asking and where I was pausing, was as it relates to the privilege on those cases because they were at the direction of an attorney from - - from the beginning of when I became engaged in those.

APP 10-16 (emphasis added). Thus, although UHC determined that United Toxicology was not a "phantom lab," UHC *continued to investigate United Toxicology without any breaks in between*. In other words, UHC's investigation of United Toxicology—up to the point of filing suit against Next Health in 2017—was simply one long investigation. And, the investigation was spearheaded by Jonathan Wilson, UHC's in-house legal counsel, all prior to December 6, 2015.

And UHC's knowledge of potential fraud involving United Toxicology goes back even further than that:

Q.      (By Ms. O'Hara) With respect to United Toxicology, you testified that there was a concern it was a paper laboratory; is that correct?

A.      That it was a phantom laboratory - -

. . . .

Q.      Where did the concern that it was a phantom laboratory come from?

A.      I believe it was a result of a review of an OIG investigation or qui tam investigation.

Q.      Who did the review of the qui tam investigation?

A.      I believe someone at Payment Integrity had identified that.

Q.      Was it part of the normal course of business for [Payment] Integrity to go through the OIG publications and press releases to identify certain providers that should be given a second look?

. . . .

A.      Payment Integrity, it certainly could identify news articles, media articles, as would SIU or anybody else within the organization.

. . . .

Q.      Okay. Explain to me in your words how you understood that that concern about Untied Toxicology came to be.

A.      So I think there were a number of things kind of in the industry in general just kind of simultaneously happening as it relates to laboratory services, right. We had started to see as an industry, insurance industry and laboratory industry, we had started to see a large increase in potentially fraudulent laboratory services and showing up in a - - in a variety of ways.

And one of the ways that we were seeing as an organization and as a broader industry was nonexistent labs billing agencies or billing providers for services they weren't providing. And so there was suspicion that this might be one of those circumstances. And so there was a request to look at it further.

APP 26-29. This testimony is striking for two reasons. First, it shows that UHC's suspicions about United Toxicology stretched back even further than when it was referred to UHC's SIU. Second, it demonstrates the breadth of UHC's overall efforts to detect fraud, and its sophistication as a claimant. UHC was suspicious of United Toxicology because of publicly available documents from the Office of the Inspector General, as well as broader trends within a niche part of the healthcare industry, which ultimately spurred UHC's investigation into United Toxicology. UHC

simply cannot now argue that it could not possibly have known about United Toxicology's alleged fraud at or around the time it allegedly began to occur.

> **(iii)** **As a result of its sophistication and its actual knowledge of alleged fraudulent activity related to Next Health labs, UHC was in a superior position to discover any alleged fraud perpetrated on it.**

Texas courts hold claimants to a very high standard when examining whether alleged fraud was "inherently undiscoverable," and on top of that, Texas courts hold sophisticated parties to an even higher "reasonable diligence" standard. *See, e.g.*, *Hooks v. Samson Lone Star, Limited Partnership*, 457 S.W.3d 52, 57, 59 (Tex. 2015). It is hard to imagine a more sophisticated party than UHC when it comes to the ability to detect the type of fraud alleged in this case. More fundamentally, UHC was in a superior position to discover any alleged fraud perpetrated on it.

In *BP Am. Production Co. v. Marshall*, an oil and gas case, the Texas Supreme Court categorically held that the discovery rule does not apply to defer the accrual of royalty owners' claims for underpayment. 342 S.W.3d at 66. The Texas Supreme Court reasoned that "the injury was not inherently undiscoverable because royalty owners can timely discover such injuries through the exercise of due diligence" because, "even though information that would have revealed the injury may not have been available from public records, it was nevertheless available from several other sources, including the lessee, its general partner, and gas purchasers." *Id.*

The Fifth Circuit further added onto the *Marshall* Court's analysis of the discovery rule. In *Vanderbilt Mortg. and Finance, Inc. v. Flores*, the Fifth Circuit distinguished that case from *Marshall* to hold that the discovery rule did apply to toll the statute of limitations. 692 F.3d 358, 368 (5th Cir. 2012). But in contrast to *Marshall*, which the Fifth Circuit noted "involved an existing, known relationship between the parties," in *Flores* there was no "relationship between the parties," and no reason for the party bringing the claim to know the facts giving rise to the claim. *Id.*

Here, UHC both (1) had access to documents—such as claim reimbursement forms—that would have told it of the alleged fraud and (2) had an ongoing relationship with the Next Health labs and Synergen as those labs' billing company dating to late 2014. According to UHC's own complaint, Synergen "verifies demographics in claim submissions, submits (and resubmits) claims to payers (including UHC)[.]" Doc. No. 1, ¶ 15. Again, Synergen was submitting claims to UHC on behalf of Next Health labs dating back to 2014. For statute-of-limitations purposes it is irrelevant that the claimant may not know the specific cause of the injury, the party responsible for it, the full extent of it, or the chances of avoiding it. Even were these factors relevant they would not support UHC's claim because Tobin testified that UHC could have asked at any time who Next Health's billing company was or, for that matter, could have asked any questions to detect the alleged fraud at issue:

> Q.      (By Ms. O'Hara) And of course you could ask, correct? You could - - you could seek to inquire that if it was important to the investigation?
> A.      Could we ask somebody who their billing company is?
> Q.      Yes.
> A.      Sure. We could ask any person any question.
> . . . .
> A.      To the best of my knowledge, no one directly asked who the billing company was for any of those entities specifically.
> Q.      (By Ms. O'Hara) And certainly that would have been possible for somebody to ask, correct?
> A.      Again, we can ask anyone any question we'd like.
> Q.      So the answer is, yes, it was possible?
> A.      We are able to ask people questions.
> Q.      And no one asked that question?
> A.      To the best of my knowledge, no one asked any of the five entities that we've been referencing, as Next Health entities, whether or not they had a billing company and, if so, who that was.

APP 19, 21-22. And that, at its heart, is UHC's statute-of-limitations problem in this case: UHC could have asked any number of questions to do its due diligence, but it failed to do so.

In *Via Net v. TIG Insurance Company*, the Texas Supreme Court analyzed whether a sophisticated party was duly diligent enough to invoke the discovery rule. 211 S.W.3d 310 (Tex. 2006). Via Net's customer, Safety Lights, contracted to be added as an additional insured on Via Net's insurance policy. *Id.* at 312. Via Net's insurance broker issued a certificate of insurance listing Safety Lights as "holder" and stating that "holder is added as additional insured re: General Liability." But the certificate of insurance also said it was "issued as a matter of information only and confer[red] no rights upon the certificate holder." *Id.* Via Net's insurance policy did not provide for additional-insured coverage, and no endorsement adding Safety Lights as an additional insured was ever issued. *Id.* A few years later, a Via Net employee sued Safety Lights for personal injuries. *Id.* Safety Lights requested a defense. *Id.* The insurer denied the claim, and Safety Net sued Via Net for breach of contract.

The Texas Supreme Court held that Safety Net's breach-of-contract suit was time barred and the discovery rule did not apply because Safety Lights had a duty to use due diligence to protect its interests and verify performance of the contract. *Id.* at 314. The court stated that "due diligence may include asking a contract partner for information needed to verify contractual performance." *Id.* "If a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment. But failing to even ask for such information is not due diligence." *Id.* at 314 (citation omitted).

As Tobin testified, UHC could have asked any question UHC wanted of any person. UHC attempts to hide behind the notion that it "in good faith relies on the information provided to it in the claim forms to determine whether payment is owed and, if so, the amount of the payment to make." Doc. No. 1, ⁋ 14. But as the Texas Supreme Court stated, such reliance is not enough. UHC had a duty to perform due diligence to verify that the payments it was making were accurate by

posing the appropriate questions to Next Health or Synergen. The fact that UHC "receives nearly two million health care claims per day" does not absolve it of that responsibility under Texas law.

### (iv)    UHC has unsuccessfully made these same arguments under similar circumstances in Texas courts.

This is not the first time UHC has tried to invoke the discovery rule to save its untimely-filed claims. UHC tried these very same arguments in Texas courts in similar circumstances without success.

In *United Healthcare Servs. Inc. v. First Street Hospital LP*, UHC sued a licensed hospital—First Hospital—and its related entities, alleging that the hospital conspired with various freestanding emergency centers and their related entities and owners to use the hospital's license to charge facility fees in connection with care provided at the off-site emergency rooms, thereby defrauding UHC out of money it should not have paid. 570 S.W.3d 323, 328 (Tex. App.—Houston [1st Dist. 2018], pet. denied). UHC sued for, among other claims, fraud. The factual background in that case is important to understanding the First Court of Appeals' application of the due diligence standard under the discovery rule under those circumstances.

In March 2011, UHC wrote a letter to St. Michael—a freestanding off-site emergency room not connected to a hospital—demanding reimbursement of $1.8 million in overpayments. UHC contended that St. Michael was not entitled to collect the "facility fees" it billed UHC because the Texas Department of Insurance had previously issued a letter limiting such fees to "hospital based services" and St. Michael was an unlicensed freestanding emergency room facility that was not comparable to a hospital-based facility. *Id.* at 330–31.

In April 2011, another insurance company, Aetna Life Insurance Company, sued First Hospital and St. Michael in federal court. Aetna alleged that St. Michael was a "freestanding center," not a licensed hospital-based emergency room and, therefore, had no legal right to recover

facility fees in connection with medical care provided at its facility. According to Aetna, St. Michael nevertheless began billing for facility fees in 2007 under its own name and tax identification number. Aetna denied the facility fee charges and did not pay them. Then, in August 2009, according to Aetna's complaint, St. Michael began submitting facility fee claims under First Hospital's name and tax identification number through a "sham affiliation agreement" entered to "defraud Aetna." Aetna asserted that St. Michael "masqueraded as a hospital emergency room" to collect the unowed facility fees. *Id.* at 331.

UHC learned of Aetna's lawsuit on June 2, 2011, when an associate general counsel with UHC reading about it on an online health news blog. After reading about the Aetna lawsuit, UHC's associate general counsel downloaded a copy of Aetna's complaint against First Street and St. Michael from PACER the same day. *Id.* at 332.

On December 14, 2011, UHC hired a law firm to "inquire into the relationship" between First Hospital and the off-site emergency rooms. According to the First Court of Appeals, "[t]he appellate record [was] silent as to United's and its counsel's actions over the next couple years regarding the investigation and any information uncovered. The next indication of activity, according to this record, is in May 2014." *Id.* At that point, UHC's counsel wrote to First Hospital to say that a license was required for free-standing emergency medical care facilities unless they met a statutory exemption. The parties then exchanged additional correspondence.

Around June 1, 2015, UHC contacted Aetna's litigation counsel. Then, nearly three months later, on August 28, 2015, UHC sued First Hospital and St. Michael. The defendants sought summary judgment on statute of limitation grounds arguing the discovery rule did not apply. The trial court granted the defendants summary judgment, UHC appealed, and the First Court of Appeals affirmed.

The court held that UHC's fraud cause of action began to accrue on June 2, 2011 when UHC obtained a copy of Aetna's nearly identical complaint against First Hospital and St. Michael. *Id.* at 339. To support its conclusion, the court noted that, six months after it downloaded a copy of Aetna's complaint, UHC hired counsel to inquire into First Hospital's contractual relationship with the off-site emergency rooms. *Id.* at 340–41. The court then held: "[t]here is no indication in the record that United obtained any additional information about First Hospital's relationship with the Off-site ERs between June 2011 (when it obtained a copy of Aetna's complaint) and December 2011 (when it hired counsel to investigate). Having enough information to cause one to engage investigative counsel strongly suggests that the inquiry-notice standard has been met." *Id.* at 341.

The Houston First Court of Appeals in *First Street* upheld the trial court's dismissal of UHC's fraud claim on statute-of-limitations grounds, despite UHC's attempt to invoke the discovery rule. The parallels to the facts here are striking. Although UHC hid behind assertions of privilege to avoid specifying what it knew about Next Health's allegedly fraudulent scheme and when it knew it, it is still clear from Tobin's testimony that UHC engaged its counsel regarding suspicious behavior at United Toxicology prior to December 6, 2015. APP 10-16. More importantly, Tobin's testimony makes clear that when UHC first suspected fraudulent behavior regarding United Toxicology in August 2015 it never appeared to obtain any additional information that led to its investigation of the Next Health labs and eventual initiation of litigation. APP 10-16. In other words, none of the evidence indicates that UHC obtained new information between August 2015 and December 6, 2015, or later, that implicated Next Health or Synergen in any of the conduct that UHC alleges in this case. As Tobin testified, even after UHC investigators personally visited United Toxicology in January 2016, UHC continued to investigate United Toxicology and never stopped looking into United Toxicology's claims. APP 10-16. In short, UHC

knew or should have known of the allegedly fraudulent claims from United Toxicology in September 2015. State courts in Texas have rejected UHC's arguments about the discovery rule under the same law applicable in this case. There can be no clearer indication of how Texas courts would decide this issue.

**(v)**   **UHC cannot recover for any claims Synergen submitted, not just those UHC paid prior to December 6, 2015.**

UHC has conceded that, because of the tolling agreement dated December 6, 2015, "[t]his means that UHC cannot recover under fraud for any harm it knew about, or should have known about, prior to December 6, 2015." Doc. No. 80, p. 4. In essence, UHC seems to suggest that, even if its fraud claim was untimely filed, it can still recover for fraud based on submissions from Synergen that UHC paid after December 6, 2015. In other words, UHC posits that each claim submission was its own misrepresentation, and those that caused "harm" to UHC after December 6, 2015 are actionable in this suit.

However, once again, Texas courts have told UHC the opposite. In *First Street*, UHC argued that each bill contained its own misrepresentation, each payment of a bill was a new legal injury, and thus, each bill had its own four-year limitations period. 570 S.W.3d at 344–49. The First Court of Appeals rejected that argument, holding that "[t]he same type of injury occurred as a result of each invoice: payment of invoices for Off-site ERs that allegedly were not eligible for payment of facility fees because the relationship between First Hospital and the Off-site ERs that allegedly were not eligible for payment of facility fees because the relationship between First Hospital and the Off-site ERs was not as indicated." *Id.* at 348. The court concluded that "[t]he separate bills are a form of continuing damages arising from one core alleged fraudulent misrepresentation: that First Hospital owned or operated the Off-site ERs and held federal provider-based status." *Id.*

Texas courts have repeatedly emphasized that "care must be taken to distinguish between 1) repeated injury proximately caused by repetitive wrongful or tortuous [sic] acts and 2) continuing injury arising from one wrongful act." *Rogers v. Ardella Inter Vivos Trust No. 2*, 162 S.W.3d 281, 290 (Tex. App.—Amarillo 2005, pet. denied). "[T]he mere continuation of damages after a wrongful act does not prevent the running of limitations." *Tho Q. Pham v. Carrier*, No. 07-15-00031-CV, 2017 WL 1291660, at *4 (Tex. App.—Amarillo 2017, no pet.) (mem. op.). Essentially, the court in *First Street*, examining similar circumstances to those here, held that the type of injury UHC alleges is better characterized as a continuing injury, not repetitive tortious acts.

Here, as in *First Street*, each new claim submission did not create a new cause of action. Simply put, UHC's fraud claim is barred by limitations in its entirety because UHC knew or should have known of Synergen's allegedly fraudulent claim submissions prior to December 6, 2015.

## CONCLUSION

For the foregoing reasons, Defendant Synergen Health, LLC respectfully requests that the Court grant this Motion for Summary Judgment, enter summary judgment that Plaintiffs take nothing by their claims, thus fully disposing of all claims and issues in this case, and grant Synergen such other and further relief to which it may be justly entitled.

Respectfully submitted,

/s/ Laura Reilly O'Hara
**LAURA REILLY O'HARA**
State Bar No. 00784694
**ELIZABETH F. GRIFFIN**
State Bar No. 24092450
**DANIEL J. OLDS**
State Bar No. 24088152
**CLARK HILL PLC**
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:  214.651.2250 (direct-O'Hara)
Fax:  214.651.4094 (direct-O'Hara)
Email: lohara@clarkhill.com
Email: egriffin@clarkhill.com
Email: dolds@clarkhill.com
**ATTORNEYS FOR DEFENDANT**


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was duly served via CM/ECF on all counsel of record on October 31, 2022.

/s/ Laura Reilly O'Hara
LAURA REILLY O'HARA