**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED HEALTHCARE SERVICES, INC.,** | § | |
| **UNITEDHEALTHCARE INSURANCE** | § | |
| **COMPANY,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. 3:20-CV-0301-X** |
| **vs.** | § | |
| | § | |
| **SYNERGEN HEALTH, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

**APPENDIX OF DEFENDANT SYNERGEN HEALTH, LLC'S**

Respectfully submitted,

/s/ Laura Reilly O'Hara
**LAURA REILLY O'HARA**
State Bar No. 00784694
**ELIZABETH F. GRIFFIN**
State Bar No. 24092450
**DANIEL J. OLDS**
State Bar No. 24088152
**CLARK HILL PLC**
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:  214.651.2250 (direct-O'Hara)
Fax:  214.651.4094 (direct-O'Hara)
Email: lohara@clarkhill.com
Email: egriffin@clarkhill.com
Email: dolds@clarkhill.com

**ATTORNEYS FOR DEFENDANT**

Page 202

1    We saw in the Data Miners, right?
2    A.  That's right.
3    Q.  And are you saying that that came over
4 into AMD as well?  It was --
5    A.  It was in the custom tab, just a custom
6 data field.  We just put that in there.
7    Q.  I see.
8        If you look at Exhibit 5, the third page
9 of it, please.
10   A.  Yes.
11   Q.  It looks like the fifth thing down says
12 "fin class" -- I assume is financial class -- and it
13 says "ordering location name."
14       Do you see that?
15   A.  Yes.
16   Q.  The ordering location name is referring to
17 the Data Miner.  The "fin class" is referring to
18 the -- presumably the header in the AMD, the field
19 in AMD?
20   A.  That seems like that.
21   Q.  Right.
22       And "BF," the column at the far right is
23 the column where ordering location name in the Data
24 Miner was, correct?
25   A.  It seems like that.

Page 203

1    Q.  Okay.  So those communicated with each
2 other it looks like.  Got it.
3        I hate to do this to you.  If you go the
4 next page, please.
5    A.  Yes.
6        MS. O'HARA:  On Exhibit 5?
7        MR. SINTON:  On Exhibit 5.
8    Q.  This is a -- do you see where it says --
9 we looked -- it says "order loc name" on the first
10 column --
11   A.  I see that.
12   Q.  -- and then "ordering location name" in
13 the second?
14   A.  I see that.
15   Q.  Can you -- I'm -- I don't know how AMD is
16 set up and structured.
17       Can you help me understand what to -- what
18 to make of that?  It may be as simple, right, is the
19 Data Miner Header "ordering location name" just maps
20 into two fields in AMD, right?
21   A.  That seems to be.  I have not mapped the
22 fields into AMD, but when I look at this custom tab,
23 it looks like in the patient -- in AdvancedMD, we
24 could create custom tabs, which is just custom
25 fields.  And I believe these are the different

Page 204

1 fields and different data that just went in the --
2 that they were -- that these were outside of some of
3 the -- that seems to be outside of the billing
4 information that we require.  Looks like it but...
5    Q.  Okay.  I appreciate you trying to help me
6 through.
7        Let's stop talking about ordering location
8 for a moment and -- and talk about instead -- for me
9 it's Exhibit 2, the bottom of page 28, please.
10   A.  Yes.
11   Q.  And it says -- there's a bullet says,
12 Billing Profiles:  Each LABDAQ login corresponds to
13 a different billing entity.
14       Do you see that?
15   A.  Yes.
16   Q.  If you then turn the page to 29 and go
17 down about halfway, there's a bullet that says,
18 Office Keys.
19   A.  I see that.
20   Q.  Do you see that?
21       And the second sub-bullet there says,
22 There is a unique LABDAQ login for each entity.
23       Do you see that?
24   A.  I see that.
25   Q.  Am I correct in understanding this to mean

Page 205

1 that for each LABDAQ -- for each LABDAQ, there -- it
2 corresponded to a different billing entity?  Like --
3 so -- that's at the bottom of 28, right?
4    A.  Yes.
5    Q.  And billing entity is basically another
6 name, effectively, for office key?  Fair?
7    A.  Yes and no.  I can -- I can explain.  A
8 billing entity is in our -- the way we -- the
9 nomenclature that we use, billing entity is a
10 provider that is sending the claims to bill.
11   Q.  Okay.
12   A.  So in this case with Next Health, it is a
13 lab.  So it's a CLIA certified lab --
14   Q.  Uh-huh.
15   A.  -- with a tax ID and NPI.  That's a
16 billing entity.
17       For that corresponding billing entity, we
18 have to have a billing office key, and that was --
19 that's the one-to-one correlation.  And then with
20 that was the LIS, as well, one-to-one correlation.
21   Q.  Okay.  So like -- I think this is a
22 transitive property.  Office key, on that same page
23 we're looking at, 126196 -- do you see that?  It's
24 Exhibit 2, page 29, there's a table at the bottom,
25 far right said --

52 (Pages 202 - 205)

Page 206

1    A.  Yes.
2    Q.  -- it says Office Key 126196, right?
3    A.  That's right.
4    Q.  That is effectively equal to United
5 Toxicology, right, a lab with, as you noted above, a
6 CLIA certification with a unique tax ID and an NPI,
7 right?
8    A.  That's correct.
9    Q.  And there would then be a corresponding
10 LIS or LABDAQ for United Toxicology, right?
11    A.  That is correct.
12    Q.  And I think you told me earlier, right,
13 that -- it's in your notes, too.  Hold on.
14        If you go to page 21, please, of
15 Exhibit 2.
16    A.  Yes.
17    Q.  You said that the way that SYNERGEN knew
18 to -- the way that SYNERGEN knew which license
19 entity performed the test was based on the name of
20 the Data Miner that contained the claim information,
21 correct?
22    A.  That is correct.
23    Q.  And that sort of -- I mean, that's exactly
24 what the -- it's not exactly.
25        That is what the third bullet on page 21

Page 207

1 of Exhibit 2 says, correct?
2        Can you --
3    A.  Third bullet, yes.
4    Q.  Will you read that for me?
5    A.  Claims were billed out of the office key
6 of the corresponding LIS that had its own CLIA
7 certified lab that the claims were extracted from.
8        That's correct.
9    Q.  See if I get this right here.  I couldn't
10 remember where our page problem was.
11        And so we just read that third bullet,
12 right?
13        MS. O'HARA:  Yeah.
14    A.  That's what I read.  Do you want me to
15 read it again?
16    Q.  You don't need to.  No, I just -- I'm --
17 this high process -- high-level process flow thing
18 is not on my copy of yours.  And that's what I
19 was -- it's not a big deal.
20        MR. SINTON:  Let me take a step back
21 and clean that up.
22        MS. O'HARA:  Okay.
23    Q.  So the exhibit that we have marked as
24 Exhibit 2, which I think is on the screen right
25 now -- if it's not, it will be in a moment -- is

Page 208

1 slightly different than the document that we have
2 been looking at.  It appears to be a formatting
3 issue.  I don't think there's any substantive
4 difference.
5        MS. O'HARA:  Yeah, because that line
6 is on the next page.  I think for some reason when
7 they printed that -- here, look -- pull it -- turn it
8 over.  In the corner, is it not?
9        MR. SINTON:  Uh-huh.
10        MS. O'HARA:  See, it's on mine.
11        MR. SINTON:  We all have the same
12 version.  This version is just slightly different.
13 And so it seems, frankly, unimportant administrative.
14 I just want to --
15        MS. O'HARA:  Right.  Because --
16 because that line is up here on ours --
17        MR. SINTON:  On the copy that you
18 have, that I have, and --
19        MS. O'HARA:  -- it's on the bottom on
20 that one, yeah.
21        MR. SINTON:  -- that SYNERGEN's
22 corporate representative has, correct?
23        MS. O'HARA:  Yeah.
24        MR. SINTON:  So we have all been
25 looking at the same thing, but this may look just

Page 209

1 slightly different.
2        MS. O'HARA:  Right.  But from a
3 formatting as opposed to a content standpoint.
4        MR. SINTON:  If we come across more
5 differences in it, we'll note it.  But I understand
6 that substantively there's no difference between
7 these, right?
8        MS. O'HARA:  Right.  Right.  And we --
9 and, again, we can attach Mel's copy as Exhibit 2A or
10 something so that you have got the exact --
11        MR. SINTON:  We'll figure that out.
12 I'm not overly concerned about it.
13    Q.  Okay.  So we just -- we read that third
14 bullet on page 21.
15        The bullet above it says that, Claims that
16 were coded were enter to AMD through the SYNERGEN
17 Billing Interface, automatically uploaded to the
18 corresponding billing office key of that CLIA
19 certified lab.
20        Can you explain to me what the
21 automatically uploaded part there means?
22    A.  There was no manual entry.  So there was
23 no manual data entry off all these fields.  So there
24 were -- when you look at a file --
25    Q.  Uh-huh.

53 (Pages 206 - 209)

United Healthcare Services, Inc.  Vs. Synergen Health, LLC

Page 326

1    Q.  -- second-to-last page.
2         Do you see that third box where -- across
3  the top -- it mentions "ordering location" once
4  more, right?
5    A.  I see that.
6    Q.  And so this is a SYNERGEN document.
7  SYNERGEN is using ordering location for something
8  here, right?
9    A.  To filter, right?  It says to filter.
10   Q.  Uh-huh.
11   A.  So, again, like I said, it is -- they're
12 filtering it but it is not going in a claim.
13   Q.  Understood.
14        And I guess my point is that I'm --
15 ordering location doesn't go in a claim, right?
16   A.  That's correct.
17   Q.  What goes in a claim is office key, right?
18   A.  The data inside of the master files, yes.
19   Q.  Which is the tax identification number and
20 the CLIA number --
21   A.  NPI, CLIA.
22   Q.  -- and the NPI and the address --
23   A.  That's correct.
24   Q.  -- correct?
25   A.  That's correct.

Page 327

1    Q.  And that is also headed with a singular --
2  a single office key, right?
3    A.  That's correct.
4    Q.  Each office key has multiple provider
5  profiles in AMD connected to it, correct?
6    A.  That's correct.
7    Q.  So anything that has one of those provider
8  profiles would generate a claim that has the office
9  key associated with it, right?
10   A.  That's correct.
11   Q.  If Next Health and SYNERGEN needed to
12 communicate in mass about claims to determine or to
13 dictate which lab would be used -- which lab's
14 billing credentials would be used to submit a claim
15 to United HealthCare, one way to do it would be the
16 ordering location field to relate to a provider --
17 specific provider profile, right?
18        MS. O'HARA:  Objection; form.
19   A.  I am not sure about that.  Yeah, I'm not
20 sure about that.
21   Q.  If an ordering location was created by
22 Next Health that related directly to a provider
23 profile that was created in AMD by SYNERGEN --
24 follow me so far?
25   A.  Again, that doesn't -- that doesn't seem

Page 328

1  to be the case because the provider profiles -- if
2  you look at ordering location, there are multiple
3  ordering locations and much fewer provider profiles.
4    Q.  Right.  Sure.
5    A.  So there's -- there's fewer provider
6  profiles and much more ordering locations.  So what
7  you stated of having one-to-one correlation is
8  not -- is not true.
9    Q.  I'm sorry, I didn't mean to state that.
10        What I'm trying to say -- the one-to-one
11 correlation we talked about before, right, is office
12 key, mailing entity, LABDAQ, right?
13   A.  That's correct.
14   Q.  But we actually know that that doesn't
15 quite line up because there's more LABDAQs than
16 there are office keys, right?
17        MS. O'HARA:  Form.
18   Q.  Just put it aside.  It doesn't matter.
19        What really is important is rather than a
20 one-to-one correlation, if you had the office key at
21 the top of the pyramid --
22   A.  Yes.
23   Q.  -- correct -- below it there are, let's
24 say, four provider profiles, right?
25   A.  Yes.

Page 329

1    Q.  And then below that, there are a number of
2  ordering locations at the base.  There could be
3  however many.
4         But if they related because of
5  conversations SYNERGEN and Next Health had, they
6  knew that one of those ordering locations connected
7  to one of those provider profiles, the claim would
8  end up coming out of AMD and to United HealthCare
9  with the office key that's at the top of that
10 pyramid, right?
11   A.  That can happen within that office key.
12 But, again, I need to make -- confirm this.
13   Q.  And I would suggest if you look at Data
14 Miners that begin with going to Nick's email, UH,
15 and then anything in the middle --
16   A.  Okay.
17   Q.  -- ending in ALG --
18   A.  Okay.
19   Q.  -- it will connect to a provider profile
20 that will connect to an ALG office key, and you will
21 be able to identify all of the claims that were
22 submitted to United HealthCare through ALG.  Okay?
23   A.  Okay.  I will check it.
24   Q.  I would also suggest if you look at
25 ordering location and for a period when United

83 (Pages 326 - 329)

APP000003

United Healthcare Services, Inc., United Healthcare Insurance Company Vs. Synergen Health, LLC

Page 401

1 the UTT Data Miner and they had to be filtered out
2 of that ordering location, and that's the reason.
3    Q.   So the ALG and True Labs claims were
4 coming from the UTT LABDAQ or the UTT Data Miner,
5 and then the ordering location was used to filter
6 them out, is what you're saying, right?
7    A.   Yes.
8    Q.   And my question, I think, at line 16 was
9 really -- I said "nomenclature," but I think I was
10 talking about a naming convention that you had been
11 describing earlier.  Does that seem right?
12       MS. O'HARA:  Objection, form.
13    A.   Yes, it seems that, yeah.
14 BY MR. SINTON:
15    Q.   And how does that provider profile point
16 work into this, I guess?
17    A.   The provider profiles were used under
18 each lab to be able to track the -- one is it -- it
19 showed the different types of specimens that were
20 being run under each of the Office Keys.
21    Q.   I'm looking at your --
22    A.   Document?
23    Q.   -- notes, Exhibit 2.  Like, just as a
24 tangible example, if the Office Key was 126196
25 for -- which is United Toxicology's Office Key --

Page 402

1 I'm looking at page 29.
2 (Interruption by the reporter for clarification.)
3       MR. SINTON:  United Toxicology.
4 BY MR. SINTON:
5    Q.   The provider profile UTOX would indicate
6 a stream, right?  And the provider profile UTCON
7 would indicate a confirmation test?
8    A.   Yes.
9    Q.   That's what you're describing?
10    A.   Yes.
11    Q.   Okay.  So that's what the provider
12 profiles are, and I guess is -- so you're just
13 saying that -- throw all that out the window for
14 ALG and True Labs, basically?
15       MS. O'HARA:  Objection, form.
16    A.   I'm saying is that if it's coming from
17 UTT, it will have the UTT provider profiles; but if
18 the ordering location had True Labs and ALG, the
19 corresponding provider profile names of ALG and
20 True Labs will be used.  And that's what I'm
21 stating here.
22 BY MR. SINTON:
23    Q.   Can you -- do you have an understanding
24 how that works?
25    A.   So let me explain again.

Page 403

1    Q.   Yeah.
2    A.   Your question is:  And if it was
3 extracted from UTT LIS, it would have the UTT
4 nomenclature.
5       So in -- in -- my understanding was,
6 okay, if the nomenclature was the same, then we
7 would just use provider profiles from UTOX.  UTT
8 would be UTOX, UTCON, UTSAS, all of that.
9       THE REPORTER:  I'm sorry.
10       THE WITNESS:  Sorry.  UTSAS.  That are
11 names that are in the UTT provider profile.
12 BY MR. SINTON:
13    Q.   Those are all different provider
14 profiles for United Toxicology, correct?
15    A.   Yes.
16    Q.   Okay.
17    A.   So what I -- why I added that at the end
18 is based on my research, I found that the UT -- the
19 UTT Data Miner also had ALG and True Labs claims in
20 there that we had to filter out using the ordering
21 location.
22    Q.   Uh-huh.
23    A.   So, therefore, the nomenclature would
24 not only be for UTT, it will also have provider
25 profile -- have to be named under True Labs and ALG

Page 404

1 as well, not just UTT.  That's why the correction
2 was made here.
3    Q.   And you just said again your "research."
4    A.   Right, yes.  My research, yes.  The
5 investigation that I did, yes.
6    Q.   And is that -- that's what we've already
7 talked about; there's nothing else?
8    A.   Nothing else.
9    Q.   Because that flowchart in Exhibit 8 only
10 references, I think -- we can look at it, I
11 suppose, but it talks about Sirius, right?  It
12 talks about how to handle Sirius or substance abuse
13 claims, right?
14    A.   Yes, but I also -- that -- that brought
15 up the question about how the ordering location was
16 used, and that was the discussion I had with Malsha
17 and Gillian about the filtering that was done.
18    Q.   Okay.  So we haven't talked about that
19 yet?
20       MS. O'HARA:  Objection, form.
21    A.   Could you -- could you repeat that?
22 BY MR. SINTON:
23    Q.   I'm sorry.  My understanding was that
24 you looked at Exhibit 8?
25    A.   And Exhibit 6 as well.

16 (Pages 401 - 404)

Page 449

1  956 claims on hold.
2      It says: Dear Paul, and then on July
3  18th, she sends an email to Paul saying: Following
4  our discussion, please find attached the
5  outstanding claims on hold for UHC. Please let us
6  know once they have been rerun in order to release
7  the claims out.
8      And then Paul says: Gillian, per our
9  call, please release all UHC claims currently on
10 hold and bill to ALG. We will send the Data Miner
11 reflecting the ALG lab.
12     So for us, our understanding was they're
13 running these specimens. It was not take the names
14 and change it and submit it. And so just wanted to
15 let you know, I mean, I believe if they have not
16 run these specimens, you know, Nick Austin and Next
17 Health really, you know, defrauded us. You know,
18 we never tried to collude with them. We had no
19 idea that they were -- first of all, that they were
20 not running it there. We didn't even know that
21 they're running it in another lab because if they
22 were running it in another lab, we would ask them,
23 you know, if we had any doubts on it, we would have
24 asked them to give us the -- tell us to do a
25 reference billing, so based on my discussions, and

Page 450

1  that's the reason I requested Gillian to pull some
2  of this information.
3      Q.  The reference billing you're describing,
4  I think you mentioned that last time, is that
5  Box 20 and modifier 90?
6      A.  Yeah, but I can't remember the exact --
7  Box 23, I believe.
8      Q.  It's a box that says Outside Lab?
9      A.  That's correct.
10     Q.  And the modifier 90 indicates that a lab
11 other than the one that is identified as submitting
12 the claim has performed the claim, right?
13     A.  Yes.
14     Q.  And you list some identifier for the lab
15 that actually did perform the claim with the
16 modifier 90, right?
17     A.  That's yes.
18     Q.  Okay. So, you know, I see this email,
19 Exhibit 17, and where Nick in the original email on
20 June 24, right, says: We're working to set up
21 another lab to accession, process, bill through.
22     And that's what you're pointing out to
23 UHC as the basis for your belief that all the stuff
24 that came or was submitted to UHC under ALG was
25 processed and -- was processed through ALG, right?

Page 451

1      A.  Yes.
2      Q.  This is the -- there's not -- there's
3  not a later email or discussion about ALG that you
4  can point to?
5      MS. O'HARA: Objection, form.
6      A.  I didn't look at a lot of email. I just
7  got a couple samples. These are the three I asked
8  Gillian to retrieve for me and share with me, so...
9  BY MR. SINTON:
10     Q.  And then Exhibit 18, which, I guess,
11 this is a later ALG-related email. This is an
12 instruction from Paul at Next Health to release all
13 UHC claims that are currently on hold and bill to
14 ALG. He says: They will send a Data Miner
15 reflecting the ALG lab, right?
16     A.  Yes.
17     Q.  So this is a request to go ahead and
18 bill for the ALG claims before SYNERGEN has
19 actually received a new Data Miner reflecting the
20 ALG lab, right?
21     MS. O'HARA: Objection, form.
22     A.  Again, speaking with Gillian, we didn't
23 release anything until they had the Data Miner come
24 in.
25 BY MR. SINTON:

Page 452

1      Q.  And the Data Miner that would have come
2  in would have been either a United Tox or US Tox
3  Data Miner that just had information in it
4  indicating the claims mixed in there that -- that
5  needed to be billed under ALG, right?
6      A.  It would have been under the process of
7  filtering out in the ordering location.
8      Q.  We talked during the April 20th
9  deposition about process a lot. Did you find any
10 other process documents or outlines, you know, in
11 addition to, the sort of, flowchart we looked at
12 together as Exhibit 8?
13     MS. O'HARA: Objection, form.
14     A.  I tried to look for it. I couldn't find
15 anything personally.
16     MR. SINTON: Pardon me. All right. Can
17 we take a break?
18     VIDEOGRAPHER: Off the record at 4:03.
19     (Recess held.)
20     VIDEOGRAPHER: We're back on the record
21 at 4:25.
22 BY MR. SINTON:
23     Q.  Mr. Gunawardena, I'm looking at what we
24 were given today before the deposition started,
25 which is sort of an annotated version of what was

28 (Pages 449 - 452)

 1        A.  I've been with United Healthcare on and off
 2    since 2000.
 3        Q.  Was that shortly after completing your
 4    education or did have another job in between completing
 5    your education and going to United?
 6        A.  I did not.  There was a short stint between
 7    graduation and my employment at that time, Ingenix.
 8        Q.  Did you say Genex was your --
 9        A.  Ingenix.  I-N --
10        Q.  Oh, Ingenix.  Okay.
11        A.  -- G-E-N-I-X.
12        Q.  What did you do for Ingenix?
13        A.  At that time I was an associate investigator.
14        Q.  Did that predate then the year 2000, your work
15    with Ingenix?
16        A.  That began in 2000.  Ingenix is the original
17    name for what is now known as Optum Health.
18        Q.  Optum Health is a subsidiary of United
19    Healthcare, correct?
20        A.  It's a sister segment of United Healthcare.
21    That's correct.
22        Q.  What is the -- the role or the function of
23    Optum?
24        A.  Optum plays a variety of roles for the
25    organization.  And when I say the organization, I mean



1   United Health Group.  And so the way I engage with Optum

2   most frequently is in the capacity of their fraud, waste

3   and abuse program.  They're also a technology portion of

4   our entity.  So a lot of our technology solutions come

5   from Optum.

6        Q.  And when you say technology solutions, could

7   you describe what you mean by that?

8        A.  So like our IT functions, if we have upgrades

9   to systems, rollouts to different software, et cetera.

10       Q.  Does Optum also perform certain billing

11   functions for United Healthcare subsidiaries or for

12   other entities?

13       A.  Can you help me understand what you mean by

14   billing functions?

15       Q.  Well, billing to payers.

16       A.  They perform -- do you mean like perform claims

17   adjudication processes?

18       Q.  Well, that or -- either claims adjudication or

19   are they involved in any way in billing; for instance,

20   for some of the health care provider subsidiaries that

21   United now owns?

22            MR. MINOCK:  Objection; vague.

23       A.  I'm not sure I fully understand --

24       Q.  (BY MS. O'HARA)  Okay.  Let me --

25       A.  -- the question.  I'm sorry.



 1              MS. O'HARA:  Can you read the last one

 2    back, please?

 3              (Requested portion was read.)

 4    A.  So coding reviews or medical claims review

 5    would also be a portion of that as well.  As I

 6    indicated, there's a vast number and so I clearly am not

 7    listing everything.

 8    Q.  (BY MS. O'HARA)  Understood.  How does Optum

 9    interact with, if at all, the special investigation unit

10    that you're the director of?

11    A.  So Optum and the UHC SIU engaged on a -- a

12    number of areas.  One of the main areas that we would

13    engage would be through the referrals of tips for

14    investigative process.

15    Q.  With respect to the Optum functions, are those

16    what you would consider normal business practices that

17    United engages in?

18              MR. MINOCK:  Objection; scope.

19    A.  Tell me more what you mean in terms of like the

20    normal business practices or can you give me more detail

21    in regards to that?

22    Q.  (BY MS. O'HARA)  Yes.  So the fraud, waste and

23    abuse functions that Optum performs, are those things

24    that are done on a regular basic to avoid fraud or are

25    they only done when fraud is suspected?



1              MR. MINOCK:  Objection; compound.

2      A.  So the overarching fraud, waste and abuse

3  program, which Optum is a part of, the overarching

4  process is set up to look for prevent, detect and

5  correct fraud, waste and abuse.

6              And so we, as an organization, as most

7  organizations are set up to be looking for potential

8  fraud, waste and abuse matters and we identify those in

9  a variety of ways.  One of the best ways that we get

10  information is based on tips.  And so if a tip comes in,

11  it's pretty direct information in regards to something

12  that's occurring.

13              Also, all of the organization is really

14  looking for fraud, waste and abuse, right.  We're all

15  kind of students of -- of the dollar.  And so we are all

16  looking for any potential fraud, waste and abuse

17  occurring within the organization or outside of the

18  organization that is impacting our members.  And so it's

19  all of our responsibility.  Meaning, all of UHC to be

20  watching for that in the work that we do and then

21  reporting that according to the fraud, waste and abuse

22  tip lines.

23      Q.  Understood.  With respect to the United -- or

24  I'm sorry -- the SIU function, the special investigation

25  unit that you're the director of, is that also something



1  and abuse activities of Ingenix and Optum?

2           MR. MINOCK:  Objection; vague.

3      A.  Are you asking how the tip came to our team?

4      Q.  Well, how -- what -- what took the

5  investigation of the Next Health subsidiaries from

6  something that was done by Ingenix or Optum or -- or --

7  let me step back because you said it wasn't necessarily

8  investigation.

9           What -- what led to the opening of the

10  first SIU file against a Next Health subsidiary entity?

11     A.  The first UHC SIU investigation that was open

12  was on United Toxicology.

13     Q.  What led to that first SIU investigation

14  against United Toxicology?

15     A.  My recollection of that was that there was an

16  escalated legal matter as it relates to a flag that had

17  been placed on United Toxicology.  And my -- Rick Munson

18  was engaged by legal and ultimately I was then engaged

19  and asked to go and perform an onsite inspection or my

20  team to perform an onsite inspection of United

21  Toxicology.

22           We were invited down by United Toxicology's

23  attorneys, counsel at the time, to inspect the facility.

24  And the reason for the inspection -- or the reason that

25  they had requested that we come down to do the



1  inspection is because there was concern that it was a

2  paper lab; meaning, that it didn't -- it only existed on

3  paper.  It didn't exist in a brick and mortar type

4  functionality.  And so we were invited to come down and

5  -- and identify that -- verify that --

6       Q.  Look at the --

7       A.  -- that was an accurate statement from their

8  attorneys.

9       Q.  So did you form an opinion or come to a

10  conclusion after you went to the onsite visit of the

11  laboratory that it wasn't a paper lab or what did you

12  conclude based on that investigation?

13            MR. MINOCK:  Objection; vague.  Are we

14  talking about --

15       Q.  (BY MS. O'HARA)  Well, let me -- let me start

16  over again.

17            Did you yourself actually go down to the

18  site visit at the United Toxicology?

19       A.  I didn't personally visit United Toxicology in

20  2016.

21       Q.  I'm sorry.  Say that again.  What was --

22            MS. O'HARA:  Can you read back the answer?

23            (Requested portion was read.)

24       Q.  (BY MS. O'HARA)  You didn't personally visit in

25  2016.  Who personally visited in 2016?



1       A.  It would have been Jeffrey Lewitsky and Thomas

2   Laurlia.

3       Q.  Were you supervising Mr. Lewitsky and

4   Mr. Laurlia?

5       A.  Thomas Laurlia, it was his supervisor.  I was

6   not for Jeff Lewitsky.  He and I were peers at the time.

7       Q.  Did you have discussions with them after they

8   returned from their site visit of United Toxicology?

9       A.  I reviewed their investigative memorandum or

10  their interview memorandum.

11      Q.  Was the interview memorandum sent only to you

12  or did it have other recipients?

13          MR. MINOCK:  Objection to the extent it

14  calls for privileged information.

15      A.  I don't recall who all the recipients were at

16  the time.  I know that Rick Munson and I both were part

17  of that conversation.

18      Q.  What is your understanding of what Mr. Lewitsky

19  and Mr. Laurlia -- is it -- how do you spell his last

20  name?

21      A.  L-A-U-R-L-I-A.

22      Q.  Laurlia?

23      A.  Laurlia.  Correct.

24      Q.  What was your understanding of Mr. Lewitsky and

25  Mr. Laurlia's conclusions after they returned from the



1   site visit?

2        A.   That United Toxicology was there physically.

3             MR. MINOCK:  I just want to clarify, Laura,

4   that you're asking what her conclusions were personally

5   from reviewing the memo?

6             MS. O'HARA:  What her understanding of

7   their conclusions was.

8             MR. MINOCK:  But it's her personal

9   understanding of their conclusions is what you mean,

10  right?

11            MS. O'HARA:  Well --

12            MR. MINOCK:  As opposed to United's

13  conclusions?

14            MS. O'HARA:  Right.

15       Q.  (BY MS. O'HARA)  I -- I mean, let me ask it

16  more specifically.

17            What was the conclusion of United following

18  the investigation visit that Mr. Lewitsky and

19  Mr. Laurlia made to United Toxicology in June of 2016?

20            MR. MINOCK:  Objection --

21       Q.  (BY MS. O'HARA)  I'm sorry.  Excuse me.

22  January of 2016.

23            MR. MINOCK:  I'll object to the extent this

24  calls for privileged information.

25       A.   So I can tell you factually what happened in



 1  terms of like --

 2       Q.  (BY MS. O'HARA)  Let's start with that, yes.

 3       A.  So when -- when we, United, were approached by

 4  legal counsel for the Next Health entities, and

 5  specifically at this time United Toxicology, they were

 6  concerned about the flag that had been placed on that

 7  entity, United Toxicology.  They had requested that we

 8  come down there and verify that they were not what we

 9  refer to as a phantom lab.

10            Prior to my team going down there and doing

11  those investigations, we lifted or removed that flag.

12  And then we went down there, and based upon our review

13  and the report back from Jeff and Thomas that there was

14  a physical location for that laboratory, we did not

15  place a flag back on the provider, United Toxicology.

16  We did continue to investigate United Toxicology.

17       Q.  In what way did you continue to investigate

18  United Toxicology?  And when I say "you," I mean United

19  Healthcare as an organization.

20            MR. MINOCK:  Objection to the extent this

21  calls for privilege information.

22       A.  So we continued an investigation as it relates

23  to the entity.

24       Q.  What did that investigation entail?

25       A.  I'm -- the privileged piece of it is where I'm



 1  starting to get tripped up in terms of the actual

 2  investigation.

 3                  THE WITNESS:  So I'm asking for guidance.

 4                  MS. O'HARA:  Do you need to talk to your

 5  lawyer?

 6                  THE WITNESS:  May I please?

 7                  MS. O'HARA:  Yes.

 8                  MR. MINOCK:  Take a second?

 9                  MS. O'HARA:  Yes.

10                  THE VIDEOGRAPHER:  The time is 9:50 a.m.

11  We are off the record.

12                  (Break taken from 9:50 a.m. to 10:00 a.m.)

13                  THE VIDEOGRAPHER:  The time is 10:00 a.m.

14  We are back on the record.

15     Q.  (BY MS. O'HARA)  Could you read the last

16  question back, please?

17                  (Requested portion was read.)

18                  MR. MINOCK:  I'll just renew the objection

19  as to extent and just cautious the witness not to reveal

20  any privileged information.  I know you're not trying to

21  probe the --

22                  MS. O'HARA:  Right.  So -- so you're -- by

23  that, your cautioning as to attorney/client

24  communication or -- I just want to be sure I know what

25  privilege you're asserting.  Is it attorney/client or



1  work product or what?

2            MR. MINOCK:  It would be both.  It's -- it

3  would be both.

4       Q.  (BY MS. O'HARA)  Okay.  Can you answer the

5  question?

6       A.  So in regards to the United Tox

7  investigation -- or United Toxicology investigation --

8  so I want to step back just a tiny bit just to the very

9  end of 2015, in terms of when I was engaged in terms of

10  doing -- requesting the onsite and the communications

11  that were going on there.

12            When I had indicated that it had been an

13  escalated matter within the organization or it had been

14  escalated, it had been escalated to Nicholas Maglio and

15  then Jonathan Wilson, who is here with us, in terms of

16  it being a legal matter.  And so Nick and Jonathan

17  engaged Rick Munson and myself.  And that's how the

18  onsite and the investigation began.

19            And so to be clear and part of what my

20  question was obviously in terms of where you were --

21  what questions you were asking and where I was pausing,

22  was as it relates to the privilege on those cases

23  because they were at the direction of an attorney from

24  -- from the beginning of when I became engaged in those.

25            And so I can tell you from a factual

1  involvement we had had with entities within the

2  organization.

3          So as part of our due diligence when we

4  open an investigation, we would seek out information of

5  any other fraud, waste and abuse activity that may have

6  happened or been identified within the organization

7  related to an entity.  We would identify if there were

8  any contracts as it relates to any of the entities; if

9  it was a participating or a nonparticipating provider.

10  We would -- and if there was, then we would procure

11  copies of the -- the contracts or the network

12  agreements.

13     Q.  So specifically in this case with respect to

14  United Toxicology, what exactly did United Healthcare do

15  regarding the investigation of Next Health -- well, let

16  me start over again.

17          What did investigation of -- well, when did

18  the first investigation of United Toxicology for fraud,

19  waste and abuse begin?

20     A.  When did we get our first activity or when was

21  the first activity related to fraud, waste and abuse --

22     Q.  Yes.

23     A.  -- related to one of the Next Health entities?

24     Q.  Correct.

25     A.  Okay.  And then is there a specific entity



 1   you're referencing --

 2        Q.  Yes.  United Toxicology.

 3        A.  United Toxicology.  Regards to United

 4   Toxicology, I believe that was August of 2015.

 5        Q.  What information did United Healthcare have

 6   regarding United Toxicology in August of 2015 as it

 7   related to potential fraud, waste and abuse?

 8        A.  At that time, I believe that there was

 9   information in regards to -- I think we had gotten some

10   member complaints at that time.  So there were some

11   referrals that had come through.

12        Q.  Member complaints with respect to what

13   specifically?

14        A.  Services not being rendered, I believe.

15        Q.  Who was responsible for investigating those

16   member complaints in August of 2015?

17        A.  Review of member complaints or any tip, leads

18   and referrals would be part of the validations team.

19   They would do a preliminary investigation or review.

20        Q.  Where would the documents be that related to

21   the work of the validations team in response to the tips

22   received from -- or complaints received from members

23   against United Toxicology in August of 2015?

24              MR. MINOCK:  Objection; scope.

25        A.  I -- I don't know where all of the -- I mean,



 1 | the circumstances and the facts that have been presented
 2 | and the data that's available.
 3 |     Q.  (BY MS. O'HARA)  And of course you could ask,
 4 | correct?  You could -- you could seek to inquire that if
 5 | it was important to the investigation?
 6 |     A.  Could we ask somebody who their billing company
 7 | is?
 8 |     Q.  Yes.
 9 |     A.  Sure.  We could ask any person any question.
10 |     Q.  Are there also situations when you're working
11 | -- well, let me tie it specifically to these -- to these
12 | five investigations.
13 |          During your investigation, first, of United
14 | Toxicology, were there communications between anyone on
15 | your team and anyone at Next Health asking to
16 | substantiate billings that had been submitted to United?
17 | And when I say substantiate, clarify, provide medical
18 | records, that sort of thing.
19 |     A.  I believe we requested medical records of these
20 | cases.
21 |     Q.  Did you receive them?
22 |     A.  I believe we received some medical records from
23 | some of the entities during the course of these
24 | investigations.
25 |     Q.  Did you have conversations -- and I'm going to



 1      Q.  So with respect, again, to topic number 15.

 2   When did your investigation begin of Synergen, if at

 3   all?

 4      A.  We -- UHC SIU didn't have an investigation into

 5   Synergen.

 6      Q.  And this question isn't as narrowly tailed as

 7   the SIU.  I'm talking about UHC as an organization.  As

 8   the question indicates, when did any investigation of

 9   Synergen begin by UHC?

10           MR. MINOCK:  Objection; vague.

11      A.  So my understanding and my knowledge of when

12   Synergen became something that UHC was investigating or

13   looking into further, was July of 2019.

14      Q.  What was the trigger for United to look into

15   Synergen further, as you say?

16           MR. MINOCK:  Objection to the extent this

17   calls for privilege information.  I think you -- you can

18   answer.

19      A.  So my understanding is that outside counsel,

20   Adamson, had provided information to Jonathan Wilson and

21   discussions began there in regards to Synergen.

22      Q.  So with respect to the investigation that

23   United did, your testimony is that there was no

24   independent determination by United in any of the fraud,

25   waste and abuse investigations or evaluations that



1      A.  As director of SIU, I didn't ask anyone

2   directly if they were responsible for personally

3   submitting the claims to United.

4      Q.  Did the corporation ever ask anybody who was

5   involved -- or let me step back.

6           Did the corporation ever ask anyone who the

7   billing entity was for the five laboratories during the

8   course of the years it investigated United Toxicology,

9   US Toxicology, Medicus, ALG and True Labs?

10           MR. MINOCK:  Objection; vague.

11      A.  To the best of my --

12           MR. MINOCK:  Sorry, Kelly.

13           THE WITNESS:  No.  My apologies.

14      A.  To the best of my knowledge, no one directly

15   asked who the billing company was for any of those

16   entities specifically.

17      Q.  (BY MS. O'HARA)  And certainly that would have

18   been possible for somebody to ask, correct?

19      A.  Again, we can ask anyone any question we'd

20   like.

21      Q.  So the answer is, yes, it was possible?

22      A.  We are able to ask people questions.

23      Q.  And no one asked that question?

24      A.  To the best of my knowledge, no one asked any

25   of the five entities that we've been referencing, as





1  Next Health entities, whether or not they had a billing

2  company and, if so, who that was.

3      Q.  Have you been involved in any SIU

4  investigations that did relate to -- specifically to

5  billing companies as opposed to providers?

6            MR. MINOCK:  Objection; scope.

7      A.  Are you referencing one of the specific

8  questions?  I'm sorry.

9      Q.  Well, yes, number 15.  The last phrase of it

10 says, Or any billing company which submitted such

11 claims.

12            MR. MINOCK:  Objection.  Is that -- is that

13 regarding submitting claims on Next Health's behalf?

14            MS. O'HARA:  Yes.

15            MR. MINOCK:  You can answer, Kelly.

16     A.  So I -- I did not nor am I aware of anyone

17 conducting any investigations on a billing company which

18 submitted claims on behalf of Next Health.

19     Q.  Let's go now to topic number 14.  Which is,

20 UHC's identification of any abnormal testing activity by

21 one or more Next Health subsidiary laboratories during a

22 routine claims review from January 1, 2013 to January 1,

23 2017, comma, the individuals involved in same and the

24 decisions made regarding next steps or further action

25 with respect to same.



 1  Toxicology.

 2      Q.  All right.  Do you have any information or is

 3  -- was there any abnormal activity identified for US

 4  Toxicology prior to opening the SIU file?

 5      A.  I don't believe so.

 6      Q.  Was there any abnormal testing activity

 7  identified by United with respect to Medicus before the

 8  SIU file?

 9      A.  Yes.

10      Q.  Okay.  What -- what was that activity that was

11  identified as abnormal or unexpected or aberrant -- or

12  whatever term --

13          MR. MINOCK:  Objection; vague.

14          Sorry, Kelly.  Go ahead.

15      A.  My understanding is that there was a review

16  completed within Optum as it relates to Medicus, I

17  believe, in late 2014, early 2015.  And it was in

18  regards to the organization, being aware of a CIA

19  agreement or corporate integrity agreement that had

20  happened between Medicus and the government.

21              And so we, United, had started a review of

22  claims to identify if we had any exposure to the

23  allegations that were put forward in that case as it

24  relates to Medicus.  And so at that point, a request for

25  medical records, I believe, occurred.  Some records were



 1  and US Tox, which are now understood to be part of the

 2  Next Health organization.

 3      Q.  So in the course of your investigation of ADAR,

 4  clearly that was not something that Synergen was ever

 5  involved in, in terms of promoting that type of practice

 6  amongst your members, correct?  You never came to the

 7  conclusion that the billing company somehow would have

 8  been able to determine that what you've just described

 9  was occurring?

10          MR. MINOCK:  Objection; compound and

11  mischaracterizes prior statements.

12      A.  I -- I don't know if they knew or not.

13      Q.  Well, how could they have possibly known?

14          MR. MINOCK:  Objection; calls for

15  speculation.

16      A.  I don't know.

17      Q.  There was never any -- any information

18  uncovered in your investigation that showed they did

19  know, correct?  "They" being Synergen, was aware of this

20  testing scheme that you've described?

21      A.  So during the course of the investigation --

22  so, again, in my capacity as director of SIU, Synergen

23  wasn't something that we knew of or the entity of

24  Synergen wasn't known and we didn't investigate them.

25  And as an organization, we weren't aware of them until



1  2019.

2      Q.  So none of the members you interviewed were any

3  of the other people you talked to in the course of

4  investigating ADAR -- ever talked about Synergen or

5  suggested in any way that it somehow had involvement in

6  -- in this testing scheme?

7      A.  So I wasn't and we weren't aware of Synergen

8  until 2019.

9      Q.  So the answer is -- to that question, did any

10  of these interviews that you did or any of the

11  investigation you did identify Synergen as being

12  involved, the answer is, no, correct?

13      A.  We didn't ask any information in regards to

14  Synergen during any of those interviews.

15          MS. O'HARA:  Okay.  Objection,

16  nonresponsive.

17      Q.  (BY MS. O'HARA)  None of the interviewees or

18  tipsters or anyone else ever claimed that Synergen had

19  awareness of that billing scheme by United Toxicology or

20  US Toxicology, correct?

21      A.  No one provided those statements that I'm aware

22  of.

23      Q.  Let's go to topic number 13.  This question is:

24  The basis for UHC's belief, if it had one, that Synergen

25  knew or otherwise had reason to know that any



1   the direction of legal or with approval of legal to

2   place a flag on a provider.

3         Q.  So the information about the decision that led

4   to the hard deny flag for United Toxicology, is that all

5   contained in the SIU file for United Toxicology or no?

6         A.  The process to do that?

7         Q.  The process that was done to initiate the hard

8   deny flag for United Toxicology, is that all part of the

9   SIU file on United Tox or is that housed somewhere

10  separately?

11              MR. MINOCK:  Objection; assuming facts not

12  in the evidence.

13        A.  I don't know if there's any information, per

14  se, to indicate how and why that flag was play --

15  placed.

16        Q.  (BY MS. O'HARA)  With respect to United

17  Toxicology, you testified that there was a concern it

18  was a paper laboratory; is that correct?

19        A.  That it was a phantom laboratory --

20        Q.  That phantom laboratory.

21        A.  -- laboratory on paper.

22        Q.  Where did the concern that it was a phantom

23  laboratory come from?

24        A.  I believe it was as a result of a review of an

25  OIG investigation or qui tam investigation.



1    Q.  Who did the review of the qui tam

2    investigation?

3    A.  I believe someone at Payment Integrity had

4    identified that.

5    Q.  Was it part of the normal course of business

6    for Paper (sic) Integrity to go through the OIG

7    publications and press releases to identify certain

8    providers that should be given a second look?

9    A.  Who is Paper Integrity?

10    Q.  Okay.  I thought I said Payment Integrity.

11    A.  Oh.

12    Q.  That's what I meant.

13    A.  My apologies.

14    Q.  That's okay.

15    A.  Payment Integrity, it certainly could identify

16    news articles, media articles, as would SIU or anybody

17    else within the organization.

18    Q.  Okay.  And -- and so that process is normal

19    course of business; it doesn't take initiation by an

20    attorney to do it, correct?

21    A.  Anybody can read a newspaper or a news article

22    and identify that there's potential concern and want the

23    organization to look at it.

24    Q.  Of course.  But was it Payment Integrity's role

25    specifically to do that as part of their efforts to



1   prevent fraud, waste and abuse?

2             MR. MINOCK:  Objection; assumes facts not

3   in the evidence.  You can answer.

4        A.  I don't know if that's part of their normal

5   process.

6        Q.  (BY MS. O'HARA)  So Payment Integrity read an

7   article about an OIG qui tam involving paper

8   laboratories, and that's what led to the concern that

9   United Tox was a paper laboratory?

10       A.  No.

11       Q.  Okay.  Explain to me in your words how you

12  understood that that concern about United Toxicology

13  came to be.

14       A.  So I think there were a number of things kind

15  of in the industry in general just kind of

16  simultaneously happening as it relates to laboratory

17  services, right.  We had started to see as an industry,

18  insurance industry and laboratory industry, we had

19  started to see a large increase in potentially

20  fraudulent laboratory services and showing up in a -- in

21  a variety of ways.

22             And one of the ways that we were seeing as

23  an organization and as a broader industry was

24  nonexistent labs billing agencies or billing providers

25  for services they weren't providing.  And so there was



 1  suspicion that this might be one of those circumstances.

 2  And so there was a request to look at it further.

 3      Q.  And the suspicion that this United Toxicology

 4  might be a phantom or a paper lab, did it come from

 5  anywhere other than Payment Integrity reading the

 6  article about the OIG qui tam?

 7      A.  Not to the best of my knowledge.  I'm not sure.

 8      Q.  So with that point, did Payment Integrity turn

 9  the rest of the investigation over to SIU or did they

10  continue to work their -- work on it independent of the

11  SIU file?

12      A.  So at the time the Medicus investigation had

13  kind of concluded and there was -- concluded -- an

14  overpayment had gone out and not significantly long

15  after that, there was this flag that was placed on

16  United Toxicology.

17          And when the flag was placed on United

18  Toxicology, United Toxicology's attorneys reached out to

19  United Healthcare -- sorry -- there's a lot of United's

20  here -- United Healthcare and indicated that they wanted

21  to know why there was a flag and why we were not paying

22  their claims.

23          At that time, my understanding is that we

24  indicated that we put the flag on there with the

25  suspicion or the appreciation that they were not a real



 1        Q.   Can you be any more specific?

 2        A.   I don't recall the exact date.

 3             MS. O'HARA:  That's Number 2.

 4             (Deposition Exhibit 2 was marked.)

 5        Q.   (BY MS. O'HARA)  I'm going to hand you what's

 6   been marked as Exhibit Number 2 to your deposition.

 7             Do you recognize that?

 8        A.   Yes.

 9        Q.   What is it?

10        A.   This is the declaration that I executed in

11   connection with the settlement agreement.

12        Q.   What did this declaration have to do with the

13   settlement agreement, based on your understanding?

14        A.   It was part of the settlement agreements with

15   United Healthcare.

16        Q.   When you say part of the settlement

17   agreement, do you mean it was a requirement of the

18   settlement agreement you entered into with United?

19        A.   That was my understanding.

20        Q.   What was your understanding of why this

21   declaration that's been marked as Exhibit Number 2 to

22   your deposition was a requirement to the settlement you

23   entered into with United Healthcare?

24             MR. PINKER:  Objection, form.  And let me

25   just instruct you and remind you not to share any of



 1        Q.   Right.  But again, you don't have any
 2   personal knowledge upon which to base sworn testimony
 3   that Synergen was aware that the samples were not rerun
 4   before they were billed out by US Toxicology and
 5   Medicus?
 6        A.   I can't recall any conversation with Synergen
 7   about rerunning tests.  Either to rerun or not to
 8   rerun.
 9             MS. O'HARA:  Objection.  Nonresponsive.
10        Q.   (BY MS. O'HARA)  So as you sit here today,
11   you don't have any personal knowledge that Synergen was
12   aware that those samples had not been rerun before they
13   were billed out to US Toxicology and Medicus?
14             MR. SINTON:  Object to the form.
15        A.   I am not aware that Synergen specifically
16   discussed were these tests rerun.  I don't know what
17   Synergen knew or didn't know.
18        Q.   (BY MS. O'HARA)  All right.  After these
19   meetings that you reference in your declaration,
20   Paragraph 17 of your declaration, were there any
21   follow-up communications confirming what the process
22   would be to address the issue of the holds by United?
23        A.   There would have definitely been e-mails
24   between either myself or Corey Dudley or a member of
25   the Next Health billing department with Synergen to




 1 | discuss the logistics of how the samples that were to

 2 | be billed under US Toxicology and Medicus Laboratories

 3 | were going to be received by Synergen so that we could

 4 | ensure that they were properly billed.

 5 |     Q.   Was there any discussion that you recall ever

 6 | in these meetings in September of 2015 where someone

 7 | suggested that the samples should be billed for

 8 | improperly?

 9 |     A.   No.

10 |     Q.   All right.  I'd like to move to Paragraph 18

11 | of your declaration.  You say, "Synergen submitted

12 | these claims through US Toxicology and Medicus rather

13 | than United Toxicology which had performed most of the

14 | underlying tests because both Next Health and Synergen

15 | knew that UHC would have denied the claims if they were

16 | submitted through United Toxicology's billing

17 | credentials."

18 |         What do you base that statement on in terms

19 | of documentation, memory, or something else?

20 |     A.   We had received e-mail messages from Synergen

21 | noting that virtually all claims submitted to United

22 | Healthcare by United Toxicology were being declined.

23 |     Q.   Was Exhibit Number 3 to your deposition, that

24 | we looked at previously, one of those e-mails regarding

25 | notification of the denials by United?



1          MR. SINTON:  Object to the form.

2      A.    I would, I guess, specify as it relates to

3  Synergen billed because that was how they were involved

4  with us.

5      Q.    (BY MS. O'HARA)  Right.

6      A.    But, yeah, how many labs.  If we processed

7  those samples over a larger number of laboratories, it

8  would be less claims per month.

9      Q.    Right.  So the conversation wasn't about

10 let's process them all out of one lab and then divide

11 them up amongst other labs just for the billing.  It

12 was process, i.e., run the samples, and bill through

13 additional labs?

14     A.    I don't know if we specified testing

15 separately from billing.

16     Q.    Okay.  But process means testing, right?

17     A.    I mean, process means process.  It's handling

18 the sample.  I'm not a clinician.  So as it relates to

19 our relationship with Synergen, I'm talking about

20 bills.

21     Q.    Right.  But, again, in terms of Synergen's

22 perspective on the situation, they were viewing it as

23 processing, running samples and billing samples through

24 the same lab?

25          MR. SINTON:  Object to the form.



1      Q.    (BY MS. O'HARA)  You don't have any

2   information?

3      A.    I don't have any information about Synergen

4   and how they interpreted any messages, nor do I know if

5   the word process was specifically used in an e-mail or

6   not.  If you have an e-mail you'd like me to look at,

7   I'm happy to review it.

8      Q.    So back to Paragraph 19, this last phrase

9   where you say, "To try to avoid scrutiny from UHC."

10          Was that something you specifically recall

11   ever being implemented?  Actually, it's more than just

12   the last phrase.  It's the last phrase -- let me start

13   over.

14          The last phrase of your declaration Paragraph

15   19 says, "Suggested spreading out the claims across

16   multiple labs' billing information to try to avoid

17   scrutiny from UHC."

18          Was that process ever implemented by Synergen

19   or United -- Next Health?

20      A.    Not to my knowledge, no.

21      Q.    Okay.

22          MR. SINTON:  Laura, can we go off the record

23   real quick.

24          MS. O'HARA:  Yeah.

25          THE VIDEOGRAPHER:  Going off the record at



1  applicable, syndicated laboratory.

2          What I'm saying in that paragraph is that we

3  updated the ordering locations for those samples in

4  question to clarify that although they were coming

5  through on United Toxicology or US Toxicology's -- in

6  this paragraph I'm only referring to United Toxicology.

7  Even though they were coming through on United

8  Toxicology's lab information system, they were to be

9  billed under ALG's CLIA.

10     Q.   (BY MS. O'HARA)  What was your understanding

11  of why Andrew Hillman and Seymon Narosov told you to

12  instruct Synergen in that way?

13     A.   United Healthcare had ceased paying United

14  Toxicology for its laboratory samples.

15     Q.   Did you communicate this in an e-mail to

16  Synergen?

17     A.   Yes.

18     Q.   Were you in possession of that e-mail when

19  you signed your declaration or worked on Paragraph 20

20  of your declaration?

21     A.   I had seen a copy of it that was provided by

22  United Healthcare's counsel.

23     Q.   So the samples that you were instructing

24  Synergen on in Paragraph 20, were those laboratory

25  toxicology samples only?



NICK AUSTIN  Non-Confidential                              August 05, 2022
UNITED HEALTHCARE vs SYNERGEN HEALTH                                   91

1          A.    I believe they were -- I don't know whether

2     genetic samples were included in there, but the

3     majority of them would have been toxicology samples.

4          Q.    All right.  Other than the e-mail that you

5     said United Healthcare's lawyers showed you, did you

6     have any independent recollection of the content or the

7     instructions that you gave that you talk about in

8     Paragraph Number 20 to your declaration?

9          A.    The only information besides what I remember

10    from my time at Next Health is the e-mails, of which

11    there were more than one, that I saw as provided by

12    United Healthcare's counsel.

13         Q.    Okay.  But separate and apart from the

14    e-mail, did you actually have an independent

15    recollection of what you wrote in -- or what you signed

16    off on in Paragraph 20 of your declaration?

17              MR. SINTON:  Object to the form.

18         A.    I remember -- I remember that time period,

19    but more generally than what it is in the declaration.

20    The specificity in the declaration comes from review of

21    the e-mails.

22         Q.    (BY MS. O'HARA)  Okay.  So let's just go

23    through Paragraph 20 and tell me which part you do have

24    specific recollection of.

25         A.    I remember it -- I could not have clarified



NICK AUSTIN  Non-Confidential                                    August 05, 2022
UNITED HEALTHCARE vs SYNERGEN HEALTH                                        92

 1  exactly what the ordering locations look like without
 2  review of the e-mails.
 3      Q.   What is your understanding -- anything else
 4  in Paragraph 20 that you could not have signed off on
 5  without looking at the e-mails?
 6      A.   No.
 7      Q.   What is your understanding of the meaning of
 8  ordering location in the Next Health system?
 9           MR. SINTON:  Object to the form.
10      Q.   (BY MS. O'HARA)  Do you have an understanding
11  of the meaning of the ordering location within the Next
12  Health system?
13           MR. SINTON:  Object to form.
14      A.   It's a way of identifying which laboratory or
15  syndicated laboratory the sample originated from.
16      Q.   (BY MS. O'HARA)  Are you aware of there being
17  times where the ordering location instead referred to
18  the location of the physician's office where the sample
19  had actually been drawn?
20      A.   I am not.
21      Q.   Who inputted the information regarding
22  ordering location into the system -- the Next Health
23  system?
24      A.   The data entry team that was employed by Next
25  Health.



1        Q.    Do you recall ever having any conversations

2   with anyone at Synergen about the content of your

3   Paragraph 20 to your declaration?  I'm sorry.

4   Paragraph 19 or 20.

5        A.    I don't recall any specific e-mail

6   conversations about those paragraphs.

7        Q.    Okay.  I'm referring to the old-fashioned

8   understanding of the word conversation, which meant,

9   like, verbally.

10       A.    Not that I can remember.

11       Q.    Okay.  And verbally either in-person meeting

12  or on a telephone call?

13       A.    We had weekly update meetings over the phone

14  with Synergen, but I can't recall the specific topics

15  discussed on those meetings.

16       Q.    With respect to Paragraph 21 of your

17  declaration you say, "In August 2016, based on

18  instructions from Andrew Hillman and Seymon Narosov, I

19  communicated with several Synergen and Next Health

20  employees about submitting substance abuse claims for

21  patients with UHC insurance to UHC using True Labs'

22  billing information.  The information for these claims

23  was sent to Synergen through the United Toxicology

24  laboratory information system."

25            All right.  Let's stop right there.



1        Q.   (BY MS. O'HARA)  So we're actually talking

2    about a clinical function here, though, not a legal

3    function.  I'm saying based on your understanding of

4    the laboratory processes while you were at Next Health,

5    True Labs had reference agreements with other CLIA

6    certified laboratories in the company, right?

7             MR. SINTON:  Objection to form.

8             MR. PINKER:  Join.

9        A.   We had a number of reference agreements.  I

10   believe True Labs had reference agreements with United

11   Toxicology and US Toxicology.

12       Q.   (BY MS. O'HARA)  And what does that mean in

13   your -- based on your understanding in your role?

14       A.    That United Toxicology or US Toxicology would

15   test a sample for a fee.

16       Q.   So you don't have any personal knowledge as

17   to whether that happened with respect to the

18   instructions that you gave in Paragraph 21 of your

19   declaration?  Those samples.

20             MR. SINTON:  Object to the form.

21       A.   Can you repeat the question?

22       Q.   (BY MS. O'HARA)  Yes.  How do you know that

23   via reference agreements those samples weren't run by

24   US Toxicology or United Toxicology and then billed by

25   True Labs?



 1       A.    Those samples were run by United Toxicology

 2    and US Toxicology and billed by True Labs.

 3       Q.    Okay.  But what I'm saying is how do you know

 4    it wasn't done under a reference agreement which is

 5    permissible, correct?

 6             MR. PINKER:  Objection.  Legal conclusion.

 7             MR. SINTON:  Object to the form.

 8       A.    There were reference agreements in place,

 9    they could have been.

10       Q.    (BY MS. O'HARA)  Okay.  All right.  And so

11    earlier you said -- you testified along the lines of

12    you thought your answer to a question might be

13    different than United Healthcare's answer.

14             What did you mean by that?

15       A.    Given where we're at today, clearly United

16    Healthcare didn't feel that ALG or True Labs billing

17    for samples that were processed by United Toxicology

18    and US Toxicology was appropriate.

19       Q.    At the time, did you feel it was appropriate?

20       A.    Yes.

21       Q.    Was your feeling that it was appropriate

22    based upon conversations you had with others?

23       A.    We had a compliance department which hadn't

24    expressed concerns about billing for samples through

25    laboratories that did not perform the actual test.



1          A.    It was being concerned about the relationship

2     with ADAR clinic for sure.

3          Q.    (BY MS. O'HARA)   On Paragraph 22 of your

4     declaration you say, "Synergen closely monitored

5     incoming payments from UHC to determine whether

6     labeling claims for services performed by United

7     Toxicology with ALG or True Labs' billing information

8     was working."

9               When you say, "To determine whether labeling

10    claims for services performed by United Toxicology" --

11    was working -- "with ALG or True Labs billing

12    information was working," where do you get that?

13    What's the basis for that statement?

14         A.    I mean were we able to successfully collect

15    on those samples.

16         Q.    Right.  And monitoring payments was part of

17    what Next Health had hired Synergen as a revenue cycle

18    management company to do; that was part of their

19    regular responsibilities, correct?

20         A.    Yes.

21         Q.    All right.  So -- so other than it being part

22    of their regular responsibilities, is it your testimony

23    there was some additional monitoring that was done

24    here?

25         A.    There was more frequent communication that



1  was occurring at that time.

2        Q.   And when you say more frequent communication,

3  what do you mean by that?

4        A.   I mean that Next Health employees, including

5  Andrew Hillman and Seymon Narosov, were sending

6  requests to Synergen asking for status updates.

7        Q.   So Synergen was complying with the requests

8  made to it by Next Health for more frequent reporting

9  on reimbursement; is that right?

10       A.   Synergen was replying to messages received by

11  Next Health, in addition to providing the routine

12  reporting to me.

13       Q.   Okay.  And when you say in the second part of

14  that Paragraph 20 -- 22, "Synergen sent near-daily

15  updates about UHC payments to ALG and True Labs," is

16  that again near-daily based upon requests by Seymon

17  Narosov and Andrew Hillman?

18       A.   Not just them, but requests from Next Health

19  members and employees.

20       Q.   In other words, Synergen didn't decide to

21  provide near-daily updates of its own accord, it was

22  instructed by Next Health to do that?

23       A.   I don't recall Synergen changing their

24  process other than to reply to requests from Next

25  Health.



JOSHUA J. DANIEL                                          July 29, 2022
UNITED HEALTHCARE V SYNERGEN HEALTH LLC                            101

 1  Mr. Sinton and his partner was through legal counsel.
 2      Q.    So when you provided the document -- the
 3  content of this declaration, was that in person at the
 4  mediation?
 5      A.    Yes, ma'am.
 6      Q.    Was it your understanding that signing this
 7  declaration was a requirement of you being dismissed
 8  from the lawsuit that had been filed against you by
 9  United?
10      A.    No, I didn't -- I didn't take it as a
11  requirement.  It was part of the information that we
12  discussed there at the mediation, but I don't -- I can't
13  say that this declaration was required in order to
14  settle.
15      Q.    Well, what is your understanding of why it
16  was addressed during the mediation?
17      A.    My understanding was -- is that part of the
18  mediation was to discuss financially a release, as well
19  as to discuss information.  But I don't know -- in other
20  words, there was a financial component and then there
21  was conversations; and I don't know what of the two
22  actually led to settlement.
23      Q.    But payment of a settlement amount and
24  signing a declaration was part and parcel of the release
25  you got to get out of the lawsuit United filed against



JOSHUA J. DANIEL                                          July 29, 2022
UNITED HEALTHCARE V SYNERGEN HEALTH LLC                        102

1   you?

2       A.    What I am saying is, is I don't know if

3   there, for example, had just been a financial settlement

4   if that would have gotten me out of the lawsuit.  I

5   don't know that.  Does that make sense?  I don't know

6   what United Healthcare exactly needed to release us from

7   the lawsuit.  It could have just been all a financial

8   thing, or it could have been just all -- do you see what

9   I'm saying?

10      Q.    Well, it wasn't just a financial thing.  You

11  signed the document.

12      A.    Right.  Correct.  Yeah, it was --

13      Q.    Right.

14      A.    -- in this -- yes.

15      Q.    Okay.

16      A.    Yes.

17      Q.    And it was attached to the settlement

18  agreement.  True?

19      A.    Yes, ma'am, that is correct.

20      Q.    And that document you didn't bring with you

21  today because objections have been filed on your behalf

22  saying we don't get to see it.  Is that your

23  understanding?

24      A.    Well, I provided that documentation to my

25  attorney because he told me to send it to him, all the



 1  sure that -- that all patient statements were going out

 2  for them.

 3      Q.    But there was no other nexus between the

 4  United meeting and this directive?

 5      A.    I don't recall at the United Healthcare

 6  meeting specifically talking about patient statements.

 7      Q.    All right.  And is it -- is it your testimony

 8  that you don't -- well, were you involved in giving any

 9  direction to Synergen on sending out patient statements?

10      A.    Not that I recall.

11      Q.    Okay.  Did you hear or see anyone giving

12  Synergen direction on sending out patient statements?

13      A.    No, because I didn't recall who at Next

14  Health directed them to go send out patient statements.

15  I just know that it was done.

16      Q.    Well, how do you know that it was done?

17      A.    Because I remember just coming out of the

18  meeting with United Healthcare.  It was we need to make

19  sure that all the reconciliation -- I knew that it was

20  an initiative, I knew it was something that needed to

21  happen; but I don't know who individually by name

22  specifically directed that to go get done.

23      Q.    Well, other than knowing that your group at

24  Next Health had discussed after the United meeting that

25  statements needed to be sent, how do you know that



1  anyone at Next Health gave that direction to Synergen?
2  That's what I'm asking.
3      A.    Well, I just assumed that it was going to
4  happen because we as a group talked about that it needed
5  to happen.
6      Q.    Well, you understand when you signed this
7  declaration you said that the statements are based on
8  personal knowledge.  True?
9      A.    Yes.
10     Q.    All right, then.  So are you saying you don't
11 have any personal knowledge that Next Health directed
12 Synergen to send out patient statements to United
13 Healthcare members that had not previously received any
14 statements so that fewer patients would tell United
15 Healthcare that they had never received any bill?
16     A.    No.  What I'm saying is, you asked me who
17 specifically directed Synergen to send out patient
18 statements; and I responded that I don't know who
19 specifically did.  That's different from saying that I
20 don't know that anyone --
21     Q.    Okay.
22     A.    -- at Next Health ever told them.
23            MS. O'HARA:  Well, objection,
24 nonresponsive.
25     Q.    (BY MS. O'HARA)  I also asked you:  How do



 1  statements to United Healthcare people.  So it would

 2  have had to have been someone in Next Health.

 3      Q.    But it is still an assumption; agreed?

 4      A.    No, I don't agree, because I -- I don't

 5  believe commonsense-wise that someone, a consultant or

 6  someone walking up and down the streets, called Synergen

 7  and said, "We need to go ahead and have patient

 8  statements to send out to United Healthcare" and they

 9  did it.

10      Q.    Okay.

11            MS. O'HARA:  Objection, nonresponsive.

12      Q.    (BY MS. O'HARA)  What about the last phrase,

13  "...so that fewer patients would tell United they had

14  never received any bill or statement."

15            You don't have any knowledge of that being

16  told to Synergen.  True?

17            MR. SINTON:  Objection, form.

18      A.    So I'm sorry.  Can you rephrase that to where

19  I can understand it a little bit better?

20      Q.    (BY MS. O'HARA)  All right.  Do you see the

21  last phrase of the document that you signed,

22  paragraph 30?

23      A.    Yes, ma'am.

24      Q.    All right.  You don't have any personal

25  knowledge that that was shared with Synergen, that the



 1  reason for sending out statements was so that fewer

 2  patients would tell United they had never received any

 3  bill?

 4      A.    No, that was an assumption on why these

 5  patient statements needed to go out.

 6      Q.    Okay.  What's the next paragraph where you

 7  discussed Synergen in your declaration?

 8      A.    (Reviewing document.)  Paragraph 46.

 9      Q.    Okay.  And this paragraph is basically what

10  you had testified to earlier in terms of the reasons for

11  the meeting or the content of the meetings that Next

12  Health had with Synergen after United stopped paying the

13  claims?

14      A.    Yes, ma'am.

15      Q.    Okay.  Let's now look at paragraph 47.

16      A.    Okay.

17      Q.    So you say, (Reading:)  Everyone in the

18  meetings discussed that the claims were being submitted

19  through ALG even though they had not performed the

20  tasks.

21           That's different than what you testified

22  to earlier about nobody saying that the tests had not

23  been performed by the lab that they were going to be

24  billed under, the ALG lab.  True?

25           MR. SINTON:  Objection, form.



JOSHUA J. DANIEL                                        July 29, 2022
UNITED HEALTHCARE V SYNERGEN HEALTH LLC                          135

1  Synergen had any awareness that those labs being

2  submitted through ALG were not being rerun, that those

3  specimens were not being rerun through ALG by Next

4  Health?

5      A.    Well, Nick's e-mail says that they are

6  looking for another lab.

7      Q.    Right.

8      A.    This agreement over here talks about ALG.

9      Q.    Right.

10      A.    So what this paragraph doesn't say here is,

11  "We're going to reprocess the labs through ALG."  It

12  says, "We're looking for a new lab."

13           So I'm not trying to be argumentative; but

14  what I'm trying to say is, is ALG was already a lab at

15  the time that this e-mail was written by Nick.

16      Q.    Right.  But if -- what I'm saying is, from

17  Synergen's perspective, there would be no reason --

18  because, you know, this instruction is given, hold the

19  samples, don't bill anything else under UT or US Tox

20  until we can set up a new lab and rerun those samples

21  and bill through the new lab.

22      A.    Yes.

23      Q.    That's what the e-mail is saying; correct?

24      A.    Yes.

25           MR. SINTON:  Objection.  Object to the



JOSHUA J. DANIEL                                                    July 29, 2022
UNITED HEALTHCARE V SYNERGEN HEALTH LLC                                    136

```
 1   form.
 2        Q.    (BY MS. O'HARA)  June of 2016, June 24, 2016.
 3              So --
 4        A.    Yes, ma'am.
 5        Q.    -- so certainly that's a very direct
 6   statement that Synergen is not supposed to just rebill
 7   under some new lab, specimens that were run by another
 8   lab.  They are to wait until the new lab is set up and
 9   then the specimens will be rerun by Next Health and then
10   they will be billed to United; correct?
11        A.    Correct.  Right.
12        Q.    All right.  So is there any information you
13   have that would suggest Synergen was aware that that
14   process would be different when it came to what you have
15   said in paragraph 47 about billing through ALG?  In
16   other words, Synergen was not being told:  Just take
17   those bills and rerun them or -- or resubmit them
18   through another lab; and we're not going to bother to
19   rerun the specimens.  They weren't told that in that
20   meeting; correct?
21              MR. SINTON:  Object to form.
22        A.    They weren't told in the meeting that I
23   reference in paragraph 47.  It wasn't specified that ALG
24   had not run those samples.
25        Q.    (BY MS. O'HARA)  Right.
```



JOSHUA J. DANIEL                                        July 29, 2022
UNITED HEALTHCARE V SYNERGEN HEALTH LLC                           137

1     A.    It wasn't specifically said in the meeting.

2     Q.    Right.  And you don't have any knowledge from

3  any source that that was ever said to Synergen.  True?

4     A.    That it was never communicated to Synergen,

5  that is true.

6     Q.    Right.  Right.

7           And it is not your testimony, Mr. Daniel,

8  that Mr. Gunawardena, Mr. Mel Gunawardena or Mr. Duminda

9  Gunawardena or any of their employees or employees of

10 Synergen were committing fraud with respect to United

11 Healthcare, is it?

12    A.    No.

13    Q.    All right.  You believe them to be good

14 people?

15    A.    I believe they are good people.

16    Q.    And you never saw any evidence of --

17    A.    I'm sorry.  Just -- and I'm not -- I -- I

18 know Mel.  I've met Mel.  I know D.  I've met D.  I'm

19 not saying I know everyone at Synergen.

20    Q.    Right.  But you understood they were running

21 the company?

22    A.    Yes, they were the owners of the company.

23    Q.    Right.  And they were involved in the

24 operation of the company, not on the granular level, but

25 certainly involved enough to know that they would not



1       Q.  Go ahead.

2       A.  So you would like to know the amount

3  reimbursed for Date of Service prior to --

4       Q.  December 6, 2015.

5       A.  Yes.  Let me obtain that information.

6            THE REPORTER:  Are we going off the record?

7            MS. O'HARA:  Yes.  Off the record.  Sorry.

8            THE VIDEOGRAPHER:  We're off the record.  The

9  time is 5:54.

10            (A recess was taken.)

11            MS. O'HARA:  Can we read back the last

12  question?  Play it back.  Sorry.  The last question.

13            THE VIDEOGRAPHER:  We're back on the record,

14  the time is 5:57.

15            (The previous question was played back)

16  BY MS. O'HARA:

17       Q.  Mr. Adams, did you have an opportunity to

18  calculate make those calculations we discussed before

19  the break?

20       A.  Yes, I did.  For opinion five, the amount of

21  the reimbursements related to that that were prior to

22  December 6 2015 Date of Service was $5,483,320.  And

23  for opinion six, for the amount of reimbursements for

24  Date of Service prior to December 6, 2015, the amount

25  was $2,398,045.



## DECLARATION OF COREY DUDLEY

1.      I, Corey Dudley, am over 18 years of age and of competent mind to make this declaration. The facts stated in this declaration are based on my personal knowledge and are true and correct.

2.      In or around February 2012, I started working for Business Partners in Healthcare ("BPIH") after William Baus and Josh Daniel recruited me to the company. I worked in the billing department and my responsibilities included, among other things, overseeing accounts receivables and revenue cycle management. As part of my responsibilities, I managed accounts receivable and call center staff in India and the United States. I reported to William Baus.

3.      In or around 2013, a *qui tam* lawsuit was filed against BPIH and certain affiliated entities, including Medicus Laboratories. As part of the resolution of that lawsuit, Medicus paid $5 million and entered into a Corporate Integrity Agreement ("CIA") with the United States government. Once the CIA was in place, approximately one-third of my time was devoted to ensuring Medicus honored its reporting obligations under the terms of the CIA.

4.      BPIH moved office locations in approximately 2014 from a space on Alpha Road to a building at 5710 LBJ Freeway in Dallas. Shortly thereafter, the owners of BPIH, Medicus, and other affiliated entities, including Andrew Hillman, Semyon Narosov, and Josh Daniel, created Next Health.

5.      Next Health absorbed the administrative operations of BPIH and other affiliated entities and acted as a parent company and owner to Medicus and other affiliated entities, such as U.S. Toxicology and United Toxicology. Next Health owned and operated several different laboratories. I can't recall which laboratories were actually licensed to perform laboratory

APP 000058

services, but I now know that some laboratories were not licensed to perform any laboratory services.

6.      Around the time that Next Health was created, William Baus left and I became Next Health's Director of Billing Services for laboratory operations. I reported to Nick Austin.

7.      As Next Health's Director of Billing Services, I oversaw Next Health's laboratory billing operations. In this role, I coordinated and communicated with Synergen (Next Health's third-party billing agent) about claim submissions to payors, including UnitedHealthcare ("UHC"). I oversaw patient payment collection policies and dealt with complaints from patients and providers about bills (or EOBs that they thought were bills). I also assisted Next Health executives and sales representatives in extracting and/or creating reports that showed specimen referral volume, payment amounts, and other billing information related to tracking laboratory specimens.

8.      When laboratory specimens were sent to Next Health, accessioning teams sorted the specimens and entered demographic information into LabDaq, a software program. Next Health transmitted claim information to Synergen in HL7 data files that came from Next Health's LabDaq software.

9.      Andrew Hillman and Nick Austin decided which laboratory entity would be used to submit claims to payors, including UHC. I know that their decisions were not based on whether any specific laboratory actually performed any testing services.  Instead, when choosing which Next Health-affiliated laboratory would be listed as the billing entity, Hillman and Austin focused on how best to maximize payment from insurers and/or how to avoid claim denials. Oftentimes, the laboratories they chose had not performed the test.

APP009052
App. 2

10.     Hillman, Austin and others would frequently ensure that claims submitted to UHC contained misrepresentations about the Next Health labs. For example, in 2015 they instructed me to inform Synergen that all Sirius Laboratories tests should be billed to UHC through Medicus Laboratories. The document attached hereto as Exhibit A (NH-00065524) is a true and correct copy of an email I sent to Synergen relaying this instruction. Misrepresenting lab information in connection with UHC claims was routine at Next Health.

11.     For example, in or around June 2016, UHC was denying many claims submitted by United Toxicology and U.S. Toxicology. On June 24, 2016, Nick Austin instructed Synergen to stop submitting claims to UHC through United Toxicology and U.S. Toxicology because Next Health was "working to set up another lab to accession/process/bill through… ." The document attached hereto as Exhibit B (NH-00017094) is a true and correct copy of an email Nick Austin sent, which I was copied on, along with Andrew Hillman, Semyon Narosov, Mike Austin, and Josh Ihde, where he gave this instruction to Synergen. Approximately three weeks later Nick Austin informed Synergen that Next Health had created a new lab that it would use to bill for "UHC samples," despite the fact that the tests were "going to come through United Toxicology." The document attached as Exhibit C (NH-00017053) is a true and correct copy of an email Nick Austin sent with this direction. Indeed, Nick Austin instructed Synergen to submit claims to UHC through the new lab regardless of where the specimens were actually referred, or where any services were actually performed. The new lab was "ALG" (a/k/a American Laboratories Group).

12.     In another example, Josh Ihde and other Next Health leaders wanted to bill Next Health lab claims to UHC through Champion Medical Center – an affiliated hospital in

App. 55
APP009055

Louisiana. The document attached hereto as Exhibit D (NH-00064791) is a true and correct copy of an email I sent at the direction of Next Health leadership to implement this plan.

13. Charges for services were usually set by Andrew Hillman and based on a multiplier of the Medicare fee schedule. Charges were generally set around 15x – 17x the Medicare fee schedule.

14. In or around 2015, Next Health signed a deal with MultiPlan, which resulted in payors paying a percentage of Next Health's billed charges. Jeremy Rossell ran a financial analysis that showed that the MultiPlan deal would result in higher reimbursements if Next Health increased the amounts it charged for tests. After that, Jeremy Rossell and Andrew Hillman decided to increase the charges for services to around 17x – 26x the Medicare fee schedule.

15. As Director of Billing Services, I was supposed to manage patient billing issues. At Next Health this did not mean collecting deductibles, coinsurance and copayments from patients. Instead, it meant explaining "Next Health's billing policy" to patients and doctors. Josh Daniel, Nick Austin, Andrew Hillman and others made clear to me that Next Health did not intend to collect deductibles, coinsurance and copayments from patients and they instructed me and my team to make this clear to patients. The document attached as Exhibit E (NH-00061751) is a true and correct copy of an email where a provider representative asked me to "Next Health's billing policy" to a patient so "that their concerns about the bills they [were] receiving from United Toxicology and Medicus Laboratories" would be alleviated. The document attached as Exhibit F (NH-00064878) is a true and correct copy of another email where a provider asked me to work with a patient who wanted written confirmation that he would not owe any money in connection with ALG and True Lab claims. Consistent with "Next Health's

App. 54

billing policy," the patient was told he did not have to pay anything. The document attached as Exhibit G (NH-00046140) is a true and correct copy of another email exchange where a patient wanted confirmation of a "zero balance notice" received from Next Health. The document attached as Exhibit H (NH-00061094) is a true and correct copy of an email exchange where a cancer patient was upset about a $15,000 bill she received from ALG. Again, per "Next Health's billing policy" this member was told she did not have to pay anything.

16.     The documents attached as Exhibits I (NH-00017153) and J (NH-00016786) are true and correct copies of two example emails that reflect Next Health's policy of routinely writing off claims and not holding patients financially responsible for cost-sharing amounts.

17.     The document attached as Exhibit K (NH-00024301) is a true and correct copy of an email exchange where a provider asked Next Health to cap bills to patients at $100 to avoid angry patients. I remember several of these types of emails from my time at Next Health. Next Health agreed to cap bills for providers, to write off patient balances, and to send bills to doctors instead of patients so the doctors could discard the bills or explain Next Health's billing policy to the patients before the patient got angry.

18.     These are just a few manifestations of Next Health's policy. In all cases, I was instructed by Next Health's owners to forego collection of patient deductibles, copayments and coinsurance.

19.     Next Health never informed UHC that it was not holding UHC members responsible for their deductible, coinsurance and copayment charges.

20.     I helped pull files and medical records when responding to audit requests. I would often see requisition forms that were missing important information (including physician and/or patient signatures). I always told Next Health's compliance officer (Jose Tabuena or Chris

APP-000057
App. 5

Anderson) about these issues. It was generally known throughout the Next Health offices that some Next Health clients were using stamps of doctor signatures. It was also generally known that Next Health sales staff were pushing doctors to use custom profiles that included all toxicology tests that could be run by Next Health. Doctors were also being pressured to pair codes for screening tests and confirmation tests together so that Next Health could increase its charges.

21.     After Semyon Narasov and Andrew Hillman were indicted in late 2016 and UnitedHealthcare filed a lawsuit in early 2017, everything slowed down at Next Health. I continued to work at Next Health until November 2017. Before I left, Andrew Hillman offered me a raise and "virtual ownership shares" to stay with Next Health (although Next Health may have become Critical Healthcare Management at that point in time). I felt like this was intended to be hush money and I declined the offer.

22.     Jeremy Rossel, son of Cary Rossel, served as CFO of Next Health and ran a team of finance and accounting personnel that Hillman described as the team of people who manage our 300 LLCs during tours of Next Health's building at 5710 LBJ Freeway. Jeremy Rossel and his team were in charge of paying commissions to Next Health's sales staff. They were also responsible for paying "distributions" to Next Health's owners and investors.

23.     Cary Rossel was an owner in Next Health and several of its related companies. He had various side deals with Hillman and Narosov. He funded shortfalls in payroll for Next Health and he received distributions of company profits. After Hillman and Narosov were indicted, Cary Rossel became the face of Critical Healthcare Management ("CHM") – which was just a rebranding effort in connection with several of Next Health's affiliated LLCs. It was well-

APP 00058
App. 58

known through Next Health's offices that Cary was made the fact of CHM because "he was cleaner" than Hillman and Narosov. Cary's daughter Ilana is married to Semyon Narosov.

    I declare under penalty of perjury that the foregoing is true and correct.

Date: 5/13/19

Corey Dudley

App.57

**RESPONSE:** Plaintiffs admit that they investigated claims for lab services submitted by at least one Next Health subsidiary laboratory prior to April 1, 2015, but deny that any of the claims are at issue in this lawsuit. Plaintiffs deny that Plaintiffs were aware of Synergen's role or involvement in the submission of any of the claims it investigated prior to April 1, 2015.

**REQUEST FOR ADMISSION NO. 19:** Admit that prior to March 1, 2015 YOU had begun investigating claims for laboratory services submitted by Synergen on behalf of at least one Next Health subsidiary laboratory.

**RESPONSE:** Plaintiffs admit that they investigated claims for lab services submitted by at least one Next Health subsidiary laboratory prior to March 1, 2015, but deny that any of the claims are at issue in this lawsuit. Plaintiffs deny that Plaintiffs were aware of Synergen's role or involvement in the submission of any of the claims it investigated prior to March 1, 2015.

**REQUEST FOR ADMISSION NO. 20:** Admit that prior to February 1, 2015 YOU had begun investigating claims for laboratory services submitted by Synergen on behalf of at least one Next Health subsidiary laboratory.

**RESPONSE:** Plaintiffs admit that they investigated claims for lab services submitted by at least one Next Health subsidiary laboratory prior to February 1, 2015, but deny that any of the claims are at issue in this lawsuit. Plaintiffs deny that Plaintiffs were aware of Synergen's role or involvement in the submission of any of the claims it investigated prior to February 1, 2015.

**REQUEST FOR ADMISSION NO. 21:** Admit that prior to January 1, 2015 YOU had begun investigating claims for laboratory services submitted by Synergen on behalf of at least one Next Health subsidiary laboratory.

**RESPONSE:** Plaintiffs admit that they investigated claims for lab services submitted by at least one Next Health subsidiary laboratory prior to January 1, 2015, but deny that any of the claims are at issue in this lawsuit. Plaintiffs deny that Plaintiffs were aware of Synergen's role or involvement in the submission of any of the claims it investigated prior to January 1, 2015.

**REQUEST FOR ADMISSION NO. 22**: Admit that United's Special Investigations Unit ("SIU") launched an investigation into claims for laboratory services submitted on behalf of Next Health subsidiary laboratory United Toxicology during the year 2014.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 23**: Admit that United's Special Investigations

APP000060