## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY,

     Plaintiffs,

  v.

SYNERGEN HEALTH, LLC,

     Defendant.

Case No. 3:20-cv-00301-X

## PLAINTIFFS' RESPONSE TO SYNERGEN'S MOTION FOR SUMMARY JUDGMENT

**FIGARI + DAVENPORT, LLP**

Andrew G. Jubinsky
andy.jubinsky@figdav.com

901 Main Street, Suite 3400
Dallas, TX 75202
T: (214) 939-2000

**SINTON, SCOTT, MINOCK & KEREW**

Scott P. Kerew
skerew@ssmklaw.com
Adam J. Sinton
asinton@ssmklaw.com
Benjamin D. Van Horn
bvanhorn@ssmklaw.com
Joseph Minock
jminock@ssmklaw.com

1550 Market Street, Suite 400
Denver, Colorado 80202

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

STATEMENT OF FACTS..................................................................................3

    I.    <u>Background</u> ...................................................................................... 3

    II.   <u>Timeline</u> ........................................................................................ 6

        A.   **UHC denies United Toxicology claims** ............................... 6

            *1.   Scheme 1: Claims falsely representing that US Toxicology performed tests*................................................................ 6

            *2.   Scheme 2: Claims falsely representing that Medicus performed tests*  7

        B.   **UHC removes flag on United Toxicology**........................ 10

        C.   **UHC denies United Toxicology, US Toxicology, and Medicus claims because of the ADAR Group** .................... 11

            *3.   Scheme 3: Claims falsely representing that ALG performed the tests* .................................................... 12

            *4.   Scheme 4: Claims falsely representing that True Labs performed tests* .............................................. 14

        D.   **Litigation** ....................................................................... 15

        E.   **Synergen changed its corporate testimony on the most important issue in the case via errata after reviewing UHC's expert report** ................................................. 15

ARGUMENT AND CITATIONS OF AUTHORITY.....................................19

    I.    **THE EVIDENCE CREATES A GENUINE DISPUTE OF MATERIAL FACT ON UHC'S FRAUD CLAIM, WHICH MUST BE DECIDED BY A JURY.** .......................................................... 20

        A.   **A reasonable factfinder could conclude that Synergen knowingly or recklessly made material misrepresentations to UHC**.......................................................................... 20

        B.   **There is sufficient evidence for a reasonable factfinder to conclude that UHC justifiably relied on Synergen's representations.**........................................................... 24

C.   There is sufficient evidence for a reasonable factfinder to conclude that Synergen caused UHC harm...................................... 28

II.   UHC'S FRAUD CAUSE OF ACTION IS NOT BARRED BY THE STATUTE OF LIMITATIONS. .................................................. 31

A.   UHC's cause of action for claims submitted that falsely represented that Medicus, ALG, or True Labs performed the tests accrued within the limitations period................................. 31

B.   Synergen does not establish that UHC's fraud cause of action accrued prior to December 6, 2015.................................................. 34

CONCLUSION............................................................................................39

# TABLE OF AUTHORITIES

**<u>Cases:</u>**

*Aland v. Martin,*
    271 S.W.3d 424, 429–30 (Tex.App.—Dallas 2008), no pet. .........................21

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 251 (1986) ........................................................................19

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.,*
    590 S.W.3d 471, 497 (Tex. 2019) ...........................................................25

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 325 (1986) ........................................................................19

*Clark v. Truist,*
    No. 3:19-cv-00589-X, 2022 WL 296053, at *7 (Feb. 1, 2022 N.D. Tex.).........34

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,*
    51 S.W.3d 573, 577 (Tex. 2001) .............................................................25

*Field v. Mans,*
    516 U.S. 59, 70–71 (1995) .................................................................25, 26

*Grant Thornton LLP v. Prospect High Income Fund,*
    314 S.W.3d 913, 923 (Tex. 2010) ...........................................................25

*Henry v. Bank of Am.,*
    147 A.D.3d 599 (N.Y. 2017) ...................................................................32

*Hooks v. Samson Lone Star, Ltd. P'ship,*
    457 S.W.3d 52, 57 (Tex. 2015) .......................................................31,32,34

*Int'l Shortstop, Inc. v. Rally's, Inc.,*
    939 F.2d 1257, 1265 (5th Cir. 1991)........................................................21

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.,*
    546 S.W.3d 648, 653 (Tex. 2018) ......................................................19,25

*Landmar, LLC v. Wells Fargo Bank, N.A.,*
    978 F.Supp.2d 552, 562 (W.D.N.C. 2013)................................................34

*Lewis v. Bank of Am. NA,*

343 F.3d 540 (5th Cir. 2003) ...........................................................25,26

*Nwokedi v. Unlimited Restoration Specialists, Inc.*,
428 S.W.3d 191, 199 (Tex.App.—Houston [1st Dist.] 2014), pet. denied........21

*Potter v. Anthony Crane Rental of Texas, Inc.*,
896 S.W.2d 845, 850 (Tex.App.—Beaumont 1995), pet. denied...................29

*Quintana v. Wiener*,
717 F.Supp. 77, 80 (S.D.N.Y. 1989) .......................................................32

*Ruebeck v. Hunt*,
142 Tex. 167, 176 (Tex. 1943) ...............................................................34

*Russell v. Russell*,
865 S.W.2d 929, 933 (Tex. 1993) ...........................................................21

*Spoljaric v. Percival Tours, Inc.*,
708 S.W.2d 432, 435 (Tex. 1986) ...........................................................21

*Stafford v. Wilkinson*,
304 S.W.2d 364, 367 (Tex. 1957) ...........................................................32

*Texas Dept. of Trans. v. Olson*,
980 S.W.2d 890, 893 (Tex.App.—Fort Worth 1998), no pet........................29

*TIG Ins. Co. v. Aon Re., Inc.*,
521 F.3d 351, 357 (5th Cir. 2008) ...........................................................34

*TIG Specialty Ins. Co. v. Pinkmonkey.com, Inc.*,
375 F.3d 365, 369 (5th Cir. 2004) ...........................................................19

*Tompkins v. Cyr*,
202 F.3d 770, 782 (5th Cir. 2000) ...........................................................29

*Topalian v. Ehrman*,
954 F.2d 1125, 1131 (5th Cir. 1992). ......................................................29

*Travis v. City of Mesquite*,
830 S.W.2d 94, 98 (Tex. 1992) ...............................................................29

*United Healthcare Servs., Inc. v. First St. Hosp. LP*,
570 S.W.3d 323 (Tex.App.—Houston [1st Dist.] 2018), pet. denied......31-40

*Via Net v. TIG Ins. Co.*,

211 S.W.3d 310 (Tex. 2006) ...............................................................34

**<u>Rules:</u>**

Fed. R. Civ. P. 56..........................................................................................18

**INTRODUCTION**

This is a billing-fraud case. Defendant Synergen Health LLC, a healthcare billing company, tricked Plaintiffs ("UHC") into paying millions of dollars for lab tests by changing the names and billing information in the claims Synergen submitted to UHC. Synergen worked for Next Health, the parent company to several laboratories, and when UHC stopped paying claims from one of those labs, Synergen shifted the claims to be submitted under a different one of those lab's information—misrepresenting where the services were performed so that UHC would make payments it would not have otherwise made. UHC originally sued Next Health labs for underlying conduct that led UHC to deny claims from those labs, but then discovered this whack-a-mole fraud scheme and sued Synergen.

Synergen portrays itself as just a simple messenger, but a jury must decide what to make of Synergen's conduct. Synergen harvested claim information from one lab's computer system, filtered out the information relating to UHC members, and then submitted that information in claims to UHC under a different lab's name. Synergen tracked the claims that it re-labeled through a relatively simple naming convention, which was kept in a data field that was not part of the information submitted to UHC in claims. This was no mistake, either, as there were at least four different iterations of this re-labeling scheme.

Synergen's recitation of facts is incomplete and misleading. Synergen cherry picks pieces of the record to build a strawman version of UHC's fraud claim. Synergen ignores most of the evidence—including Synergen's own documents and e-mails, as

1

well as additional testimony—which strongly supports UHC's claim. Synergen's pending motion argues that it is entitled to summary judgment for two reasons.

**First**, it contends that UHC does not have evidence that could be construed to prove Synergen committed fraud. This argument is presented in a vacuum—ignoring the most important facts in the case—and effectively asks the Court to construe the facts that are presented in Synergen's favor, turning the summary judgment standard on its head. It is undisputed that, after alerting Next Health to payment freezes UHC had placed on certain labs, Synergen began pulling UHC-member-specific testing data from those labs' information systems and billing reimbursement claims for those tests using the tax identification and national provider numbers of different labs. Synergen even testified that it would never bill claims that way, but, after further review of its own records, Synergen revised its testimony and admitted that it did, in fact, bill that way here. Multiple Next Health witnesses have testified describing Synergen's role in this fraud. It is undisputed that Synergen, which made a percentage of the amount UHC paid on the claims it submitted, agreed to start billing claims using new labs' credentials because "[Next Health] needs the cash and so do we." And it is undisputed that Synergen advised Next Health, in writing, that they might be able to avoid future payment freezes by spreading out claim submissions to UHC across multiple labs to "stay under the radar." Based on the evidence—much of which Synergen ignores—there are disputes of material fact. A jury must decide why Synergen did reasonable factfinder could conclude that

Synergen knowingly submitted false information to UHC; that UHC's reliance on claim submissions was justified; and that Synergen's conduct caused UHC harm.

**Second**, Synergen argues that this action is time-barred under the statute of limitations, and UHC isn't entitled to rely on the discovery rule. But Synergen misses the point. Synergen fraudulently billed UHC through four different entities. It billed through three of those entities within the default four-year limitations period. And it used the fourth entity in a manner designed to circumvent UHC's fraud investigation—meaning it would not have been reasonable for UHC to discover the fraudulent nature of those claims within the limitations period, and UHC is entitled to invoke the discovery rule for those claims. Ultimately, Synergen is asking the Court to declare, as a matter of law, that by December 6, 2015, UHC should have known that some US Toxicology claims submitted in October 2015 falsely represented that US Toxicology performed the tests listed therein. The only support Synergen offers for this determination is that UHC is a sophisticated entity with a special investigation unit, and that UHC had concerns that United Toxicology—an entirely different entity—may have engaged in unrelated and different fraudulent activity. This cannot be sufficient to establish that UHC should have known that these few US Toxicology claims were fraudulent within only about eight weeks of their submission.  Synergen's motion for summary judgment should be denied.

## STATEMENT OF FACTS

## I.   <u>Background</u>

Synergen is a "revenue cycle management" and billing company that contracts with healthcare providers, including laboratories, to perform insurance billing and

collections. (Synergen Dep. p.18, App. 6.) Synergen contracted with Next Health to prepare and submit lab claims, track payments, appeal denied claims, and perform myriad other functions. (SYNERGEN 38, App. 123.) Synergen was paid based on a percentage of collections, so if claims weren't paid, then Synergen wasn't paid either. (Synergen Dep. Ex. 2, p.15, App. 150.) During the relevant period, Next Health was Synergen's biggest and most important client. (Synergen Dep. p.131, App. 34.)

Next Health owned a web of entities, including five lab entities that had CLIA licenses—American Laboratories Group (ALG), Medicus Laboratories, United Toxicology, US Toxicology, and True Labs. Each of these five lab entities (eventually) had its own CLIA license, national provider identifier (NPI), and tax identification number. (Synergen Dep. Ex. 2, pp.29-30, App. 164-165.) Synergen originally testified that all five entities had their own laboratory information system ("LIS" or "LabDaq"), which was where all the information about a lab's patients and related testing was stored. (Synergen Dep., pp.61-62, App. 16-17; Synergen Ex. 2, p.19-21, App. 154-156.) But Synergen admitted in a subsequent deposition that only Medicus, United Toxicology, and US Toxicology had their own LabDaq. (Synergen Dep., p.392, App. 100.)

Synergen connected to each LabDaq and extracted the information about that lab's patients and tests from the prior day by creating and downloading an Excel file, referred to as a "DataMiner." (Synergen Dep. Ex. 2, p.19, App. 154; Synergen Dep. p. 359, App. 92.) A DataMiner contains about 70 separate data fields, including some fields that are reflected in an actual claim, and several others that are not reflected

in a claim. (*See* Synergen Dep. Ex. 2, pp.20-21, App. 155-156.) A DataMiner *does not* have a field for which lab performed the tests; Synergen knew which lab performed the tests because it logged into a specific lab's LabDaq to extract the DataMiner. (Synergen Dep., pp. 217-218, App. 55-56.)

Synergen uploaded the DataMiners into AdvancedMD, Synergen's billing software that created and submitted claims. (Synergen Dep., p.359, App. 92.) AdvancedMD created claims by combining some information from a DataMiner with information from the "Group Masterfile" connected to the lab-specific Office Key that the DataMiner was loaded under. (Synergen Dep. Ex. 2, pp.20-21, 28-29, App. 155-156,163-164; Synergen Dep. pp.359-360, App. 92.)

Each claim submitted to UHC made representations about the patient (i.e., UHC member), the tests performed, the lab that performed those tests (including name, address, tax identification number ("TIN"), and National Provider Identification number ("NPI"), and other information pertinent to UHC's payment determinations. (*See, e.g.,* UHC000002168, manually filed) The claims submitted to UHC do not identify Next Health—just the lab that purportedly performed the testing. (*See id.*) The claims submitted to UHC do not identify Synergen, either—just the lab that purportedly performed the testing. (*See id.*; Tobin Dep. p.40, App. 195.)

UHC receives millions of claim submissions per day and adjudicates those claims based on the information contained in the claim submissions. (Tobin Dep., p. 51, App. 196.) When claims were submitted, they were represented to be true, accurate, and complete. (Synergen Dep., p.104, App. 27.)

5

II.   <u>**Timeline**</u>

Synergen began submitting claims for Medicus, US Toxicology, and United Toxicology in March 2014. (Synergen 38, App. 123.) Next Health was created at the end of 2014, which rolled up Business Partners in Healthcare and several other companies into a single entity, and took ownership of Medicus, US Toxicology, United Toxicology, among many other entities. (Daniel Dec., ¶ 5, App. 183.)

### A.  UHC denies United Toxicology claims

Because of concerns that United Toxicology was a lab on paper only (*i.e.*, no brick-and-mortar office), UHC began denying United Toxicology claims on or around August 31, 2015. (Interrogatory Rsps., p.5, App. 349.) By September 10, 2015, Synergen identified that UHC was denying United Toxicology claims and, over the next month, talked to Next Health about what to do. (SYNES00025065, App. 272; Austin Dec. ¶ 17, App. 181-182.) On September 28, 2015, Next Health and Synergen management teams had a meeting about what steps to take to deal with UHC denying United Toxicology claims. (SYNES00038888, App. 277.)

1.   <u>Scheme 1: Claims falsely representing that US Toxicology performed tests</u>

Following the September 28, 2015 meeting, Synergen wrote to Next Health describing the internal code they would use to identify and track claims for tests performed by United Toxicology, but that would be falsely billed under US Toxicology—adding "_UST" to the end of the name a particular data field. (SYNES00022955, App. 283.) On September 30, 2015, when Next Health asked Synergen whether UHC samples had been billed and "if yes, [under] what lab,"

6

Synergen responded that the "samples with requisition date 09/23 have been billed out under [US Toxicology] … The ordering location on these samples will be changed manually." (SYNES00091243, App. 284 (emphasis added).) When Next Health employees asked Synergen what was going on with these "_UST" naming conventions, Synergen responded "we had to create these ordering locations under UST to support UHC billing." (SYNES00037703, App. 286.)

On October 9, 2015, Synergen asked Next Health's billing manager whether UHC claims that came from United Toxicology's LabDaq should actually be submitted to UHC as US Toxicology claims: "In addition to the claims we sent last week, we have received [additional] claims under [United Toxicology] data miners. Would appreciate if you could confirm us to release these claims under [US Toxicology]. Attached is the list of specimens for your reference." (SYNES00090961, App. 289.) Next Health responded: "Yes, these are United Healthcare plans. They should be released through [US Toxicology]." (SYNES00090972, App. 291.)

   2. Scheme 2: Claims falsely representing that Medicus performed tests

Next Health used a company called Sirius Laboratories to recruit referrals from addiction treatment facilities. (Austin Dec. ¶ 12, App. 181.) Sirius did not have equipment and could not perform lab services. (*Id.*) Synergen and Next Health referred to Sirius specimens as "substance abuse" specimens and used the acronyms "UTSAS" ("United Toxicology Substance Abuse Screen") and "UTSAC" ("United Toxicology Substance Abuse Confirmation"). Synergen then submitted claims to UHC for testing ordered from Sirius using United Toxicology's billing information.

After UHC started denying United Toxicology claims, Next Health told Synergen to "hold" UHC substance abuse claims as Next Health began "looking at billing UHC claims for UTSAS and UTSAC via another lab." (SYNES00110382, App. 297.)[1]

Next Health and Synergen decided to submit those claims to UHC through Medicus—again, treating claims submitted to UHC differently than those submitted to other insurance payors. Synergen told Next Health that it had "created the provider profiles under Medicus" and confirmed that "starting Monday [December 7, 2015] *we will be releasing the [held] UHC Sirius samples under Medicus*." (SYNES00112982, App. 300 (emphasis added).) Synergen even asked Next Health if false documents could be created to reflect that physicians had ordered tests from Medicus instead of United Toxicology: "[L]et us know if there is a possibility of generating the order forms to reflect Medicus lab." (SYNES00114352, App. 302; *see also* SYNES00110156, App. 304.)

On December 23, 2015, Synergen confirmed that it was using Medicus to bill United Toxicology claims that had been previously placed on hold: "[S]ubstance abuse [UHC] claims are now be[ing] billed under Medicus laboratories … under provider profiles MLSAS[2] (Screening) and MLSAC (Confirmation). Total claims and charges

---

[1]    *See also* SYNES00110380, App. 295 (Synergen confirming, on October 20, 2015, that "from 10/12/2015 to until now, we are holding both screens and confirmations [for UHC] claims."); SYNES00136862, App. 298 (noting that only UHC (not other payors) substance abuse claims were being billed through Medicus).

[2]    MLSAS stands for "Medicus Laboratory Substance Abuse Screen" and MLSAC stands for "Medicus Laboratory Substance Abuse Confirmation."

enter [sic] in the month also include 52 ($186,009.30) claims for [ ] October that were previously held." (SYNES00136862, App. 298.) On December 30, 2015, Synergen sent Next Health an email with two attachments that split out how claims that had been "on hold" were submitted to UHC: "Released under Medicus" and "Released under United" (SYNES00038354, App. 308)

Next Health and Synergen chose to "submit[] some United Toxicology claims under US Toxicology's billing credentials and other United Toxicology claims under Medicus Laboratories' billing credentials … because both Next Health and Synergen knew that UHC would have denied the claims if they were submitted through United Toxicology[.]" (Austin Decl. ¶¶ 17–18, App. 181-182.)

Next Health's former executives offered testimony suggesting that Synergen was aware it was billing with false information.[3] Nick Austin confirmed that Synergen knew that UHC had frozen payments to United Toxicology, after which

---

[3]   Synergen's motion spends many pages block-quoting from Nick Austin's and Josh Daniel's depositions for the proposition that while those former Next Health lab executives "attested in [their] declaration[s] that Synergen committed fraud, [they] admitted that was not true during [their] deposition[s]." (Br. at 19–27.) Synergen's characterization is not supported by the testimony. Of course, because intent must be proven circumstantially, Mr. Austin could not say for certain whether Synergen believed that tests performed at United Toxicology were rerun by other labs before being billed through those other labs (even though he testified that those tests were not rerun). (*Compare* Austin Decl. ¶¶ 17–18, App. 181-182 *with* Austin Dep. pp.65, 73, App. 219, 221.) But, as described below, Mr. Austin believes Synergen was well-aware that the tests were not being run or rerun by the billing labs because they never discussed rerunning them. (Austin Dep. p.66, App. 219.) A reasonable factfinder could determine that Synergen knew, based on its interactions with Next Health personnel, that the tests it billed through other labs had not been rerun, even if Mr. Austin was unable to say what Synergen knew for certain. At the very least, it would be reasonable to conclude, from the circumstantial evidence, that Synergen submitted claims recklessly without knowing whether those tests had been rerun.

time Next Health instructed Synergen to not bill claims using United Toxicology's license. (Austin Dep. pp.74, 78, App. 221, 222.) He also confirmed that the claims contained actual misrepresentations: Tests were "billed with a CLIA license different from the actual licensed lab that performed the test." (Austin Dep. p.57, App. 217.) In fact, Mr. Austin explicitly testified that "US Toxicology and Medicus Laboratories [ ] billed the samples … actually performed … [by] United Toxicology." (Austin Dep. p.72.) And when asked if he had "personal knowledge to suggest that Synergen was aware of the fact that the samples that were billed through the US Toxicology and Medicus Laboratories were not rerun by those laboratories before billing," he responded that the data reflecting those samples "were received by Synergen through United Toxicology's lab information system." (Austin Dep. p.72, App. 220.) He also testified that, for claims that were held before being falsely billed, Next Health and Synergen "never discussed" that those test samples were being rerun through the billing labs. (Austin Dep. pp.65-66, App. 219.)

### B.  UHC removes flag on United Toxicology

Meanwhile, United Toxicology's attorneys had contacted UHC, denied the allegation that United Toxicology was a fake lab, assured UHC that United Toxicology ran a compliant operation, and indicated they may sue UHC over the claim denials. (Wilson Dec. ¶ 3, App. 192; UHC Interrogatory Rsps., p.5, App. 349) UHC agreed to lift the flag on United Toxicology, but directed its special investigation unit to open an investigation into United Toxicology. (UHC Interrogatory Rsps., pp.5-6, App. 349-350; Tobin Dep. pp.30, 101–05, App. 194,199-200.)

On January 12, 2016, UHC SIU opened an investigation into United Toxicology and a few weeks later, SIU toured the United Toxicology facility. (UHC Interrogatory Rsps., p.2, App. 346.) During that inspection, UHC SIU investigators learned for the first time that Next Health owned United Toxicology, as well as US Toxicology, and on February 2, 2016, SIU opened an investigation into US Toxicology. (UHC Interrogatory Rsps., p.2, App. 346; Tobin Dep. p.56, App. 197.)

### C. UHC denies United Toxicology, US Toxicology, and Medicus claims because of the ADAR Group

During the Spring of 2016, UHC received member and customer complaints in the Austin, Texas area about unwanted drug tests. (UHC Interrogatory Rsps., pp.2-3, App. 346-347.) These complaints linked to claims submitted by United Toxicology, US Toxicology, and Medicus and for tests purportedly ordered by three physicians. (*Id.*) UHC SIU investigators went to Austin, TX and interviewed affected members and learned that the common thread was a purported clinic called the ADAR Group. (*Id.*; Tobin Dep. pp.57–58, 107–08, 167–68, App. 197, 200, 201.) The ADAR Group was taking kickbacks from Next Health and using them to pay the physicians for the use of their credentials and to pay $50 gift cards to people with commercial insurance in exchange for urine specimens.[4] (Tobin Dep. p.58, App. 197.) As UHC learned more about the ADAR Group and its connections to United Toxicology, US Toxicology, and

---

[4]     On June 9, 2016, CBS News released a story highlighting part of the ADAR Group scam. The video is still available. (*See* Questionable Tactics Used to Profit from Genetic Testing Boom, CBS NEWS (June 9, 2016), available at https://www.cbsnews.com/news/cbs-news-investigation-genetic-testing-scam-call-kirk-zajac-craigslist/.)

Medicus, it placed flags on those labs to deny their claims. (UHC Interrogatory Rsps., pp.2-3, App. 349-350; Tobin Dep. pp.57–60, 107, 183–84, App. 197, 200, 202.)

During June 2016, Synergen had meetings with Next Health where they tried to figure out why UHC was denying claims and discussed how to circumvent those denials. (Austin Dec. ¶19, App. 182; Daniel Dec. ¶ 46, App. 190.) On June 17, 2016, Synergen circulated a chart listing the volume of claims submitted to different payors and identifying the number of additional entities that may be required to split up those claims. (SYNES00131041, App. 311.) On June 24, 2016, Next Health instructed: "Synergen – until further notice please do not submit any United Healthcare bills for laboratory services that are performed in United Toxicology or US Toxicology. We are working to set up another lab to accession/process/bill through." (SYNES00060468, App. 312.) Synergen acknowledged: "We will hold all UHC claims until you give us further instructions to proceed." (SYNES00060464, App. 314.) And indeed, Synergen circulated a list of 956 "United Healthcare claims on hold" for tests that had been performed by United Toxicology or US Toxicology. (SYNES00019043, App. 316.)

    3.  <u>Scheme 3: Claims falsely representing that ALG performed the tests</u>

On July 12, 2016, Next Health told Synergen to start "billing UHC samples (both toxicology and genetics) … through ALG. *They're going to come through United Toxicology's labdaq* under the ordering location UHALG." (SYNES00111516, App. 318 (emphasis added).) On July 19, Next Health further instructed Synergen: "Regarding the UHC samples [you] had on hold – please bill them through ALG. We will be updating the ordering location on our end but no need to wait for us."

(SYNES00134736, App. 320 (emphasis added).) Two days later, Synergen confirmed to Next Health that "[a]ll UHC claims have now been released under ALG." (SYNES00109040, App. 321.)

Synergen and Next Health used a simple code to identify the claim information that Synergen was to take out of United Toxicology and US Toxicology LabDaqs and then submit under ALG's information: the ordering location field starts with "UH" and ends with "ALG." (N. Austin Dec. ¶ 20, App. 183; SYNES00109466, App. 323.) Synergen's employees discussed that, for UHC claims, they were to use ALG to bill for tests that has been performed by United Toxicology and US Toxicology. (SYNES00107208, App. 324.)[5] Synergen even created internal process-flow documents detailing how to extract information from United Toxicology's LabDaq, filter by "primary payer" as "United Health Care" and extract those claims to be billed under ALG (office key 133465), while the claims for other carriers would be billed under United Toxicology (office key 126196). (SYNES00090649, App. 366.)

A discussion between Synergen's Founder and Managing Partner, Mel Gunawardena, and its Senior Manager of Operations, Mazeer Mawjood, reflect that Synergen agreed to start billing UHC claims using ALG's credentials because "[Next Health] needs the cash and so do we." (SYNES00115989, App. 334.) Synergen traded with Next Health as the first payments started coming in betray their excitement. On August 16, 2016, Synergen reported to Next Health: "GOOD NEWS!! Received

---

[5]   "UTT" is an acronym for United Toxicology, and "UST" is an acronym for US Toxicology. (Synergen Dep. p.292, App. 74.)

payments of $2,397,640.25 for ALG for deposit date 8/15." (SYNES00134952, App. 335.) On August 24, 2016, Synergen reported to Next Health:

> We are happy to see the UHC payments coming through ALG. At the same time, we wanted to quickly bring the below to your attention. If you can please provide us with the information to setup more CLIA IDs and newer entities we will be able to further distribute the claims and as a result **stay below the radar**. . . . We believe that the sooner we breakdown the ALG volume into other entities, the better we will do in avoiding any attention on ALG.

(SYNES00093216, App. 337-338 (emphasis added).)

UHC began denying ALG claims in November 2016 and on December 8, 2016, Synergen wrote to Next Health, "[I]t looks like [ALG] has been flagged by [UHC]. *Please let us know if we would be directing the billing via a new lab or next steps to proceed*." (SYNES00014957, App. 340 (emphasis adde).) Between August and November 2016, UHC paid ALG more than $14.2 million, based on Synergen's submission of claims that falsely represented that ALG performed the services reflected in those claims. (UHC000002168, Manually filed.)

### 4. Scheme 4: Claims falsely representing that True Labs performed tests

In August 2016, per further instructions from Next Health, Synergen began submitting substance abuse claims for patients with UHC insurance using True Labs' billing information. True Labs did not have a LabDaq, so Synergen pulled data from the United Toxicology's LabDaq—marked with the code "UH" and "True Labs" in a specific field—and billed the resulting claims to UHC representing that True Labs performed the tests. (*See* SYNES00063560, App. 343; Austin Decl. ¶ 21, App. 183.) UHC paid True Labs more than $750,000 based on Synergen's submission of claims

that falsely represented that True Labs performed the services reflected in those claims. (UHC000021484, Manually filed.)

### D. Litigation

UHC sued Next Health on January 26, 2017. (*See* UnitedHealthcare Ins. Co. v. Next Health, et al., No. 3:17-cv-00243, Dkt. 1 (Jan. 26, 2017).) UHC's original complaint in that case does not include any allegations concerning the fraudulent conduct that is the subject of this suit. *See id.* After years of delay and multiple motions to compel, Next Health was forced to produce its documents, including extensive communications with Synergen. (*See id.,* Dkt. 85, 85-1, 86, 116-119, 164, 169, 172, 227, 271) UHC's attorneys reviewed these documents, identified that Synergen had an active role in the creation and submission of fraudulent claims, and informed UHC on or about July 19, 2019. (UHC Interrogatory Rsps., p.20, App. 364.)

### E.  Synergen changed its corporate testimony on the most important issue in the case via errata after reviewing UHC's expert report

Synergen's understanding about the falsity of the information it submitted about the labs that performed the services can also be inferred from its changing corporate testimony on the subject. On April 20, 2022, Synergen sat for its Rule 30(b)(6) corporate deposition through its Founder and Managing Partner, Mel Gunawardena. That day, Mr. Gunawardena testified that each of Next Health's licensed labs had a laboratory information system ("LIS," here, brand-named "LabDaq"), by which that lab tracked and recorded data for each lab test it had performed. (Synergen Dep. p.51, App. 14.) He testified that each lab's LabDaq directly correlated to a single "office key" containing that lab's billing profile, which Synergen

15

used to submit claims to UHC. (*Id.* at pp.61-62, App. 16-17; Synergen Dep. Ex. 2, pp.21, 28-29, App. 156, 163-164.) Synergen stated it would only bill UHC using the credentials of the lab from which it retrieved the underlying claim information in a simple "one-to-one" correlation. (Synergen Dep. pp.205-207, 302, 328, App. 52-53, 77, 83; Synergen Dep. Ex. 2, pp.21, 28-29, App. 156, 163-164)

In other words, Synergen testified that it simply loaded the data it took out of a particular lab's LabDaq into the corresponding lab's Office Key in AMD and then submitted the resulting claims to UHC. For example, when Synergen extracted information from "the United Tox[icology] LabDaq, [ ] then [the resulting claims] would have been billed under office key 126196 for United Toxicology[.]" (Synergen Dep. p.216, App. 55.) Synergen even drew up a chart showing this "one-to-one" process for the specific purpose of testifying about it. In the diagram Synergen created to support its corporate testimony, each of the five Next Health labs had their own LabDaq, from which Synergen extracted data to bill claims associated with that lab:



(Synergen Dep. Ex. 2, at p.22, App. 157.) When specifically asked whether Synergen could take claim information from the LabDaq of one lab and subsequently bill the

resulting claim to UHC using the office key of a different lab, Synergen testified that "can't happen." (Synergen Dep. pp.257, App. 65.) For example, Synergen testified that its "team would not go and pull a Data Miner out of United Toxicology LabDaq and then save it under an ALG name and process it under an ALG office key" because that it would be "grossly improper." (*Id.* p.261, App. 66.)

But, it turns out, that is *exactly* what Synergen did. (*See, e.g.,* SYNES00090649, App. 366; Adams Report, ¶¶ 28, 30, App. 253-255.) In fact, Synergen submitted at least 6,953 claims to UHC using Next Health lab billing credentials that did not match the Next Health lab from which the claim information data was generated by Next Health, and UHC paid at least $15,700,539 associated with those claims. (Adams Report, pp. 16-17, App. 257-258.)

After receiving UHC's expert report, Synergen provided UHC with a deposition errata sheet seeking to unwind its 30(b)(6) testimony about how Synergen submitted claims under ALG and True Labs' billing credentials. The errata sheet advised, in primary part, that upon "further investigation," the inviolable "process" Synergen had described both with its testimony and with its own demonstrative diagrams, did not actually apply to claims submitted to UHC through ALG or True Labs—the claim submissions that are the overwhelming focus of the case. (Synergen Dep. Errata Sheet, App. 87.)

On July 20, 2022, Synergen's revised testimony was that ALG and True Labs did not, in fact, have their own LabDaqs, and so the claims Synergen billed to UHC through ALG's and True Labs's billing credentials had actually originated from

17

testing data that Synergen pulled from the LabDaqs of United Toxicology, US Toxicology, and Medicus. (Synergen Dep. pp.403, 413–14, App. 103, 106.) Here is a simple visualization of the difference between the original and modified testimony (reflecting Synergen's billing practices from July 2016 on):



The revised testimony comports with testimony offered by Next Health's former executives. All claims billed out of ALG and True Labs were based on data Synergen pulled from other labs' LabDaq information systems. (*See, e.g.*, Austin Dep. pp.71-73, App. 220-221.) And again, Synergen treated UHC different than other payors; the green lines on the right side of the diagram above reflect that for non-UHC payors, Synergen continued to bill tests through the labs from which the data originated. (*See, e.g.*, SYNES00090649, App. 366.) ALG and True Labs were not used as anything but billing conduits for UHC claims to avoid the payment freezes.

In its revised testimony, Synergen explained that it now "assum[es]" that ALG and True Labs had their own actual lab machines (though no LabDaqs) that were

"connected" to the United Toxicology, US Toxicology, and/or Medicus LabDaqs (Synergen Dep. at 432, 440-41, App. 110, 112-113).

## ARGUMENT AND CITATIONS OF AUTHORITY

Summary judgment is only appropriate if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and the evidence must be viewed in the light most favorable to the non-moving party. *TIG Specialty Ins. Co. v. Pinkmonkey.com, Inc.,* 375 F.3d 365, 369 (5th Cir. 2004). A motion for summary judgment must be denied if a jury could reasonably find in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

To prevail on a fraud claim under Texas law, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).

Synergen contends that UHC's fraud claim fails as a matter of law because there are no facts to support that Synergen knowingly submitted false information to UHC or that UHC justifiably relied on the false information. Synergen further

suggests that UHC's fraud claim is entirely barred by the statute of limitations. But, because a reasonable jury could find in UHC's favor, Synergen's motion should be denied.

## I.   The evidence creates a genuine dispute of material fact on UHC's fraud claim, which must be decided by a jury.

Synergen doesn't dispute, for purposes of this motion, that it submitted claims containing material misrepresentations or that UHC suffered injury. Instead, it argues that UHC has "no evidence" (A) that Synergen knowingly or recklessly submitted claims containing material misrepresentations; or (B) that UHC's reliance on the information it submitted was justifiable. Synergen also concludes (C) that its conduct didn't cause UHC harm. There is, however, substantial factual support for each of these elements.

### A.   A reasonable factfinder could conclude that Synergen knowingly or recklessly made material misrepresentations to UHC.

Synergen first asserts that "element 2 fails," arguing that UHC cannot show that Synergen knew its representations were false or that Synergen made those representations recklessly as positive assertions without knowledge of their truth. (Br. at 16–28.)[6] According to Synergen, "UHC's evidence is so circumstantial that any inference that Synergen committed fraud would be nothing more than conjecture."

---

[6]   This section of Synergen's argument is titled "Element 2 Fails." As the fraud standard is quoted by Synergen (*see* Br. at 14), Element 2 deals only with *knowledge* of the falsity (or *reckless disregard* for the falsity) of the representation made by the defendant, but not with falsity of that representation itself. UHC therefore assumes, for purposes of this motion, that Synergen concedes UHC has sufficient evidence to show that Synergen made material misrepresentations. And indeed, UHC's statement of facts makes clear that there are facts supporting that contention.

(*Id.* at 17.) That assessment confuses the law, omits a universe of applicable facts, and misconstrues the facts it does present.

As Synergen concedes, "[s]ince intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). And even "[s]light circumstantial evidence' of fraud … is sufficient to support a finding of fraudulent intent." *Id.*; *see also Aland v. Martin*, 271 S.W.3d 424, 429–30 (Tex.App.—Dallas 2008), no pet. ("Any ultimate fact may be proved by circumstantial evidence. An ultimate fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case." (citing *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993)). Short of a confession, intent cannot ever be proven directly, so it is nearly always "a fact question within the realm of the trier of fact because it is dependent upon the credibility of witnesses and the weight to be given to their testimony." *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 199 (Tex.App.—Houston [1st Dist.] 2014), pet. denied. The Fifth Circuit has "emphasized repeatedly that cases which turn on the moving party's state of mind are not well-suited for summary judgment." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991).

Here, there is significant evidence from which a jury could reasonably infer that Synergen knew that in submitting the claims at issue to UHC, it was misrepresenting the identity of the lab that performed the services, or that it made

such misrepresentations recklessly as positive assertions without knowledge of the truth.

First, Synergen knowingly submitted information to UHC using the credentials of labs that were different from the labs from which it pulled testing data. For example, Synergen confirmed with Next Health that claim information that came from United Toxicology's LabDaq was to be submitted to UHC labeled with US Toxicology's information. (SYNES00090972, App. 291.) Further, during its initial corporate deposition, Synergen testified that every claim it billed to UHC under a specific lab contained information that it took out of the same lab's LabDaq, and that pulling information from one lab's LabDaq information system and billing a claim using a different lab's billing credentials "can't happen" because it would be "grossly improper." (Synergen Dep., p.261, App. 66.) Synergen even created a demonstrative chart to support this purportedly inviolable process. (Synergen Dep. Ex.2, p.22, App. 157.) But that process, as Synergen later admitted, was not followed and Synergen changed its testimony to acknowledge that all the claims it submitted to UHC on behalf of ALG and True Labs were based on testing data it retrieved out of *other labs* LabDaqs (*e.g.*, United Toxicology, US Toxicology, and Medicus). (Synergen Dep. pp. 382-392, 409, App. 98-100, 104.) A jury must decide whether Synergen knew it was submitting false information to circumvent UHC's denials of claims from other labs or whether Synergen really thought that, for example, ALG had real lab equipment that was, just coincidentally, only used for UHC patients and was somehow connected to the flagged labs LabDaqs.

Second, Synergen's data-manipulation practices specifically targeted UHC. During Schemes 1 and 2, Synergen only set up billing profiles under US Toxicology and Medicus "to support UHC billing." (SYNES0037703, App. 286.) And during Schemes 3 and 4, Synergen created instruction sets for its employees explaining how to bill tests from United Toxicology's LabDaq to UHC through ALG or True Labs, but to bill claims for other payors through United Toxicology. (SYNES00090649, App. 366.)

Third, Synergen held certain claims that came from one lab and then submitted those claims under another lab. During Scheme 2, Synergen held claims for tests performed by United Toxicology (listed on attachments titled "UTSAS-hold" and "UTSAC-hold") but then submitted hundreds of them to UHC under Medicus's billing information (attachment titled "Released under Medicus"). (*See* SYNES00112977, App. 310; SYNES00038354, App. 308-309.) During Scheme 3, Synergen circulated a list of 956 "United Healthcare claims on hold" showing those tests had been performed at United Toxicology and US Toxicology, but then billed through ALG. (SYNES00019043, App. 316.)

Fourth, once Scheme 3 appeared to be working, Synergen advised Next Health that, to avoid future payor scrutiny, they should attempt to "further distribute the claims [between various labs] and as a result *stay below the radar*." (SYNES00093216, App. 337.) Why would Synergen be concerned about staying "below the radar" if it was not actively trying to deceive UHC? A jury must answer that question.

23

<u>Fifth</u>, Synergen was financially incentivized to assist Next Health in procuring payment because it received a portion of every claim paid by UHC. (Synergen Dep. Ex. 2, p.15, App. 150.) Synergen's internal discussions reveal that it started billing claims under ALG's credentials because "[Next Health] needs the cash and so do we." (SYNES00115989, App. 334.)

And <u>finally</u>, Next Health's former executives signed sworn declarations and offered testimony expressing their opinions that Synergen was aware that it was submitting false information. While Synergen argues that, during their depositions, "both Austin and Daniel conceded that their declarations were based on conjecture and speculation," their testimony is consistent with their declarations. Both stated that they supplied Synergen with information sufficient for Synergen to be aware that it was billing through labs that hadn't performed the tests reflected in the claims. Both men testified that they attended meetings with Synergen in which billing through different entities was discussed, and neither stated that Synergen was told tests pertaining to held claims were being rerun.

Viewing the evidence in the light most favorable to UHC, a reasonable factfinder could determine that Synergen knowingly or recklessly misrepresented to UHC the identity of the labs that performed certain tests.

### B. There is sufficient evidence for a reasonable factfinder to conclude that UHC justifiably relied on Synergen's representations.

Synergen doesn't contest that UHC relied on the information Synergen submitted. Instead, Synergen claims that UHC's reliance on that information was not justifiable. (Br. at 28–32.) To support this theory, Synergen argues that because

24

UHC has systems in place to prevent and detect fraud, waste, and abuse, it was "uniquely situated to become aware of fraud or attempted fraud perpetrated on it through the claim submission process" and it therefore would not have been "reasonable" for UHC to rely on the accuracy of that information. (*Id.* at 28–29.) This argument fails too, as Synergen confuses the governing legal standard and irrationally construes the facts to reach its conclusion.

UHC is required to show that its reliance on the information Synergen submitted was "justifiable." *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). But to be clear, Synergen appears to be mixing terms. "Justifiable" reliance is not the same standard as "reasonable" reliance. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (The "'justifiable reliance' element of common law fraud does not require a plaintiff to demonstrate reasonableness." (citing *Field v. Mans*, 516 U.S. 59, 70–71 (1995); also citing Restatement (Second) of Torts § 545A, Comment *b*)). Instead, justifiability focuses on a "fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). That is why the justifiability of a party's reliance "presents a question of fact for the jury to decide." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019) (quoting *Orca Assets G.P., L.L.C.*, 546 S.W.3d at 654). Here too, the question of whether UHC's reliance on the information Synergen submitted was justifiable is the province of the jury.

Of course, Synergen stresses the Texas Supreme Court's tautological observation that "justifiable reliance may be negated as a matter of law when circumstances exist under which reliance cannot be justified." *Barrow-Shaver Res. Co.*, 590 S.W.3d at 497. In essence, that court had concluded that a party may not "blindly rely" on certain representations if, at the time the representations were made, the circumstances warranted further investigation. *See JPMorgan Chase Bank, N.A*, 546 S.W.3d at 657; *see also Lewis*, 343 F.3d at 546 (party cannot ignore clear "red flags"). But those cases dealt with plaintiffs engaging in a single, personal transaction, unlike this case, where UHC receives millions of claims per day through entirely impersonal transactions and is legally obligated to process those claims within a finite period.[7] Further, as Synergen testified, when claims are submitted to UHC, they were represented to be true, accurate, and complete. (Synergen Dep. p.104, App. 27.)

Synergen contends that "Next Health-affiliated laboratories were already on UHC's radar long before Synergen submitted the claims at issue in this case," and thus UHC's reliance on the false information in the claims at issue was not justified. (Br. at 31.) Under Synergen's analysis, if a provider had *any* kind of problem in the past, then UHC would need to categorically deny all of that provider's claims once it found out about the problem. This is a preposterous and unrealistic result.

---

[7]     Moreover, a "plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation cannot offer as a defense the plaintiff's failure to make the investigation or examination to verify the same." *Field*, 516 U.S. at 72.

It's true, as Synergen notes, that following Medicus's entry into a Corporate Integrity Agreement ("CIA") with the OIG in 2014, Optum Payment Integrity performed a post-payment review of thirty Medicus claims. But the coding issues that were the subject of the CIA and subsequent post-pay review have nothing to do with this case. And being subject to a CIA with the government is a strong incentive to submit accurate claims that can be relied upon.

Most of Synergen's focus, of course, is on United Toxicology. UHC received member complaints about United Toxicology in August 2015. Around the same time, UHC put United Toxicology on a "hard deny" based on the allegation that United Toxicology was a fake lab. But United Toxicology threatened to sue UHC for the denials and implored UHC to inspect its lab and stop denying claims. (Wilson Dec. ¶ 3, App. 192.) UHC opened an investigation into United Toxicology and inspected the lab in January 2016 (which demonstrated that it was not, in fact, a fake lab). (UHC Interrogatory Rsps., p.5, App. 349; Tobin Dep. pp.57–60, 107, 183–84, App. 198, 200, 202.)

These interactions with United Toxicology show that UHC was not "blindly relying" on claims. But ultimately, they are not relevant to whether UHC's reliance on claims *from other labs* was justifiable. Although many of the fraudulent claims submitted in this case reflect services now known to be *performed by* United Toxicology, UHC does not seek to recover for any claims *submitted with* United Toxicology's information. Instead, UHC seeks to recover money it was tricked into paying *other labs* because Synergen took United Toxicology's claims and then

27

changed the name on the claims to one of the other labs so that UHC would pay it. Indeed, the fraud was designed to cover up United Toxicology's (and later, other labs') involvement.

At bottom, Synergen's argument is essentially that because UHC has an investigation department to prevent fraud and waste, UHC is never justified in relying on the information in claims submitted to it. This view misunderstands the legal standard and is detached from reality. UHC's size, the volume of claims it receives every day, and breadth of providers it receives claims from, as well as applicable legal requirements, are why it has an investigations department, but it is not required to be omniscient. Synergen would effectively make it *caveat emptor* for payors, but the healthcare system would grind to a halt if that was the case and that is why each claim submission includes a certification that it contains true, accurate, and complete information. (Synergen Dep. p.104, App. 27.)   Finally, UHC *did* eventually deny claims from all of these labs but even after UHC sued the labs for fraud, they filed a counterclaim against UHC seeking hundreds of millions of dollars for the claims that UHC denied, still contending that the claims were legitimate and should have been paid. *See UnitedHealthcare Ins. Co. v. Next Health, et al.*, No. 3:17-cv-0243., Dkt. 183 (N.D. Tex. Aug. 1, 2018)

### C. There is sufficient evidence for a reasonable factfinder to conclude that Synergen caused UHC harm.

Synergen argues that its fraudulent misrepresentations didn't proximately cause harm to UHC. (Br. at 32–33.) Specifically, it speculates that "[w]ithout Synergen, Next Health would have simply executed its alleged scheme by itself or in

conjunction with another revenue cycle management company" and that Synergen itself was merely "a messenger between Next Health and UHC." (Br. at 32.) So, Synergen suggests it was a mere paper pusher—a company moving data from the inbox to the outbox—and it therefore did not cause UHC harm.

As with the other elements at issue in Synergen's motion, causation is the province of the trier of fact; and a reasonable jury could conclude that Synergen's conduct was a substantial factor in bringing about UHC's harm. *See Potter v. Anthony Crane Rental of Texas, Inc.*, 896 S.W.2d 845, 850 (Tex.App.—Beaumont 1995), pet. denied ("The question of proximate cause is one of fact particularly within the province of a jury."), *writ denied* (Nov. 9, 1995); *Tompkins v. Cyr*, 202 F.3d 770, 782 (5th Cir. 2000) ("Establishing causation requires facts sufficient for the fact-finder reasonably to infer that the defendant's acts were a substantial factor in bringing about the injury."). A plaintiff does not need direct evidence to satisfy causation. *Tompkins*, 202 F.3d at 782. "Circumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Id.* (*citing Texas Dept. of Trans. v. Olson*, 980 S.W.2d 890, 893 (Tex.App.—Fort Worth 1998), no pet.). And in Texas, there "can be more than one proximate cause of an event." *Olson*, 980 S.W.2d at 893; *see also Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

On proximate cause, Synergen cites no record evidence whatsoever. Instead, it would have the Court read UHC's complaint as a judicial admission and, because Synergen doesn't point to any specific paragraphs, to hunt through that pleading to find support for an argument it does not care to establish with post-pleading record

facts. (Br. at 32 (generally stating that "UHC's pleadings allege" Synergen was only Next Health's messenger).) And unsworn, unadmitted pleadings are not competent summary judgment evidence. *See, e.g.*, *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). It also mischaracterizes the pleadings; UHC does not allege that Synergen was a mere messenger.

Indeed, the record reflects that Synergen's conduct was a substantial factor in bringing about UHC's harm. Synergen logged into the labs' LabDaqs to pull out the raw information needed to create claims, saved that information in a certain way, then manipulated that information across several files to create new UHC-targeted files, manually changing and rearranging thousands and thousands of data elements, then uploaded those files into its own software to create the actual claims, transmitted the claims it created to UHC, and then shared in the profits of the scheme. (*See* SYNES00090649, App. 366; Synergen Dep. Ex. 2, pp. 15-29, App. 150-164; Adams Report, ¶ 26, App. 253.) Not only did Synergen execute this scheme, it counseled Next Health on *how to design the scheme, too*. (*See* SYNES00093216, App. 337-339.) Synergen's argument, that "[w]ithout Synergen, Next Health would have simply executed its alleged scheme … in conjunction with another revenue cycle management company" is of no consequence, because *Synergen did help design and execute these schemes*. The rank speculation that another billing company could have played Synergen's active role in carrying out this fraud is simply not a defense and is irrelevant to causation.

30

## II.  **UHC's fraud cause of action is not barred by the statute of limitations.**

Synergen argues that the statute of limitations completely bars UHC's recovery for fraud. But Synergen stacks two false premises to reach its conclusion. First, Synergen incorrectly assumes that *all* of the different fraud at issue here— thousands of separate claim submissions; at least four distinct groups of misrepresentations—are subject to only one accrual date. Second, Synergen incorrectly calculates what the purported single accrual date would be.

### A.  **UHC's cause of action for claims submitted that falsely represented that Medicus, ALG, or True Labs performed the tests accrued within the limitations period.**

Under Texas law, the statute of limitations for fraud is four years. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4).[8] "Causes of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015). The default accrual date has also been described "as the date that the allegedly tortious act was committed and caused an injury." *United Healthcare Servs., Inc. v. First St. Hosp. LP*, 570 S.W.3d 323, 335 (Tex.App.—Houston [1st Dist.] 2018), pet. denied. ("*First Street*").

Here, UHC alleges that Synergen submitted thousands of claims that contained one of four different misrepresentations:

> 1. US Toxicology performed tests (submitted during October 2015 – December 2015)

---

[8]    Synergen incorrectly cites to Tex. Civ. Prac. & Rem. Code § 16.051, which is a catch all statute, but also sets a four-year statute of limitations.

2.  Medicus performed tests (submitted between December 7, 2015 and Janaury 2016)

3.  ALG performed tests (submitted between July 2016 and November 2016)

4.  True Labs performed tests (submitted between August 2015 and November 2015)

UHC entered into a tolling agreement with Synergen on December 6, 2019 (before filing suit on February 7, 2020). All of the Medicus, ALG, and True Labs false claim submissions (items 2-4, above) and resulting payments were made after December 6, 2015, so none of them are barred by the statute of limitations.[9] *See Hooks*, 457 S.W.3d at 57.

Synergen argues, however, that all of the different misrepresentations and resulting damages are subject to a single date of accrual. (Br. at 48.) Synergen argues that because "in *First Street* each claim submission did not create a new cause of action" the same must be true here. (Br. at 49.) But the reason *First Street* reached that conclusion was because there was "one core alleged fraudulent misrepresentation" and all the subsequent claim submissions were made under that original "core" misrepresentation.[10] 570 S.W.3d at 347-48. The court specifically noted

---

[9]    *Some* US Toxicology claims that misrepresented that US Toxicology performed tests were submitted and paid prior to December 6, 2015. UHC would therefore be barred by the statute of limitations from recovering on those claims, except for the fact that they are saved by the discovery rule (discussed in the next section).

[10]    The cases analyzed in *First Street* all had this same line of reasoning. *See, e.g., Stafford v. Wilkinson*, 304 S.W.2d 364, 367 (Tex. 1957) (no separate accrual where subsequent misrepresentations were "merely repetitions of the original representations"); *Quintana v. Wiener*, 717 F.Supp. 77, 80 (S.D.N.Y. 1989) (renter's fraud claim was based on original wrongful representations in rental documents, so subsequent rent payments did not have separate accrual dates); *Henry v. Bank of*

that "[t]here is no claim that the individual bills misrepresented the services provided to a particular patient on a particular date, included distinct misrepresentations, or were otherwise unique." *Id.* at 347.

Here, unlike in *First Street*, all the claim submissions at issue are alleged to have *unique* misrepresentations—that a certain laboratory performed certain services for a certain patient on a certain date. (*See, e.g.,* UHC000002168; UHC Interrogatory Rsps., pp.9-12, App. 353-356.)

And even if each claim submission and resulting payment is not subject to its own accrual date, then each one of the four different groups of misrepresentations must be subject to its own accrual and limitations period. Indeed, Synergen told Next Health they should change the nature of the misrepresentations by using different labs to "stay under the radar." *First Street* is inapposite because its holding was premised on there not being different misrepresentations at issue. 570 S.W.3d at 347 ("There is no claim that the individual bills misrepresented the services provided to a particular patient on a particular date, included distinct misrepresentations, or were otherwise unique.").

Because none of the claim submissions that misrepresented that Medicus, ALG, or True Labs performed tests were even submitted until after December 6, 2015,

---

*Am.*, 147 A.D.3d 599 (N.Y. 2017) (single wrong with continuing effects, so no separate accrual); *Landmar, LLC v. Wells Fargo Bank, N.A.*, 978 F.Supp.2d 552, 562 (W.D.N.C. 2013) (fraudulently procured promissory note was initial wrongful act and monthly invoices and related payments did not create distinct accruals because all stemmed from same original wrongful act).

UHC is not barred by the statute of limitations from recovering based on these sets of misrepresentations.

### B. Synergen does not establish that UHC's fraud cause of action accrued prior to December 6, 2015.

Assuming, for the sake of argument, that all of the different misconduct and misrepresentations at issue in this case are subject to a single date of accrual, Synergen's attempt to identify a date prior to December 6, 2015 fails. Synergen argues that the discovery rule does not apply and UHC's cause of action accrued whenever UHC first paid a claim based on a false representation. But Synergen confuses when the discovery rule is applicable and conflates the question of *whether it applies* with the analysis undertaken *if it applies*. Because Synergen cannot establish *as a matter of law* that UHC's fraud claim accrued prior to December 6, 2015, its statute of limitations argument should be rejected.

"The determination of whether the discovery rule applies to a particular cause of action is a question of law." *Clark v. Truist*, No. 3:19-cv-00589-X, 2022 WL 296053, at *7 (Feb. 1, 2022 N.D. Tex.) (citing *TIG Ins. Co. v. Aon Re., Inc.*, 521 F.3d 351, 357 (5th Cir. 2008)). Whether the discovery rule applies "is decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a *particular* injury was discoverable." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006). The Texas Supreme Court has "long held that fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered." *Hooks*, 457 S.W.3d at 57 (citing *Ruebeck v. Hunt*, 142 Tex. 167, 176 (Tex. 1943)); *see also First Street*, 570 S.W.3d at 335.

34

Here, the discovery rule applies because UHC alleges it was injured by making payments based on false representations (a type of injury that is inherently undiscoverable) and is asserting a fraud claim. *See Hooks*, 457 S.W.3d at 57; *First Street*, 570 S.W.3d at 335-37. The first wrongful act at issue—the submission of claims relabeled with US Toxicology's name and billing information—only occurred in early October 2015. (SYNES00022954, App. 282-283.) This means that for those claims to be barred by the statute of limitations, Synergen must prove that UHC should have discovered that it was defrauded by those relabeled US Toxicology claims in under 8 weeks (*i.e.*, prior to December 6, 2015). And the only evidence Synergen even points to is that UHC had earlier received a tip that an entirely different lab, which did not submit any of the claims at issue in this lawsuit, was not real (which UHC determined was incorrect).

Synergen appears to argue that the discovery rule does not apply at all, because (i) UHC's injuries are not "inherently undiscoverable," (ii) UHC is a sophisticated party and "in the perfect position to discover exactly the type of fraudulent activity," and (iii) the discovery rule did not apply in *First Street*.

Synergen contends that the discovery rule did not apply in *First Street*, so it shouldn't apply here. (Br. at 47.) But this is another misreading of that case, as *the discovery rule was applied* in *First Street*. *See* 570 S.W.3d at 337, 340. The court noted that the determination of when, in the exercise of reasonable diligence, a plaintiff should have known of the wrongful act and resulting injury is normally a question of fact, but there are certain circumstances where it can be determined as a matter of

law. *Id.* at 337. And there, when the plaintiff received and reviewed Aetna's "nearly identical" publicly filed lawsuit, which contained "overlapping parties, factual assertions, and claims" to the plaintiff's eventual suit, its cause of action accrued, as a matter of law. *Id.* at 340.

While knowledge of the "nearly identical" suit was sufficient to trigger the accrual of the plaintiff's claim, other evidence cited by the defendant in that case was not sufficient to trigger accrual of the plaintiff's claim. First, the defendant argued that the plaintiff's claim should have accrued in July 2010 because of disclosures about the defendants' relationships with each other made to the plaintiff, but the court held that the a disclosure that entities had relationships with each other, "without any indication that the disclosure's assertions were false or that an underlying scheme was underway, did not put [the plaintiff] on notice of any wrongdoing and did not cause [plaintiff's] claim to accrue." *Id.* at 337-38. Second, the defendant argued that the plaintiff's claim should have accrued in March 2011, when the plaintiff sent a $1.8 million overpayment demand to one of the defendants, but the court rejected this date because the demand letter was only evidence that the plaintiff "suspected [the defendant] did not qualify to recover some of the fees it had submitted but not of the reason for [the plaintiff's] suspicion." *Id.* at 338.

Synergen's arguments are all really geared towards the inquiry that is undertaken when the discovery rule applies—that is, when was the fraud discovered, or should have been discovered in the exercise of reasonable diligence. Thus, the specific issue here is when UHC knew, or reasonably should have known, that the

claims Synergen submitted through US Toxicology prior to December 6, 2015, contained the false representations that US Toxicology had performed the underlying lab services.

While Synergen repeatedly concludes that UHC should have known about the fraudulent conduct at issue in this case, Synergen cannot point to anything that even suggests how UHC could have known that the claims Synergen submitted through US Toxicology prior to December 6, 2015, contained the false representations that US Toxicology had performed the underlying lab services.

Synergen only offers the following points before leaping to its unsupported conclusion:

- <u>UHC is a sophisticated party</u> (This appears to be an overly simplistic nod to *First Street,* where the court stated that a sophisticated party is charged with knowledge of other identical lawsuits **in the public domain** – but that court never suggested that sophisticated parties are generally clairvoyant.)

- <u>UHC has a unit dedicated to trying to catch fraud</u> (This point actually hurts Synergen's argument—this is not a case where the Court is left to wonder whether UHC could have detected these misrepresentations earlier if it had just conducted an investigation. UHC was diligently trying to identify fraud, but there is no evidence that it detected the misrepresentations at issue in this case prior to December 6, 2015. Synergen is asking the Court to usurp the jury's role in finding as a matter of law that UHC's failure to identify those earlier was unreasonable.)

- <u>UHC had "knowledge of potential fraud involving United Toxicology" as early as August 2015</u> (None of the claims at issue in this case involve fraudulent misrepresentations by United Toxicology. *See* Doc. 24, p.8. Moreover, the type of "potential fraud" that UHC suspected in August 2015—that United Toxicology was not a real lab—is not what is at issue here, and in fact was investigated by UHC and found to be untrue as United Toxicology is in fact a real lab. (UHC Interrogatory Rsps. p.5, App. 349.)

- <u>UHC had "investigated claims" submitted by Next Health labs prior to January 1, 2015</u> (UHC "investigates" claims for myriad different reasons,

not just because of fraud. UHC's post-pay review of Medicus claims was done "to verify consistency with coding and billing requirements and to ensure payment accuracy." (UHC Interrogatory Rsps. p.5, App. 349.) This review of Medicus claims also occurred before the fraud at issue in this case even started, and it is impossible to have notice of a fraud that has not yet occurred.)

- "UHC had an ongoing relationship" with the Next Health labs and Synergen" prior to January 1, 2015 (That UHC received claims from a provider in the past cannot possibly be construed to mean that UHC knew fraud was occurring.)[11]

The fraudulent US Toxicology claim submissions at issue were submitted to UHC during early October 2015. (See SYNES00038888, App. 277.) UHC could not have had actual knowledge of fraud before it occurred, nor could it have discovered a fraud that did not yet exist. Unlike in *First Street,* where there was a publicly available lawsuit that laid out essentially identical allegations, here, there was no publicly available identical suit putting UHC on notice of the exact wrongdoings giving rise to this lawsuit. Synergen simply makes a leap that UHC, through the exercise of reasonable diligence, would or should have known of the US Toxicology fraud within two months of the first false claim being submitted with no facts to support this conclusion. Notably, UHC's January 26, 2017 complaint against the labs for whom Synergen relabeled and submitted the claims does not include any

---

[11]    "Next Health labs" is Synergen's convenient way of conflating multiple entities into a single unit. While Synergen interacted with Next Health, United Toxicology, US Toxicology, Medicus, ALG, True Labs (and other entities under the Next Health umbrella) as a single unit, UHC interacted with the entities separately until it pieced together their affiliations during 2016. And even once UHC knew of affiliations between the entities, that alone is not enough to attribute one entity's fraud or conduct to another entity, much less to suspect that the entities are relabeling claim submissions to circumvent UHC's denial or review of claims from one entity.

allegations of that conduct, because even at that time, UHC was still unaware of the schemes at issue in this case. *See UnitedHealthcare Ins. Co. v. Next Health,* No. 3:17-cv-0243, Dkt. 1 (Jan. 26, 2017 N.D. Tex.).

Ultimately, Synergen doesn't point to anything that indicates, much less establishes as a matter of law, that UHC should have known that the claims Synergen submitted through US Toxicology prior to December 6, 2015, contained the false representations that US Toxicology had performed the underlying lab services.

**CONCLUSION**

For the foregoing reasons, Synergen's motion for summary judgment should be denied.

Respectfully submitted November 21, 2022.

*/s/ Adam J. Sinton*

**FIGARI + DAVENPORT, LLP**

Andrew G. Jubinsky
andy.jubinsky@figdav.com
901 Main Street, Suite 3400

Dallas, TX 75202-3796
Telephone: (214) 939-2000
Facsimile: (214) 939-2030

**SINTON, SCOTT, MINOCK & KEREW**

Scott P. Kerew
skerew@ssmklaw.com
Adam J. Sinton
asinton@ssmklaw.com
Benjamin D. Van Horn
bvanhorn@ssmklaw.com
Joseph Minock
jminock@ssmklaw.com

1550 Market Street, Suite 400
Denver, Colorado 80202

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 21, 2022, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system under Local Rule 5.1(d), which will automatically send notification of such filing to all counsel of record.

*/s/ Adam J. Sinton*