UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED HEALTHCARE SERVICES, INC. et al., | § § § | |
| *Plaintiffs*, | § § § | Civil Action No. 3:20-CV-0301-X |
| v. | § § | |
| SYNERGEN HEALTH LLC, | § § | |
| *Defendant*. | § § | |

## MEMORANDUM OPINION AND ORDER

United Healthcare Services, Inc. and UnitedHealthcare Insurance Company (collectively, "United") sued Synergen Health LLC ("Synergen"), alleging that Synergen worked with Next Health LLC ("Next Health") to defraud United. Synergen now brings a *Motion for Summary Judgment* [Doc. 101], a *Motion to Designate Responsible Third Party* [Doc. 100], a *Motion to Exclude Expert Testimony* [Doc. 98], and an *Objection to a Magistrate Judge's Order* [Doc. 120]. For the reasons below, the Court **DENIES** those motions and **OVERRULES** Synergen's objections.

## I. Factual Background

Next Health owned five laboratories—called United Toxicology ("UT"), US Toxicology ("UST"), Medicus, American Laboratories Group ("ALG"), and True Labs—and it routinely submitted claims to United for its services for United's insureds. Starting in 2014, Next Health retained Synergen, a billing company, to submit its claims to United.

1

In August 2015, United became concerned that the UT laboratory didn't exist, so it stopped paying claims from that lab on August 31, 2015. To circumvent that newfangled restriction, starting in September 2015, Next Health and Synergen allegedly began submitting claims for services performed at the UT laboratory by representing that those services were really performed at (1) the UST laboratory and, (2) starting in December 2015, the Medicus laboratory.

By January 2016, United had determined that the UT laboratory did, in fact, exist. But during its investigation of the UT laboratory in January 2016, United discovered that Next Health also owned the UST laboratory, so United started investigating that lab as well. Later, in the summer of 2016, United received a complaint that physicians had ordered unwanted testing and had billed United for those tests out of the UT, UST, and Medicus laboratories. Accordingly, United stopped paying claims from all three laboratories.

Stymied in its alleged attempt to funnel UT-laboratory claims through the UST and Medicus laboratories, Next Health started billing for services in the UT and UST laboratories using another laboratory—the ALG laboratory. Likewise, in August 2016, Next Health allegedly began submitting false bills claiming that its True Labs laboratory performed services that it never performed.

United sued Next Health in 2017.[1] During discovery in that case, United discovered Next Health's communications with Synergen and decided to sue

---

[1] *UnitedHealthcare Ins. Co. v. Next Health, et al.*, No. 3:17-CV-0243-X (Jan. 26, 2017), ECF 1.

Synergen as well. Two relevant events ensued. First, United retained Jacob Adams, a data analyst and fraud examiner, to analyze Synergen's process for extracting claims data from Next Health and submitting it to United. Second, in its privilege log and during deposition testimony, United asserted privilege. Synergen moved to compel production of those privileged materials, and a United States Magistrate Judge denied that motion.

## II. Analysis

Synergen (1) moves for summary judgment, (2) moves to exclude Adams's testimony, (3) moves to designate Next Health as a responsible third party, and (4) objects to the Magistrate Judge's ruling. The Court considers each in turn.

### A. Motion for Summary Judgment

Courts can grant summary judgment only if the movant shows "there is no genuine dispute as to any material fact."[2]  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact."[3]  Although the movant has the burden, "the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case."[4]  Synergen claims that (1) there's no evidence of fraud and (2) the statute of limitations bars United's fraud claim.

---

[2] Fed. R. Civ. Proc. 56(a).

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

[4] *Soto v. William's Truck Serv., Inc.*, No. 3:11-CV-3242-B, 2013 WL 487070, at *1 (N.D. Tex. Feb. 8, 2013) (Boyle, J.).

### 1. No Evidence of Fraud

"To prevail on a fraud claim, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result."[5]  Synergen attacks elements two and four.

Synergen attacks the second element—intent—claiming that "UHC's evidence is so circumstantial that any inference that Synergen committed fraud would be nothing more than conjecture."[6]  To begin, Synergen's criticism of circumstantial evidence is misguided: "Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence."[7]  Regardless, United provides enough evidence to create a genuine factual dispute regarding Synergen's scienter.[8]

Synergen also attacks the fourth element—justifiable reliance. Although "[j]ustifiable reliance usually presents a question of fact . . . . the element can be

---

[5] *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (cleaned up).

[6] Doc. 102 at 17.  *But see Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991) ("[C]ases which turn on the moving party's state of mind are not well-suited for summary judgment.").

[7] *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986).

[8] *See, e.g.*, Doc. 112-2 at 69 (depicting Synergen employee's request to Next Health to "provide us with the information to setup [*sic*] more . . . newer entities" in order to "further distribute the claims and as a result stay below the radar" and statement that "the sooner we breakdown the ALG volume into other entities, the better we will do in avoiding any attention on ALG"); *id.* at 66 (depicting

negated as a matter of law when circumstances exist under which reliance cannot be justified."[9] Here, Synergen claims that United's reliance could not have been justified because it "had a comprehensive system set up to detect . . . fraud."[10] But Synergen cites no case holding that an entity's fraud department—no matter how sophisticated—renders it impotent to pursue fraud claims. And that's likely because a defendant can negate justifiable reliance only by pointing to, *inter alia*, the plaintiff's "appreciation of ***facts and circumstances***" showing that it "is extremely unlikely that there is actual reliance."[11] So Synergen can't categorically negate justifiable reliance by touting United's fraud department: It needs to point to specific facts and circumstances that should have alerted United to the fraud.

Synergen attempts to find two such facts, asserting that United "was suspicious of . . . Medicus in late 2014 and United Toxicology in August of 2015."[12] But neither of those supposed "red flags" is strong enough for the Court to conclude that, as a matter of law, it "is extremely unlikely that there is actual reliance on [United's] part."[13] Concerning Medicus, United previously investigated Medicus based on a "corporate integrity agreement" Medicus formed with a government

---

Synergen employee's statement about the urgency of getting ALG claims paid because Next Health "need[s] the cash and so do we").

[9] *JPMorgan*, 546 S.W.3d at 654.

[10] Doc. 102 at 29.

[11] *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (cleaned up) (emphasis added).

[12] Doc. 102 at 32.

[13] *Grant Thornton*, 314 S.W.3d at 923 (cleaned up).

agency.[14]  Synergen provides no evidence that that involved the sort of fraud at issue here.  Concerning the UT laboratory, in 2015, United became aware of "allegations . . . that [UT] was not an actual lab."[15]  In response, it began denying claims from the UT laboratory, opened an investigation, and commenced payments only after determining that UT was an actual laboratory.  But the UT-laboratory allegations—misrepresenting that a fake laboratory is a real laboratory—involve a different type of fraud than the kind of which United now accuses Synergen—misrepresenting which laboratory rendered a service.  Accordingly, the Court cannot conclude, as a matter of law, that "there is [no] actual reliance on [United's] part."[16]  That's a fact issue for the jury.

Lastly, Synergen claims that United has no evidence of proximate causation because Synergen was a mere "messenger between Next Health and [United]."[17]  "Establishing causation requires facts sufficient for the fact-finder reasonably to infer that the defendants' acts were a substantial factor in bringing about the injury."[18]  Here, United has produced sufficient evidence for the jury reasonably to infer that

---

[14] Doc. 103 at 24.

[15] Doc. 112-2 at 81.

[16] *Grant Thornton*, 314 S.W.3d at 923 (cleaned up) (emphasis added).

[17] Doc. 102 at 32.

[18] *Tompkins v. Cyr*, 202 F.3d 770, 782 (5th Cir. 2000).

Synergen was more than a mere "messenger" and that its acts were a substantial factor in bringing about the fraud at issue.[19]

## 2. Statute of Limitations

In Texas, "[a] person must bring [a] suit on [fraud] actions not later than four years after the day the cause of action accrues."[20] "Generally, causes of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy."[21] But "[b]ecause fraud vitiates whatever it touches, limitations does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it."[22]

Here, the parties signed a tolling agreement on December 6, 2019, so, the parties appear to agree, the question is whether United's fraud claim accrued before December 6, 2015—four years before the tolling agreement. United's fraud claim involves alleged misrepresentations that occurred between September 2015 and December 2016.[23] United's complaint breaks those misrepresentations into four groups. One group involves misrepresentations that occurred before December 6,

---

[19] *See, e.g.*, Doc. 112-2 at 69 (depicting Synergen employee's suggestion to Next Health that the parties should "further distribute the claims" to "stay below the radar" and "avoid[] any attention on ALG").

[20] TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4).

[21] *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (cleaned up).

[22] *Id.* (cleaned up).

[23] The parties hotly contest whether United's claim accrued at the time of each new misrepresentation—September 2015, December 2015, July 2016, and August 2016—or whether the claim accrued at the time of the first misrepresentation—September 2015. Because the Court concludes that United's claim, even for the September 2015 misrepresentations, didn't accrue until at least January 2016, it need not decide whether one or several accrual dates impact United's claim.

2015—namely, "claims submitted to [United] under [UST]'s billing information between September 2015 and January 2016."[24]  Because the other three groups of misrepresentations occurred within the limitations period, the only question is whether the pre-December 6, 2015 misrepresentations occurred outside the limitations period.

Synergen contends that United should have discovered those misrepresentations through the exercise of reasonable diligence before December 6, 2015.  Not so.  United provides evidence that it didn't even discover that Next Health owned the UST laboratory until January 2016.[25]  So United couldn't have known about any fraud involving UST and UT until it discovered the relationship between those entities in January 2016.  Likewise, there's no reason to think United should have discovered the fraud with reasonable diligence before December 6, 2015.[26]  Upon receiving allegations concerning the UT laboratory, United stopped paying claims from that laboratory while it had "[c]onversations [with] United Toxicology's attorneys . . . through December 2015."[27]  Those conversations led to the inspection

---

[24] Doc. 1 at 16–17.

[25] *See, e.g.*, Doc. 111 at 194 ("Based on information gathered during the on-site inspection of United Toxicology, namely that United Toxicology shared some common areas with US Toxicology, I instructed UHC's SIU to open an investigation into US Toxicology at the beginning of February 2016."); *id.* at 202 (recognizing that United knew there was a "relationship of some kind between United Toxicology and US Toxicology . . . . when we went down for the onsite inspection and we were able to see that there were other entities or other laboratories kind of in the same physical space as [] Next Health").

[26] In fact, Synergen even touts United's fraud-investigation team as a "comprehensive system set up to detect the kind of fraud it accuses Synergen of in this case," so there's no reason to think that reliance on that system was unreasonable.  Doc. 102 at 29.

[27] Doc. 112-2 at 81.

8

of the UT laboratory, which, in turn, divulged the connection between the UT and UST laboratories.  Synergen doesn't explain why those efforts were unreasonable or inadequate.  Accordingly, United's fraud claim didn't accrue until at least January 2016 when United discovered the relationship between Next Health and the UST lab.

Synergen objects, spilling significant ink over the "discovery rule."  The discovery rule delays the limitations period in "cases in which the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable."[28]  Synergen says that United can't satisfy that test.  But Synergen misses the forest for the trees.  In Texas, "[a]ccrual of a cause of action is deferred in two types of cases": (1) "those involving allegations of fraud" and (2) "[t]he other type, in which the discovery rule applies."[29]  Because only United's fraud claim remains, accrual isn't based on the discovery rule.

Accordingly, the Court **DENIES** Synergen's motion for summary judgment.

## B. Motion to Exclude Expert Testimony

Under Federal Rule of Evidence 702,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[30]

---

[28] *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996) (cleaned up).

[29] *Id.*

[30] FED. R. EVID. 702(a)–(d).

In that analysis, courts "act as gate-keepers which make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[31]  Synergen contends that (1) Adams isn't qualified as an expert and (2) his opinions won't be helpful to the jury.

### 1. Qualifications

An expert must be qualified to answer a "relevant question in th[e] case."[32] United brings a fraud case, so one relevant question is whether Synergen possessed the requisite scienter.[33]  To show scienter, United seeks to prove that Synergen deviated from its regular billing process only for the bills in question.  Enter Adams. Adams is a Certified Public Accountant and a Certified Fraud Examiner.  He's the Director of the Disputes and Investigations group at his firm, and he previously worked as an external auditor for various companies.  He has years of experience examining companies' internal control processes and determining whether those companies act in conformity with those policies.  In short, United has retained an expert in internal control processes to opine on whether Synergen followed its internal control processes because that is probative of fraudulent intent.  Adams is qualified to opine on that question.  Synergen presses two counterarguments.

---

[31] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (cleaned up).

[32] *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007).

[33] Doc. 108 at 24 (recognizing that United must prove that "Synergen kn[e]w it was submitting false information to UHC" and was not "doing so recklessly . . . without any knowledge of such falsity").

10

First, Synergen complains that Adams "has not written any articles or publications" and "has not trained any other employees at his firm."[34]  But Synergen cites no law categorically requiring publications or teaching experience to qualify as an expert, so that argument fails from the get-go.

Second, Synergen contends that "Adams's complete lack of any semblance of credentials or experience in the healthcare industry disqualifies him from serving in an expert capacity in this case."[35]  To begin, that's factually wrong.  As Synergen itself admits, Adams has "experience related to the issues" in this case from a "year he [] spent working on three cases" for United.[36]  In any event, more fundamentally, Synergen tilts at windmills.  United expressly warrants that Adams will not "offer[] 'healthcare opinions' or opinions about the general standards billing companies should follow when submitting claims to insurance companies."[37]  In fact, Synergen isn't even a healthcare company—it's a billing company—so it's unsurprising that United retained a billing expert instead of a healthcare expert.  Accordingly, the Court will not categorically exclude Adams's testimony.

---

[34] Doc. 98 at 11.

[35] *Id.*

[36] *Id.* at 10.

[37] Doc. 108 at 21.

## 2.  Helpfulness to the Jury

For expert-opinion testimony to be relevant, it must "assist the trier of fact to understand or determine a fact in issue."[38]  "[L]ow probative value, or a total lack of it, will render proposed expert testimony unhelpful and, therefore, inadmissible."[39] Here, Adams's proposed testimony has significant probative value.  Adams compiled United's claims data and Synergen's related files.  He then cross-referenced those datasets in order to show how a claim proceeded from the laboratory, through Synergen's systems, and, ultimately, to United.  Armed with that data compilation, Adams then identified "deviations"—claims that didn't follow Synergen's usual billing process.  Deviations from a normal billing procedure could be intentional.  And when those deviations occurred only for claims United alleges were fraudulent, that's circumstantial evidence that Synergen possessed fraudulent intent.  Accordingly, Adams's proposed testimony will help the jury in determining whether Synergen possessed the requisite scienter.  Synergen raises three objections to that analysis.

First, United's counsel directed Adams to assume, for some of his opinions, that "any claims submitted under ALG's or True Labs's billing credentials[,] when those claims' information was not extracted from an ALG or True Labs LABDAQ, respectively, were based on false information."[40]  Based on those assumptions, Adams gave the following conditionally-phrased opinions:

---

[38] *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) (cleaned up).

[39] *Loy v. Rehab Synergies, LLC*, 558 F. Supp. 3d 402, 407 (S.D. Tex. 2021) (cleaned up).

[40] Doc. 98 at 19.

> If Synergen did not extract the information included in claims it submitted under ALG's billing credentials from an ALG LABDAQ, then United paid $14,270,594 to ALG based on false information.

> If Synergen did not extract the information included in claims it submitted under True Lab's billing credentials from True Lab LABDAQ, then United paid $777,293 to True Labs based on false information.[41]

Synergen complains that those "opinions do not include any independent conclusion that the 'deviations' [Adams] identified constituted false information."[42]   In short, Synergen contends Adams should have made his own independent conclusions instead of making assumptions.

But experts may make assumptions about disputed facts.  "When facts are in dispute, . . . . a trial court [may not] exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."[43]  It's up to the jury to "decide whether it should accept or reject [expert] testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate."[44]  In other words, Adams is entitled to assume disputed facts, and Synergen is entitled to vigorously cross examine him on such assumptions. But the Court may not categorically exclude Adams's testimony because he made an assumption.

---

[41] Doc. 108 at 26 (cleaned up).

[42] Doc. 98 at 16.

[43] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249 (5th Cir. 2002).

[44] *Id.* at 250.

Second, Synergen propounds—sans explanation—that Adams's testimony concerning "when Synergen may have deviated from its own internal controls does not tend to prove fraudulent intent."[45]  That's wrong.  Synergen denies fraudulent intent on the ground that "Synergen thought the samples were being re-run through the labs the credentials of which were used for the claim submissions."[46]  In other words, Synergen portrays itself as an unknowing messenger that was itself bamboozled by Next Health's "alleged scheme."[47]  Adams's testimony seeks to rebut that point.  As noted, Adams's proposed testimony that Synergen deviated from its normal process tends to show that Synergen's actions *vis-à-vis* the claims in question were done with knowledge—they weren't mistakes Synergen accidentally swept into its system.

Third, Synergen complains that Adams's "methodology essentially amounted to using a glorified Excel spreadsheet."[48]  But Synergen fails to explain why the assembly and interpretation of spreadsheets are categorically verboten for upstanding experts.  Nor could it.  Courts routinely allow expert testimony based on spreadsheets.[49]

---

[45] Doc. 98 at 18.

[46] Doc. 102 at 18.

[47] *Id.* at 32.

[48] Doc. 98 at 18.

[49] *See, e.g., B.J. Tidwell Indus., Inc. v. Diversified Home Prods., Inc.*, No. CIVA SA06CA-0264FBNN, 2007 WL 3118300, at *2 (W.D. Tex. Oct. 19, 2007).

14

### C. Motion to Designate Responsible Third Party

Under Texas law, "[a] defendant may seek to designate a person as a responsible third party."[50]  That designation, in turn, "obligates the trier of fact to assign a percentage of responsibility to each [] defendant . . . and [responsible third party] with respect to each cause of action alleged."[51]  Federal courts in Texas allow parties to designate responsible third parties in diversity cases.[52]  A court "shall grant" a defendant's motion to designate a responsible third party "unless the objecting party establishes: (1) the defendant did not plead sufficient facts concerning the alleged responsibility of the person . . . ; and (2) after having been granted leave to replead, the defendant failed to plead sufficient facts concerning the alleged responsibility of the person."[53]

Synergen fails on that first prong, which requires "the ***defendant*** [to] ***plead*** sufficient facts concerning the alleged responsibility of the" third party.[54]  As evidence for its motion, Synergen only cites eleven excerpts of Plaintiffs' complaint—instead of Synergen's own answer.  Accordingly, Synergen fails to cite any facts that it has pled showing Next Health's alleged responsibility.  Synergen raises two objections.

---

[50] TEX. CIV. PRAC. & REM. CODE § 33.004(a).

[51] *Estate of Pruitt v. Asphalt Zipper, Inc.*, No. 21-50717, 2022 WL 2826450, at *3 (5th Cir. July 20, 2022) (per curiam).

[52] *Davis v. Dall. Cnty.*, No. 3:07-CV-0318-D, 2007 WL 2301585, at *1 (N.D. Tex. Aug. 10, 2007) (Fitzwater, J.).

[53] TEX. CIV. PRAC. & REM. CODE § 33.004(g)(1)–(2).  Under Texas law, the defendant's pleadings must "satisfy the pleading requirement of the Texas Rules of Civil Procedure."  *Id.* § 33.004(g)(1). Although the parties dispute whether Texas or Federal pleading standards apply, the Court need not decide that issue here because Synergen doesn't point to its own pleadings at all.

[54] *Id.* § 33.004(g)(1) (emphases added).

First, Synergen cites a Western District of Texas case holding that "a defendant must plead sufficient facts ***in its motion*** to designate a responsible third party, ***not in its previously filed answer***."[55]  But that's wrong.  *Plead* means "[t]o assert or allege ***in a pleading***"—not to propound a proposition in a motion or other briefing.[56]  Further, Section 33.004 is riddled with context showing that *plead* refers to allegations made in formal pleadings.  For instance, Section 33.004(g)(1) requires the defendant to "plead sufficient facts" in a manner that "satisf[ies] the pleading requirement of the Texas Rules of Civil Procedure."[57]  And the Texas Rules of Civil Procedure, in turn, create pleading standards for "[a]n original pleading which sets forth a claim for relief, whether an original petition, counterclaim, cross-claim, or third party claim."[58]  Facts stated for the first time in a motion wouldn't meet that pleading standard.  Next, Section 33.004 requires courts to give the defendant an opportunity "to replead."[59]  An opportunity to replead makes sense only if a court evaluating a motion to designate a responsible third party looks to pleadings.[60]  In short, *plead* refers to the assertion of a fact in formal pleadings—not to everything filed with a court.

---

[55] *Waggoner v. Wal-Mart Stores Tex., L.L.C.*, No. A-07-CA-0703-JRN, 2009 WL 10669214, at *4 (W.D. Tex. Feb. 20, 2009) (emphases added).

[56] *Plead*, Black's Law Dictionary (11th ed. 2019) (emphasis added); *see also Pleading*, Black's Law Dictionary (11th ed. 2019) ("A formal document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses.  In federal civil procedure, the main pleadings are the plaintiff's complaint and the defendant's answer.").

[57] TEX. CIV. PRAC. & REM. CODE § 33.004(g)(1)

[58] TEX. R. CIV. PROC. 47.

[59] TEX. CIV. PRAC. & REM. CODE § 33.004(g)(2).

[60] *Id.*

16

Second, Synergen cites to factual assertions in United's complaint, and, it argues, a defendant may "point[] to the allegations in a plaintiff's Complaint [to] meet[] the notice-pleading burden."[61]  Here's the problem: As United rightly notes, of the eleven excerpts of United's complaint that Synergen cites, "Synergen denied three of those paragraphs outright[,] and it denied the others to the extent that Synergen is alleged to have worked with Next Health to defraud UHC."[62]  Synergen cites to no case where a defendant expressly denied an allegation but then attempted to co-opt it to establish a responsible third party.[63]  And courts have been careful to note that defendants may rely on "Plaintiff's own allegations *to which Defendant does not object*."[64]

But that's not the end of the line for Synergen's motion.  Although neither party cites it, the second prong of Section 33.004(g) requires the Court to "grant[] leave to replead."[65]  Accordingly, the Court **DENIES WITHOUT PREJUDICE** Synergen's motion to designate a responsible third party.  Synergen may amend its answer only to plead facts concerning the alleged responsibility of Next Health within 21 days.

---

[61] Doc. 114 at 4.

[62] Doc. 104 at 3.  Notably, Synergen doesn't contend its partial admission concerning eight of those excerpts should constitute a pleading supporting Next Health's alleged responsibility.

[63] Synergen cites one case where, in its motion to designate, the defendant said, "[i]f Plaintiffs' allegations are accepted, Roth Capital and Flemming are 'responsible third parties.'"  *Magna Equities II, LLC v. Heartland Bank*, No. CV H-17-1479, 2018 WL 1135482, at *3 n.14 (S.D. Tex. Feb. 28, 2018) (cleaned up).  But that says nothing of what the defendant pled.  And, in any event, it doesn't appear that either party raised the issue of whether the defendant denied the allegation.

[64] *Taylor v. Taser Int'l, Inc.*, No. H-17-673, 2018 WL 2967628, at *3 (S.D. Tex. June 13, 2018) (emphasis added).

[65] TEX. CIV. PRAC. & REM. CODE § 33.004(g)(2).

### D. Motion to Compel

Synergen moved to compel production of a variety of purportedly privileged materials. The Magistrate Judge denied that motion. [Doc. 119]. "Federal Rule of Civil Procedure 72(a) . . . provides that the district judge shall modify or set aside any portion of the magistrate judge's order that is clearly erroneous or is contrary to law."[66] "[T]he court reviews the magistrate judge's legal conclusions *de novo*, and reviews her factual findings for clear error."[67] Synergen objects to the Magistrate Judge's ruling on four grounds.

First, in determining whether United waived its claim of privilege over its investigations, Synergen claims that "the Magistrate Judge only applied the more stringent Texas state-law test for determining whether UHC had impliedly waived . . . the work-product doctrine" instead of "the more lenient federal-law test for implied waiver."[68] And that's partially correct. The Magistrate Judge applied the state-law standard for implied waiver both to United's claims of attorney-client privilege and to its claims of work-product protection.

But that doesn't change the outcome. Under the federal work-product standard, "[t]o place work product at issue in litigation, a party must rely on the work product to prove its claims in the case."[69] Although Synergen claims that, by invoking

---

[66] *Advanced Physicians, S.C. v. Conn. Gen. Life Ins. Co.*, 431 F. Supp. 3d 857, 860 (N.D. Tex. 2020) (Fish, J.) (cleaned up).

[67] *Id.* (cleaned up).

[68] Doc. 120 at 8.

[69] *Doe 1 v. Baylor Univ.*, 335 F.R.D. 476, 488 (W.D. Tex. 2020) (cleaned up).

18

the discovery rule, United "relied on . . . what it did not know . . . prior to December 6, 2015," that argument flips the standard on its head. Under Synergen's reasoning, every potentially privileged document would be discoverable in this case because every document would either (1) show that United knew about the fraudulent scheme or, (2) by not mentioning facts related to the fraudulent scheme, help show that United lacked knowledge of the scheme. But Synergen cites no case in which a party waived work-product protection over all requested documents merely by invoking the discovery rule. And that's likely because parties "rely on" a document when they "refer[] to [it] throughout the complaint"—not when the complaint doesn't mention a document.[70] Accordingly, invocation of the discovery rule doesn't spring open the floodgates of discovery. The Magistrate Judge correctly declined to find waiver, and any difference of opinion on the standard was harmless.

Second, Synergen asserts that the Magistrate Judge erred in concluding that the documents it reviewed *in camera* were not outcome determinative. Specifically, Synergen regurgitates its argument that any documents predating December 6, 2015 would be "dispositive of whether UHC *should have known* of its alleged injury prior to December 6, 2015."[71] Once again, the idea is that documents concerning United's investigation before December 6, 2015 would, at a minimum, show that United didn't have reason to know about Synergen's alleged fraud. And, once again, that

---

[70] *Id.* (cleaned up).

[71] Doc. 120 at 12.

19

argument's too cute by half.  Invocation of the discovery rule doesn't *sub silentio* waive all work-product protection.

Third, Synergen contends that it should be able to overcome any work-product protection because it "has a substantial need for these documents and testimony because they could evidence that UHC should have known of its alleged injuries prior to December 6, 2015, which would bar UHC's suit in its entirety on limitations grounds."[72]  Once again, a defendant doesn't have a substantial need for all work-product-protected documents merely because the discovery rule may apply.  Having also reviewed the documents *in camera*, the Court concludes that they are not outcome determinative and that Synergen doesn't have a substantial need for them. The Magistrate Judge didn't err on that point.

Fourth, the Magistrate Judge concluded that "UHC is not utilizing the discovery rule to shield information vital to its claims and has not waived any privilege or protection."[73]  Synergen has a problem with that statement—but it's hard to decipher exactly what that problem is.  Synergen appears to stress that the discovery rule focuses on when "a plaintiff . . . should have known of ***its injury***, rather than ***the person who caused that injury***."[74]  Thus, the argument goes, that rule "expands the circumstances in which the discovery rule does not delay accrual—it

---

[72] *Id.* at 14.

[73] Doc. 119 at 8.

[74] Doc. 120 at 13 (emphases added).

does not constrict those circumstances."[75]  Fair enough.  And that's why the Court didn't look to when United discovered Synergen—July 2019—to determine the accrual date; instead, the accrual date occurred only once United should have known of its injury—January 2016 at the earliest.  Regardless, that point is inapposite: United didn't waive its privilege claims merely by invoking the discovery rule.

The Court **OVERRULES** Synergen's objections to the Magistrate Judge's order.

### III. Conclusion

For the foregoing reasons, the Court **DENIES** Synergen's *Motion for Summary Judgment* [Doc. 101], *Motion to Designate Responsible Third Party* [Doc. 100], and *Motion to Exclude Expert Testimony* [Doc. 98].  The Court **OVERRULES** Synergen's *Objection to a Magistrate Judge's Order* [Doc. 120].

**IT IS SO ORDERED** this 26th day of June, 2023.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[75] *Id.*